1      UNITED STATES DISTRICT COURT
       DISTRICT OF MINNESOTA
2

 -------------------------------------------------------------
3           )
 United States of America, ) File No. 21-cr-108
4           )     (PAM/TNL)
    Plaintiff,  )
5           )
 v.         )
6           )
 Tou Thao(2),    ) Courtroom 7D
7 J. Alexander Kueng(3), and ) St. Paul, Minnesota
 Thomas Kiernan Lane(4),  ) Monday, January 24, 2022
8           ) 9:33 a.m.
    Defendants.  )
9           )
 -------------------------------------------------------------
10

11

12    BEFORE THE HONORABLE PAUL A. MAGNUSON
   UNITED STATES DISTRICT COURT SENIOR JUDGE
13

14    **(JURY TRIAL PROCEEDINGS - VOLUME III)**

15

16

17

18

19

20

21

22

23

24
   Proceedings recorded by mechanical stenography;
25 transcript produced by computer.

1    <u>APPEARANCES:</u>

2    For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                             BY:  ALLEN A. SLAUGHTER, JR.
3                                 LEEANN K. BELL
                                  MANDA M. SERTICH
4                            300 South 4th Street, #600
                             Minneapolis, MN 55415
5
                             DEPARTMENT OF JUSTICE
6                            CIVIL RIGHTS DIVISION
                             BY:  SAMANTHA TREPEL
7                            150 M Street NE
                             Washington, D.C. 20530
8
     For Defendant           ROBERT M. PAULE, PA
9    Tou Thao:               BY:  ROBERT M. PAULE
                             920 2nd Avenue South, #975
10                           Minneapolis, MN 55402

11                           PAULE LAW PLLC
                             BY:  NATALIE PAULE
12                           5100 West 36th Street
                             P.O. Box 16589
13                           Minneapolis, MN 55416

14   For Defendant           LAW OFFICE OF THOMAS C. PLUNKETT
     J. Alexander Kueng:     BY:  THOMAS C. PLUNKETT
15                           101 East 5th Street, #1500
                             St. Paul, MN 55101
16
     For Defendant           EARL GRAY DEFENSE
17   Thomas Kiernan Lane:    BY:  EARL P. GRAY
                             332 Minnesota Street, #W1610
18                           St Paul, MN 55101

19   Court Reporter:         RENEE A. ROGGE, RMR-CRR
                             United States District Courthouse
20                           300 South 4th Street, Box 1005
                             Minneapolis, MN 55415
21

22

23

24

25

1                              **I N D E X**

2                                                               PAGE

3      PRELIMINARY JURY INSTRUCTIONS                            195
       OPENING STATEMENT BY MS. TREPEL                          206
4      OPENING STATEMENT BY MR. ROBERT PAULE                    229
       OPENING STATEMENT BY MR. PLUNKETT                        254
5      OPENING STATEMENT OF MR. GRAY                            282

6


7      **KIMBERLY MELINE**
            Direct Examination by Mr. Slaughter                 309
8


9


10     GOVERNMENT EXHIBITS                                      REC'D
                 1                                              305
11               2                                              305
                 3                                              305
12               4                                              305
                 5                                              305
13               5A                                             305
                 7                                              305
14               7A                                             305
                 9                                              305
15               9A                                             305
                 11                                             305
16               12                                             307
                 14                                             305
17               16                                             305
                 17                                             305
18               18                                             305
                 19                                             305
19               21                                             356
                 25                                             356
20               27                                             356
                 39                                             307
21               43                                             305
                 44                                             305
22               45                                             305
                 46                                             305
23               47                                             308
                 48                                             305
24               49                                             305
                 50                                             305
25               51                                             305
                 52                                             305

| | | |
|---|---|---|
| 1 | 53 | 305 |
| | 54 | 305 |
| 2 | 55 | 305 |
| | 56 | 305 |
| 3 | 57 | 305 |
| | 58 | 305 |
| 4 | 59 | 305 |
| | 60 | 305 |
| 5 | 61 | 305 |
| | 62 | 305 |
| 6 | 63 | 308 |
| | 64 | 305 |
| 7 | 65 | 305 |
| | 66 | 305 |
| 8 | 67 | 305 |
| | 68 | 305 |
| 9 | 69 | 305 |
| | 70 | 305 |
| 10 | 71 | 305 |
| | 72 | 305 |
| 11 | 73 | 305 |
| | 74 | 305 |
| 12 | 75 | 305 |
| | 76 | 305 |
| 13 | 77 | 305 |
| | 78 | 305 |
| 14 | 79 | 305 |
| | 80 | 305 |
| 15 | 81 | 305 |
| | 82 | 305 |
| 16 | 83 | 305 |
| | 84 | 305 |
| 17 | 85 | 305 |
| | 86 | 305 |
| 18 | 87 | 305 |
| | 98 | 305 |
| 19 | 99 | 305 |
| | 100 | 305 |
| 20 | 101 | 305 |
| | 102 | 305 |
| 21 | 103 | 305 |
| | 104 | 305 |
| 22 | 106 | 305 |
| | 107 | 305 |
| 23 | 108 | 305 |
| | 109 | 305 |
| 24 | 110 | 305 |
| | 128 | 305 |
| 25 | | |

1              **P R O C E E D I N G S**

2                 **IN OPEN COURT**

3                **(JURY NOT PRESENT)**

4              (Defendants present)

5              THE COURT:  Good morning, everybody.  I've got my

6    cheaters with me because reading small type is not my long

7    suit anymore.

8              I think we have a full complement of jurors,

9    right?

10             COURTROOM DEPUTY:  Mm-hmm.

11             THE COURT:  Good.  I think we have all the nervous

12   over the weekend because of the tremendous number of COVID

13   things that had come up over -- just before we started

14   selecting, so that is good.

15             A couple of communications that I received over

16   the weekend.

17             Ms. Bell, you wanted me to get a little more

18   specific about the indictment.  I don't think I need to do

19   that.  I think preliminary is good enough and you guys --

20   you have opening statements and you have a case, so it will

21   be fine.

22             I also received a comment relating to potential

23   objections from Exhibits 21 to 35 therein.  That's what I'd

24   hoped to have covered last Friday, but I got six pages that

25   said I shouldn't do that, so we'll have to cover those -- I

1    think the term you are using is split screen.  We'll cover

2    those as we go, and you can state your objections to it.

3              With respect to the stipulation with other

4    exhibits, I thank you for the stipulation.  Counsel, I'll be

5    very candid with you I got much more into football over the

6    weekend then I did dealing with exhibits and stipulations.

7    And so I would say feel completely free with respect to the

8    first 19 that they're going to come in with limiting

9    instruction on the transcripts that are attached to it.  The

10   balance of them, we'll probably take one at a time.

11             When we get to openings -- I guess I would be

12   asking if there's an intent by anybody to be using

13   demonstrative exhibits during opening.

14             MS. BELL:  Your Honor, for the government, we

15   intended to use basically six slides.  One picture is

16   repeated three times.  And it is literally just to orient

17   the jury to who -- basically who was where.

18             THE COURT:  Who is who?

19             MS. BELL:  Who is who.

20             THE COURT:  Okay.

21             MS. BELL:  It's just who is who.  These are from

22   exhibits that were admitted.  They are part of that 1

23   through 19.

24             THE COURT:  Okay.  Let's get specific.  What are

25   they?

```
 1                MS. BELL:  So, Your Honor --

 2                THE COURT:  What exhibits are they?

 3                MS. BELL:  They are from the Milestone camera, so

 4     that is Exhibit 14.

 5                THE COURT:  Okay.

 6                MS. BELL:  And then they are from -- let me just

 7     get the numbers for you.  One is from -- two of them are

 8     from No. 9 and one is 17.  And they are just to orient to

 9     who is who.

10                THE COURT:  May I ask, did you say No. 9?

11                MS. BELL:  No. 9.

12                THE COURT:  Okay.

13                MS. BELL:  Exhibit No. 9, yes Your Honor.  Sorry

14     about that.

15                THE COURT:  Okay.  And then the last one was what?

16                MS. BELL:  17.

17                THE COURT:  Okay.  Okay.

18                MS. BELL:  And I've shown these to counsel, Your

19     Honor.  Mr. Gray did object because technically they haven't

20     been admitted yet, but of course they will be very shortly.

21                THE COURT:  Technically they have not been, but

22     they are good for demonstrative purposes at this time.  And

23     I take it that one or more of these go to Mr. Gray's

24     objection with respect to still photos and --

25                MR. GRAY:  That's correct, Your Honor.
```

```
1              THE COURT:  And we will deal with --

2              MR. GRAY:  And I'd ask the court to look at the

3      photos that they're trying to introduce.  They're photos

4      from the --

5              THE COURT:  Okay.  I will look at them.

6              MR. GRAY:  -- body camera.

7              MS. BELL:  May I approach?

8              THE COURT:  Sure.

9              MS. BELL:  Thank you.

10             MR. GRAY:  I think they're an unfair depiction of

11     my client at the time of the videos.

12             THE COURT:  Counsel, two of these are the same

13     picture.

14             MS. BELL:  Your Honor, they are actually -- there

15     are three of them that are the same, and that is because

16     counsel objected to just simply putting the one picture on

17     the same slide as the other picture so that we could

18     identify the officers both from the back and the front.  And

19     so we made them separate slides so we would not have two

20     pictures on one slide.

21             THE COURT:  Okay.  Well --

22             MS. BELL:  So that's why it's in there three

23     times.

24             THE COURT:  I do consider that to be cumulative,

25     counsel.  We're going to take -- you're going to take two of
```

1     those out of those duplicative exhibits, but outside of

2     that, for illustrative purposes they can be used in opening.

3               MS. BELL:  Your Honor, then can we just put two of

4     them on the slide at the same time so that it's just more

5     efficient?  So what we would do is put the one from far away

6     and then the one from up close and say this person is Tou

7     Thao and this person is Tou Thao.

8               THE COURT:  Okay.  Go ahead and do that, yeah.

9               MR. ROBERT PAULE:  Your Honor?

10              THE COURT:  Yeah.

11              MR. ROBERT PAULE:  If the court is ready, I do

12    have three demonstrative exhibits I was planning on using.

13              THE COURT:  Okay.  I was going to get to that.

14    Very good.  Go ahead.

15              MR. ROBERT PAULE:  I have three, and I have not

16    shown them to counsel but I will.  They are basically

17    exhibits that I intend to use as demonstrative exhibits to

18    put up on the screen during my opening to orient the jurors

19    to the area in question.

20              The first is essentially a map of Minneapolis --

21              COURT REPORTER:  Could you use the microphone,

22    please.  Thank you.

23              MR. ROBERT PAULE:  The first one, excuse me, is a

24    map of Minneapolis that was taken from the internet that

25    just shows the various neighborhoods.  My intention is to

1    use this to orient the jury to what part of Minneapolis this

2    incident occurred in.

3            The second is essentially an aerial photograph of

4    the intersection of 38th Street and Chicago Avenue South in

5    Minneapolis with three additions.  One is just to indicate

6    where Cup, C-u-p, Foods is.  The second is to indicate where

7    the Dragon Wok restaurant is.  And the third is to indicate

8    where the Speedway station is.

9            The third demonstrative exhibit is an exact

10   replicate of Exhibit No. 2, except it is blown up to bring

11   us a little closer.  And I've also got a blue square where I

12   was going to indicate that the blue Mercedes SUV was parked

13   outside of Cup Foods, as well as a black square with the

14   number 320 on it on the front side of Cup Foods on Chicago

15   Avenue to indicate where Squad 320 was parked, Your Honor.

16           I will show these to counsel.

17           THE COURT:  You can do that now.

18           MR. PAULE:  And then I can bring them to the

19   court.

20           THE COURT:  Very well.

21           Any other things on this kind of a subject?

22           MR. ROBERT PAULE:  Nothing further, Your Honor.

23   Thank you.

24           THE COURT:  Okay.

25           MR. PAULE:  May I approach the court, Your Honor?

 1              THE COURT:  Sure.

 2              Objection to these demonstratives?

 3              MS. BELL:  No, Your Honor.

 4              THE COURT:  Okay.  You may use them, then, as

 5     demonstrative exhibits.

 6              I've got to get my big three-hole punch in here.

 7     Not now.

 8              COURTROOM DEPUTY:  Sure.

 9              MR. PAULE:  Your Honor, those are my only copies.

10              THE COURT:  Okay.  What else do we have at this

11     point this morning?

12              MS. BELL:  Your Honor, I would, with the court's

13     indulgence, like to put something on the record.

14              I don't know if the court even caught it, and I

15     heard it but didn't register it at the time.  When we were

16     starting our cause discussion with the headsets on when we

17     were picking the jury, Mr. Plunkett, before he started

18     explaining his cause strikes said, "And I had wanted to just

19     note an objection to the courtroom closure before we go

20     forward."

21              And so I wanted to make sure we had something on

22     the record about the efforts this court has taken to allow

23     access when we were picking a jury, that because of COVID-19

24     and the sort of extreme position we're in now with the peak

25     coming on Omicron, that in order to space the jurors

1    carefully in order to get enough jurors in here to work

2    through the venire panel, the court allowed five members of

3    the press to be here and then allowed streaming to two

4    locations separately in the courthouse.

5              And so I just wanted to make sure that we put on

6    the record the reasons that we were in that particular

7    predicament given the COVID-19 pandemic and that, in fact,

8    the court had taken steps to allow access to the courtroom

9    for that.

10             I had not had a chance to respond to that and I

11   know the court hadn't had a chance when we were dealing with

12   the cause strikes to respond to that.

13             THE COURT:  Okay.  I -- thank you, counsel.  I

14   think I've covered this a half a dozen times and the record

15   really speaks for itself, and I think we've tried to be

16   as -- tried to be as clear as we can with respect to the

17   restrictions that just inevitably exist.

18             Okay.  Anything else?  Good enough.  Well, I guess

19   for 15 minutes the guys can sit around and talk about how

20   exciting the football games were.  I don't know what the

21   rest of you will do.

22             But, with that, we will stand in recess for a few

23   minutes and be back, unless -- have we got the entire jury

24   here?

25             COURTROOM DEPUTY:  Yeah, I'll just --

1           MS. BELL:  Could we take a bathroom break?  That

2     one would be the one thing I would ask.

3           THE COURT:  That you may do.

4           MS. BELL:  Thank you.

5           THE COURT:  And that's very appropriate.  I kind

6     of was looking at my watch at the possibility of starting a

7     little bit early, but let's take the break.  We will stand

8     in recess for at least ten minutes.

9           MS. BELL:  Your Honor, I did mean to tell you also

10    that our first witness, right now we have her scheduled to

11    come basically during what we anticipate the lunch break

12    will be.  Between instructing the jury and openings, it

13    didn't seem like we were going to get her on in the morning.

14          THE COURT:  Oh, I'm sure not.  I would be very

15    surprised if we complete openings this morning, but we will

16    see.  We'll see how it goes.

17          MS. BELL:  Thank you.

18          THE COURT:  Okay.  Oh, just a minute.  One more

19    question.  With respect to your first witness, will that get

20    into any of the exhibits that may have been stipulated to

21    but which I have not made any decisions or rulings?

22          MS. BELL:  So, Your Honor, our intention is --

23    yes.  The first -- before we actually even call the first

24    witness, we plan to offer all of the stipulated --

25          THE COURT:  I know you're going to do that.

1          MS. BELL:  Yes.  And then she will get into both

2     the original videos, so that 1 through 20, and she'll also

3     get into those combined or synced side-by-side videos.  So

4     that will be our first witness, yes.

5          THE COURT:  Okay.  That's fine.  I raise the

6     question because, as I did indicate to you, I just really

7     have not had an opportunity to review some of the later

8     training manuals and that kind of thing and -- but I'll have

9     that done before we come back in.

10          At some point we obviously will have to deal with

11     objections that may exist as to the exhibits between roughly

12     21 and 35.  Okay.

13     (Recess taken at 9:48 a.m.)

14                         *  *  *  *  *

15     (10:07 a.m.)

16                       **IN OPEN COURT**

17                      **(JURY PRESENT)**

18          THE COURT:  You may be seated.

19          Good morning, everyone, and welcome to the jury.

20     We thank you for being with us here this morning.

21          And as we start this morning, the first thing I'm

22     going to ask is that we have Ms. Magee administer the oath

23     to all of the 18 jurors that have been selected to hear this

24     case.

25          Would all of the jurors please rise and raise your

1    right hand.

2            COURTROOM DEPUTY:  Do each of you solemnly swear

3    that you will well and truly try the issues in this case and

4    true verdict render according to the evidence and the law as

5    it shall be given to you by the court, so help you God?

6            THE JURY:  (I do.)

7            THE COURT:  Thank you.  You may be seated.

8            Members of the jury, we're about to begin the

9    trial of the case about which you heard some details during

10   the process of jury selection.  Before the trial begins,

11   however, there are certain instructions that you should have

12   in order to understand what will be presented before you and

13   how you should conduct yourselves during the trial.

14           First, you have had discussions and we will

15   continue to have discussions about this COVID business.  I

16   want to assure you that we're doing everything we can to

17   keep you and your fellow jurors safe.

18           If any of you do become ill, and we hope you

19   won't, I ask that you get tested as soon as possible.  And

20   the court has rapid test kits available for this purpose.

21   If you or someone in your immediate family with whom you

22   have had recent close contact tests positive, please contact

23   the court immediately.

24           Ms. Magee, my courtroom deputy, is your appointed

25   contact for any communications after hours and she has given

1    you a cell phone number that you may use if you need to make

2    this contact.

3            Now, court will convene each day at 9:30 or

4    10:00 a.m. and will adjourn for the day between 4:30 and

5    5:00 p.m.  There will also be short recesses in the morning

6    and afternoon.  On some occasions the case moves faster than

7    the attorneys anticipate and it may be necessary to adjourn

8    earlier.

9            And the parties also try to present their cases in

10   an orderly manner.  However, this is not always possible and

11   sometimes it's necessary that certain witnesses be called

12   and scheduled at only certain times and certain days.  As a

13   result of that, those witnesses are called what we refer to

14   as out of order.  And should that happen, we'll advise you

15   of the circumstance so you understand what the purpose of

16   that particular situation might be.

17           What I say now is intended to serve as an

18   introduction to the trial of the case.  At the end of the

19   trial, I will give you further instructions.  I may also

20   give you instructions during the trial.

21           Now, unless I specifically tell you otherwise, all

22   instructions, both those I give you now and those that I

23   give you later, are equally binding on you and must be

24   followed.

25           This is a criminal case commenced by the United

1    States, which I may sometimes refer to as prosecution,

2    sometimes as the government, against the defendants.  The

3    case is based on an indictment.

4          Defendants have been charged as follows in the

5    indictment:

6          Count 2 of the indictment charges Defendant Tou

7    Thao and J. Alexander Kueng with deprivation under color of

8    law George Floyd's right to be free from unreasonable

9    seizure, in violation of 18 U.S.C. Section 242.

10         Count 3 charges Defendant Tou Thao, J. Alexander

11   Kueng, and Thomas Kiernan Lane with deprivation under color

12   of law of George Floyd's right to be free of deliberate

13   indifference to his serious medical needs, in violation of

14   18 U.S.C. Section 242.

15         Now, you should understand that an indictment is

16   simply an accusation.  It is not evidence of anything.

17   Defendants have pled not guilty to the indictment and are

18   presumed to be innocent unless and until proved guilty

19   beyond a reasonable doubt.

20         You might notice that the indictment mentions

21   rights secured and protected by the Constitution and laws of

22   the United States.  The constitutional rights involved in

23   this case are the rights of every person in the United

24   States to be free from the use of unreasonable force by a

25   police officer and to be free from a police officer's

1    deliberate indifference to their serious medical needs while

2    in police custody.  These rights belong to everyone and have

3    nothing to do with a person's race, religion, or ethnicity.

4         It will be your duty to decide from the evidence

5    whether each defendant is guilty or not guilty of the crimes

6    charged.  From the evidence you will decide what the facts

7    are.  You are entitled to consider that evidence in the

8    light of your own observations and experience in the affairs

9    of life.  You may use reason and common sense to draw

10   deductions or conclusions from facts which have been

11   established by the evidence.  You will then apply those

12   facts to the law, which I give you in these and in my other

13   instructions and in that way each reach your verdict.

14        You are the sole judges of the facts, but you must

15   follow my instructions, whether you agree with them or not.

16   You have taken an oath to do so.  Do not allow sympathy or

17   prejudice to influence you.  The law demands of you a just

18   verdict unaffected by anything except the evidence, your

19   common sense, and the law as I give it to you.

20        Now, the trial will proceed in the following

21   order:

22        First, the parties have the opportunity to make

23   opening statements.  The government may make an opening

24   statement at the beginning of the case.  The defendants may

25   make opening statements following the opening statements for

1    the government or may defer the making of an opening

2    statement until the close of the government's case.  No

3    party is obliged to make an opening statement.  What is said

4    in the opening statements is not evidence.  The statements

5    simply serve the purpose of an introduction to the evidence

6    which the parties making these statements intends to

7    produce.

8            Second, the government will introduce evidence in

9    support of the charges contained in the indictment.

10           Third, after the government has presented its

11   evidence, the defendants may present evidence, but are not

12   obliged to do so.  The defendants are presumed innocent.

13   The burden is always on the government to prove every

14   element of the offense charged beyond a reasonable doubt.

15   The law never imposes on a defendant in a criminal case the

16   burden of calling any witnesses or introducing any evidence.

17           Fourth, at the conclusion of the evidence, each

18   party has the opportunity to present closing argument in

19   support of their case.  What is said in closing argument is

20   not evidence, just as what is said in opening statements is

21   not evidence.  The arguments are designed to present to you

22   the contentions of the parties as to what the evidence has

23   shown and what inferences may be drawn from the evidence.

24   The government has the right to open and close the argument.

25           Fifth, I will instruct you on the applicable law

 1     and you will then retire to consider your verdict.  Your

 2     verdict must be unanimous.

 3             Your purpose as jurors is to find and determine

 4     the facts.  Under our system of criminal procedure, you are

 5     the sole judges of the facts.  If at any time I should make

 6     any comment regarding facts, you are at liberty to disregard

 7     it.

 8             It's especially important that you perform your

 9     duty of determining the facts diligently and

10     conscientiously, for ordinarily there is no means of

11     correcting an erroneous determination of facts by the jury.

12             You are to determine the facts in the case solely

13     from the evidence in the case, which consists of the

14     testimony of witnesses and the exhibits received in

15     evidence.

16             Questions asked by the lawyers are not evidence.

17     The evidence consists of the witnesses' answers to the

18     questions.

19             As I said earlier, statements, and arguments of

20     counsel are not evidence.  Counsel, however, may agree to

21     facts that are not in dispute; and when they do so, you are

22     to accept the facts as stipulated by counsel.

23             On occasion I may tell you that I'm taking

24     judicial notice of certain facts.  You may then accept those

25     facts as true, but are not required to do so.  It's up to

1    you to decide what inferences are to be drawn from the

2    evidence and what facts are established by the evidence.

3         The parties may sometimes present objections to

4    some of the testimony or other evidence.  It is the duty of

5    a party to object to evidence that he or she believes may

6    not properly be offered, and you should not be prejudiced in

7    any way against a party who makes objections.

8         At times I may sustain objections or direct you to

9    disregard certain testimony or exhibits.  You must not

10   consider any evidence to which an objection has been

11   sustained or which I have instructed you to disregard.

12        Now, I understand that you may want to tell your

13   family and close friends and other people about your

14   participation in this trial so that you can explain when you

15   are required to be in court.  And you should warn them not

16   to ask you about the case, tell you anything they know or

17   think that they know about it or discuss this case in your

18   presence.

19        You must not post any information on a social

20   network or communicate with anyone about the parties,

21   witnesses, participants, charges, evidence, or anything else

22   relating to this case or tell anyone anything about the

23   jury's deliberations in this case until after I accept your

24   verdict or until I give you specific permission to do so.

25        If you discuss the case with someone other than

1    the other jurors during deliberations, you may be influenced

2    in your verdict by their opinion.  That would not be fair to

3    the parties.  It would result in a verdict that is not based

4    on the evidence and the law.

5            While you are in the courthouse and until you are

6    discharged in this case, do not provide any information to

7    anyone by any means about the case.  Thus, for example, do

8    not talk face-to-face or use any electronic device or media,

9    such as the telephone, a cell or smartphone, camera,

10   recording device, computer, the internet or any internet

11   service, any text or instant messaging service or any social

12   media, including services or apps, such as Facebook,

13   Instagram, Snapchat, or Twitter, or any other way to

14   communicate to anyone any information about this case until

15   I accept your verdict or until you have been excused as a

16   juror.

17           Do not research on the internet, in libraries or

18   in newspapers or in any other way, or make any investigation

19   about this case on your own.  Do not visit or view any place

20   discussed in this case, and do not use internet programs or

21   other devices to search for or to view any place discussed

22   by the testimony.

23           Also, do not research any information about this

24   case, the law, or the people involved, including the

25   parties, the witnesses, the lawyers, or the judge, until you

1     have been excused as a juror.

2            The parties have the right to have this case

3     decided only on evidence that they know about and that has

4     been presented here in court.  If you do some research or

5     investigation or experiment that we don't know about, then

6     your verdict may be influenced by inaccurate, incomplete, or

7     misleading information that has not been tested by the trial

8     process, including the oath to tell the truth and by

9     cross-examination.  Each of the parties is entitled to a

10    fair trial rendered by an impartial jury, and you must

11    conduct yourself so as to maintain the integrity of the

12    trial process.

13           If you decide a case based on information not

14    presented in court, you will have denied the parties a fair

15    trial in accordance with the rules of this country and you

16    will have done an injustice.  It is very important that you

17    abide by these rules.  Failure to follow these instructions

18    could result in the case having to be retried.

19           During the trial you must not discuss the case in

20    any manner, even amongst yourselves, and you must not permit

21    anyone to attempt to discuss it with you or in your

22    presence.

23           Insofar as the lawyers are concerned, as well as

24    others whom you may come to recognize as having some

25    connection in the case, you are instructed that, in order to

1      avoid even the appearance of impropriety, you should have no

2      conversation whatever with those persons while you are

3      serving on the jury.

4              Now, in considering the weight and the value of

5      the testimony of any witness, you may take into

6      consideration the appearance, attitude, the behavior of the

7      witness; the interest of the witness in the outcome of the

8      case, if any; the relation of the witness to any party to

9      the suit; the inclination of the witness to speak truthfully

10     or not; the probability or improbability of the witness's

11     statements; and all other facts and circumstances in

12     evidence.  Thus, you may give the testimony of any witness

13     just such weight and value as you believe the testimony of

14     the witness is entitled to receive.

15             No statement, ruling, remark, or comment that I

16     may make during the course of the trial is intended to

17     indicate my opinion as to how you should decide the case or

18     to influence you in any way in your determination of the

19     facts.

20             At times I may ask questions of witnesses.  If I

21     do so, it's for the purpose of bringing out matters that I

22     believe should be brought out.  It is not in any way

23     intended to indicate my opinion about the facts or to

24     indicate the weight I believe you should give to the

25     testimony of the witness.

1          I may also find it necessary to admonish the

2    lawyers.  And if I do, you should not show prejudice towards

3    a lawyer or his or her client because I have found it

4    necessary to admonish him or her.

5          Under the federal system of criminal procedure,

6    you are not to concern yourself in any way with the sentence

7    that the defendant might receive if you should find him

8    guilty.  Your function is solely to decide whether the

9    defendants are guilty or not guilty of the charges against

10   them.  If and only if you find the defendants guilty of the

11   charge does it become the duty of the court to pronounce

12   sentence.

13         As I have stated, until this case is submitted to

14   you, you must not discuss it with anyone, even your fellow

15   jurors.  After it is submitted to you, you must discuss it

16   only in the jury room with your fellow jurors.

17         It's improper -- I'm sorry.  It's important that

18   you keep an open mind and not decide any issue in the case

19   until the entire case has been submitted to you under the

20   instructions of the court.

21         Now, we will begin by affording the parties for

22   each side the opportunity to make opening statements.  I ask

23   that you give them your close attention as I recognize them

24   for the purpose of making an opening statement.

25         Would the government like to proceed with an

1    opening statement, please?

2             MS. TREPEL:  Yes, Your Honor.

3             THE COURT:  Good morning.

4             MS. TREPEL:  Good morning, Your Honor, members of

5    the jury.

6             Ms. Magee, do we have the --

7                  (Pause)

8             MS. TREPEL:  Good morning.  And may it please the

9    court.

10             THE COURT:  Counsel, I wonder if we could get you

11   to bring the microphone a little more directly to your

12   voice.  You are a little soft-spoken.  It might be a little

13   difficult to hear.

14             MS. TREPEL:  Is this better, Your Honor?

15             THE COURT:  I think so.

16             MS. TREPEL:  Okay.  I will try, and please do

17   signal to me if my voice drops, because it does tend to.

18   Thank you.

19             "In your custody is in your care," that is a

20   fundamental principle of policing taught to every

21   Minneapolis police officer, including the three defendants

22   in this case.  It means that when police officers take a

23   person into their custody, those officers are responsible

24   for keeping that person safe, for protecting them.  That's

25   because when offers handcuff a person, they take away that

 1   person's ability to protect themselves.

 2           "In your custody is in your care," it's not just a

 3   moral responsibility.  It's what the law requires under the

 4   United States Constitution.  The law requires police

 5   officers to intervene, to stop another officer they see

 6   using excessive force.  And the law requires police officers

 7   to provide basic medical aid when they know someone in their

 8   custody needs it.  Failing to do so is a crime.

 9           When George Floyd was in the custody of the three

10   defendants in this case, Tou Thao, J. Alexander Kueng, and

11   Thomas Lane, they watched as Mr. Floyd suffered a slow and

12   agonizing death.

13           You will hear and you will see with your own eyes

14   that Derek Chauvin, a fourth officer of the same rank as the

15   defendants, knelt on Mr. Floyd's neck and for nine minutes

16   and 29 seconds killed him.

17           This officer, Chauvin, slowly crushed the breath

18   out of Mr. Floyd as, first, one and then two and then

19   eventually a group of passersby cried out for the other

20   officers, the defendants, to stop the slow-motion killing

21   they were all witnessing.

22           As the people standing on the sidewalk pleaded,

23   the people who could not only have stopped it, but who were

24   trained that they had an obligation to do so, stood by and

25   chose to let it continue.

1          For nine minutes and 29 seconds the three

2     defendants didn't lift a finger as George Floyd repeatedly

3     told them, "I can't breathe."

4          For nine minutes and 29 seconds the three

5     defendants ignored their own training that required them to

6     step in when they saw a person in their custody who needed

7     help.

8          For nine minutes and 29 seconds the defendants

9     ignored the cries of the bystanders and held their positions

10    as the window in which Mr. Floyd's life could have been

11    saved slammed shut.

12         Throughout the course of this trial, you will hear

13    from police officer after officer who will tell you that "in

14    your custody is in your care" means that when an officer

15    sees a threat to the safety of a person in their custody,

16    the officer must, not should, must step in and stop the

17    threat.  It means that if a person in custody requires

18    medical attention, the officers are required to provide it

19    to the best of their ability and training.  It means that if

20    someone is abusing a person in custody, the officers must

21    step in and try to stop it.

22         That is what the law requires of officers.  That

23    legal duty doesn't change if the person inflicting the harm

24    happens to be a fellow officer, even a more senior officer.

25    That may make it harder in the moment, but signing up to

 1    carry a gun and wear a badge comes with life-and-death

 2    responsibilities.  The duty to protect -- "in your custody

 3    is in your care" -- is one of them.

 4         And you will hear from police officer witnesses

 5    that when police officers intervene to protect a person in

 6    custody from a fellow officer's abuse, they're protecting

 7    their fellow officer too by stopping them from committing a

 8    crime.

 9         But, here, on May 25th, Memorial Day, 2020, for

10    second after second, minute after minute, these three

11    CPR-trained defendants stood or knelt next to Officer

12    Chauvin as he slowly killed George Floyd right in front of

13    them.

14         For more than nine minutes, each of the three

15    defendants made a conscious choice over and over again not

16    to act.  They chose not to intervene and stop Chauvin as he

17    killed a man slowly in front of their eyes on a public

18    street in broad daylight.  They chose not to protect George

19    Floyd, the man they had handcuffed and placed in their

20    custody.

21         You will hear that what led up to Mr. Floyd's

22    death was that a cashier at Cup Foods, a convenience store,

23    suspected that Mr. Floyd had paid with a counterfeit $20

24    bill and someone called the police.

25         Two officers, Defendants Kueng and Lane, arrived,

1    pulled Mr. Floyd from his car, and handcuffed him.

2    Mr. Floyd sat on a curb when they told him to, responded to

3    their questions, walked with them to their police car, where

4    they searched him.

5         When Defendants Kueng and Lane told Mr. Floyd he

6    needed to get into the police car, though, Mr. Floyd said

7    that he was claustrophobic and afraid to get in.  Defendants

8    Kueng and Lane tried pushing him in and he struggled with

9    them.  Defendant Thao and Officer Chauvin arrived and

10   Defendants Lane and Thao and even Mr. Floyd himself

11   suggested that they place him on the ground instead.

12        You will see that before the defendants took

13   Mr. Floyd to the ground, Mr. Floyd was already handcuffed

14   behind his back.  He had already been searched.  There were

15   no weapons on him.

16        When the defendants first took Mr. Floyd to the

17   ground and Officer Chauvin knelt on his neck, he struggled

18   against the officers for about 20 seconds and then he

19   stopped.  From that point on, he didn't resist.  He pleaded

20   with the defendants to let him breathe.  He repeatedly

21   begged, "Please, somebody help me."  He said, "I can't

22   breathe," not just once or twice, but 25 times as he tried

23   to alert the officers that he was dying.  After four minutes

24   on the ground, Mr. Floyd said his very last words, "Please,

25   man, I can't breathe."

1         After six minutes on the ground, at 8:25 p.m.

2    Mr. Floyd had become unresponsive.  And after Mr. Floyd lost

3    the ability to speak, the people on the sidewalk spoke up

4    for him.  These people on the sidewalk had been passing by,

5    and they stopped in horror when they saw one officer forcing

6    the breath out of a handcuffed man lying facedown on the

7    pavement with two other officers holding him down and a

8    fourth standing guard.

9         You will hear from several of those passersby:  An

10   older gentleman who pulled his car over, a high school

11   student who was walking her nine-year-old cousin to the

12   store to get a snack, and an off-duty firefighter out for a

13   walk.

14        These people stopped what they were doing and

15   cried out and then pleaded and then demanded that the

16   defendants get off -- get Officer Chauvin off of the man

17   they now know as George Floyd.  They understood, just by

18   seeing his body go limp, listening to his words, and then

19   listening to his silence, that unless somebody changed what

20   was happening, he would die.

21        "He is human," one of them reminded the officers.

22   Yet you will see that the defendants chose not to act.  They

23   chose to ignore what they saw and heard.  They chose to

24   dismiss the words of the passersby and of Mr. Floyd himself.

25   And they made that decision despite the repeated cries and

1    pleas from the shocked people standing on the sidewalk,

2    people who required no special training to understand the

3    horror of what they were seeing.

4            Now, I'm going to first focus on Defendant Thao.

5    For the entire time Chauvin pressed his knee into

6    Mr. Floyd's neck, the entire nine minutes and 29 seconds,

7    Defendant Thao stood just a few feet away doing nothing and

8    saying nothing to intervene to get Officer Chauvin off of

9    Mr. Floyd.

10           You will see both video from Defendant Thao's

11   body-worn camera and a video of him recorded by bystanders

12   and surveillance cameras that will allow you to see both the

13   direction in which Defendant Thao was looking and what he

14   could see from that perspective.

15           As an aside, you are going to see many videos

16   during the course of this trial and they will show you many

17   perspectives, videos from the police body-worn cameras,

18   videos taken by bystanders standing on the sidewalk,

19   surveillance video from the city and local businesses.  They

20   will be offered as evidence in this case in their entirety,

21   so you will see more than the small portions of video you

22   may have previously seen.

23           Turning back to Defendant Thao, these videos will

24   show that during the first six minutes that Chauvin pressed

25   Mr. Floyd face down into the street, for the entire time

1    that Mr. Floyd pleaded that he couldn't breathe and even

2    after he lost consciousness, Defendant Thao stood directly

3    next to Officer Chauvin.

4              You will see that Defendant Thao, the most senior

5    of the three defendants with eight years on the job, ask

6    Mr. Floyd, "What are you on?"

7              You will hear from MPD officers that when people

8    using drugs are in police custody, officers are trained to

9    be especially alert for medical issues.

10             Defendant Thao correctly suspected that Mr. Floyd

11   had been using drugs, but instead of exercising additional

12   care, he turned it into a taunt, telling the people on the

13   sidewalk, "This is why you don't do drugs, kids," as they

14   pleaded with him to do his job and stop Officer Chauvin from

15   killing Mr. Floyd.

16             When Mr. Floyd could still speak, he told

17   Defendant Thao exactly what and who he needed protection

18   from.  He said, "I can't breathe.  Please.  A knee on my

19   neck.  I can't breathe."  You will see Defendant Thao was

20   looking at Chauvin pressing his knee into Mr. Floyd's neck

21   as Mr. Floyd said those words.

22             You will see that by this point Chauvin had been

23   holding Mr. Floyd down by his neck for almost three minutes.

24   Defendant Thao was in easy reach of Officer Chauvin, so if

25   he had wanted to tap his partner on the shoulder, he could

1    have.  But Defendant Thao did nothing to tell Chauvin it's

2    enough, we've got it, this man isn't resisting, he's dying.

3    Instead, Defendant Thao continued standing right next to

4    Chauvin and Floyd for another three minutes until after

5    Mr. Floyd's eyes closed and he lost consciousness.

6         At that point the bystanders took over sounding

7    the alarm on Mr. Floyd's behalf.  As they gathered on the

8    sidewalk near the squad car and saw Mr. Floyd lost

9    consciousness, their cries became more urgent.

10        I'm going to pause here and talk about these

11   bystanders.  You may hear the people who watched a police

12   officer kill a man in his custody described as an angry or

13   hostile crowd.

14        As you watch the videos, pay attention to when

15   Defendant Thao steps toward the bystanders on the sidewalk

16   for the very first time at 8:25 p.m., during the sixth

17   minute that the officers had Mr. Floyd pinned on the ground

18   and after he had already lost consciousness.

19        You will see six people standing on the sidewalk,

20   including two teens and a nine-year-old, and you will hear

21   that's when their cries turned to urgent demands to look at

22   him and check his pulse.  You will know that Defendant Thao

23   heard them because he answered them.  When a bystander told

24   him, "He's about to pass out," Defendant Thao responded,

25   "That's what happens laying on the ground."

1          The bystanders told Defendant Thao what they could

2     plainly see, that Mr. Floyd had stopped speaking and was now

3     not moving and unresponsive.  They told Defendant Thao to do

4     exactly as he had been trained in that situation, to get

5     Chauvin off and check Mr. Floyd's breathing and pulse, all

6     part of a duty to a person in his custody, even when, as

7     here, an ambulance was on the way.

8          A firefighter from Minneapolis walked up and

9     identified herself.  Like all firefighters in the city, she

10    was a trained EMT, alarmed that the man she saw pinned under

11    multiple officers appeared to be unconscious.  She asked if

12    Mr. Floyd had a pulse.  Each of the three defendants

13    individually told her to get back on the sidewalk.

14          The firefighter asked, then demanded that

15    Defendant Thao check Mr. Floyd's pulse or that he get the

16    other officers to do it.  You will know that Defendant Thao

17    heard her because he responded to her.  "How long are we

18    going to have this conversation?"  And you will see on the

19    firefighter's face and in her tone of voice how urgent it

20    was, how much she cared.

21          Look at Defendant Thao's face, listen to his

22    voice, notice where he was standing when Mr. Floyd lost

23    consciousness, and you will see that, despite standing in a

24    position to see and hear how Mr. Floyd had stopped talking

25    and lost consciousness and to hear the bystanders beg him to

1   check a pulse, he chose to do nothing.

2          Now, on the other side of the police car and out

3   of sight of the people on the sidewalk, Defendant Kueng was

4   also kneeling on Mr. Floyd.  Kueng was even closer to

5   Officer Chauvin than Defendant Thao, as Mr. Kueng was

6   kneeling on Mr. Floyd just below his waist and just inches

7   from Officer Chauvin.

8          After three minutes during which Mr. Floyd was

9   trying and failing to take in enough air, Mr. Floyd said, "A

10  knee on my neck.  I'm through."  Look at Defendant Kueng as

11  Mr. Floyd said those words.  As Mr. Floyd said, "I'm

12  through," Defendant Kueng focused his attention on a piece

13  of gravel stuck in the police car tire rather than the man

14  underneath his knee.

15         As the bystanders cried out for Chauvin to get off

16  him, Defendant Kueng continued kneeling on an unresisting

17  Mr. Floyd and casually picked the piece of gravel out of the

18  police car tire.

19         Then before Mr. Floyd lost consciousness, when

20  there was still time to get him the oxygen he so desperately

21  needed, listen for what Defendant Kueng said.  At 8:23 p.m.,

22  after the officers had already held Mr. Floyd to the ground

23  for four minutes and after Mr. Floyd had been compliant for

24  more than three minutes, Defendant Kueng said, "Just leave

25  him," as at the very same time Chauvin said Mr. Floyd was

1    staying put the way they've got him.

2         And that's what Officer Chauvin and Defendant

3    Kueng did; they just left Mr. Floyd under the weight of

4    their knees rather than moving him onto his side, the way

5    they were trained, into a position that would allow him to

6    breathe.

7         They continued applying force rather than

8    reassessing the situation the way they were trained.  They

9    used force rather than stopping the force, which here

10   included Chauvin's knee compressing a man's neck, when a

11   person has stopped resisting.  The seconds, then minutes

12   ticked by.

13        Defendant Kueng remained kneeling on Mr. Floyd in

14   that position for a full eight minutes, eight minutes.

15   Kueng, who could feel Mr. Floyd's body beneath his knee,

16   never once told Officer Chauvin to stop or we've got it or

17   get off him.  You will see that Defendant Kueng never once

18   said those things, never once said or did anything to aid

19   Mr. Floyd, even after you will see that Defendant Kueng

20   checked Mr. Floyd's pulse twice and twice said he could not

21   find one.

22        And pay attention to what you won't see happen

23   after that, after Defendant Kueng reports that he can't find

24   a pulse.  You won't see him do anything to help Mr. Floyd.

25   You won't see what a police medical trainer will tell you

1    she trains officers to do when someone in their custody

2    loses a pulse.

3              After Defendant Kueng said he couldn't find a

4    pulse, you won't see him try to roll Mr. Floyd over and

5    begin CPR.  You won't hear him say, "He has no pulse, we've

6    got to move," even though the defendants were trained that

7    seconds count when a person loses a pulse and that starting

8    CPR immediately greatly increases a person's chance of

9    survival.

10             Instead, Defendant Kueng remained crouched next to

11   Chauvin, who still had his knee on Mr. Floyd's neck, and

12   Defendant Kueng still said nothing, still never told Officer

13   Chauvin to stop, even as Chauvin continued to hold his knees

14   on Mr. Floyd for another two minutes and 44 seconds after

15   Defendant Kueng said he couldn't find a pulse, even as the

16   paramedics arrived and got ready to move Mr. Floyd onto a

17   stretcher.

18             Now, Defendant Lane knelt at Mr. Floyd's feet to

19   the right of Defendant Kueng and remained there for the

20   entire nine minutes and 29 seconds that Officer Chauvin

21   knelt on Mr. Floyd's neck.

22             For the first four minutes, as Mr. Floyd

23   repeatedly warned the officers that he couldn't breathe, you

24   will see and hear that Defendant Lane did nothing.

25             After about four minutes, Defendant Lane asked,

1    "Should we roll him on his side?"  Defendant Lane knew to

2    ask that question because he, like every MPD officer, was

3    trained over and over again on the answer to that question.

4    Yes, you've got to.

5            When someone is facedown handcuffed and compliant,

6    you roll them on their side as a matter of course, both

7    because of the dangers to a person's breathing and because

8    you will hear there's simply no reason to kneel on someone's

9    neck after a person is handcuffed and compliant.

10           But Defendant Kueng, who had so recently been

11   drilled in these basic principles, shot done Lane's

12   question.  Defendant Kueng said, "No, just leave him," and

13   Officer Chauvin agreed.

14           And Defendant Lane went back to doing and saying

15   nothing for another minute as Officer Chauvin kneeled on

16   Mr. Floyd's neck.  At that point one of the bystanders on

17   the sidewalk yelled, "He's passing out."  And Defendant Lane

18   acknowledged, "I think he's passing out."  But Defendant

19   Lane didn't do anything.  He also didn't say anything else,

20   like we've got to get off of him now or let's move.

21           Another minute passed and Lane again asked about

22   rolling Mr. Floyd on his side.  This time no one answered

23   him, no one shot him down, no one told him no.  But instead

24   of taking this opportunity to follow up and stop the abuse

25   of the man who was in his custody and care, he went back to

1    doing nothing.  He didn't repeat himself or try to point out

2    the danger, hey, this guy is passed out and you are both

3    still on top of him.  This was already after more than six

4    minutes had passed and after Mr. Floyd had stopped speaking,

5    stopped moving, and lost consciousness.

6            By then the voices of the folks watching from the

7    sidewalk were growing desperate.  They could see that

8    Mr. Floyd was unresponsive and they understood that when a

9    human being goes from talking to unresponsive, action is

10   required.  So they yelled for the officers to take his

11   pulse.

12           Defendant Lane asked Kueng if Mr. Floyd had a

13   pulse.  You will see Defendant Kueng check for a pulse and

14   then say, "I can't find one."  And then Defendant Lane took

15   no action.  Lane said and did nothing more at all for the

16   next two minutes and 44 seconds after learning that the

17   person in his custody and care had no pulse.  When duty

18   required immediate action, Lane said nothing, he chose to do

19   nothing.

20           Now, I expect you will hear Defendants Kueng and

21   Lane referred to as rookies and you will hear that Officer

22   Chauvin had been --

23           MR. GRAY:  Judge, I object to this as argument.

24   It's been argument all through the opening statement.

25           THE COURT:  I sustain that.  That is argument,

 1    counsel.

 2              MS. TREPEL:  Okay.

 3              As a newer officer, it can be awkward or even

 4    uncomfortable to call out a more experienced colleague.  But

 5    each of these defendants, you will hear, wore the same badge

 6    and swore the same oath.  And you will hear that being a

 7    police officer comes with life-and-death responsibilities.

 8              As you listen to the evidence, pay attention to

 9    what witnesses say about the training these two defendants

10    received before taking on those responsibilities.

11              You will hear that before becoming MPD officers in

12    December 2019, they had both completed a month's long

13    policing skills course required by the State of Minnesota.

14    They then passed a state-mandated exam required to become

15    licensed police officers.  They had received their CPR

16    certifications.

17              And then, already fully qualified to begin work as

18    police officers, Defendants Kueng and Lane attended and

19    graduated from the five-month MPD Police Academy.  After

20    that, although they were fully qualified police officers in

21    their own right already, they completed MPD's five-month

22    field training program, where they partnered with several

23    experienced officers for additional on-the-job training.

24              During their almost year and a half of training,

25    the defendants learned that a police officer has a duty to

1   protect a person in his custody and care; that police

2   officers must intervene if they see another officer abusing

3   a person in custody; that after a struggle has ended, the

4   time to use force is over and officers must switch to an "in

5   your custody is in your care" mentality.

6        If the person in custody then needs medical aid,

7   you will hear that no matter what happened earlier, in fact,

8   especially if an officer used force, it's now the officers

9   duty to provide that aid.

10        The defendants learned basic medical skills, like

11   how to take a pulse, assess breathing, and provide CPR.  And

12   you will hear that the defendants learned that leaving a

13   person handcuffed and facedown in what you will hear is

14   called the prone position is dangerous because it can

15   prevent a person from being able to breathe.

16        So they had drilled and drilled both during their

17   skills course and in the police academy, and one of the most

18   basic forms of medical care they could provide is placing

19   someone on their side in what you will hear is called the

20   side recovery position.

21        You will hear that the medical aid that would have

22   saved George Floyd's life was as simple as that, turning him

23   onto his side when his heart was still beating.  Defendants

24   Kueng and Lane learned this during their training to become

25   officers.  They also practiced turning people onto their

1    side or getting them up as their last step in their many

2    prone handcuffing drills.

3           Prone handcuffing is when officers handcuff people

4    facedown and then for safety and, because you will hear

5    there is no purpose in continuing to hold a compliant and

6    handcuffed person down, get them up or turn them onto their

7    side.  Officers practice this over and over.

8           Defendant Thao received all of this training too

9    and then got yearly refresher costs.  So no matter when an

10   officer joined the force, this training would be fresh in

11   their mind.

12          Defendant Lane had all of this same training.

13   Plus, you will hear he had additional experience because he

14   worked as a juvenile detention officer for Hennepin County.

15   There he got even more training, including more training on

16   the dangers of leaving a person restrained in the facedown

17   position.

18          And you will see that the bystanders quickly saw,

19   without any of this specialized training, that Mr. Floyd

20   needed help and they pleaded with the defendants to step in

21   and help him.

22          MR. GRAY:  Your Honor, I object to this as

23   repetitive and also argumentative.

24          THE COURT:  Counsel, you are arguing.  After all,

25   this is not evidence, that is, what the government intends

 1     to prove.

 2              Continue.

 3              MS. TREPEL:  Thank you, Your Honor.  I will be

 4     sure to phrase it as the evidence will show.

 5              You will see and the evidence will show that

 6     despite the bystanders' cries, despite the defendants'

 7     training, and despite George Floyd losing a pulse, the

 8     defendants chose not to act.

 9              MR. GRAY:  Judge, the same objection.  She's just

10     going right back into the argument.

11              THE COURT:  This part I'll overrule.

12              Proceed.

13              MS. TREPEL:  You will see that after nine minutes

14     and 29 seconds, Mr. Floyd was beyond the power of the

15     paramedics and doctors to revive.

16              You will see that when the ambulance arrived, it

17     was the paramedics and not these defendants, who had been

18     there the whole time, who finally indicated to Officer

19     Chauvin that he needed to get up.

20              And you will see that it was the paramedics who

21     told Defendant Lane to start CPR in the ambulance.  You will

22     see that Defendant Lane knew how to do CPR because finally,

23     inside the ambulance, he began doing it when told to, almost

24     five minutes after Defendant Kueng said he couldn't find a

25     pulse.

1            And although the paramedics and later the doctors

2      and nurses attempted to resuscitate Mr. Floyd, you will

3      learn that he was at that point past saving.  They declared

4      him dead at the hospital about an hour later.

5            You will hear that the Hennepin County medical

6      examiner ruled that Mr. Floyd's death was a homicide.  He

7      will explain to you that Mr. Floyd's heart and lungs

8      stopped, and that the immediate cause of death was law

9      enforcement subdual restraint and neck compression.

10           You will also hear from a doctor who specializes

11     in lungs and breathing.  He will explain that, based on the

12     position that Mr. Floyd was in, facedown and handcuffed

13     behind his back with Officer Chauvin's knee on his neck and

14     Defendant Kueng applying additional weight, pressing him

15     into the unyielding concrete, Mr. Floyd was for far too long

16     unable to expand his chest to take in enough oxygen.

17           The doctors will explain that, although Mr. Floyd

18     had drugs in his system and, like many people, suffered from

19     high blood pressure and narrowed arteries, it was the police

20     restraint and lack of oxygen that caused his death.

21           Before I wrap up, I want to talk very briefly

22     about the charges in this case.  At the end of this case,

23     the judge will instruct you on the law, but having the

24     charges in mind as you listen to the evidence can be

25     helpful.

1          The charges here are that the defendants violated

2     Mr. Floyd's constitutional rights.  The law requires police

3     officers to intervene when they see another officer using

4     excessive force and they have the ability to act.

5          The first count charges Defendant Thao and

6     Defendant Kueng with failing in their duty to intervene to

7     stop or attempt to stop Chauvin's excessive force.

8     Defendant Lane is not charged with this crime.

9          The law also requires police officers to provide

10    basic medical aid when they know a person needs it.  The

11    second count charges all three defendants with seeing

12    Mr. Floyd in serious medical distress and ignoring their

13    duty to help him.

14         Both charges allege that these crimes resulted in

15    George Floyd's death.  You will hear that the defendants are

16    not charged with intentionally killing Mr. Floyd, and the

17    government does not have to prove that the defendants

18    intended for him to die.

19         Our society gives police officers powers.

20         MR. GRAY:  Judge, I object to this as

21    argumentative.

22         THE COURT:  I think you are moving into argument,

23    counsel.  This is an opening statement, not a closing.

24         MS. TREPEL:  Yes, Your Honor.

25         You will hear that police officers have an

1  important responsibility to take care of the person who is

2  in their custody.  "In your custody is in your care."

3          At the end of this trial, once you've heard all of

4  the evidence and met all of the witnesses, we'll ask you to

5  hold these men accountable for choosing to do nothing and

6  watch a man die.  We'll ask you to find the defendants

7  guilty as charged.

8          THE COURT:  Thank you.

9          Members of the jury, let's take a brief morning

10  break at this time.  I would caution you, once again, not to

11  discuss the case amongst yourselves or other persons.  And

12  we will be in recess for, oh, maybe between 10 and

13  15 minutes.

14          The jury may be excused.

15              (Jury excused.)

16                  **IN OPEN COURT**

17               **(JURY NOT PRESENT)**

18          THE COURT:  I hadn't asked earlier.  I assume we

19  will go with Mr. Plunkett, Mr. Paule, and Mr. Gray, in that

20  order; is that right?

21          MR. GRAY:  I was last on the indictment, Your

22  Honor.

23          MR. PLUNKETT:  The indictment, Your Honor, goes

24  Mr. Paule, Mr. Plunkett, and Mr. Gray.

25          THE COURT:  Okay.  Okay.  So we start with

1     Mr. Paule?

2               MR. ROBERT PAULE:  That's fine, Your Honor.

3               THE COURT:  Okay.  Okay.  Very well.  Will do.

4               MR. PLUNKETT:  Your Honor?  I'm sorry.  I

5     apologize.  Right when the court is getting up.  At some

6     point I wanted to make a motion for a mistrial based on the

7     opening.  We can do that now or at any time.  I'm just

8     marking the record at this time.

9               THE COURT:  Go ahead.

10              MR. PLUNKETT:  Thank you, Your Honor.

11              Through the course of the opening we heard

12    Mr. Gray make several objections.  I think three out of four

13    were sustained.  And I simply -- the objection focuses more

14    on prosecutorial misconduct and the comments that were made.

15              We all know very well that openings are not

16    arguments, and I have a lot of respect for Ms. Trepel, but a

17    lot of her argument -- a lot of her opening was arguments,

18    and Mr. Gray pointed that out.

19              At this point I'm going to be completely candid

20    with the court.  It's probably premature to grant a

21    mistrial, but if we're going to have a record made about a

22    series of acts by the prosecution that could eventually lead

23    to a mistrial, I do need to make the record when they occur,

24    and that's what I'm doing at this time.

25              Thank you, Your Honor.

 1            THE COURT:  Okay.  Thank you very much.

 2            Incidentally, I don't know if I put this on the

 3    record, I know I've mentioned it to you, and that is that

 4    any time any of you, defense counsel, make an objection or a

 5    motion, I assume all defense join in that defense or

 6    motion -- in that motion or objection, unless you expressly

 7    turn it down.

 8            And, with that, that motion that you have just

 9    made will be denied.  I will confess it was moving farther

10    into the argument side than the court normally expects to

11    hear, but it is not grounds for mistrial.

12                    (Recess taken at 11:04 a.m.)

13                          *  *  *  *  *

14        (11:17 a.m.)

15                        **IN OPEN COURT**

16                        **(JURY PRESENT)**

17            THE COURT:  You may be seated.

18            Mr. Paule, I recognize you for your opening.

19            MR. ROBERT PAULE:  Thank you, Your Honor.

20            May it please the court --

21            THE COURT:  Proceed.

22            MR. ROBERT PAULE:  -- counsel for the government,

23    Mr. Plunkett, Mr. Kueng, Mr. Lane, Mr. Gray, and you,

24    members of the jury.

25            Good morning to everyone.  My name is Robert

 1    Paule.  I, along with Ms. Natalie Paule, represent Mr. Tou

 2    Thao.  That is how you pronounce his name.  We have the

 3    honor of representing him in this matter.

 4          Mr. Thao, I'd like you to stand, remove your mask,

 5    with the court's permission, so the jury can see who you

 6    are.

 7          COURTROOM DEPUTY:  Let me make sure your mic is

 8    on.

 9          MR. ROBERT PAULE:  Thank you, Lynn.

10          You may be seated.

11          I'd like to begin at least my opening statement by

12    acknowledging a tragedy, because that's really why we are

13    hear.  The death of Mr. Floyd is indeed a tragedy, just as

14    the death of any human being is a tragedy as well.  However,

15    a tragedy is not a crime.

16          Now, what brings us all here to this courtroom in

17    the middle of a pandemic, with plexiglass everywhere, are

18    the events of May 25, 2020.

19          You will find out from the evidence in this case,

20    not from an argument of a lawyer, that there is a store

21    called Cup Foods.  Cup Foods is located on the corner of

22    38th and Chicago.

23          I'm going to step away from the podium to use a

24    little bit of technology to orient you to the area in

25    question.  There we go.

1          First of all, for those of you not familiar with

2     it, this is essentially a map of Minneapolis showing the

3     various neighborhoods involved.

4          To orient you to this, this area where it says,

5     "Central" and where I'm circling is essentially downtown

6     Minneapolis.  The area of 38th and Chicago where this case

7     occurred is located in the central neighborhood on the south

8     side of Minneapolis.  That is located here (indicating).

9     Excuse me.  Right there where it says, "Central."

10          Now, moving along to the intersection in question,

11     this is an overhead photograph with some modifications of

12     38th and Chicago.  38th Street runs west to east.  And

13     Chicago Avenue South, because Chicago Avenue does not go

14     north of downtown, runs from north to south.

15          You will see at this intersection there are three

16     specific places indicated.  One is Cup Foods, not to be

17     confused with Cub Foods, but Cup Foods.  That is where the

18     counterfeiting took place.

19          Across the street on the south side of 38th Street

20     directly across from Cup Foods is the Dragon Wok restaurant.

21     That you will come to know because you will see surveillance

22     video that was taken from a camera placed there by the

23     owners of the Dragon Wok.

24          And then kitty-corner from the Dragon Wok on the

25     west side of Chicago Avenue directly across from Cup Foods

1    is a Speedway station.

2              So you will hear information about that and about

3    people there.

4              I think that all of us are familiar with this

5    incident.  It's been on the news so much.  I think all of us

6    are also aware of a video that was taken by a young woman

7    named Darnella Frazier.  She is the one who placed this

8    video, if I understand it correctly, on her Facebook

9    account, where it shortly went viral and drew the nation's

10   attention to this incident.

11             I would point out, however, that that Facebook

12   video does not show what happened before that.  And for you

13   to understand what happened, the entirety of the incident,

14   and for you to understand why the officers chose to act the

15   way they did, you have to look at what occurred before the

16   Facebook video because, again, the Facebook video does not

17   show the entirety of the actions.

18             Now, what the evidence will show is this incident

19   began about 8:00 p.m. on a Monday evening.  It was May 25th,

20   2020, when an employee of Cup Foods, again, Cup Foods, which

21   is located at 38th and Chicago, placed a 911 call.  The

22   employee placed that 911 call to report that a customer,

23   later identified as George Floyd, had passed a counterfeit

24   $20 bill.  The employee, when making this phone call to 911,

25   also indicated that he believed that this person was under

1    the influence of either drugs or alcohol.

2           I would note at the outset that, despite what you

3    might hear otherwise, passing a counterfeit $20 bill is a

4    crime under both state and federal law.

5           The 911 call resulted in police being dispatched

6    to Cup Foods.  What you will find out is that a squad car

7    that had both then-Officer Lane and then-Officer Kueng,

8    Squad 320 -- and you will probably hear a little bit of

9    evidence about why that squad car had that particular number

10   to it -- was dispatched to go and investigate the situation.

11          The officers arrived shortly thereafter and spoke

12   with the store employees.  The store employees verified that

13   they believed that Mr. Floyd had indeed passed a counterfeit

14   bill, and they led the police officers out of the store and

15   pointed out across the street that there was a blue Mercedes

16   SUV.

17          Now, I'm going to step over again to hopefully use

18   that correctly.  This is the third exhibit I'm using, and

19   this is not something that's evidence in the case.  This is

20   used strictly for demonstrative purposes.

21          But when Squad 320 arrived, Squad 320 arrived

22   driving southbound on Chicago Avenue.  Excuse me.  I won't

23   use my finger.  I will use a pen.  But drove southbound and

24   parked in the front of Cup Foods.  They were parked on the

25   east side of Chicago Avenue almost directly in front of Cup

1    Foods.  The vehicle was facing south.

2             After the officers, Officer Lane and Kueng, went

3    into Cup Foods, they were directed again by the employee,

4    who pointed out a blue Mercedes-Benz.  The blue Mercedes was

5    an SUV.  I will refer to it sometimes as a blue Mercedes,

6    sometimes a Mercedes, sometimes SUV.  Not trying to confuse

7    you.  But they pointed out that the person they believed

8    passed the counterfeit bill was seated in this car.  So I

9    indicated with a blue square on the south side of 38th

10   Street east of Chicago Avenue where that was.

11            Now, as another aside, you are going to see a lot

12   of video in this case.  One of the types of video you see is

13   what's referred to as body cams or body camera footage.  In

14   Minneapolis police officers, at least those in uniform, are

15   equipped with a body camera.  This body camera is mounted on

16   their chest.  And usually what happens is an officer can

17   activate it by tapping it or doing something like that.

18            But you will actually see the body cam evidence in

19   this case that shows both Officer Lane and Officer Kueng

20   going over to talk to the occupants of that blue Mercedes

21   SUV to figure out what was going on.  We, as citizens in

22   this society, expect police to investigate potential crimes.

23   That's what they were doing in this incident.

24            So the two police officers go over to the Mercedes

25   SUV and what you will notice, if you watch this evidence, is

1    you will see that Officer Lane, as he's crossing 38th Street

2    headed over to the Mercedes SUV, notices that the occupants

3    inside this blue Mercedes SUV are moving around.  He makes a

4    note of that, in other words, he says that to his partner.

5          Because people moving around can mean different

6    things to different people, but that can draw some

7    suspicions of law enforcement that something may be afoot,

8    either something -- perhaps people hiding evidence or

9    perhaps for their safety.  They're worried about someone

10   drawing a weapon.

11         So he made that comment as he's crossing 38th

12   Street.  Then Officer Lane goes up to the blue Mercedes SUV.

13   What you will find out about the blue Mercedes SUV is that

14   the person seated in the driver's seat was George Floyd.

15   There was another man in the passenger seat, whose name is

16   Morries Hall.  There was a third occupant of that blue

17   Mercedes SUV, a woman named Shawanda Hill.

18         But when the police went over there, Officer Lane

19   went up and he had to knock on the window of the driver's

20   side loudly with his flashlight to get the attention of

21   Mr. Floyd.  When you view this evidence, you will see that

22   Mr. Floyd is actually turned away and is doing something

23   with his back towards the driver's side door.  So Officer

24   Lane (indicating) loud enough on that window to draw the

25   attention of Mr. Floyd.

1              What he does is he's asking Mr. Floyd to roll down

2       the window, but Mr. Floyd instead opens the passenger --

3       excuse me, the driver's side door.  He's still not sitting

4       there and following directions.  Officer Lane is rightfully

5       nervous about what's going on inside the car, so he asked

6       Mr. Floyd to put his hands on the steering wheel.

7              What you will learn is that, from a safety

8       standpoint, a person's hands are important for a police

9       officer because that is typically where danger comes from.

10             So he specifically directs Mr. Floyd to put his

11      hands on the steering wheel.  Mr. Floyd is protesting at

12      this time stating he's done something wrong.  "I'm not that

13      guy."  You will hear all this.  But he's not putting his

14      hands on the steering wheel.

15             So at this point Officer Lane draws his firearm

16      and directly commands him to put his hands on the steering

17      wheel, and what you will see from the body cam footage is

18      Mr. Floyd's left hand going on there, but his right hand is

19      out of sight.

20             And you -- again, one of the beautiful parts about

21      our legal system is the right to a trial by a jury.  You, as

22      the jury in this case, get to decide what the facts are.

23      It's not what I say they are.  It's not what any other

24      lawyer says they are.  You, as the jury, as a group get to

25      decide what the facts are.

1          But when you watch that video, watch to see what

2    you think Mr. Floyd is doing with his right hand.  What you

3    will see is he is reaching towards the center console area

4    of this blue Mercedes SUV.

5          Now, one of the other things that you will learn

6    is that following this incident law enforcement seized that

7    blue Mercedes SUV and took it in for what's called

8    processing.  This is where people in law enforcement look

9    for evidence and document what's happened.

10          And you will see photographs from inside that blue

11   Mercedes SUV particularly of that center console area where

12   Mr. Floyd's right hand was.  You will find that what they

13   found in there, when police searched that, was indeed

14   counterfeit money.  And they also found narcotics in that

15   car, and these are illegal drugs.  They were found in that

16   center console area.

17          Now, Mr. Floyd continues to protest, continues to

18   not follow the directions from Officer Lane.  Meanwhile, at

19   this time Officer Kueng is on the other side of the blue

20   Mercedes SUV talking to the passengers trying to figure out

21   what's going on and keeping an eye on them.

22          But as Mr. Lane talks to Mr. Floyd, Mr. Floyd is

23   not following his instructions, so Officer Lane orders him

24   to get out of the car.  Again, Mr. Floyd refuses to follow

25   instructions.

1          Think about this.  We expect law enforcement to

2     investigate criminal behavior.  And law enforcement are

3     given powers, one of the many things Ms. Trepel said, but

4     law enforcement have the right and the duty to investigate

5     criminal behavior, and we expect that they will do so.

6          So when Mr. Floyd doesn't want to get out of the

7     car, ultimately Officer Lane begins to pull him out

8     physically.  You will see on the video, you will see for

9     yourself that Mr. Floyd is not only not following commands,

10    but he's physically resisting at this point.

11         Officer Kueng, on the other side of the vehicle,

12    notices the struggle and goes around the rear of the blue

13    Mercedes SUV and assists Officer Lane in handcuffing and

14    getting Mr. Floyd completely out of the vehicle.  You will

15    see a struggle that was going on at this point.  Again,

16    Mr. Floyd is not following commands.

17         By the way, I'm not saying these things as a means

18    to try to denigrate Mr. Floyd.  What I'm doing is pointing

19    out what his actions were during this time.

20         So Mr. Floyd is now out of the vehicle, and

21    Mr. Kueng then takes and begins to try to walk him over.

22    And if I can go back over here, at this point the officers

23    are on the driver's side of the blue Mercedes SUV right here

24    (indicating).

25         And what happens is Officer Kueng takes Mr. Floyd

1    over and has him seated down by the wall.  The wall is the

2    outside wall of the Dragon Wok restaurant.  At this point

3    Mr. -- I'll stand near a microphone.  At this point

4    Mr. Floyd is handcuffed.

5           When you look at the body camera evidence, watch

6    and I believe you will notice that at least once, if not two

7    times, Mr. Floyd appears to either attempt to fall down or

8    to sit down as Mr. Kueng is escorting him over to the wall

9    by the Dragon Wok.

10          When he's over at the wall at the Dragon Wok,

11   Officer Kueng asks him, "Can you identify yourself?"  He

12   takes Mr. Floyd's name, because Mr. Floyd gives him his full

13   name and date of birth.

14          And then you will notice that there was a

15   Minneapolis Park police officer, Officer Chang, Peter Chang.

16   He arrives as backup.

17          Later in this trial you will hear testimony from a

18   woman named Jenna Scurry.  She works for Minneapolis 911

19   dispatch, and she can give you detail about what she calls

20   out when a person does a 911 call, how police and everyone

21   else responds.

22          But there was a back up officer that arrived at

23   this point from the Minneapolis Park Police.  He was at a

24   nearby park, but arrived as backup.

25          What you will find out is that the Minneapolis

1    Police Department and the Minneapolis Park Police, who

2    basically patrol the park system of Minneapolis, will work

3    together.  They actually attend the same police academy.

4           So Officer Chang shows up.  So Officer Kueng gives

5    him Mr. Floyd's name and asks him to run it for warrants.

6    That is to check and see if somebody has a warrant out for

7    their arrest or something like that.  It's pretty much

8    routine police behavior.

9           At this point Officer Lane comes back over, and

10   both he and Officer Kueng begin talking to Mr. Floyd.

11   Officer Lane and Officer Kueng at this point appear to be

12   concerned about the behavior of Mr. Floyd.  They indicated

13   that he is, quote, acting very erratic and they are asking

14   him if he is, quote, on something, presumably referring to

15   drugs or narcotics of some sort.

16          Officer Kueng even noted that Mr. Floyd had foam

17   around his mouth, and you will see the video of that.  And

18   Officer Kueng actually asks Mr. Floyd about that foam.

19   Mr. Floyd appears to acknowledge that and tells the

20   officers, quote, I was hoopin' earlier.  When I use the word

21   "hoopin'," I'm spelling it h-o-o-p-i-n.  That is a word that

22   you will find out is subject to at least two different

23   meanings.  But he acknowledges that he was doing what's

24   called hoopin' earlier.

25          And at this point the two officers then bring

1       Mr. Floyd over.  They walk him across -- back northbound

2       across 38th Street towards their squad car.  Again, as they

3       are walking him, Mr. Floyd appears to sag down.  They are

4       telling him to keep walking.

5             They then arrive on the driver's side of

6       Squad 320, which is parked outside of Cup Foods.  At this

7       point again Mr. Floyd is protesting.  He appears to not

8       comprehend fully what's going on.  And what he tells the --

9       excuse me.  The officers tell him to get up alongside the

10      side of the car so they can search him.

11            When officers detain someone, if they have a

12      reason to do so, they are authorized to make sure that a

13      person doesn't have any weapons or the means to hurt them.

14      So they'll perform what's called a pat search, which is a

15      search of the outer part of a person's clothing and

16      sometimes going into their pockets, to make sure there's

17      nothing that that person could use to harm the officers.

18            So Officer Kueng is trying to get Mr. Floyd to

19      lean up against Squad 320 to allow him to perform that

20      search.  You will see the body cams.  You will hear the

21      protestation.  I would point out that Mr. Floyd is not only

22      protesting verbally, he's not following instructions, but

23      he's actually physically resisting.

24            You will hear of a struggle that's going on, and

25      at this point you will start to hear a third voice, a voice

1    from a person that was standing on the side of the road and

2    somehow came over because of curiosity or something, nothing

3    untoward, and began speaking to Mr. Floyd himself.  This

4    person was later identified as Charles McMillian.  Charles

5    McMillian began saying things to Mr. Floyd like, "Just get

6    in the car, you can't win."

7         Officers search Mr. Floyd.  And what do they find

8    in his pocket?  They find a small glass pipe commonly used

9    to smoke narcotics.  Again, I'm not trying to denigrate

10   Mr. Floyd, but we've now got the drugs that were recovered

11   in the Mercedes and you've got a glass pipe found on

12   Mr. Floyd's person.

13        Now I'd like to shift gears and go back to the 911

14   dispatch.  Originally when the call went out, the 911

15   dispatcher sent or dispatched Squad 320 to respond to the

16   counterfeiting call.

17        At this time Officer Thao, my client, and his

18   partner then for the day, Officer Chauvin, responded as

19   backup, much like Officer Chang did.  But they were

20   responding from the Third Precinct, which is a little bit

21   east, a couple miles east at least, of 38th and Chicago.  So

22   they responded initially as what's called Code 3.

23        Now, you'll hear terminology from police officers

24   that might be a little different to you.  You will hear

25   different codes.

1          One is what's called Code 2.  And if I'm a police

2     officer and I'm responding to something Code 2, It means

3     drive there but obey the traffic laws.  I'm not using my

4     lights or sirens, presumably not making any side trips, but

5     I'm driving directly to the place that I'm going to and

6     observing traffic conditions, in other words, no lights or

7     siren.

8          Code 3 means something different.  It means that

9     I'm there to proceed as fast as is safely possible.  This is

10    where you see police officers with their lights and sirens

11    on approaching intersections, slowing to go through and then

12    going forward.

13          Code 4 means something different.  It means

14    essentially the situation is under control.  You will hear

15    from the witnesses themselves from the witness stand behind

16    me, they will explain this much better than I will.

17          But Officers Thao and Chauvin, who are partners

18    for that day, begin responding to the area.  First Code 3.

19    Then you will hear Code 4, which means essentially that the

20    situation is under control.  So at that point the squad that

21    contains both Officer Thao and Officer Chauvin continues on

22    to go for backup, but they do so without using their lights

23    and siren.

24          As another note, the squad -- excuse me, police

25    squad cars also have cameras that can show things.  What you

1     will see from my client, Officer Thao, then-Officer Thao's

2     body camera footage is that you can see the car going and

3     you can see the lights on and you can see them slowing.  You

4     will also overhear the conversation.

5           And I would note that they respond -- I would

6     assume one of the things is you will find out that this is

7     either the third or fourth days for both Officer Kueng and

8     Officer Lane as essentially full-fledged police officers.

9     We might disagree about some of the verbiage, but they've

10    completed the field training program and are essentially

11    allowed to go on calls by themselves.

12          But both these officers were paired together that

13    day.  They were new, at least in the eyes of my client,

14    Officer Thao.  That is one of the reasons that they went and

15    continued for back up.

16          You will also notice from the evidence in this

17    case that while en route my client indicates that the area

18    of 38th and Chicago is what he refers to as Bloods

19    territory.

20          Now, the Bloods are one of several Minneapolis

21    street gangs.  They are based in the central area of

22    Minneapolis, and they often wear red clothing to

23    differentiate themselves from other street gang members.

24          Officers Thao and Chauvin ultimately arrive at

25    38th and Chicago.  And, again, when you see the body camera

1     footage, they park sort of on the east side of 38th Street,

2     but then decide to pull forward more towards the front of

3     Cup Foods and park on the north side of 38th Street.  This

4     is at 8:17 p.m.

5             At this point both Officer Chauvin and Officer

6     Thao exit their squad and walk over to Squad 320 to see what

7     is going on and to see if their assistance is still needed.

8     And what you will see is at this point Officer Chauvin

9     arrives first, Officer Thao behind him, but when they

10    arrive, there's a struggle going on.  At this point Officer

11    Kueng and Officer Lane are struggling trying to get

12    Mr. Floyd to get in the backseat of the squad car.

13            And think about this.  What they're really doing

14    is they're trying to do what's called detain him to allow

15    them to complete their investigation about whether any sort

16    of a crime has been committed.  Mr. Floyd is still not

17    responding to their commands and he's physically resisting

18    them.

19            At this point when the officers arrive, Officer

20    Lane is now on the passenger side of Squad 320, basically --

21    so he's standing almost in the lane of Chicago Avenue if I

22    was driving northbound on Chicago Avenue.  But they're

23    struggling trying to get Mr. Floyd in the car.  And at this

24    point, then, Mr. Lane is on the other side trying to do it.

25            Officer Chauvin goes around to the passenger side

```
1    as well too, and then you will see that Mr. Floyd basically

2    ejects himself out of the passenger -- the rear part of

3    Squad 320 and begins to struggle physically with both

4    Officer Lane and Officer Chauvin.

5            Officer Kueng is at this point back on the

6    driver's side of the car, but he quickly goes around, as

7    does my client following him, around the rear part of

8    Squad 320 to figure out what's going on.

9            At this point, then, my client, Officer Thao,

10   comes back around the blue Mercedes SUV.  He opens the rear

11   squad door and looks in to see what's going on.  And you

12   will see from his body camera footage that Mr. Floyd, even

13   in handcuffs, is still struggling mightily with the

14   officers.

15           You will see at some point Officer Chauvin, I

16   believe, and I'll let you decide what the video shows, with

17   his arm around trying to get him out of the car so they can

18   deal with Mr. Floyd.

19           Ultimately my client closes the door and goes back

20   around.  That's about the time that Mr. Floyd is finally out

21   of the car and is placed on the ground.

22           Now, when Mr. Floyd is placed on the ground, he's

23   placed first, I think, on his back, but then laid over

24   facedown in what, again, you will learn is something called

25   the prone position.
```

1              And the other three officers, Officer Chauvin up

2      near the head area, Officer Kueng on the middle of

3      Mr. Floyd, and Officer Lane by his feet or the leg area,

4      these officers are then holding him down in this position,

5      they are restraining him.  And at this point there's a

6      discussion about what to do.

7              You, again, will hear what the officers were doing

8      during this time, who was saying what to who, but at some

9      point the officers request what's called an MRE, which

10     stands for maximum restraint something, equipment, I

11     believe, MRE.  Sometimes this is referred to what's called

12     the hobble device.

13             And what this is is this is a means of, when

14     somebody is resisting, to put them in a maximum restraint.

15     Their handcuffs are behind their back.  They would attach

16     this device too somehow and restrain his feet so the person

17     really can't do much of anything.

18             But at that point, then, Officer Thao goes back

19     and opens the rear compartment to Squad 320 and begins going

20     through a bag.  It might seem like it takes a while for him

21     to find that, because it's not his squad car and there are

22     what are called duty bags in the back of the squad belonging

23     to each of the other two officers.

24             So Officer Thao is attempting to locate this

25     hobble device in these duty bags.  He ultimately finds it

1    and goes over and offers it to them, but at that point the

2    decision is made not to use that maximum restraint

3    equipment.  Officer Thao then inquires if medical assistance

4    has been requested.

5            Now, I'm going to step aside.  In this case you

6    will hear terminology that -- things like EMS.  That stands

7    for emergency medical services.  And, again, when Jenna

8    Scurry, who is the dispatcher from Minneapolis 911, she can

9    elaborate on this, but what you will learn is that when

10   police officers believe that medical assistance may be

11   required, they will ask for EMS, emergency medical systems.

12           And so at this point Officer Thao asks if EMS has

13   been requested and is told that it has been.  Officer

14   Thao -- apparently this was done when he was back looking

15   for the hobble device.  But as he's sitting there trying to

16   determine what to do, they clarify that EMS has been

17   requested and essentially what level.  They say Code 2.

18           So Officer Thao then gets on his radio.  And one

19   of the things you will learn about is what type of equipment

20   police officers have, but he's got a radio that allows him

21   to communicate via police dispatch channels on his left

22   shoulder.

23           So Officer Thao then uses his radio to ask

24   dispatch to do what's called step up the emergency medical

25   service response to Code 3.  That's, again, lights and

1     siren.  They clarify that that is what they are going to do,

2     so they do that.

3           While Officer Thao is standing next to the squad,

4     he learns that a pipe had been discovered in the search of

5     Mr. Floyd and turns and actually asks Mr. Floyd, "What are

6     you on?"  You can draw your own conclusions, but I think

7     it's pretty clear that my client, Officer Thao, is wondering

8     why Mr. Floyd is behaving in the manner in which he is.  And

9     at this point emergency medical services has already not

10    only been requested, but asked to step up and arrive as soon

11    as possible.

12          Now, going back to my map -- I'm going to go back

13    to the first exhibit that I showed you.  Okay.  So, again,

14    we have the central neighborhood, which is essentially --

15    can you see this?  Here (indicating) is the central

16    neighborhood.  And I believe it's sort of near this area of

17    the central neighborhood, right here (indicating) that is

18    38th and Chicago.

19          But the emergency medical services have been

20    requested, and it comes in this particular part of

21    Minneapolis from what's called Hennepin Healthcare.

22    Hennepin Healthcare is kind of a new acronym for what we

23    used to call Hennepin County Medical Center or, back in my

24    parents' day, General Hospital, which is located downtown

25    somewhere in this area (indicating).  So it's not that long

1        of a drive for them to get there.

2                At this point, because Mr. Floyd is restrained,

3        you will see video showing my client standing there, as

4        Ms. Trepel pointed out a number of different times, standing

5        there trying to figure out what to do.

6                Clearly, Mr. Floyd does not need an additional

7        officer restraining him, so he essentially acts as what's

8        called, in his own words, a human traffic cone to try to let

9        oncoming traffic know that there's a police officer here.

10       Maybe they will see him if they don't see the other officers

11       on the ground.

12               And at this point you will start to see that a

13       crowd is beginning to form on the sidewalk.  If I am where

14       Officer Thao is and the car is over here (indicating), the

15       crowd is forming in front of him on the sidewalk on the east

16       side of Chicago Avenue in front of Cup Foods.

17               You will hear that a group of people came there

18       and they began interacting with the officers.  This is

19       essentially when that Facebook video that went viral was

20       begun to be taken.

21               But that Facebook does not capture what all the

22       entirety of the situation would have happened there before

23       that allows you to understand what the police officers were

24       thinking and why they were taking the action that they did.

25               Now, what you will hear is names like Darnella

1    Frazier.  She is the young woman who took that video.

2    Another woman named Alyssa Funari.  Charles McMillian, he is

3    the gentleman who is the first one talking to Mr. Floyd.

4    You will hear him say repeatedly, "You can't win" and "Get

5    in the car."  Then you will hear about another person named

6    Donald Williams.  And, finally, another person named

7    Genevieve Hansen, who is an off-duty Minneapolis firefighter

8    who happens upon the scene.

9            Now, all these people came and, as Ms. Trepel told

10   you, they began observing and they began objecting, and

11   they're getting more vociferous.  Now, again, I point out

12   something.  What I say is not evidence.  You, as the jury,

13   get to decide what is the evidence.  But look to that crowd

14   and you will see them objecting and getting louder and

15   objecting more to what they perceive is happening.

16           But one of the things that no lawyer can change is

17   that none of those people knew any of what was going on

18   before that point, save for Mr. McMillian, who I believe you

19   will hear began observing this as Mr. Floyd is being walked

20   across 38th Street by the two officers.  Other than that,

21   none of those people on that sidewalk knew what was going

22   on.

23           Now I'm going to speak briefly about the charges,

24   as did Ms. Trepel.  My client, Mr. Thao, is charged with

25   violating the Constitution of the United States.  That is

1    why we are in this courtroom.  He is not charged with

2    violating any state law.  But he's charged with violating

3    the Constitution essentially in two ways.

4            And, again, one of the things that I will point

5    out is that I may talk to you about the law and the facts,

6    but you, as the jury, get to decide what facts have and have

7    not been proven in this courtroom, no matter what I or any

8    other lawyer says.

9            The second point that I want to make clear is that

10   it is not my job as a lawyer to tell you what the law is.

11   That is solely the responsibility of the court, and I have

12   no doubt that Judge Magnuson will instruct you on what the

13   law is.

14           But essentially the two charges against my client

15   are that he violated the Constitution by, one, failing to

16   intervene when Officer Chauvin was using force, accused of

17   being unreasonable force, under the circumstances.  That's

18   the first count.

19           The second count is that he violated the

20   Constitution because he was what's called deliberately

21   indifferent to the serious medical needs of a person, in

22   this case Mr. Floyd.

23           Now, both of these charges require that the

24   government prove specifically that my client was acting

25   willfully in taking each of those respective allegations.

1    The court will tell you what "willfully" means.  It is not

2    my place to do so.

3              As in any criminal case, Mr. Thao is presumed to

4    be innocent of these charges and the burden is solely on the

5    government to prove these allegations beyond a reasonable

6    doubt.

7              Now, in conclusion, I think we all understand that

8    police officers are often called to deal with situations

9    where they have little information.  These can be difficult

10   situations.  They can be dynamic and changing situations.

11   They can be very dangerous situations at times.

12             And if you look at the people that they are

13   dealing with, oftentimes these people are emotional, they

14   are scared, they are angry, and oftentimes they've either

15   been using or under the influence of some sort of chemicals.

16             Police actions are often very difficult to

17   understand and fully comprehend in a vacuum, and I don't

18   want you to do that in this case.  That's why it is

19   important that you focus on all the evidence, not just what

20   happens once the crowd begins to show up.

21             This case involves the use of force by police

22   officers.  Use of force is often disturbing to watch and

23   difficult to comprehend, even if the best of circumstances.

24             In this case, the video that shows this is both

25   graphic and disturbing.  It can be difficult to watch.

1    That's one of the reasons that I believe the court inquired

2    of you as potential jurors if you were able to do that.  But

3    you will be required to do that.

4           Now, as I stated at the outset of my opening

5    statement, the events that occurred that day are indeed a

6    tragedy, but the fact that something ends tragically does

7    not mean that a crime has been committed.

8           The fact that Mr. Floyd lost his life under tragic

9    circumstances, it is a tragedy, just as loss of any human

10   life, but that does not mean that the actions of Mr. Thao

11   were criminal.

12          In this case, at the end, once you've heard all

13   the evidence, I will stand before you and I will ask you to

14   render the only verdict that will be justified under the

15   circumstances and that, ladies and gentlemen, is a verdict

16   of not guilty on all counts.

17          Thank you very much for your time.

18          THE COURT:  Thank you, Mr. Paule.

19          Mr. Plunkett.

20          MR. PLUNKETT:  May it please the court, Ms. Bell

21   and your team, Mr. Paule, Ms. Paule, Mr. Thao, Mr. Gray,

22   Mr. Lane, friends, family, supporters, members of the jury.

23          This case is about a tragic event in our nation's

24   history that most of, if not all, have viewed through social

25   media and various news sources.

1           As they say, things can't be unseen, but that

2     video, that video is not what Alex Kueng saw.  It's not what

3     Alex Kueng perceived and it's not what he experienced on

4     May 25, 2020.  Please keep in mind that the video that you

5     saw, the video that may be etched in your minds has little

6     to nothing to do with what Alex Kueng saw and perceived.

7           In fact, I anticipate that you will hear from at

8     least one witness that an eyewitness from the sidewalk had

9     no idea that Alex Kueng and Mr. Lane were even there.  They

10     couldn't see him.  He couldn't see them.  And Alex Kueng

11     certainly could not see or react to what the people on the

12     sidewalk were seeing and reacting to.

13           This case is about a tragic tale, about a rookie

14     officer, a rookie less than three full shifts out of his

15     career -- into his career as a Minneapolis police officer

16     that was confronted with an extraordinarily complex, rapidly

17     unfolding set of circumstances.

18           The evidence is going to show that Mr. Kueng --

19     he's going to stand and take off his mask.  Thank you.  Have

20     a seat.  -- was thrusted into these events with, one,

21     inadequate training; two, lack of experience; three, a

22     perceived subordinate role to Officer Chauvin; and, four,

23     confidence in Officer Chauvin, a senior officer, not only a

24     senior officer, Officer Chauvin, but also Alex Kueng's field

25     training officer or FTO just two and a half shifts before

1        the encounter with Mr. Floyd.

2                A field training officer or FTO is an officer

3        chosen by the City -- by the Minneapolis Police Department

4        to mentor and train a recruit immediately after the recruit

5        finishes the Minneapolis Police Academy.  You will learn,

6        through the evidence, that an FTO has considerable sway,

7        considerable power over a recruit's future.

8                These four items, which are failures on the part

9        of the Minneapolis Police Department, combined with a

10       confrontational crowd, created a dynamic, unusual, and,

11       frankly, foreign situation.  Alex Kueng did his even best to

12       do his job, just the way he'd been trained.

13               In the end, the evidence will show that on

14       May 25th, 2020, George Floyd, our entire community, and Alex

15       Kueng were let down by the Minneapolis police

16       administration.

17               My name is Tom Plunkett.  It is a great honor to

18       be here.  It is a privilege to be a lawyer in America and to

19       serve our constitutional principles that so many have given

20       so much to preserve and able to stand before you in this

21       distinguished court and be given the honor of serving as

22       Alex Kueng's attorney.

23               This is an opening statement.  It is meant to be

24       my opportunity to give you an overview or a road map to the

25       case.  I'm supposed to tell you what the facts, many of

1    which were left out by the government, will show.

2            So here's what I'm going to do in the next half

3    hour or so.  I'm going to introduce you to some of the key

4    players.  I'm going to introduce you to the police officers.

5    I'm going to introduce them to you because they are not

6    abstract beings.  They are people.  They are people with

7    lives and families and dreams of careers.  And then I'm

8    going to just outline what Mr. Kueng, my client, Alex Kueng,

9    believes the facts will show.  And then, finally, I'm going

10   to talk a little bit about the law and the burden of proof.

11           Understanding who we are talking about is a fact

12   that you need to consider to make the important decisions

13   about whether Mr. Kueng acted willfully.  Very important

14   word.

15           The court will define "willfully" for you, and you

16   must follow the court's definitions.  I'm going to

17   paraphrase and try to sum it up for you, but I don't give

18   you the law.  The court gives you the law.  Any law that I

19   give you is not the law because it hasn't come from the

20   court.

21           I do anticipate that the court will instruct you

22   that "willfully" means committing acts with a bad purpose or

23   improper motive, to disobey or disregard the law,

24   specifically intending to deprive Mr. Floyd of his rights.

25   That is a paraphrase of what "willfully" means.

1          You, as a jury, need to decide this important

2     question of willfulness.  In doing so, you will hear and see

3     evidence.  I respectfully submit to you the evidence is not

4     simply data marks in time during a 20-minute encounter

5     between Mr. Floyd, Alex Kueng, and the other officers on

6     May 25th, 2020.  Instead, the facts need to be considered in

7     light of the people who participated.

8          To answer this willful question, to determine if

9     there's a bad purpose or improper motive, you will need to

10    know just who these people are, where they came from.  And

11    so I am going to introduce them to you.  Who are the people?

12    Alexander Kueng.

13         Mr. Kueng was just 26 years old when these events

14    unraveled.  He grew up in a culturally and ethnically

15    diverse home in a culturally and ethnically diverse area of

16    Minneapolis, that is, North Minneapolis.  Alex Kueng's

17    mom --

18         MS. BELL:  I'm going to object at this point.

19         THE COURT:  I'm sorry.  I couldn't hear.

20         MS. BELL:  Objection, Your Honor.

21         THE COURT:  Overruled.

22         Proceed.

23         MR. PLUNKETT:  Alex Kueng's mom, Joni Kueng, a

24    teacher in North Minneapolis, is white.  Alex Kueng's

25    absentee father was Nigerian.  He died at a fairly young

1    age.  Ms. Jodi Kueng later adopted four at-risk youth,

2    making Ms. Kueng the only white person in the home where

3    they grew up.  Ms. Joni Kueng, Alex's mom, is a teacher in

4    North Minneapolis, just as her father was.

5            Alex Kueng did not grow up dreaming of being a

6    police officer.  He dreamed of being a professional soccer

7    player and to his credit --

8            MS. BELL:  Your Honor, objection.

9            THE COURT:  Yeah, I think, counsel, we're starting

10   to get away a little bit from the case.  I'm going to ask

11   you to cut the introduction short.

12           MR. PLUNKETT:  The point is that neither he or his

13   family had any romanticized notions about the police and

14   their community.

15           Alex Kueng's path to a career in law enforcement

16   came to him later.  He felt there needed to be a change in

17   policing, and the only way to accomplish that was to take

18   the problem on firsthand.  He wanted to create change from

19   within.

20           To make this happen, Alex Kueng, a 2012 graduate

21   of Patrick Henry High School, finished his college degree at

22   the University of Minnesota, getting a BA in sociology of

23   law, criminology and deviance in 2018.  He had worked loss

24   prevention for two department stores while in college.

25           In anticipation of completing his college degree,

1    he began the Minneapolis Police community service officer

2    program.  That was in December 2017.  The community service

3    officer program or CSO is a traditional -- pardon me,

4    transitional job for people seeking to become Minneapolis

5    police officers.  On February 19, 2019, Mr. Kueng began his

6    orientation at the Minneapolis Police Academy.

7            Mr. Thomas Lane was Alex Kueng's partner on

8    May 25th, 2020.  Interestingly, Alex Kueng and Lane attended

9    the same police academy class.  Mr. Lane had completed one

10   more shift than Alex Kueng, and what that means is that

11   Kueng and Lane had five post-FTO shifts between them when

12   they were placed as partners in the same squad car.

13           You will find out through the evidence that it's

14   not uncommon in Minneapolis to place inexperienced officers

15   together.  It has to do with how the officers bid their

16   assignments.

17           Basically, officers bid to be on a specific

18   vehicle, a squad car.  Generally, there are three to five

19   officers assigned to a squad car, and that assignment is

20   determined by a bidding system where the senior officers

21   pick first.  So obviously they pick their friends.

22           Mr. Lane is older than Mr. Kueng by about ten

23   years.  After high school, Lane worked in construction for a

24   bit.  Then found his way back to college.  Both Kueng and

25   Lane have degrees in sociology of law, criminology and

1      deviance from the University of Minnesota at different

2      times.  Mr. Lane has worked in juvenile corrections for both

3      Ramsey and Hennepin County.

4           Kueng and Lane had never met prior to joining the

5      police academy class on February 19th, 2019.

6           Mr. Lane is represented by Mr. Earl Gray.

7           Mr. Tou Thao.  On May 25th, 2020, Mr. Tou Thao was

8      working with Derek Chauvin in Squad 330.  Mr. Thao has about

9      ten years of experience, eight to ten years' experience as a

10     police officer in the City of Minneapolis.  He also began

11     his career as a CSO, the same program that Mr. Kueng

12     participated in.

13          Officer Thao was driving Squad 330 on the day

14     these events transpired.  His role was to stand between the

15     officers and the crowd that gathered.  That fact will be

16     shown by several different videos of this event.

17          Mr. Thao is represented by Bob Paule and

18     Ms. Natalie Paule.

19          Officer Derek Chauvin was the most senior officer

20     on the scene on May 25th, 2020, with approximately 19 years

21     on the street.  He was the most senior officer by about nine

22     or ten years.

23          Officer Chauvin has been an FTO or field training

24     officer in the Third Precinct for a very long time.  In

25     fact, in fact, he was Alex Kueng's FTO.  Mr. Lane, who was

1    in FTO at the same time as Alex Kueng, they worked the same

2    shift as Officers Chauvin and Kueng.

3              You will find out through the evidence that the

4    FTO has great control over young officers' future in the

5    Minneapolis Police Department.  The recruit, which is what

6    an FTO -- what an officer on FTO, is called, is referred to,

7    can be terminated from the department at the FTO's

8    recommendation.

9              You will find that each recruit by policy is

10   required to have four different FTOs and work in two

11   different precincts.  That is part of the FTO training

12   policy.

13             That did not happen with Alex Kueng and Officer

14   Chauvin.  Instead, Officer Chauvin was Kueng's FTO for two

15   of the four phases of Mr. Kueng's, Alex Kueng's, FTO

16   experience.  A review of Alex Kueng's recruit officer

17   performance evaluations or ROPEs, will reveal that Officer

18   Chauvin was the FTO for 42 out of roughly 79 or so shifts

19   that Alex Kueng worked during his FTO experience.  While

20   that violates MPD policy, that is what you will find out.

21             The evidence will show that Officer Chauvin took

22   over control of the scene on May 25th, 2020.  You may hear

23   that MPD policy states that the senior officer in the first

24   car to arrive is in charge.  If that were true, that would

25   mean Mr. Lane, who was partway through his fourth shift as a

 1      police officer, was in charge.

 2              Despite that policy, you will see that Officer

 3      Chauvin was clearly in charge once he arrived.  You will

 4      hear Officer Kueng -- pardon me.  You will hear Mr. Kueng

 5      and Mr. Lane call him "sir" and you will see and hear him,

 6      Officer Chauvin, call all of the shots.

 7              Chief Arradondo is a recently retired Minneapolis

 8      police chief.  He began working for the Minneapolis Police

 9      Department in 1989.  You will hear some evidence about the

10      Minneapolis Police Department's duty to intervene.  Chief

11      Arradondo wrote that policy I believe, the policy on duty to

12      intervene, in 2016.  He later became the chief in

13      approximately August 2017.

14              The facts will show that, although he wrote the

15      policy on the duty to intervene, he never mandated

16      scenario-based training on the duty to intervene after he

17      drafted the policy and never implemented scenario-based

18      training after he became the chief of police.  The facts

19      will show that he was aware of the problems with the FTO and

20      the training program as early as 2017.

21              Inspector Katie Blackwell, a police inspector, is

22      a very high ranking officer in the Minneapolis Police

23      Department.  There are only three or four ranks higher than

24      the inspectors, including the rank of chief.

25              Inspector Blackwell was in charge of training at

1    the times leading up to and after May 25th, 2020.  You will

2    learn that Inspector Blackwell was well aware of the

3    problems in Minneapolis Police Department Academy and FTO.

4    I anticipate that you will find out -- Inspector Blackwell

5    will testify about the programs that she oversaw and changes

6    that she implemented.

7         I also anticipate that she will provide

8    information about the ROPEs, the recruit officer performance

9    evaluations, what those ROPEs consider and the criteria for

10   evaluating an FTO.

11        You will also learn that Inspector Blackwell has

12   known Officer Chauvin for quite some time and, in fact,

13   approved him to be an FTO.

14        Inspector Blackwell will testify about the

15   expectations on the duty to intervene.  But, more important,

16   an expectation is the amount and level of training recruits

17   and officers receive.

18        When Inspector Blackwell is testifying, the

19   biggest question will be:  Does the training illuminate the

20   expectations of the department?  That is, because if an

21   officer leaves the training and they can't implement the

22   lesson, the training has failed.

23        You will learn that the academy training on

24   intervention is little more than a word on a PowerPoint, an

25   officer reading the policy and then giving a couple of

1    examples of what excessive force are.

2              There's going to be other trainers that are going

3    to testify.  You will also hear from several other police

4    officers who were involved in the training in the

5    Minneapolis Police Department Academy.  They are all very

6    important.

7              They are important since they will help you

8    understand what is trained, what is retained, and what

9    experienced officers who are directly involved in the

10   implementation of training and policy know and understand

11   about what is taught and the general knowledge of policies.

12   There's going to be several of them.  There might be an

13   officer named Dinh, Soucy, Dick.

14             I know you are going to hear from a training

15   officer named MacKenzie.  She doesn't do use of force.  She

16   does medical training.  While all are trained to initiate

17   CPR if there is not a pulse, there isn't a lot of training

18   in how to apply that in the field.

19             You will hear testimony from many officers who I

20   have not mentioned, and I'll talk about that testimony in my

21   closing.

22             To talk about all the testimony that every officer

23   is going to provide you during this trial, I would have to

24   talk on and on until the end of time and then I would not be

25   very popular.

1          You will hear from a distinguished cast of medical

2     professionals, all of whom know much more about medicine

3     than all of the officers in the Minneapolis Police

4     Department combined.

5          I did not mention the several bystanders who will

6     testify.  That's not an oversight on my part.  I left them

7     out because what they saw and what they reacted to is not

8     what Alex Kueng saw, not what Alex Kueng perceived, and not

9     what he reacted to.  The evidence will also show that Alex

10    Kueng did not see this event through their eyes.

11         I anticipate the court will instruct you that you

12    must consider these events as they were perceived by the

13    individual officers as they occurred with no application of

14    20/20 hindsight.  You should take the instruction as it

15    comes to you from the court.

16         One witness you will not hear from is George

17    Floyd.  You will hear, however, and see a lot about

18    Mr. Floyd, how he came to meet the four officers on

19    May 25th, 2020.

20         You will learn that this is not a nine-minute

21    encounter or 20- or 30-minute encounter.  You will learn

22    that this case is not about forgery and that the forgery had

23    very little to do with why Mr. Floyd was detained on

24    May 25th, 2020.

25         You will learn that what started out as a forgery

1   changed quickly into an investigation of Mr. Floyd's unusual

2   conduct.  When the police approached him and asked him to

3   see his hands, you will learn why Officer Lane and Officer

4   Kueng became concerned when Mr. Floyd reached for the center

5   console of the car he was driving rather than simply showing

6   his hands, as he was requested to do.

7          I'm going to go over the details of the case, but

8   I'm not going to do it in as detailed a fashion as Mr. Thao

9   [sic] did.  I'm not here to repeat the same things.  You've

10  heard it once.  I'm going to hit some highlights.  You don't

11  need to hear it again.

12         I've already pointed out that this began as a

13  forgery call and changed shortly after the newly minted

14  Officer Kueng and Lane had contact with Mr. Floyd and his

15  two cohorts.  Those are Mr. Hall and Ms. Hill.

16         It's fairly simple.  The officers arrived.  They

17  went into the business.  They met with the owner or the

18  manager to find out what was going on, and then they walked

19  across the street.  That's where the blue SUV was that

20  Mr. Paule has already talked about.  They had concerns, as

21  Mr. Paule has already pointed out, because of Mr. Floyd's

22  actions.

23         Another reason they had concerns is because

24  there's two of them, two of the officers, and three of the

25  other people.  It's a numerical imbalance.

1           There is a struggle at the car, at the squad car.

2     Mr. Floyd is, frankly, not cooperative.  And eventually they

3     get him to the squad car, not because of the forgery, but

4     because they need to investigate what's going on here.  They

5     need to figure out what this unusual behavior is.  They've

6     got a person who is potentially impaired sitting behind the

7     wheel of a car.  They've got odd behavior.

8           Watch the video from the -- I believe it's called

9     the Milestone camera from across the street.  I think you

10    already saw a screenshot of it.  Watch the car during the

11    struggle, because you have to understand that this is more

12    than a nine-minute encounter.  This was a serious struggle.

13    Watch the car.  It almost seems like it rocks back and forth

14    from the force of the struggle between the two officers and

15    Mr. Floyd and later three officers.

16          Mr. Chauvin arrives, Officer Chauvin, and he

17    begins taking over the whole case, the whole scene.  He

18    becomes the shot caller.

19          You are going to be watching these videos, and I

20    assume that someone's going to give you a transcript of it;

21    the government.  Please don't let the transcript be a

22    substitute for what you see and hear.  If it's important,

23    you see it in the transcript and you think it's important,

24    if it's important to you, I respectfully would ask that you

25    take the time to compare it to the video as carefully as you

 1    can.  Listen.  Don't just read.

 2              You are going to find out that the officers were

 3    told that there's a thing in the policy called a neck

 4    restraint, but they were never trained.  Officer Kueng and

 5    Lane were never trained on the neck restraint.  You are

 6    going to find out that senior officers, officers that have

 7    been around longer, know things that rookies don't.  They

 8    know techniques.  They are trained on other things.

 9              You are going to find that Mr. Kueng did, in fact,

10    check the pulse of Mr. Floyd and immediately reported that

11    to Officer Chauvin.  "He doesn't got one."  "Huh?"  "A

12    pulse."  He doesn't have a pulse.  He checked a radial

13    pulse, not a carotid pulse.  He's replaying that information

14    to the person most able to check a carotid pulse.

15              The medics arrive.  They check a pulse.

16    Consistent with their training, they do not immediately

17    start doing CPR at the scene because in their estimation the

18    scene was not safe yet.  They took him someplace else to

19    provide medical care and safety.

20              So what's the law here?  And Mr. Paule's touched

21    on the law, but I'm going to go over it independently.

22              Alex Kueng is charged with two counts in his

23    criminal indictment.  Both counts of the indictment charge

24    him with deprivation of civil rights.  Although each count

25    is an alleged violation of the same statute or law, the

1    counts, they have different elements.  So they're, Count 2

2    and Count 3, the same statute, but different elements.

3    Elements are what the government needs to prove to you by

4    proof beyond a reasonable doubt.

5            In Count 2 it is alleged that Alex Kueng and

6    Mr. Thao deprived Floyd of his right to be free from an

7    unreasonable seizure during the arrest on May 25th, 2020.

8            In Count 3 it is alleged that Alex Kueng deprived

9    Mr. Floyd of liberty without due process of law by acting

10   with deliberate indifference to his serious medical needs.

11           Now, the judge, as I've already said, will

12   instruct you on what the law is in this case.  What I say is

13   not the law.  And if there is a difference, you must go with

14   what the judge tells you.

15           There are four elements to each of these offenses,

16   four things the government has to prove.  For now I'm going

17   to focus just on the second of those four elements, that is,

18   that the government has to prove that Alex Kueng acted

19   willfully.  I keep putting emphasis on that word because

20   it's an important word.

21           To act willfully means that it must be proven that

22   Alex Kueng acted with a bad purpose or improper motive to

23   disobey or disregard the law, specifically, intending to

24   deprive Mr. Floyd of his rights.  Again, you need to take

25   the law as the court gives it to you.

1          It does not need to be proven, however, that Alex

2     Kueng had a specific familiarity with the Constitution.

3     That's not the point.  However, the government does need to

4     show that Alex Kueng had a specific intent to deprive George

5     Floyd of a right protected by the Constitution.  That

6     specific intent must be proven.

7          If it is not shown that there was a willful act

8     with specific intent to deprive Mr. Floyd and not just

9     shown, but shown by proof beyond a reasonable doubt, the

10    crime is not proven.

11         In Count 3 the government must prove that Alex

12    Kueng acted with deliberate indifference.  That means that

13    the government must prove that George Floyd suffered from

14    one or more objectively serious medical needs and that Alex

15    Kueng knew of the serious medical needs, but deliberately

16    disregarded George Floyd's medical needs.

17         That's my summary of the law.  The court will tell

18    you what the law is.  The point is this:  In Count 3

19    Mr. Kueng is not guilty if the government fails to show,

20    first, knowledge of the specific medical need and a

21    deliberate disregard.

22         The legal principle I have mentioned is proof

23    beyond a reasonable doubt.  That is proof -- the burden of

24    proof that the government must meet before you, as a jury,

25    could find Mr. Alex Kueng guilty.

1          So what is proof beyond a reasonable doubt?  It is

2     proof of such convincing character that a reasonable person,

3     a jury, after careful consideration, would not hesitate to

4     rely and act on in the most -- in life's most important

5     decisions.  Proof beyond a reasonable doubt is proof that

6     leaves you firmly convinced of Mr. Alex Kueng's guilt.  That

7     is not to say that it's proof beyond all possible doubt, but

8     the point is, the decisions you make in this case are one of

9     the most important decisions in life.

10          After the close of the evidence, I will give you

11     my closing argument.  At that time I will talk to you about

12     what the evidence has failed to show.  I will provide you

13     argument.

14          Throughout these proceedings the government, as

15     you can see, always goes first.  That changes for closing

16     arguments, though.  They still go first, but they have an

17     opportunity to come back and talk to you again after the

18     defense lawyers are done.

19          Common sense, please bring that to this case.

20     Please bring worldly experience.  Please bring an

21     understanding of human nature and conduct.  Because we can

22     sit here and talk about what the law is, but in the final

23     analysis, all cases and everything we do is about people.

24          In the end, the evidence will not show that Alex

25     Kueng is guilty, and you will have a duty to return a

1    verdict of not guilty on both counts.

2          Thank you.

3          THE COURT:  Thank you, Mr. Plunkett.

4          Members of the jury, let's take a noon recess at

5    this time.

6          I would caution the members of the jury that you

7    still haven't heard any evidence in this case.  You heard

8    opening statements by three of the people.  There is still

9    one opening statement that will be taken after we come back

10   from lunch.  And so, with that, I caution you not to discuss

11   the case, to keep an open mind.

12         And we will stand in recess at this time and be in

13   recess until 2:00 this afternoon.

14         We are in recess.

15         The jury may be excused.

16     (Lunch recess taken at 12:28 p.m.)

17                         *  *  *  *  *

18     (1:51 p.m.)

19                     **IN OPEN COURT**

20                    **(JURY NOT PRESENT)**

21         THE COURT:  Counsel, I came in a couple minutes

22   ahead of the jury.  I've now had an opportunity to review

23   the stipulation with respect to exhibits to be admitted, and

24   we'll do that at the appropriate time, but two questions.

25         One is:  Mr. Paule, on behalf of Mr. Thao, you

1    were objecting to a series of the exhibits.  I first of all

2    want to learn, I guess, from the government, what's your

3    position with respect to that objection?

4              MS. BELL:  So, Your Honor, as I understand the

5    objection from Mr. Paule, it is that materials about

6    training received by Officer Lane or Officer Kueng don't go

7    to his knowledge in this.

8              THE COURT:  I think that's right.  My guess is

9    that -- well, as near as I can tell, they're either exhibits

10   that relate to later-day, if you can use that word,

11   later-day training materials through which Mr. Thao may not

12   have been privy or they may be kind of personnel records

13   relating to Mr. Kueng or Mr. Lane.

14             MS. BELL:  Right.  So just like, Your Honor, when

15   we have like a multiple-defendant trial and one person has a

16   felon in possession and one doesn't, we're in kind of that

17   dynamic.

18             THE COURT:  Yeah, I think we are.

19             MS. BELL:  And so --

20             THE COURT:  We're building up to it, because I'm

21   looking at what your position is.  If your basic position is

22   sort of agreement with Mr. Paule that this doesn't apply,

23   then I should give a limiting instruction to the jury that

24   they don't -- these exhibits don't apply.

25             MS. BELL:  I think maybe the way, judge, to give

```
 1      the limiting instruction, because I agree that one certainly

 2      could be given here, but I might suggest that the court just

 3      make it broader to the jury that exhibits are evidence that

 4      pertain to only one -- that don't pertain to all of the

 5      defendants, should only be considered for the defendant to

 6      which they pertain.  And that way we've covered all of the

 7      defendants and aren't doing something special, because

 8      Mr. Lane has training that Mr. Kueng doesn't have, like

 9      there's differences amongst them all.

10              THE COURT:  I understand what you are saying.

11              MS. BELL:  Yeah.

12              THE COURT:  But I need to come down to you,

13      Mr. Paule.  After Mr. Gray's completed his opening, we will

14      take a break and then come back in to hear testimony.  And

15      my guess is that when I come back, I should receive all of

16      these exhibits that are stipulated to be entered simply

17      because it goes in a hurry.  But as to those that you have

18      an objection, I could make a blanket statement of that

19      objection or I could wait for you to object when that

20      specific exhibit comes up.  And I leave it to you as to

21      which you'd rather have me do.

22              MR. ROBERT PAULE:  Your Honor, thank you for

23      asking.  I think, from my point of view, I think a blanket

24      noting the objection and giving a cautionary instruction

25      would be appropriate.  I don't think I need to stand up here
```

1    and make a show in court.

2              THE COURT:  Okay.  That's fine.

3              Then I'll turn to Mr. Gray and Mr. Plunkett, as

4    Ms. Bell suggested that I try to make this applicable to

5    everybody, that if it applies only to this one defendant, it

6    does apply to this defendant and not to the other

7    defendants.

8              MR. GRAY:  Yes, Your Honor.  I guess I'm not

9    supposed to stand up.  Yes, I would ask for the same type of

10   instruction from this ruling.

11             THE COURT:  Okay.  Mr. Plunkett, what's your feel?

12             MR. PLUNKETT:  I feel the same way as Mr. Gray

13   does.  And just to clarify, Your Honor, I don't think it

14   would work if you just gave it once at the beginning of, you

15   know, Mr. Paule's evidence that Mr. Paule's worried about.

16   I think when something comes up that's only applicable to

17   one defendant, we should get the instruction every time.

18             THE COURT:  Okay.  Well, why don't -- if I may, I

19   will give this blanket instruction first, that it's

20   applicable only to that defendant to which it is directed.

21   Then I will give the blanket instruction that Mr. Paule has

22   gone through the work of establishing for us.  And then as

23   exhibits come up, I leave it in your hands if you feel that

24   you need to stand up and ask for the limiting instruction,

25   again, we'll consider it at that time.  Okay.  That's that

1     part.

2              The other part that is not offered at this time,

3     but I think we might be getting to it, and that is the still

4     pictures taken from the videos that Mr. Gray has stated an

5     objection to, this might -- I think just a general

6     objection.  Any further comments about that?

7              MR. GRAY:  Well, Your Honor, we have the video.

8     We've seen the video.  The witnesses will testify as to what

9     they saw when they took the video.  And now they're trying

10    to get -- now they're going to use pictures of the video for

11    the jury which just enhances the certain part of the video,

12    which is totally unfair to the defendant, I believe.

13             THE COURT:  Okay.  Ms. Bell.

14             MS. BELL:  Your Honor, a still photo doesn't

15    enhance any part of the video.  It simply allows us to pause

16    the video in a precise way.  Anyone who's spent any time

17    trying to pause the video, when you want to pause it, knows

18    it doesn't go well and it actually takes a little bit of

19    time.  And so this will actually be more efficient because

20    we won't have to call the video, find the right place in the

21    video, pause the video.  We will be able to just ask the

22    witness, instead of showing them the whole video again, to

23    get them oriented, Did you see this at this point in time as

24    a place of reference?  And so these are simply reference

25    points.  They are admissible because they are from exhibits

1    that are agreed upon to be admitted in this case.  And so

2    they are actually helpful to the jury and they are helpful

3    to presentation of an efficient case, which I know the court

4    has really pushed us to do and we really tried to do that.

5                 MR. GRAY:  Your Honor, may I respond?

6                 THE COURT:  Sure.

7                 MR. GRAY:  They are pictures of the video.  If

8    they go -- I ask that they not go to the jury and just have

9    videos go to the jury, if they're just using them for

10   pictures of the video, so the jury doesn't get back there

11   and start looking at these pictures and not devoting their

12   time to the video, which is the main evidence.  It's not the

13   pictures.  A picture can take -- an isolated picture can be

14   very unfair to the whole picture.  Thank you.

15                MS. BELL:  Your Honor, I have no issue with the

16   court -- no one from the government is going to represent

17   that a single picture represents the whole video.  If that

18   ever became an issue, the court can certainly caution the

19   jury.

20                THE COURT:  How about the suggestion that Mr. Gray

21   just made, that the stills be used as demonstrative

22   exhibits, but not go to the jury room?

23                MS. BELL:  So the reason that it is important that

24   they go to the jury room is because so that they have the

25   time stamps on them.  It is helpful to the jury to

1    understand what happened and it has a time stamp on the top

2    of it.  And so they will be able to go, oh, we should move

3    the video to this section because this is around the time

4    when Officer Kueng did the pulse checks or this is around

5    the time when they pulled Mr. Floyd out of his car.  And so

6    they're going to be able to use those stills to find the

7    right places in the video.  We are trying to be efficient

8    and helpful to the jury, which, of course, is the standard

9    for admissibility of evidence.  And so that way the jury can

10   find the right places in the video.  The witnesses will have

11   talked about those stills and those times, and so their

12   testimony will be connected to those times in particular,

13   and so it would be helpful to the jury.

14            THE COURT:  Okay.

15            MR. GRAY:  Well, Your Honor, the video has time

16   stamps on it.  They can simply go through the video instead

17   of having these pointed out in the jury room.  If they want

18   to present evidence of the photos, that's one thing; but

19   they have them go back to the jury, that's just totally

20   unfair to the defendants.

21            THE COURT:  Counsel, my bigger concern, quite

22   candidly, is that these are cumulative and duplicative and

23   can end up -- they can end up being confusing to the jury,

24   but they are so many of them.  We can spend forever trying,

25   trying the case going item by item through these, through

```
1    these still pictures, and I don't feel that that's

2    necessary.

3              I'm going to at this time permit the government to

4    use the still pictures as they choose, hopefully reducing

5    the number of the use of them to that that is significant.

6    At this time I'm not going to permit the still pictures to

7    go to the jury, but only to say that they are illustrative,

8    but I do reserve the right to change that ruling if I find

9    that it would be prejudicial not to let them go.

10             Okay.  With that --

11             MR. PLUNKETT:  I'm going to remain seated, if

12   that's okay.

13             THE COURT:  Sure.

14             MR. PLUNKETT:  Thank you.

15             THE COURT:  Go ahead and get the jury.

16             MR. PLUNKETT:  Your Honor, very quickly.  I would

17   ask that -- it's a common practice, but I'd ask that the

18   court put it into an order that only a lawyer who is

19   handling a witness or handling an exhibit or handling a

20   side -- or examination be allowed to object, and certainly

21   for having a sidebar only the lawyer that's handling the

22   witness should be allowed to participate in the sidebar.

23   I've always done that in every trial, but here in the middle

24   of my opening the lawyer not handling the opening objected.

25   So I think it's important now to put it into an order.
```

1          THE COURT:  Okay.  Well, the court does so order.

2     Whoever is handling the witness is the person that will

3     inquire and will carry the objections, et cetera, with

4     respect to that witness.

5          MS. BELL:  Your Honor, I did have one other issue.

6     As the court knows, the government did make a motion in

7     limine regarding jury nullification.  And I only raise this

8     issue because I know that defense objected to the

9     government's opening as argument.  And while I don't agree

10    with that characterization, to the extent that it was

11    argument, the defense, from the government's perspective,

12    certainly went well past that line.  And I raised the jury

13    nullification issue in particular because Mr. Plunkett said

14    at the end of his opening, "But we can sit here and talk

15    about what the law is, but in the final analysis all cases

16    and everything we do is about people."

17         THE COURT:  Okay.  Your statement is correct

18    except for one thing.  The jury nullification has been

19    raised.  The court has ruled on that in limine, and the

20    court's ruling stands.  That's where that issue is.  Okay.

21              (Off record discussion.)

22         THE COURT:  We've got a computer issue here.  I

23    will step out for a minute while the reporter restarts her

24    computer.

25         (Pause)

1        **IN OPEN COURT**

2        **(JURY PRESENT)**

3              THE COURT:  You may be seated.

4              Mr. Gray, I'll recognize you for opening.

5              MR. GRAY:  Thank you, Your Honor.

6              Your Honor, counsel, Mr. Lane, ladies and

7     gentlemen of the jury.

8              One of the disadvantages of a joint trial is when

9     you are the last lawyer to give an opening statement, a lot

10    of what has already been said I was going to say in my

11    statement.  I do have some statements to make, some -- call

12    your attention to the evidence that's going to come in, but

13    I don't think I'll be quite as long as the other lawyers.

14             My client, Thomas Lane -- stand up, Tom.  Take

15    your mask off.

16             As you can see, he's a rather tall individual.

17             You can sit down.

18             And it would be good for you to take a look at

19    him, because what we'll go through in this trial, you will

20    learn a lot about him and you will learn a lot about his

21    conduct.  And when you decide this case, you have to keep in

22    mind the individual and the evidence.

23             So in this case -- it's rather a remarkable case,

24    I believe, because the indictment charges Mr. Lane with

25    deliberate indifference.  So he's only charged in one count

1      and that's called deliberate -- willfully, deliberately

2      indifferent to George Floyd's medical needs.

3             The willfully part you've already heard from

4      Mr. Plunkett.  The deliberately indifferent part is where

5      you know -- I'm talking about know -- you know somebody's in

6      trouble, medically or physically or mentally, you know that

7      and you don't do anything, you're indifferent about it.

8      It's not that difficult.

9             And the responsibility of a law enforcement

10     officer, as has been stated by the government, is that once

11     a law enforcement officer takes custody or arrests or

12     detains an individual, an arrestee, he has a responsibility

13     to take care of that man and make sure he's okay up and

14     until he releases him to wherever he goes.  And we don't shy

15     away from that.  We agree with that, that Mr. Lane did have

16     the responsibility.  And our evidence will show that he, in

17     fact, did.

18            And all of the government evidence that you are

19     going to see in this case, see and hear, their videotapes,

20     all will point to one factor, that Mr. Lane from the

21     beginning of the time that he came into contact with George

22     Floyd until the time when he walked out of that ambulance,

23     he was totally concerned and did everything he could

24     possibly do to help George Floyd.

25            So the evidence in this case will show that -- get

 1    my notes here -- that -- and, by the way, as far as the

 2    instructions, I am not going to talk about instructions and

 3    the law.  Judge Magnuson is the judge of the law.  You are

 4    the judge of the facts.  And you are to decide what facts

 5    are proven and do the facts fit the law that Judge Magnuson

 6    is going to give you.

 7              So let's first find out who Thomas Lane is.  Get

 8    my papers mixed up here.  Thomas Lane is 38 years old.

 9    Thomas Lane is married, and his wife is in the courtroom and

10    she's expecting her first child.

11              MS. TREPEL:  Objection, Your Honor.

12              MR. GRAY:  Excuse me?

13              MS. TREPEL:  I said, "Objection, Your Honor."

14              THE COURT:  Overruled.

15              MR. GRAY:  He's married.  His wife's name is

16    Courtney, and she's in the courtroom.  They're expecting

17    their first child.

18              Thomas Lane grew up in Arden Hills.  He went to

19    Mounds View High School.  After high school he worked

20    digging holes all through Wisconsin and part of Minnesota

21    for cable, first with the shovel and then the backhoe.  He

22    did this work for three years, manual labor.

23              After three years, he decided maybe he should get

24    an education.  He has a brother that's a biology teacher in

25    high school, and he has a younger sister that's an artist.

1          So starting school -- he went to Century College,

2     a junior college, I believe it is, and he got an associate's

3     degree in sociology and law enforcement.  He then went to

4     the University of Minnesota to get his graduate degree, his

5     degree in sociology again and law enforcement.

6          During the time he went to college, he worked

7     nights in security in downtown Minneapolis at various bars,

8     where he was a bartender, a server, and also the guy at the

9     door checking IDs.  He did all that work throughout his

10    college days without any conflict.

11         He's, you will see evidence -- and you will never

12    see any evidence of him ever bullying anybody or physically

13    even harming anybody.  That's not Thomas Lane.  Thomas Lane

14    is what you'd call a gentle giant, a big guy, but he's not

15    mean or anything of that nature.

16         Now, after college, after he graduated, he went

17    and he got a job at a place called Totem Town.  Totem Town I

18    vividly remember because it's been in Ramsey County for as

19    long as I can remember, since I was a kid, and it was a

20    juvenile center for delinquent kids.

21         After about six months there as a probation

22    officer, he -- Totem Town finally closed, after 50 or

23    60 years in business.  So he obtained a job as a -- at the

24    juvenile center in Minneapolis, Hennepin County Juvenile

25    Center, as a corrections officer.

 1              I apologize.  I have to have some water.

 2              He worked as a corrections officer for a year and

 3      a half.  And they, the state -- or the government, excuse

 4      me, the United States of America, has all of his records

 5      from there and they have all of his records from Totem Town,

 6      and what you don't find in those records is that he ever had

 7      any problem with anybody being mean, physically abusive, or

 8      anything of that nature with juvenile delinquents.

 9              So he did that job as a correction officer for

10      about a year and a half.  He always wanted to be a

11      Minneapolis Police Department law enforcement officer.  He

12      always wanted to do that because his grandfather was a

13      homicide detective in the Minneapolis Police Department.

14      His great-grandfather was the chief of police in Minneapolis

15      Police Department.  And his great-great-grandfather was also

16      a patrolman in the Minneapolis Police Department.  He really

17      cared for his grandfather and he wanted --

18              MS. TREPEL:  Objection, Your Honor.

19              THE COURT:  Yeah, I think, counsel, personal

20      family may be stretching.

21              MR. GRAY:  So he wanted to become a police officer

22      in Minneapolis.  He applied, and in February 2019 he got

23      notice that, yes, we'll accept you as a police officer.

24              So the first thing they do, they have to take a

25      physical test, a psychological -- a psychology test to see

1    if they are all right, and check their criminal histories,

2    of course.  And he passes all of that.

3          And then they go through a four-and-a-half-week

4    theory training, where it's back at Century College that he

5    graduated from.  So they went to the -- he went to Century

6    College for five and a half weeks.

7          And then after that training, I believe it's into

8    April or May, starting late February, March -- in any event,

9    he then went to the Hennepin County Technical College to

10   learn the technical aspects of law enforcement, handcuffs,

11   what does a gun look like and things of that nature.

12          In August he passed the -- he finished the

13   Hennepin County technical school and then he took the POST

14   test.  The POST test is a test that you take to become a

15   state employed licensed police officer.  He passed that too.

16          Then comes the time in Minneapolis, now that you

17   are there, you go to what's called the school where you

18   learn, the academy, it's called.  And this is a school where

19   you learn about the Minneapolis Police Department and the

20   Minneapolis police officers.  It's like a military academy.

21   They wear uniforms.  It's yes, sir; no, sir.  And when an

22   officer walks by you, you stand at attention.  You do what

23   you are told.  And you learn that and it's drilled into your

24   brain until about December of 2019.  Yes.  And in December

25   of 2019 he graduated from that area of training to become a

1    Minneapolis police officer.

2              Now -- and you might hear somebody say, well, on

3    December 10th of 2019 he became a police officer.  Well, he

4    did and he didn't, because after December 10th of 2019, you

5    now -- well, first you have to take a month and you go

6    around the police department learning about the different

7    departments.

8              After that, you are now assigned what's called a

9    field training officer.  And you've heard from the other

10   lawyers about these guys, but these are the select group --

11   at least these rookies, these recruits learn that, they are

12   the select group of Minneapolis police officers that are

13   going to train you.  They are going to sit with you in the

14   car and you are going to be driving it or maybe sitting next

15   to them, and you're going to do police work and they're

16   going to critique you.  They're going to grade you.  They're

17   going to tell you what to do.  They're your boss, basically.

18   They're your educator.

19             And for the next five months, that's what Tom Lane

20   did.  He had three field training officers.  First one was

21   downtown and was in Minneapolis.  He was downtown, that

22   precinct.  The next two field training officers -- he had

23   three of them -- the next two were in the Third Precinct,

24   where Derek Chauvin was located and he met Derek Chauvin

25   there.

1          And you will hear from him that he asked Derek

2     Chauvin questions when he had a question, and Derek Chauvin

3     replied.  And he heard from the Third Precinct Derek Chauvin

4     was an excellent field training officer; follow what he

5     does.

6          So on May 20th of 2020, no more field training

7     officers.  He's now on his own.  He's on his own as a police

8     officer.  He's now made it as a Minneapolis police officer

9     patrolman.

10         May 25th, five days later, I believe it was

11    Memorial Day, and the upper echelon, the chiefs, the

12    captains, the lieutenants, the sergeants, whoever did it,

13    put Thomas Lane with one of his classmates, Mr. Kueng, on

14    Memorial Day night.  They were teamed together, two rookies.

15    If you add all of their experience without a field training

16    officer, you'd come up with seven days, seven days -- seven

17    workdays.

18         So what happens?  They are out and about as

19    patrolmen and they get a call, and they get a call that Cup

20    Foods -- I know you've heard this, but the one thing you

21    have to understand, and the judge will tell you this, each

22    and every one of these defendants has a constitutional right

23    to have their case decided by the evidence against them, not

24    the evidence against the other two, not the evidence against

25    another one.  They have a right -- and the judge will tell

1    you -- they have a right to have the evidence presented

2    against them to only be considered, not the evidence against

3    the others.  So I have to go into this and discuss with you

4    what happened that night.

5            Thomas Lane and Mr. Kueng get the call, forgery or

6    counterfeiting at Cup Foods and the man appears to be

7    intoxicated.  So they go and they drive to Cup Foods.  You

8    see it on the maps.  You will see it all through this trial.

9    They pulled up to Cup Foods -- and I've got to get another

10   drink of water.

11           They pulled up to Cup Foods.  As has already been

12   told you, according to law enforcement, police officers,

13   this area of 38th and Chicago is known as the Blood area.

14   The Blood wear red clothes and apparently it is some kind of

15   a gang.  You will see, interestingly enough, that the

16   passenger in George Floyd's car was wearing quite a red

17   outfit.

18           You also will hear from these law enforcement

19   officers that testify that this area, 38th and Chicago, is

20   known as a high-crime area.  So -- and in Cup Foods one of

21   the managers has a Glock in the back of his back -- has a

22   gun.  I believe you will see a picture of it.  So it's not

23   like stopping down to someplace that didn't have a little

24   bit of danger.

25           So Tom and -- Mr. Kueng and Tom Lane go into Cup

1    Foods.  They are told by the employees that that guy over

2    there in the blue Mercedes passed a counterfeit bill.  He

3    appears to be intoxicated.  And we went out there twice to

4    try to talk to him to just get our money back and he ignored

5    us.  We went out there the first time and then we went out

6    there again, and he wouldn't give us the money back.  But

7    he's still there.  So the employee said, Go get him.  Can

8    you go get him?

9         And they did.  Officer Klein at the time and

10   Officer -- Officer Kueng, excuse me, and Tom Lane, Officer

11   Lane, walked across the street.  And they both had, thank

12   goodness from our standpoint, they both had their body

13   cameras on.  And walking across the street, Tom Lane

14   mentioned they are moving around in that car, which puts law

15   enforcement officers on alert; what's going on in that car.

16        So they get there and Tom Lane could not -- you

17   will hear from him -- he could not see in through the

18   window, so he hit the window with the flashlight.  The

19   window came down.  There was a conversation.  You will hear

20   it and see it on the body-worn camera.

21        And, basically, George Floyd acted erratic.  Let's

22   picture it that way.  He wouldn't do what he was told.  He

23   had his arm digging down in the side, his right hand, which

24   they learned in the law enforcement business that that could

25   either be getting a gun or hiding contraband.  It's a

 1    danger.

 2            When you stop a car like this or when you approach

 3    a car like this, as a law enforcement officer, it's as scary

 4    for that law enforcement officer as it is for anybody,

 5    because he does not know who he's approaching.

 6            So Lane says, "Show me your hands," and he ignored

 7    it.  He was talking about getting shot by a cop, George

 8    Floyd was; making no sense.  And, finally, Tom Lane did what

 9    he was taught to do and what he had seen his field

10    protection -- field training officers do, he pulled out his

11    gun and said, "Show me your f'ing hands."

12            Finally, when he did that, George Floyd put his

13    hands on the wheel, but he still would not comply, he was

14    still not being compliant.  He tried to get out of the car.

15    Tom put -- Mr. Lane put him back in the car.  They then --

16    he pulled him out of the car.

17            And, by the way, the one thing that has not been

18    mentioned yet, George Floyd was 6'4", 225 pounds.  You will

19    see pictures of him.  He was all muscle.  And when you have

20    a person that's under the influence or on drugs, they are

21    very -- as common sense will tell you, sometimes quite hard

22    to control.

23            And, finally, Tom Lane pulled George Floyd out of

24    the car and they wrestled with him.  Kueng came over --

25    Kueng was on the other side of the car to watch the

1  passengers -- came over and they both handcuffed him.  They

2  wrestled with him to handcuff.  They have him sit down

3  because they have -- there's two police officers and there's

4  two other people.  There's three in this group.

5          So Tom goes over to talk to the lady, I believe

6  her name was Shawanda.  And he asked, "What's with the --

7  Mr. Floyd, what's with George Floyd?  Is he on -- is he

8  drunk?"  That's what he asked.  And she says, "No.  He just

9  doesn't like police officers.  He was shot by one."  Well,

10 that's not true.  He wasn't shot by any police officer ever.

11 But that's what she said, and she denied that he was drunk.

12         So that's the first time that Tom Lane asked

13 anybody or asked George Floyd anything about George Floyd's

14 physical or mental condition.  She said no.

15         Now we go over to where he's got George Floyd, he

16 and Kueng, and they're going to walk him over to the squad

17 car and detain him.  That's what police procedure is.

18 You've got an investigation here.  You've got counterfeit

19 bills.  You've got suspicious conduct by all three of these

20 individuals.  You want to detain Mr. Floyd, hold him in your

21 backseat, search his car, talk to the people, and do what's

22 called an investigation.  That's their job.

23         So they're walking him over to the car, and twice

24 you will see on the video he falls down sort of and they

25 help him out.  They don't shove him down.  They don't do

1      anything like that.

2            And, in addition, Tom Lane on the way over there

3      asks him, "Are you on something?"  Referring to drugs.  And

4      he says, "No, I'm not on anything."  He denied being on

5      drugs.

6            You will learn -- toxicology -- he was taking

7      fentanyl and methamphetamine.  You will find out also that

8      in the backseat of the squad car -- and these squad cars are

9      cleaned every day.  In the backseat, after the wrestling

10     match, there was fentanyl and methamphetamine.  Where did

11     that come from?

12           So he says, no, I'm not on any drug.  If he had

13     said yes, the policy in Minneapolis Police Department would

14     be to take him to a hospital, take him to Hennepin County

15     Medical Center.  But he denied.  He was indifferent about

16     his own condition.  He denied being on drugs.

17           So they get him to the squad car, these two guys

18     with five, six days of being on their own, and he says he's

19     claustrophobic.  He wasn't claustrophobic when he was in his

20     own car, but now he's claustrophobic.

21           And what do these two officers do?  First they

22     searched him because that's part of the deal, you've got to

23     search the man.  And, remember, he's still handcuffed.  And

24     then they say, no, you have to go in the squad car.  And he

25     says, "No, I'm claustrophobic.  Tom Lane says, "I'll roll

1   the window down, I'll crack the window if you'll just go in

2   there."  "No, I won't."  George Floyd says again, "I'm

3   claustrophobic."  "Roll the windows down."  Five times, five

4   Times Thomas Lane told George Floyd that I'll roll the

5   window down if you'd just get in the car.

6            Another time George Floyd said to Thomas Lane --

7   and you will see this in the body cameras -- "Stay" with me,

8   stay with me," he said to Thomas Lane.  Well, unknown to

9   Mr. Lane and Mr. Kueng drugs were coming out of his mouth.

10  And he said, "I'll stay with you, I'll stay with you."

11           Now, you'll see, as the other lawyers had said,

12  there was quite a tussle.  When you have a man with the

13  strength that Mr. Floyd had, and you will see he was quite

14  muscular, and they are trying to put him in the backseat of

15  a squad car, even though handcuffed, kicking and fighting,

16  you could actually see the squad car in the video go back

17  and forth.  It was a good wrestling match.

18           So what happens?  Because Chauvin, Derek Chauvin,

19  and his partner, Mr. Thao, were in the neighborhood and they

20  heard about the call, they decided to go over there.  Before

21  them, the Park cop that you've heard about came there and

22  they asked him to watch the two other individuals until we

23  get George Floyd detained in the car.

24           George Floyd says, "I want to go out on the

25  ground."  You will hear him.  I think he said it two or

1    three times.  And Thomas Lane is over on the passenger side

2    back door.  And they're now going to take him out and put

3    him on the ground next to that area.

4           And what happens?  All of a sudden he sees Derek

5    Chauvin, and you will see this on the video.  He goes in

6    front of Thomas Lane and grabs ahold of George Floyd

7    himself.  And now he's got George Floyd.  Thomas Lane backs

8    off.

9           And what he's learned, when field training

10   officers take over like that, you must have done something

11   wrong.  And you know what?  These two rookies simply could

12   not get this fellow in the backseat and they were doing

13   something wrong.

14          So what does Chauvin do?  He takes over, and he

15   takes over and he grabs the guy and he puts him on the

16   ground.  Thomas Lane backs off.  Kueng is there.  Kueng

17   comes from around the other side.

18          And now they're on the ground.  Thomas is down by

19   his legs.  You will see in the photos that George Floyd's

20   head is -- you cannot see that knee on George Floyd's neck

21   from where Thomas Lane was at.  It was on the corner of the

22   back of the car.

23          In any event, though, as soon as he went down on

24   the ground, because George Floyd had a cut on his lip,

25   Thomas Lane, pursuant to the procedure that they're supposed

1   to do, he calls for the ambulance, for ER, "Cut lip, 2,"

2   which means you don't have to sirens and lights, but get

3   here, we have a cut lip on this man.

4          Shortly after that, it was up to a 3 because of

5   his condition with respect to excited delirium.  Excited

6   delirium is a physical and mental condition that police

7   officers learn in their school, that a person on drugs

8   fights and fights and then he rests and he acts like he's

9   unconscious or is unconscious and when he wakes up, which he

10  does, he has super-human strength.  And they're taught that

11  at the academy.  So they up the ambulance to a 3, lights and

12  siren.  It still took nine minutes to get there.

13         Next thing -- what did Tom Lane also doing during

14  this time?  He's the one that said, "Should we hobble him?

15  My hobble is in the back of my -- our squad."  The hobble

16  comes out.  But all of a sudden Chauvin says, "No, he's good

17  where he's at.  We don't need the hobble."

18         If they had hobbled him, he would be on his side

19  and no doubt be alive today.  That was what Thomas Lane

20  learned in his academy.  And the FTO, he also learned that

21  they are the ones that know.  He says no, so Thomas Lane

22  said, okay, no hobble.

23         So we have Lane suggesting the ambulance -- or

24  calling the ambulance, telling Thao, I believe it was, to up

25  it to a 3.

```
 1              And then, most importantly, ladies and gentlemen,
 2     Thomas Lane said to Chauvin, "Shall we roll him over?"
 3     That's what they're taught at the academy, you have to roll
 4     somebody over on his side because of what is called
 5     positional asphyxia.  And Tom said that.  "Shall we roll him
 6     over?"  And Chauvin says, "No, he's good where he's at."
 7     And Tom says, "Well, I'm concerned about excited delirium."
 8     Chauvin says he's staying where he's at.
 9              Tom Lane later, where he was down by his feet --
10     and, by the way, after three or four minutes you will notice
11     Tom Lane just has his hands on his feet.  He's not putting
12     pressure on him or anything.  Watch for that in the video.
13              But Tom Lane says he looks and he -- by the way,
14     two or three days after this incident, he gave a lengthy
15     statement to the Bureau of Criminal Apprehension.  In that
16     statement he said --
17              MS. TREPEL:  Objection, Your Honor, hearsay.
18              MR. GRAY:  Well, Your Honor, it's not hearsay.  My
19     client will be testifying.
20              THE COURT:  I think we have to wait for the client
21     to testify, then.
22              MR. GRAY:  Okay.
23              THE COURT:  It's hearsay now.
24              MR. GRAY:  It would be a statement of a client.
25              THE COURT:  Proceed.
```

1          MR. GRAY:  All right.  In any event, when you --

2     the breathing was checked.  All right?  And Thomas Lane said

3     at the scene he's breathing.  So he's concerned more about

4     George Floyd.  He's breathing.

5          Then after that, Thomas Lane tells Kueng to check

6     his pulse.  And obviously you can't check the carotid pulse

7     because Derek Chauvin still has his knee on his neck under

8     the back of that SUV, that squad car.  So his carotid pulse

9     you couldn't check.  And what does Kueng -- he checks his

10    wrist, radial I believe, and he says, "I can't find one."

11    And then Tom Lane, he reaches down and he tries to find a

12    pulse on Mr. Floyd's ankle.

13         At about that time, all of a sudden you hear the

14    sirens and the lights and the ambulance is arriving.  And

15    you will hear Tom in the video saying, "Here we go," which

16    is the ambulance is arriving.

17         Now, once the ambulance arrives, it pulls up and

18    an emergency room person, an ER guy, comes out of the

19    ambulance, along with the other ER person, and there's only

20    two.

21         And by this time you will hear that there's a

22    crowd that's quite loud.  It was loud enough where Derek

23    Smith, the person that's checking out George Floyd, didn't

24    want to stay there.  He wanted to take George Floyd and go

25    down a block or two.

1           So what does Derek Smith do?  He goes and checks

2     the carotid artery on George Floyd.  He says nothing to any

3     of the law enforcement officers.  The only thing he actually

4     said to the law enforcement officers is when he came down

5     from the ambulance, he said, "Get out of my way."  And

6     that's because once the ER people are there, they take over.

7     The police department backs off.  And he says, "Get out of

8     my way.

9           So he checks the carotid artery and says nothing

10    to Thomas Lane, no police officer.  And then he just -- he

11    walks back to the ambulance and goes in the ambulance to get

12    the gurney, the stretcher; still hasn't said anything.  And

13    he comes out with the gurney, and Tom Lane even before that

14    has picked up George Floyd to put on the stretcher.

15          And finally the gurney comes out and Thomas Lane

16    helps with the ER guy, Derek Smith, and Chauvin, who is

17    still on his neck.  He just got off his neck at that time.

18    And they put him on the gurney.  And he was on a gurney on

19    his back, so that was the first time that his face could be

20    seen, George Floyd.

21          Tom Lane went up to Derek Smith, extremely

22    concerned about George Floyd, and said, "Can I go with you?

23    Can I help you?"  Sir -- to Derek Chauvin, "Sir, can I go

24    with him?"  "Go ahead."

25          And Thomas Lane gets into the ambulance and he and

1    Derek Smith, because of the crowd, whether it was unruly or

2    aggressive or whatever, Derek Smith will testify and will

3    tell you that because of this crowd, they wanted to move a

4    couple blocks down before they do cardiopulmonary

5    resuscitation.  Chest compressions is an easier word to say.

6         So when Thomas Lane got into the back of the

7    ambulance, he and Derek Smith with the other ER person got

8    in the ambulance and they drove off.  And when they're

9    driving off, you will see on the video Thomas Lane doing

10   chest compressions trying to revive George Floyd, not

11   deliberately indifferent about his health at all.

12        At the same time Derek Smith is taking out a

13   LUCAS.  A LUCAS is a machine you put on the chest of the

14   person, and it's an automatic chest compressor.  Derek Smith

15   was having trouble with it.  Thomas Lane was helping him,

16   picking up the body at the same time Derek Smith was taking

17   George Floyd's clothes off.

18        Finally, after two blocks the driver, Bravinder I

19   believe his name was, he parks the ambulance and he comes

20   back into the back of the ambulance where the two men are,

21   Thomas Lane and Derek Smith.  And now there's three of them,

22   and they're two blocks down and -- or maybe three.  And

23   Thomas Lane still has his body camera on.  Thomas Lane says,

24   "Well, do you need me anymore?  Shall I ride with you to the

25   hospital?"  They say, "No, we don't need you any more."

1            He got out of the ambulance.  He hitched a ride

2     with a fire truck going to the area of 38th and Chicago and

3     got a ride there and stood there and was still not -- didn't

4     know if George Floyd was alive or dead.  He was hoping he

5     was alive, but in his own mind it didn't look real good.

6            And there they were questioned by the upper brass.

7     A lieutenant questioned him.  I think a sergeant questioned

8     him.  And, of course, the next day he was terminated.  It

9     was his fault.  Terminated from his job.  Kueng was

10    terminated also.  They were probationary law enforcement

11    officers.  The first year as a cop, they can just -- you're

12    fired.

13           So that's Thomas Lane's story.  I'll be back at

14    the end of this case and discuss with you the law, the

15    presumption of innocence, proof beyond a reasonable doubt,

16    and the elements of the crime of deliberate indifference.

17           If there ever were a case that the government has

18    failed miserably to prove that my client was deliberately

19    indifferent, it's this case.  This is a perversion of

20    justice, ladies and gentlemen.

21           Thank you.

22           THE COURT:  Thank you, Mr. Gray.

23           MR. GRAY:  Thank you, Your Honor.

24           THE COURT:  Members of the jury, we're going to

25    take a brief afternoon recess at this time.

1          Again, I would caution you not to discuss the case
2     during the course of the recess.
3          I'm also going to suggest that during the
4     recess -- as you go to the jury room, in the equipment box
5     that you have there are some notepads.  And when you do come
6     back in, if you would bring those notepads with a pencil or
7     pen with you, I'd appreciate it.  I will give you some more
8     instructions about notes at that time.
9          With that, the jury may be excused.
10    (Jury excused)
11                        **IN OPEN COURT**
12                      **(JURY NOT PRESENT)**
13          THE COURT:  Counsel, who is the first witness you
14    will be calling?
15          MS. BELL:  Your Honor, it will be Kim Meline from
16    FBI.
17          THE COURT:  Okay.  Very well.  Thank you.
18          We'll see you in just a few minutes.
19    (Recess taken at 2:44 p.m.)
20                        *  *  *  *  *
21    (2:57 p.m.)
22                        **IN OPEN COURT**
23                        **(JURY PRESENT)**
24          THE COURT:  Ladies and gentlemen of the jury, I'd
25    asked that you bring your notebooks with you when you come

1   back, come back now, and I see that you've done that and I

2   thank you.

3          I'm going to now ask that you open the notebook

4   and on the very first page write your name and then

5   immediately flip it over to the next page.

6          Now, let me talk a little bit about notes.  Notes

7   are for your -- notebooks are for your convenience.  Some

8   people take copious notes and that's fine, you can do that.

9   Some people take very few or no notes.  Fine, you can do

10  that.  You don't take notes because your neighbor is or you

11  don't not take notes because your neighbor is not taking.

12  It's whatever you personally prefer, and you're completely

13  free to do that.

14         You should also know that at the conclusion of the

15  case you will have your notebooks with you in deliberations

16  to make reference back to the testimony, and you are

17  perfectly welcome to do that.

18         But I do caution you about something, and that is

19  as you are in deliberations, remember it's the issues of the

20  case, the guilt or non-guilt of the defendants, not whose

21  notes are right.  So don't get waylaid on that type of

22  discussion.

23         Finally, with the notebooks, at the conclusion of

24  it all, after you've rendered your verdict, et cetera, the

25  notebooks, the notes will be destroyed and they will not be

1    seen by anybody after the conclusion of the case.

2         Okay.  With all of those instructions you know

3    about notes and, Mr. Slaughter, you were standing up here

4    and then I talked for a long time, so --

5         MR. SLAUGHTER:  No worries, Your Honor.

6         THE COURT:  -- you sat down.

7         Would you call your witness, please.

8         MR. SLAUGHTER:  Thank you, Your Honor.  The

9    government would Kimberly Meline to the stand, please.

10        THE COURT:  Okay.  Ms. Meline, if you would come

11   forward, please.

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  And stop somewhere.

14                    KIMBERLY MELINE,

15        called on behalf of the government, was duly

16   sworn, was examined and testified as follows:

17        THE COURT:  If you'd take the witness stand,

18   please.  And I will ask that, once you are there, please

19   remove your mask and then speak into the microphone or slide

20   right up to the microphone.

21        THE WITNESS:  Yes, sir.

22        THE COURT:  And, with that, if you would give us

23   your name and spell your last name, please.

24        THE WITNESS:  My name is Kimberly M. Meline, and

25   the last name is spelled M-E-L-I-N-E.

```
 1              THE COURT:  Okay.  Proceed.

 2              MR. SLAUGHTER:  I have one administrative matter,

 3     Your Honor, regarding the stipulations the parties have

 4     entered into regarding certain evidence, just a housekeeping

 5     matter before the jury, Your Honor.

 6              THE COURT:  I forgot.

 7              MR. SLAUGHTER:  It's on me, Your Honor.  I should

 8     have brought it up beforehand.

 9              THE COURT:  Members of the jury, the parties in

10     the case, to their credit, have entered into a stipulation

11     to receive a large number of exhibits in evidence.  You

12     don't need to write these down, but I do need to read the

13     record -- these exhibits into the record.

14              The following record -- exhibits have been

15     received:  Exhibit Number 1, 2, 3, 4, 5, 5A, 7, 7A, 9, 9A,

16     11, 14, 16, 17, 18, 19, and 21.  Did I say twenty -- I'm

17     sorry.  21 is not admitted.  Strike 21.  And then

18     Exhibits 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56,

19     57, 58, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69, 70, 71, 72,

20     73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87,

21     98, 99, 100, 101, 102, 103, 104, 106, 107, 108, 109, 110,

22     and 128.

23              Then, members of the jury, you should know that

24     certain exhibits that have just been received are exhibits

25     that apply to only one of the three defendants.  Maybe a
```

1    personnel record as an example, that type of thing, that

2    exhibit will not be applicable to the other two defendants.

3         Now, there are quite a series of these exhibits

4    that have just been received where Mr. Thao, they're not

5    applicable to him.  And we will remind you, as best we can

6    recall, whenever any of those exhibits would come up so that

7    they would be applicable maybe to another defendant, but not

8    to Mr. Thao.

9         So, with that background, I think we can receive

10   those exhibits and you can proceed, Mr. Slaughter, and thank

11   you for drawing it to my attention.

12        MR. SLAUGHTER:  Thank you, Your Honor.  If I

13   may -- and I think I might have missed it.  Your Honor, our

14   stipulation includes --

15        THE COURT:  Oh, just a minute.  I do have more to

16   say.

17        Exhibits numbered 5A, 7A, and 9A are transcripts

18   of videos and what's being said on those videos.  Those

19   transcripts are someone's idea of what is being said, and

20   they will be provided to you and are provided to you as an

21   aid in your consideration of the particular exhibit.

22        The one thing I caution you about, though, is that

23   if there's any discrepancy with what you see on the

24   transcript and what you see and hear from the video itself,

25   you are bound by the video and not by the transcript,

1   because the transcript is somebody else's idea of what they

2   think was said.

3            Okay.  Now, if I missed another one, let me know.

4            MR. SLAUGHTER:  I might not have heard Your Honor,

5   but Government Exhibit 12 at paragraph 12 and Government

6   Exhibit 39, which is at paragraph 19 of the stipulation --

7            THE COURT:  I'm sorry.  Exhibit 12?

8            MR. SLAUGHTER:  Correct, Your Honor.

9            THE COURT:  Okay.  I did not have Exhibit 12.  Is

10  there -- on the stipulation, but I may have just missed it.

11  Is there objection to Exhibit 12, Mr. Chang's body camera?

12  I'll then receive it, assuming it was in there and I just

13  missed it.

14           And then what other number?

15           MR. SLAUGHTER:  Government Exhibit 39 at

16  paragraph 19, Your Honor.  It's a dispatch summary timeline.

17           THE COURT:  Yeah, 39 is received.  I have that.

18           MR. SLAUGHTER:  And I apologize if I missed it,

19  but 6 -- I'm sorry, Government Exhibit 63.

20           THE COURT:  Again, I do not have 63.  Let me look

21  at the record here.  Maybe --

22           MR. SLAUGHTER:  It's at paragraph 40 of the

23  stipulation.  I have a copy of the stipulation as well, Your

24  Honor.

25           THE COURT:  Okay.  I think in my copying over, I

 1    probably missed it.  No, I do not -- I don't have it on my

 2    copy because there's a three-hole punch right at that spot.

 3    So 40 is included in --

 4              MR. SLAUGHTER:  It's 39, Your Honor.

 5              THE COURT:  I'm sorry.

 6              MR. SLAUGHTER:  12, 39, and 63 are the three

 7    different exhibits that I missed.

 8              THE COURT:  63 is the one I was just talking

 9    about, and that is received.

10              MR. SLAUGHTER:  And my esteemed counsel just let

11    me know that I didn't hear 47 either, Government Exhibit 47.

12    That's similarly at the top of the page, paragraph 24 of the

13    stipulation.  It might have gotten three-hole punched as

14    well.

15              THE COURT:  That is entirely possible.  Again,

16    which number are you missing?

17              MR. SLAUGHTER:  Government Exhibit 47, Your Honor.

18    It's at paragraph 24 on page 4 of our stipulation.

19              THE COURT:  Yeah, I think the precise same thing

20    has happened there.  And so that also is received.  Okay.  I

21    think we have it.

22              Proceed.

23              MR. SLAUGHTER:  My first thing would have been to

24    offer numbers of different exhibits, but His Honor already

25    took care of that.

1          DIRECT EXAMINATION

2     BY MR. SLAUGHTER:

3     Q.  I think you stated your name.  Is that correct?

4     A.  Yes, that's correct.

5     Q.  Where are you employed?

6     A.  I'm employed by the Federal Bureau of Investigation,

7     commonly referred to as the FBI.

8     Q.  What are your responsibilities there?

9     A.  Within the FBI I work for a unit called the Multimedia

10    Exploitation Unit.  I am the program manager for the Field

11    Audio Video Program.  And I'm also a forensic examiner

12    specifically related to audio evidence, video evidence, and

13    image evidence.

14    Q.  Let's break that up a little bit.  So you said

15    "exploitation," so let's start with that.  What does that

16    mean?

17    A.  So, as I said, the unit that I work for is called the

18    Multimedia Exploitation Unit, and basically what we do as a

19    unit is make sure that the FBI is using all evidence that's

20    commonly referred to as multimedia, audio, video, and image,

21    to the best of our abilities in order to garner leads.

22          So we exploit that media or basically just use it

23    to the best of our abilities in order to understand it and

24    to determine what we can use to assist in our

25    investigations.

1    Q.  So when you say "the Field AV Program," what does that

2    mean?

3    A.  So the Field Audio Video Program is a program that is

4    run through the Multimedia Exploitation Unit, and

5    essentially what we are is a collection of forensic

6    examiners of that type of media, of audio, video, and

7    imagery.  And the Field Audio Video Program provides

8    software, hardware, and training for examiners throughout

9    the country.

10   Q.  What are your responsibilities in your present role?

11   A.  As I said, I'm the program manager, so my job is to make

12   sure that personnel within the program are trained, that

13   they are trained to do their jobs well, that they know how

14   to process evidence related to investigations and also that

15   they have what they need in order to do it, including

16   hardware, software, and training.

17   Q.  How many individuals do you supervise?

18   A.  Directly I supervise five regional program managers

19   across the country, but in addition to that, we have

20   approximately 100 different individuals throughout the FBI

21   who perform these types of tasks, and those are essentially

22   assigned work through those regional program managers.

23   Q.  When you say -- are those all people you supervise?

24   A.  Indirectly, yes, in that I help assign them work related

25   to our investigations.

1    Q.  And is that all tied -- are all those individuals

2    forensic media examiners?

3    A.  Of some sort, yes.  Some also have additional duties

4    related to things like computer forensics or photography,

5    but they all do audio and video examinations as well.

6    Q.  Well, just taking a step back, how long have you been

7    with the FBI?

8    A.  I've been employed with the FBI for about 11 -- or just

9    shy of 11 years now.

10   Q.  Has it always been in this capacity?

11   A.  It has not.  I actually took this position with the

12   Multimedia Exploitation Unit about three years ago -- about

13   three and a half years ago, actually.  Prior to that, I

14   transferred from a unit called the Forensic Audio, Video,

15   and Image Analysis Unit, where I was doing additional types

16   of work and I was stationed in Quantico, Virginia, as

17   opposed to now where I am working out of the Minneapolis

18   office.

19   Q.  Well, what did you do before -- so those several years,

20   I should make that clear, is that also working with forensic

21   media --

22   A.  Yes, it was.

23   Q.  -- before this most recent role?

24   A.  Yes, sir.

25   Q.  What did you do before you got in the FBI?

 1     A.   Before I was hired by the FBI, I worked for the St.

 2     Cloud Police Department up in St. Cloud and there I was the

 3     crime lab director.  However, because we were a very small

 4     laboratory, I also was responsible for performing forensic

 5     examinations.  I have some training in chemistry and so I

 6     was doing chemical analysis of controlled substances, crime

 7     scene examinations, as well as video analysis.

 8     Q.   So some forensic video analysis back then too?

 9     A.   Yes.

10     Q.   How long were you at St. Cloud?

11     A.   For about two and a half years.

12     Q.   What were you doing before that?

13     A.   Just before I was hired by the St. Cloud Police

14     Department, I was working for the St. Paul Police

15     Department, which Is just a few miles from here.  I was

16     working in the laboratory there.

17     Q.   What did you do for the St. Paul Police Department?

18     A.   I was a forensic scientist or forensic examiner as well.

19     I was employed as both Criminalist I and eventually promoted

20     to the Criminalist II position.  So my responsibilities were

21     to perform forensic examinations in controlled substance

22     analysis, crime scene examinations, forensic video analysis.

23     And as the Criminalist II, I also supervised the duties of

24     the Criminalist I position.

25     Q.   How many years were you at the St. Paul Police

1    Department in that role?

2    A.  In that role, I was in the -- assigned to the crime lab

3    for about four to four and a half years.

4    Q.  Combined, how many years experience do you have in

5    forensic video?

6    A.  I began training in forensic video analysis in about --

7    in 2004.  So I'm in the neighborhood of 18 years of

8    experience.

9    Q.  You touched upon it a little bit.  What's your formal

10   education?

11   A.  I have a bachelor's of science degree in institute of

12   technology studies as well as psychology.  The institute of

13   technology studies, I focused in chemistry and chemical

14   engineering.  And I graduated from the University of

15   Minnesota-Twin Cities.

16   Q.  Any additional training specific to, if you will,

17   forensic media analysis?

18   A.  Absolutely.  So in addition to the training that I

19   received through my bachelor's degree, which didn't directly

20   relate to computer forensics or video analysis, I also have

21   attended ongoing training, extensive training, within the

22   field of forensic video analysis and other areas of

23   forensics.  That training included things like vendor

24   training, so learning how to use specific software packages.

25   It included things like general forensic training, how to

1    display evidence to its best ability, and also a number of

2    different on-the-job assignments in order to further that

3    education.

4    Q.  What, if any, certifications specific to forensic video

5    analysis have you gotten?

6    A.  I've been certified by two different organizations as a

7    forensic video analyst.  I've been certified by LEVA, which

8    is the Law Enforcement and Emergency Services Video

9    Association, specifically to be a forensic video examiner or

10   forensic video analyst.

11             I've also been certified by the IAI, which is the

12   International Association for Identification, and I have

13   been certified by the IAI as a forensic video examiner.

14             And in addition to that, following my

15   certification, I have also served in a number of roles with

16   the certification board of the IAI, including as the chair

17   of the certification board for the -- for that organization.

18   Q.  Well, how did you get certified with LEVA, for example?

19   A.  With LEVA, the certification was a number of years of

20   experience as a forensic video examiner.  They also required

21   four separate one-week training sessions in various aspects

22   of forensic video analysis and the law.

23             In addition to that, in order to complete my

24   certification as an examiner, I was required to complete

25   casework and defend my work before a certification board in

1    person.

2    Q.  Just so the jury understands, what are some of the

3    things a forensic video examiner with your experience can do

4    with video media?

5    A.  There's a number of different things that we can do.  It

6    ranges from the easy, things like just simple processing,

7    you know, trying to make things play at the same time side

8    by side, what we call synchronization; or it could be

9    something much more difficult, like trying to determine the

10   specific camera that captured a piece of video or whether an

11   individual depicted within video or image is a suspect or

12   something along that lines.

13          Probably one of the more technical things we do is

14   called photogrammetry, which is making measurements inside

15   video or image.  So if, for instance, I was to try to

16   determine what the height of a bank robber was or how fast a

17   getaway vehicle was traveling within a series of video,

18   those would be examples of different things that I could do

19   as a forensic video examiner.

20   Q.  And I want to make sure I am clear.  You said that doing

21   the side-by-side thing is a relatively easy thing to do?

22   A.  Under certain conditions, yes, absolutely.  That's one

23   of the easier things that I would do as a forensic video

24   examiner.

25   Q.  Have you provided any lectures or workshops for other

1    forensic media examiners?

2    A.  I have.  I have lectured in front of the International

3    Association for Identification.  I've also taught different

4    courses in relationship to forensic video analysis,

5    including teaching classes for the Field Audio Video

6    Program.

7    Q.  In fact, where were you the week before last?

8    A.  Two weeks ago I was in Portland, Oregon.  We are

9    inducting a new training class into the Field Audio Video

10   Program, and so I was teaching video analysis to that class

11   in Portland two weeks ago.

12   Q.  Where were you last week?

13   A.  Last week I was in London within the United Kingdom, and

14   at that time I was consulting with the London Metropolitan

15   Police Service because they are interested in some of the

16   tools that we use within the FBI.  And so I was briefing the

17   London Metropolitan Police Service's counterterrorism unit

18   on different tools and how to use them.

19   Q.  Have you ever been published?

20   A.  I have.

21   Q.  How many times?

22   A.  I've been published twice.  I completed a study on error

23   rates specific to capturing the height of individuals in

24   video in different methodologies.  So that particular study

25   was published through the *Journal of the International*

1      *Association for Identification*.

2                    I also was published through the *Journal of the*

3      *American Academy of Forensic Sciences*, which published in

4      part my study on how to determine the -- or excuse me, not

5      how, but essentially a case study of whether laypeople or

6      examiners were better at determining the make and model of

7      vehicles depicted in imagery.

8      Q.  Have you testified in court before?

9      A.  Yes, I have.

10     Q.  About how many times?

11     A.  Somewhere in the neighborhood of 80 and 90 times over

12     the course of my career.

13     Q.  So let's talk about this matter.  You are not a case

14     agent, correct?

15     A.  That's correct, I'm not.

16     Q.  You understand you are first being brought here as sort

17     of a foundational witness to address certain exhibits that

18     have been admitted -- and I think you heard us talking about

19     them -- as well as some proposed exhibits as well;

20     understood?

21     A.  Yes, sir.

22     Q.  To be clear, just given your expertise, were you asked

23     to address some of those original exhibits, the media, and

24     create some combined exhibits?

25     A.  Yes, I was.

1    Q.  Side-by-side exhibits?

2    A.  Yes.  I was asked to play several of the videos that I

3    received side by side so that they played at the same time,

4    essentially that they were synchronized.

5    Q.  So before we talk about that, I want to make sure that

6    we talk about just the underlying exhibits themselves.  The

7    jury has heard about media, and I want to make sure that we

8    talk about just some of the original media, if you will.

9    Understood?

10   A.  Yes, sir.

11   Q.  All right.  So -- and His Honor talked about them a

12   little bit, but I'm going to -- I think he just gave out the

13   numbers.

14           We have Government Exhibit 2, which is what we've

15   described as a Cup Foods interior video; is that correct?

16   A.  That's correct.

17   Q.  Government Exhibit 3, which is the Cup Foods exterior

18   video at 38th Street?

19   A.  Yes, sir.

20   Q.  Government Exhibit 4, the Cup Foods exterior video for

21   Chicago Avenue?

22   A.  Yes, that's correct.

23   Q.  A number of different body-worn cameras, Government

24   Exhibit 5, 7, 9, 11, and 12, correct?

25   A.  Yes, that's my understanding.

```
 1    Q.  Well, you reviewed all those, correct?

 2    A.  I did, yes.

 3    Q.  You understand the exhibit numbers now?

 4    A.  Yes, sir.

 5    Q.  And we also have Government Exhibit 14, the Milestone

 6    video?

 7    A.  Yes, that's correct.

 8    Q.  Government Exhibit 16, the Dragon Wok video?

 9    A.  Yes, sir.

10    Q.  Government Exhibit 17, what we call the Frazier video?

11    A.  Yes, sir.

12    Q.  Government Exhibit 18, what we call the Oyler video?

13    A.  Yes.

14    Q.  And Government Exhibit 19, what we call the Hansen

15    video?

16    A.  Yes, sir.

17    Q.  And then, finally, Government Exhibit 20, what we call

18    the Funari video.  Do those all sound familiar to you?

19    A.  They do.

20    Q.  And is it your understanding that this is the world of

21    at least working digital video associated with this, the

22    events of May 25, 2020?

23    A.  Yes, that's correct.

24    Q.  There was one additional form of media from a location,

25    correct?
```

```
 1    A.  There was.  However, that video was not able to be
 2    played.  It was corrupted and it did not play correctly.
 3    Q.  Do you recall where that was from?
 4    A.  It was from the Speedway gas station just across the
 5    street from the Cup Foods.
 6    Q.  And, as you've heard, the parties have already
 7    stipulated to the admissibility.  They're into evidence.
 8    His Honor has already put them into evidence as far as
 9    exhibits in this matter.  Understood?
10    A.  Yes, sir.
11    Q.  Now, just so we are clear about where some of these
12    media sources are from --
13              MR. SLAUGHTER:  I'd like, if we could, Your Honor,
14    to dim the lights a little bit and I'll pull up the map --
15    or a map.
16    BY MR. SLAUGHTER:
17    Q.  Are you familiar with this exhibit, Government
18    Exhibit 1?
19    A.  Yes, I am.
20              THE COURT:  Counsel, could I interrupt and ask a
21    question?  What do you mean when you use the word "media
22    source"?
23              MR. SLAUGHTER:  I'm sorry, Your Honor.  The
24    location where video was taped.
25              THE WITNESS:  Yes, that's my understanding.
```

 1          MR. SLAUGHTER:  That's my -- I'm sorry, Your

 2    Honor.  I'll use a different phraseology.  It's my problem.

 3          THE COURT:  Okay.  Proceed.

 4    BY MR. SLAUGHTER:

 5    Q.  Video.  And I was counseled before to not say "media,"

 6    but it's video, correct?

 7    A.  Yes, it is.

 8    Q.  I'm showing you what's been marked as Government

 9    Exhibit 1.  And fair to -- have you grown familiar at least

10    with this intersection over time --

11    A.  I have.

12    Q.  -- from your review of this different media we are

13    talking about?

14    A.  Yes, that's correct.

15    Q.  You are familiar at least with 38th Street, East 38 th

16    Street, and Chicago Avenue?

17    A.  I am.

18    Q.  I want to make sure we just go through the different

19    locations where different exhibits were found, if that's

20    okay?

21    A.  Yes.

22    Q.  And then I'll -- likely I'll play just a bit of these

23    underlying videos so that the jury becomes at least somewhat

24    familiar with them.

25    A.  Okay.

1    Q.  So on Government Exhibit 1, just going to Government

2    Exhibit 2, which is described as Cup Foods interior, if you

3    could, go ahead and point out where Cup Foods is just so

4    we're clear.

5    A.  I'm not sure if this is a touch screen or --

6    Q.  I believe it is a touch screen.

7              THE COURT:  It should be.

8              THE WITNESS:  Excellent.

9              So the Cup Foods is just here (indicating), as

10   indicated on -- within the map.

11   BY MR. SLAUGHTER:

12   Q.  And we already talked about we have an interior camera

13   and then two different exterior cameras and different

14   exhibits that we've made for this?

15   A.  Yes, that's correct.

16   Q.  And to be clear, Government Exhibit 2 contains like the,

17   if you will, the product that we got from Cup Foods from the

18   interior and then a more readily playable form so the jury

19   can play it easier?

20   A.  Yes, that's correct.

21              MR. SLAUGHTER:  With the court's permission, I'm

22   going to play Government Exhibit 2 briefly.

23              THE COURT:  Proceed.

24              MR. SLAUGHTER:  I'm trying to get rid of --

25

```
 1      BY MR. SLAUGHTER:
 2      Q.  So you're familiar with Government Exhibit 2?
 3      A.  Yes.  This is an example of the video that was captured
 4      inside the Cup Foods store.
 5      Q.  Government Exhibit 3 is identified as Cup Foods
 6      exterior, 38th Street -- facing 38th Street; is that
 7      correct?
 8      A.  Yes, that's correct.
 9      Q.  And I'm just going to pull up Cup Foods, expand this a
10      little bit.  If you could, just indicate where that
11      generally is or where that is.
12      A.  Generally speaking, the camera that captured that video
13      is this associated here (indicating).
14              MR. SLAUGHTER:  No idea why it's highlighting.
15      With the court's permission, I'll play a short piece of
16      Government Exhibit 3, Your Honor.
17              THE COURT:  Proceed.
18                  (Video recording played)
19      BY MR. SLAUGHTER:
20      Q.  This is just Government Exhibit 3 facing -- the Cup
21      Foods exterior facing 38th?
22      A.  Yes, that's correct.
23      Q.  And we have another one, another camera, and I'm not
24      going to ask you to indicate in case I have more issues with
25      this.  This is another camera facing Chicago Avenue?
```

1    A.  Yes, it's the camera right next to the one I just

2    pointed out a moment ago.

3    Q.  And that faces what direction?

4    A.  It faces north just in front of the Cup Foods store.

5            MR. SLAUGHTER:  With the court's permission, may I

6    play Government Exhibit 4?

7            THE COURT:  Proceed.

8                (Video recording played)

9    BY MR. SLAUGHTER:

10   Q.  Is this Government Exhibit 4?

11   A.  Yes, sir.

12   Q.  Again, to be clear, for both Government Exhibit 3 and

13   for Government Exhibit 4, just like 2, kind of like the

14   original kind of stuff we got from the owner and then a more

15   readily playable version?

16   A.  Yes, that is.

17   Q.  And I'm not going to go in chronological order, but I

18   want to make sure that we talk about some of the other

19   locations, if you will.

20           We have -- they jury has already heard about a

21   place called Dragon Wok.  I'm just expanding this.  There's

22   a camera indicated at this Dragon Wok business?

23   A.  Yes.  The Dragon Wok video actually had three different

24   cameras, but probably the most relevant one is the camera

25   that's displayed there.

 1     Q.  And that's what been made Government Exhibit 16?

 2     A.  Yes, that's correct.

 3     Q.  The original media -- someday when the jury gets this,

 4     is the original media in a more playable form of that media?

 5     A.  Yes, that's correct.

 6     Q.  When I -- I shouldn't say "media."  Video?

 7     A.  Video, yes.

 8              MR. SLAUGHTER:  With the court's --

 9              THE COURT:  Counsel, what is the Dragon Wok

10     number?

11              MR. SLAUGHTER:  16, Your Honor.  I apologize.

12              THE COURT:  Okay.  Thank you.

13              MR. SLAUGHTER:  Government Exhibit 16.  And ask if

14     I could briefly play Government Exhibit 16 for the jury.

15              THE COURT:  Proceed.

16                  (Video recording played)

17     BY MR. SLAUGHTER:

18     Q.  This is what we have as Government Exhibit 16?

19     A.  Yes.  That's the video that was captured from the camera

20     indicated on the map just above the Dragon Wok.

21     Q.  This is across the street from what location?

22     A.  From the Cup Foods, just across the street from the Cup

23     Foods.

24     Q.  I skipped over, I jumped over what is the Milestone.

25     And if you could indicate -- well, here I'm going to pull it

1    up.  What is the Milestone?

2    A.  So Milestone is what -- it's been previously referred to

3    as Milestone.  It's essentially the video that is being

4    captured by one of the traffic cameras owned by the City of

5    Minneapolis.  The reason it's usually referred to as

6    Milestone is Milestone is the more difficult version of the

7    software used to play the video.

8    Q.  So for Government Exhibit 14, fair to say there's

9    actually a copy of that software, the contents, and then,

10   frankly, a more playable version of the Milestone footage

11   from that night?

12   A.  Yes, that's correct.

13            MR. SLAUGHTER:  With the court's permission, I'll

14   play briefly Government Exhibit 14.

15            THE COURT:  Proceed.

16                 (Video recording played)

17   BY MR. SLAUGHTER:

18   Q.  Is this what we've designated as Government Exhibit 14?

19   A.  Yes, it is.  That's a sample of the video that was

20   captured by that traffic camera.

21   Q.  And to be clear, this Milestone system allows someone

22   after the fact to move in and out; is that correct?

23   A.  It does.  It has what capabilities that are usually

24   referred to as pan/tilt/zoom.  So basically the operator has

25   the ability to move the camera.

1    Q.  And that happens -- well, that can also be done real

2    time, correct?

3    A.  Yes, it can.

4    Q.  And so, for example, this recording shows someone moving

5    the camera at times?

6    A.  Yes, it does.

7    Q.  But you agree that the parties have zoomed this in I

8    think it's two evolutions before doing a more playable

9    recording off of this Milestone program?

10   A.  Yes, that's correct.  I believe it was somewhere in the

11   neighborhood of 150 percent, so just slightly zoomed in.

12   Q.  We have a number of other what we call bystander videos,

13   and they're at Government Exhibit 17, 18, 19, and 20.  Just

14   using this image, Government Exhibit 14, we can at least

15   refer to the location or their proximity to Cup Foods, if

16   you will.

17            Government Exhibit 17 is described as the Darnella

18   Frazier video.  From what perspective was she recording on

19   May 25, 2020?

20   A.  That recording was captured from the curb just in front

21   of the Cup Foods.  So the individual was standing

22   essentially on the sidewalk while that video was being

23   captured.

24   Q.  Government Exhibit 19 is described as the Genevieve

25   Hansen video.  From what perspective was she recording on

1    May 25th, 2020?

2    A.  Similarly, that recording was also captured from the

3    sidewalk just in front of the Cup Foods.

4    Q.  Skipping one, but Government Exhibit 20 is described as

5    the Alyssa Funari video.  From what perspective was she

6    recording on May 25th, 2020?

7    A.  Similarly, she was also recording from the sidewalk just

8    in front of the Cup Foods building.

9    Q.  I'm pulling up -- well, I hope I'm pulling up Government

10   Exhibit 1 here, just the map.

11          We have one remaining bystander video.  Government

12   Exhibit 18 is described as the Alisha Oyler video.  From

13   what perspective was she recording on May 25, 2020?

14   A.  She was actually recording from across the street at

15   Speedway.  So that, if I may --

16   Q.  Please do.

17   A.  -- was in the neighborhood here (indicating).

18   Q.  You're indicating to the west of the Cup Foods; is that

19   correct?

20   A.  That's correct.

21   Q.  And you would also agree the parties -- that exhibit,

22   the audio has been redacted from that exhibit; is that

23   correct?

24   A.  Yes, that's correct.

25   Q.  Government Exhibit 5 is -- has been marked as "BWC

1    Lane."  And you are familiar that "BWC" stands for body-worn

2    camera?

3    A.  Yes, I'm familiar.

4    Q.  And you would agree that Government Exhibit 5 actually

5    contains three separate video segments, portions that were

6    recorded that night by that camera?

7    A.  Yes, that's correct.

8    Q.  Government Exhibit 7, similarly it's entitled "BWC

9    Kueng," but you would agree that's Mr. Kueng's body-worn

10   camera footage from that night?

11   A.  Yes, that's correct.

12   Q.  Three separate video segments?

13   A.  Yes, that also comprises three separate video segments.

14   Q.  We have 9.  Government Exhibit 9 is entitled "BWC Thao."

15   Mr. Thao's body-worn camera video recordings?

16   A.  Yes.  It does comprise four different video segments

17   that were recorded by the body-worn camera.

18   Q.  Four?

19   A.  Yes, sir.

20   Q.  And Government Exhibit 11 is entitled "BWC Chauvin."

21   How many video segments were in that particular exhibit?

22   A.  That exhibit also comprises four different video

23   segments that were recorded by that camera.

24   Q.  And, finally, we have Government Exhibit 12, "BWC

25   Chang."  Does that contain one video segment?

1    A.  It does.

2         MR. SLAUGHTER:  With the court's permission, I'd

3    like to play briefly Government Exhibit 5 just for purposes

4    of familiarizing the jury with what it looks like.

5         THE COURT:  Proceed.

6              (Video recording played)

7    BY MR. SLAUGHTER:

8    Q.  So I've just started Government Exhibit 5.  It's just

9    the body-worn camera of Mr. Lane, correct?

10   A.  Yes, that's correct.

11   Q.  And I'm just pulling out information, if you will, at

12   the upper right-hand corner.  It provides the date; is that

13   correct?

14   A.  It does.

15   Q.  In military time?

16   A.  It also includes the time, yes, in military time.

17   Q.  When I say "military time," it's like 2000 hours in this

18   instance?

19   A.  That's correct, or approximately 8 o'clock, 8:07.

20   Q.  Almost 8 o'clock -- or 8:07 and 59 seconds?

21   A.  Yes, sir.

22   Q.  And this Axon Body 3, what is your understanding that

23   is?

24   A.  My understanding is that is the type of body-worn

25   camera, and it is a body-worn camera that is produced by the

1    company Axon.

2    Q.  So there's a poly, if you will, letter and number

3    sequence after that.  What's your understanding of what that

4    is?

5    A.  That alphanumeric actually consists of essentially a

6    serial number and an identifier for the specific body-worn

7    camera in order to link that body-worn camera to the

8    individual that was wearing it.

9    Q.  At least at that time?

10   A.  Yes, sir.

11   Q.  Having -- with this still up, this exhibit, the

12   beginning of Exhibit 5, I want to make sure that we talked

13   about some of the time differences between these different

14   sources of media -- video, the Milestone, the body-worn

15   cameras, the Dragon Wok, and the Cup.  And do all of these

16   videos have the same time indicated on them at the same

17   time?

18   A.  Very much no.  In fact, even videos that you would

19   expect to have the same time, because they usually update

20   themselves as they hit essentially like a router in order to

21   transmit, even they differ sometimes by a second or two.

22          The digital video that was recorded by a few other

23   sources, including the Dragon Wok video and the Cup Foods,

24   show significantly different, in the neighborhood of

25   minutes.

1    Q.  So, for example, like body-worn cameras worn by two

2    people sitting next to one another, could they reflect

3    different times?

4    A.  Yes, they could and still be -- be actually recording at

5    the same time but display different times.

6    Q.  I think you've explained why that occurs, but how does

7    that occur?

8    A.  Essentially what happens is it's quite a bit like when

9    your cell phone updates.  You know, my cell phone being next

10   to your cell phone, they might show slightly different times

11   and it's just a matter of when that cell phone is updating

12   itself as it's hitting a cell phone tower.

13          The same thing happens with body-worn cameras,

14   where when they hit off of a router or something like that,

15   it will update.  And so you would normally expect to see

16   slight differences in the timing of the body-worn cameras.

17   Q.  And so there are differences just across these different

18   media when it comes to the -- video when it comes to the

19   time?

20   A.  There are, just in the matter of seconds.

21   Q.  Well, let's talk about this.  How does a person -- how

22   do you make a side-by-side, like a synchronized digital

23   video exhibit?

24   A.  The first thing for me is to ignore that time and date

25   stamp, because ultimately I know, having done this for so

1    long, that often those time and date stamps can't be

2    entirely trusted.

3              Really what I'm looking at doing when

4    synchronizing video is finding events in common, either

5    audio or video cues, like a car door closing is great for an

6    audio and video cue because you can both here it and see it.

7    And if I can hear it on one video segment and see it on

8    another video segment, I can line those up and I know that

9    those videos are playing synchronized.

10   Q.  How long has this synchronization, if you will, or

11   side-by-side -- the making of side-by-side video exhibits,

12   how long has that been possible?

13   A.  Really the ability to synchronize video has been around

14   as long as video has been made.  I mean, if you think about

15   making something like a major motion picture, if you want to

16   take feeds from two different cameras in order to get

17   different actor's viewpoints, essentially what you are doing

18   is the same thing.  You are looking at those common events

19   and saying, okay, this is where my common event is and going

20   in between those two videos.

21   Q.  So when you say "synchronization," is it really just

22   making two videos play at the same time?

23   A.  That's exactly what it is.  It's a matter of -- if I

24   were to role up two TV monitors, we could do the same thing

25   if I knew exactly when to hit play on each one.

1           Me making a synchronized video just kind of takes

2       the guesswork out of it here in court so that you can see

3       what's happening on two different media -- two different

4       video sources at the same time.

5       Q.  Well, have you done this before for court?

6       A.  Yes, I have.

7       Q.  How many times?

8       A.  I've done this dozens of times in order to produce

9       exhibits to show what's happening on different cameras at

10      the same time.

11      Q.  And you touched upon this a little bit, but in the realm

12      of the forensic skills necessary, how difficult is it to

13      create, like, side-by-side videos like this?

14      A.  Ultimately this is probably one of the easiest things I

15      do because it is a matter of just finding those synchronized

16      events on two different media sources and essentially

17      placing a digital Post-It note and saying start play on

18      these two items at the same time.

19      Q.  So why do this, why create side-by-side video exhibits?

20      A.  In my opinion, the reason to do this is just to give

21      context to the video.  So things like incorporating the

22      Milestone video gives us a great overall perspective of

23      what's going on and where each individual is at specific

24      times.  And then incorporating additional video sources,

25      then the Milestone gives that context for those additional

1    sources.

2    Q.  Well, aren't multiple screens confusing to people?

3    A.  No.  Honestly, in my opinion, I think that people have

4    seen this often enough that it actually makes complete

5    sense.  It's things like watching -- you know, watching a

6    football game, which I don't know about you, but I did over

7    the weekend a little bit, being able to see things like

8    picture in picture.  It's just synchronized video.  It's the

9    ability to watch two different cameras at the same time.

10   Q.  Well, why would using -- is this your job, is this one

11   of the things you do for purposes of your role in the FBI?

12   A.  Yes, it is.

13   Q.  Why would using like a side-by-side video be better or

14   more efficient than just looking at two separate videos back

15   and forth?

16   A.  Ultimately it's just for ease of view.  I mean, having

17   the ability to look at things side by side really gives me

18   that overall perspective of what's happening from different

19   camera views rather than having to watch one and then queue

20   up the next one and figure out where that point in time is

21   and going back and forth.  So it's easier and ultimately

22   faster to watch them side by side.

23   Q.  Well, I should say faster than what?  Than looking at a

24   single view?

25   A.  Faster than looking at a single view and having to go

```
1    back and forth in between those single views in order to

2    figure out where you're at and then play back the video.

3    Q.  Well, let's talk about the combinations that you made in

4    this matter.

5    A.  Yes, sir.

6    Q.  You made several different combinations from what are

7    now admitted exhibits, correct?

8    A.  Yes, that's correct.

9    Q.  And -- well, we have 12 such exhibits; is that correct?

10   A.  Yes, sir.

11   Q.  Or proposed exhibits for identification?

12   A.  Yes, sir.

13   Q.  What types of combinations did you make?

14   A.  I made combinations comparing the Milestone video to

15   things like the individual body-worn cameras, comparing the

16   body-worn cameras -- or synchronizing the body-worn cameras

17   with some of the bystander videos, as well as things like

18   putting the body-worn cameras together so that you could see

19   the totality of the events from individual officer views.

20   Q.  Well, let's talk -- let's kind of break it down a little

21   bit.  You made a combination of the Thao body-worn camera

22   and the Frazier video.  Why did you do that?

23   A.  What stood out for me is combining the Thao body-worn

24   camera and the Frazier video really gave, because there was

25   dialogue between the two, it gave both sides of that
```

1    dialogue so that one could see --

2         MR. ROBERT PAULE:  Your Honor, pardon me.

3    Objection.  May we sidebar?

4         THE COURT:  Members of the jury, this is the first

5    time you've had this sidebar situation come up.  You are

6    going to hear an awful noise in a few minutes.  It's just

7    the way it is.  But the reason for this is just simply that

8    counsel deserves to discuss matters of law with me; and if

9    we wanted you to hear it, we would tell you, but that's just

10   the way it is.  We have to do this every once in a while.

11        Okay.

12        **(At sidebar)**

13        THE COURT:  Proceed.

14        MR. ROBERT PAULE:  Thank you, Your Honor.  It's

15   Robert Paule.

16        I would note I objected to this.  I object on a

17   couple grounds.  First of all, they're discussing evidence

18   that has not yet been admitted, in other words, the context

19   and the content of the video.

20        The second thing is I'd object under Federal Rule

21   of Evidence 403.  I think to some degree this is evidence

22   that is misleading the jury, because I could use the phrase

23   it gives context to something when in reality what I'm doing

24   is I'm emphasizing a particular part of the evidence.  With

25   regard to this specific piece of evidence, it would imply

```
 1     that my client is able to view everything that is going on

 2     from the exact opposite perspective of his.

 3              And while I appreciate the government has stated

 4     they don't intend to argue these points, they're still

 5     presenting evidence which is every bit as prejudicial, just

 6     not as direct.

 7              MR. SLAUGHTER:  Your Honor, can I be heard?  I

 8     want to make sure I can be heard over the microphone.

 9              THE COURT:  I hear you, yes.

10              MR. SLAUGHTER:  Just in response, Your Honor --

11              THE COURT:  What's the exhibit number that we're

12     dealing with here?

13              MR. SLAUGHTER:  This is Government Exhibit 28,

14     Your Honor.

15              THE COURT:  Okay.

16              MR. SLAUGHTER:  Thao/Frazier -- proposed

17     Thao/Frazier video.  Just in response -- and obviously

18     there's been a general 403 discussion when it comes to these

19     exhibits.

20              I'm just trying to lay some foundation with regard

21     to these before trying to offer them.  I recognize counsel's

22     concerns, but I'm just asking her why she made the exhibit

23     itself.  She's described herself, her experience, and,

24     frankly, her extensive background when it comes to this.

25              And the subjects that counsel are talking about
```

1    are all the subject of potential cross-examination and, of

2    course, the limiting instruction that I know we're going to

3    be potentially dealing with.

4         But I'm just trying to have her describe why she

5    made that exhibit.  I anticipate doing the same thing for

6    each one of these exhibits briefly, briefly, for purposes of

7    foundation to the point where I'm going to offer them.

8         THE COURT:  Okay.  First of all, the foundational

9    side of this, I think that's just exactly what counsel is

10   doing.  And you will use -- she will use the names of the

11   defendants and names of witnesses, et cetera, but at this

12   point it's not into the subject matter.

13        Then we turn next to the 403 subject.  The court

14   is very concerned about the 403 subject and the appropriate

15   perspectives.  We won't do that until we get down to the

16   point of actually concerning ourselves with the viewing of

17   the documents.  So I'll defer a ruling on that at this

18   point.

19        With that, I think we can proceed.

20        MR. SLAUGHTER:  Yes, Your Honor.

21             **(In open court)**

22        THE COURT:  Proceed, Mr. Slaughter.

23        MR. SLAUGHTER:  Thank you, Your Honor.

24   BY MR. SLAUGHTER:

25   Q.  So we briefly talked about what -- we hadn't gotten to

```
 1    say it yet on the record, but what was Government
 2    Exhibit 28; is that correct, the Thao/Frazier video?
 3    A.  Yes.
 4    Q.  We also talked --
 5              THE COURT:  Lights.
 6    BY MR. SLAUGHTER:
 7    Q.  You've made a number of --
 8              MR. SLAUGHTER:  I'm sorry, Your Honor?
 9              THE COURT:  I was talking to Ms. Magee.
10    BY MR. SLAUGHTER:
11    Q.  You made a few other combinations; is that correct?
12    A.  Yes, that's correct.
13    Q.  While we're sticking with just the combinations with
14    body-worn camera, did you make a couple of other
15    combinations of body-worn camera with the Frazier bystander
16    video?
17    A.  I did, with both Mr. Kueng's and Mr. Lane's.
18    Q.  And those are, just for the record, Government -- for
19    identification, Government Exhibit 23 and Government
20    Exhibit 24?
21    A.  Yes, that's correct.
22              MR. GRAY:  Excuse me.  Which one is which?
23              BY MR. SLAUGHTER:
24    Q.  23, would that be Mr. Lane's BWC and Ms. Frazier's
25    video?
```

1   A.  I believe that's correct, yes, sir.

2   Q.  And Government Exhibit 24, Mr. Kueng's BWC and

3   Ms. Frazier's video?

4   A.  Yes, sir.

5   Q.  Why make the two different once?

6   A.  Essentially because both of those give timing to

7   Darnella Frazier's video because it in itself does not have

8   a time stamp, as well as to compare the view of each officer

9   as Ms. Frazier's video was recorded.

10  Q.  Government Exhibit 21 is described as the Milestone and

11  Frazier video and audio.  Why did you create that one?

12  A.  I created that one because it gave -- as I said, the

13  Milestone gives a great overall view as showing where each

14  individual was during the incident, and having the ability

15  to see that and give timing information to the Frazier video

16  when it comes into play was helpful for me.

17  Q.  There's Government Exhibit 34 and 35.  You mentioned

18  before the side-by-side body-worn camera views?

19  A.  Yes, that's correct.

20  Q.  Is that Mr. Kueng and Mr. Lane's body-worn cameras?

21  A.  Yes, both comprise both Mr. Kueng and Mr. Lane's

22  body-worn cameras side by side.  One is being played back

23  with Mr. Kueng's audio and the other is played back with

24  Mr. Lane's audio.

25  Q.  Is 34 Mr. Kueng's audio and 35 Mr. Lane's audio?

1    A.  Yes, that's correct.

2    Q.  Well, why do that?  Why have the perspective of the two

3    BWCs across one another?

4    A.  Being able to see those two videos at the same time

5    really gives the totality of experience of each individual

6    officer during the event, as well as being able to see the

7    restraints being placed on Mr. Floyd at various times

8    throughout the course of the incident.

9    Q.  You made another Milestone/bystander combination on

10   Government Exhibit 25.  Why make another one when you did

11   one with Ms. Frazier?

12   A.  I'm sorry.  Can you give me a little bit more context

13   with Exhibit 25?

14   Q.  Oh, I apologize.  We haven't talked about the first one.

15   A.  Okay.

16   Q.  Did you -- well, first, let's just go with that.  The

17   combined Milestone and Oyler video/audio -- or I'm sorry,

18   just the video, that's Government Exhibit 25.  Why did you

19   make that one?

20   A.  Because they were coming from similar perspectives but

21   essentially slightly different.  So the Milestone was from

22   up above, and the videos recorded by Ms. Oyler were from

23   street level.  It just, again, gave context to each of those

24   sets of video with the overall view recorded by the

25   Milestone video.

```
 1              In addition to which the videos that were recorded
 2      by Ms. Oyler did not have time stamps either, and so it had
 3      that ability to place them in proper context in relationship
 4      to the time that they were recorded.
 5      Q.  So that's the reason for 25 in addition to 21 or
 6      separate from 21 --
 7      A.  Yes, sir.
 8      Q.  -- Government Exhibit 21 and 25?
 9      A.  Yes, sir.
10      Q.  You have -- we had another, if you will, Thao BWC and
11      Hansen bystander video that you created; is that correct?
12      A.  Yes, that's correct.
13      Q.  So it's separate and apart from the Frazier bystander
14      video combination with Officer Thao's BWC?
15      A.  Yes, that's correct.
16      Q.  Why did you make a separate one of that?
17      A.  Because Mr. Thao and Ms. Hansen had dialogue between
18      each other.  Watching those two side by side gave the
19      ability to see both sides of that conversation.
20              THE COURT:  Counsel, the number on that one was
21      what?
22              MR. SLAUGHTER:  Government Exhibit 33, Your Honor.
23              THE COURT:  Thank you.
24      BY MR. SLAUGHTER:
25      Q.  You had the combined Milestone and Oyler video at
```

     1    Government Exhibit 25.  You also made a combined Milestone

     2    and Officer Thao's BWC at Government Exhibit 27.  Why did

     3    you make that comparison or create that side-by-side?

     4    A.  Essentially making that comparison allowed me to be able

     5    to see, again, that overall with the Milestone of where the

     6    individuals were at various points in time, particularly in

     7    relationship to where the bystanders were as Mr. Thao had

     8    interactions with them.

     9    Q.  You made a number -- and we talked about it a little

    10    bit.  You had exterior, if you will, business cameras with

    11    combinations of things as well in addition to the Milestone;

    12    is that correct?

    13    A.  Yes, that's correct.

    14    Q.  Government 32 is the Kueng BWC and the Dragon Wok video.

    15    Why did you make that one?

    16    A.  Because there were some interactions in between the Cup

    17    Foods store and the Dragon Wok, closer to the Dragon Wok,

    18    that gave the ability to see what those interactions were,

    19    particularly as they were recorded by the Kueng body-worn

    20    cameras.

    21    Q.  A similar question for Government Exhibit 30.  The

    22    combined front Cup exterior -- we saw it looking out --

    23    combined with Officer Thao's BWC, how is that helpful?

    24    A.  Similarly, it gives a little bit of a different

    25    perspective than the Milestone.  So it gives the perspective

1    from just in front of the store and combining that and where

2    the bystanders were standing compared to the body-worn

3    camera worn by Mr. Thao.

4    Q.  And I should make clear, Government Exhibit 30, that

5    combination, was there -- it starts even with a disclaimer

6    because of the sizing on the screen; is that correct?

7    A.  Actually, it starts with a disclaimer because of the

8    timing on the Cup Foods.  So most of the video sources had

9    what's called a regular frame rate, where it plays back

10   regularly.  Unfortunately, with digital video recorders that

11   are used within security applications, often these have

12   what's called variable frame rates, where it doesn't play

13   back quite as regularly.  And so I had to make some

14   adjustments to the timing to the Cup Foods' exterior video

15   in order to make it play back in real time.

16   Q.  Government Exhibit 31, that's a combined front Cup

17   exterior with the Frazier video.  Why did you make that one?

18   A.  Once again, it gives that synchronized video between the

19   two, between the Frazier and the front Cup exterior, and it

20   gives that perspective of seeing where everyone is at

21   various times as the Frazier video is being recorded.

22   Q.  Is it common to make, like, this number of combinations

23   when it's this number of video sources?

24   A.  Absolutely.

25   Q.  So -- and I should ask you:  Some of these videos have

1    audio sources; is that correct?

2    A.  Yes, that's correct.

3    Q.  How is that shown or how is it made clear to someone

4    seeing it, that there's a change in audio or the source of

5    audio?

6    A.  What I did was in each case I indicated on the file name

7    where the audio was being recorded or which recording device

8    was capturing the audio.

9              In addition to that, you will see on multiples of

10   the synchronized videos that there is essentially like a

11   little audio symbol and that denotes which recording device

12   is capturing the audio that you can hear.

13   Q.  Well, to be clear, as to each of these side-by-side

14   proposed exhibits, have there been any additions or

15   deletions, alterations to the content from the original

16   media that have been entered into evidence here already

17   today?

18   A.  Absolutely not.

19             MR. SLAUGHTER:  With that, Your Honor, the

20   government offers into evidence, and I think I have the

21   list, I can go through it, but Government Exhibit 21, 23,

22   24, 25, 27, 28, 30, 31, 32, 33, 34, and 35, Your Honor.

23             THE COURT:  They are offered.  Are there

24   objections?

25             MR. PLUNKETT:  Objection, Your Honor, 403.

1                    THE COURT:  Okay.  Objection has been made.  We'll

2        discuss it at sidebar.

3            **(At sidebar)**

4                    MR. SLAUGHTER:  I'm here, Your Honor.

5                    MR. PLUNKETT:  Tom Plunkett is here, Your Honor.

6                    THE COURT:  Okay.  Proceed.

7                    MR. PLUNKETT:  Thank you, Your Honor.  Your Honor,

8        I've put in a written motion on this.  I think the court is

9        pretty familiar with the issue that I'm concerned about, and

10       it really goes to giving a completely different perspective

11       to the jury than any of these gentlemen could actually see

12       and appreciate, especially, but not limited to, the videos

13       that combine the Frazier with those body-worn cameras.

14                   I think that the videos -- those videos are

15       particularly troubling because the people even making the

16       videos couldn't even see Kueng and Lane, and Lane and Kueng

17       couldn't see what was going on on the other side of the car.

18       They had absolutely no appreciation of that.  They couldn't.

19       They couldn't see it.  And a large part of it they couldn't

20       even hear it because of the struggles and other things that

21       were going on.

22                   This is going to cause the jury to look at these

23       videos and develop a belief, albeit extremely false.  Even

24       if it's not a belief, it's going to be a confirmation bias

25       that this is going on while our clients were there.

1          Now, those are the ones that are especially

2     troubling.  That doesn't mean that the other combination

3     videos are any less troubling when we have the Dragon Wok --

4     pardon me, not the Dragon Wok, the Milestone combined with

5     Oyler.

6          Now, that one is not as bad because they are on

7     the same side, but, again, it is a completely different

8     perspective.  And the Milestone video is showing a much

9     broader range, and the Oyler video is really not that good

10    of a video, but it is from a different angle.

11         I think -- I could go on and on on this, but, you

12    know, the bottom line is this is tremendously prejudicial.

13    We can't unring this bell.  This is going to go into the

14    jury room, and these good and true jurors are going to be

15    looking at this seeing Derek Chauvin torturing a man at the

16    same time that they're looking at, you know, what my client

17    is looking at and they are going to attribute that knowledge

18    to my client.  It's not just my client.  Mr. Lane and

19    Mr. Thao too and their respective videos.

20         Thank you, Your Honor.

21         MR. ROBERT PAULE:  Your Honor, Robert Paule.  May

22    I add something?

23         THE COURT:  Certainly.

24         MR. ROBERT PAULE:  Thank you, Your Honor.

25         I would note that what the government is proposing

1   doing is adding a total of 12 additional videos of

2   undetermined amount of minutes being played.  And I would

3   like to object, in addition to the things that Mr. Plunkett

4   has said, to the cumulative effect of this.

5         And I would point out a couple different things.

6   Essentially, it's turning videos into a tidal wave of

7   evidence that's just repetitive.  It's just from different

8   angles.

9         I would note that this witness has used the word

10  "context" to describe the advantage of these approximately a

11  dozen times.  She also talks about perspective.  But the

12  reality is this is a sheep in wolf's clothing -- or wolf in

13  sleep's clothing, excuse me, because it allows the

14  government the opportunity to just play and play and play

15  these videos over and over again.

16        So I would join in that objection and add that

17  particular objection.

18        MR. GRAY:  Your Honor?

19        THE COURT:  Thank you.

20        Mr. Gray.

21        MR. GRAY:  Earl Gray, Your Honor.  Also, it's

22  totally unfair because these combination videos are not

23  heard or seen by my client.  I mean, maybe one or two at

24  certain times.  But when you've got combination videos like

25  this, you have total unfair evidence to my client, who has a

1   body-worn camera and he's paying attention to what he's

2   doing and not all of these other cameras combined with that.

3   It's unfair.  It's Rule 403.

4            Thank you.

5            THE COURT:  Okay.  Thank you.

6            Mr. Slaughter?

7            MR. SLAUGHTER:  Thank you, Your Honor.

8            I'd like -- first, the witness has testified as to

9   the actual probative value of these types of exhibits, and

10  they are for purposes of providing value.

11           And during each one of the opening statements you

12  heard the respective counsel talk in terms of relying on the

13  video, relying on the evidence.  Mr. Paule even talked in

14  terms of, you know, what happened before the Frazier video,

15  things of that nature.  Mr. Plunkett, I know, relies -- or

16  he said on multiple occasions the fact that what is seen is

17  perception.

18           But going just to that issue alone, the issue as

19  to what is being heard, what is being seen by the

20  bystanders, what is being said by the bystanders, and what

21  they heard by the officers on their body-worn cameras and

22  how they react to what they are hearing, in combination that

23  is of relevance, particularly the timing, Your Honor.

24           These videos are common.  This is not something

25  that is new or unique.  And the instruction can be very

1   clear to the ladies and gentlemen of the jury when it comes

2   to the combinations themselves.

3          We are trying to facilitate things as opposed to

4   make things be heard over and over again.  In fact, I have

5   an anticipated presentment involving these -- a limited

6   number of exhibits that would be very short and actually

7   less than 90 minutes, approximately, if we were able to

8   accomplish that.  It would be much faster with regard to the

9   presentment of this overall media -- and the fact of the

10  matter is counsel, their objection --

11         THE COURT:  Counsel, let me interrupt.  You are

12  talking about the timing of it.  You say that you could show

13  these in 90 minutes.  If you look at Exhibit 21 itself, that

14  is well over one-hour long.

15         MR. SLAUGHTER:  Yes, Your Honor.

16         THE COURT:  That is in evidence as -- one of these

17  combination things, the entire thing is in evidence, not

18  this.

19         Now, if it were edited down to, you know, a

20  two-minute segment, I might think differently about this,

21  but I can't see putting in an exhibit that's over an hour

22  long and telling the jury that, well, two minutes is enough.

23  They will look at the whole thing.

24         MR. SLAUGHTER:  Well, Your Honor, and the reason

25  for the length of --

1               THE COURT:  I'm having trouble hearing you.

2               MR. SLAUGHTER:  What's that?

3               THE COURT:  Take your mask off.  That will help.

4    Okay.

5               MR. SLAUGHTER:  Can you hear me now?

6               THE COURT:  Yeah, I can hear much better.

7               MR. SLAUGHTER:  Your Honor, I didn't press further

8    or go further with the witness, but we can have the witness

9    describe how we built a window of time of one hour for the

10   combination, especially with respect to the body-worn

11   cameras, on purpose in -- frankly, in an effort to avoid any

12   objection from defense counsel that we were missing

13   anything.  That actually came up in conference with counsel

14   in December when we were trying to have these finalized.

15   The combined videos themselves are longer basically because

16   defense counsel wanted to make sure that they were of a

17   certain length, and that's when we were having a

18   conversation about the combined videos themselves.

19              But we would point to certain increments of time.

20   I am not proposing to play the entirety of all these videos

21   at all, Your Honor.  We would point to a particular video.

22              THE COURT:  Counsel, first of all, they are

23   duplicative because you already introduced every one of

24   these by stipulation.  So now we're talking about -- about a

25   second bite of the same apple.  That's a concern.

1            The second concern I have is a jury should decide

2    the case based upon the facts that everybody knows is

3    evidence in the case.  And to say you are going to have just

4    these few minutes but introduce these long, long exhibits,

5    long videos, at that point the defendants, the witness, the

6    court has no idea what the jury would be deciding the case

7    on if they have all of that in their -- in their background

8    in their deliberation room.

9            MR. SLAUGHTER:  Your Honor, if we can narrow the

10   window of time for purposes of these combined videos

11   themselves, would that assuage the court's concerns?  And

12   there's really, in reality, a narrower window of time when

13   it comes across all of these.  The only reason they were

14   extended was because of that.

15           THE COURT:  Counsel, let me talk about another

16   subject.  Ms. Meline talked about with some officers, their

17   body-worn cameras, there were three segments, sometimes four

18   segments, sometimes one segment.  How do we have any idea

19   what that is?

20           MR. SLAUGHTER:  All of them are related to time,

21   Your Honor, so the --

22           THE COURT:  How would I know?  How do I know at

23   this point what's --

24           MR. SLAUGHTER:  It's on the recording itself, Your

25   Honor.  The time is indicated when the body-worn cameras are

1    combined with anything.  The actual military time is

2    recorded.

3              THE COURT:  Counsel, I guess you are right about

4    that, but at the same token, when that camera is going by

5    and that scene is going by, how does one recognize this is a

6    place that -- this has changed from this subject to that

7    subject?

8              MR. SLAUGHTER:  It's only one thing, Your Honor --

9    I'm sorry.  One moment, Your Honor.

10                  (Pause)

11             MR. SLAUGHTER:  The body-worn cameras themselves

12   are -- other than the two different officers being combined,

13   the body-worn cameras are combined with separate video

14   sources, so it's very clear and it is made clear in each one

15   of the exhibits.  They are described very clearly that's the

16   source of the media itself.

17             THE COURT:  Okay.  Anything further from the

18   defense?

19             MR. PLUNKETT:  Nothing from Tom Plunkett, Your

20   Honor.

21             THE COURT:  Okay.  Counsel, I'm going to at this

22   time receive -- and I need to -- excuse me a minute.

23                  (Pause)

24             THE COURT:  I'm going to at this time overrule the

25   objection as it relates to Exhibit No. 21, the combined

 1    Milestone and Frazier video and audio.  I do so because the

 2    Milestone camera gives an overall view of the area involved

 3    in the subject and context can be placed with that Frazier

 4    video.  However, by doing that, I'm suggesting that the

 5    Frazier video and audio will be -- that was received in that

 6    earlier document should be removed.

 7           The court will make the same ruling with respect

 8    to the combined 22 -- no.  I'm sorry.  The combined

 9    Milestone 25 with the Oyler video and 27, the combined

10    Milestone and the BWC video, I take that of Mr. Thao, I

11    guess that is, I will receive that.

12           I would defer any further rulings with respect to

13    any other combined videos to know specifically what the --

14    what portions would be shown or should not be shown and

15    counsel for the defense will be made aware of that.

16           But, in the meantime, I am -- if the entire matter

17    is produced, then I'm going to sustain the balance -- I

18    would then sustain the balance of the combined documents as

19    being prejudicial, being duplicative, and in violation of

20    403.

21           With that --

22           MR. SLAUGHTER:  Your Honor, if I may, before I

23    proceed with anything, I want to make sure I'm clear on the

24    numbers.  You are --

25           THE COURT:  I'm receiving 21 --

```
 1                    MR. SLAUGHTER:  25 and 27?

 2                    THE COURT:  -- 25 and 27 at this point in time.

 3                    MR. SLAUGHTER:  None of the other combined?

 4                    THE COURT:  None of the other combined are

 5          received at this time.

 6                          (In open court)

 7                    THE COURT:  Members of the jury, Exhibits No. 21,

 8          25, and 27 are received at this time pending further

 9          discussion.

10                    Proceed.

11                    MR. SLAUGHTER:  One moment, please, Your Honor?

12                    THE COURT:  Certainly.

13                    MR. SLAUGHTER:  Your Honor, if I may confer with

14          counsel?

15                    THE COURT:  You may.

16                          (Counsel confer)

17                    MR. SLAUGHTER:  I apologize, Your Honor.  In

18          conferring with counsel, I'm going to play what is

19          Government Exhibit 5, the first segment of Government

20          Exhibit 5.

21                    THE COURT:  Very well.  Proceed.

22                    MR. SLAUGHTER:  It's the Lane body-worn camera.

23          If we could dim the lights a little bit, please, Your Honor?

24                    THE COURT:  Counsel, when you play that, if you'd

25          be kind enough to help me with where the segment business
```

```
 1    comes into play, so I could understand it a little better.
 2                MR. SLAUGHTER:  Your Honor, the segment itself is
 3    in the underlying raw media -- I'm sorry, the raw video.
 4    There are three separate sections on the underlying exhibit
 5    that's on the disk itself, the drive that will go to the
 6    jury.
 7                THE COURT:  Okay.
 8                MR. SLAUGHTER:  For purposes --
 9                THE COURT:  Just point it out to me.
10                MR. SLAUGHTER:  For purposes of the time, we have
11    the time indicated on the body-worn camera and it begins at
12    the time that's indicated.
13                THE COURT:  All right.
14                MR. SLAUGHTER:  Playing what is Government
15    Exhibit 5, Your Honor.
16                THE COURT:  Proceed.
17                MR. SLAUGHTER:  At this point it begins at 28 --
18    it's at :08 and rolling, and this is approximately
19    34 minutes, Your Honor.
20                      (Video recording played)
21                MR. SLAUGHTER:  Your Honor, for the record, I
22    paused this video at 20:34:16 on the body-worn camera
23    footage.
24                I don't know if the court is inclined to have
25    another video yet this afternoon or if this -- coming up on
```

1   the 5 o'clock hour or not.

2            THE COURT:  Well, are we done with this one?

3            MR. SLAUGHTER:  At this point in time.  I'd

4   continue -- there is additional, obviously, additional media

5   we can play it through, if the court is so inclined, instead

6   of -- and having it play through.  Of course, this exhibit

7   will be used during later testimony as well.

8            THE COURT:  Well, I -- it's up to you.  If we

9   don't play beyond this, that's fine.  If you want to finish

10  the entire thing, that's fine too.  But anything that's not

11  shown to the jury is not going to be permanently kept in the

12  evidence.

13           MR. SLAUGHTER:  Not with this particular witness,

14  Your Honor.

15           THE COURT:  Okay.  Then we'll stop at this point.

16           MR. SLAUGHTER:  For this particular exhibit, Your

17  Honor.

18           THE COURT:  Yeah.

19           MR. SLAUGHTER:  We will play a portion of the

20  Kueng body-worn camera, if the court is so inclined.  I

21  don't know if it's -- I know it's a quarter of 5:00.

22           THE COURT:  Well, how long is the portion you want

23  to play?

24           MR. SLAUGHTER:  It's approximately 20 minutes,

25  Your Honor.

 1              THE COURT:  Yeah, maybe we should stop then.

 2              Okay.  Can we have on the lights, please, and take

 3      down the exhibit, please.

 4              Members of the jury, we are going to stand in

 5      recess at this time until tomorrow morning.  We will

 6      commence again tomorrow morning at 9:30 a.m.

 7              I would caution you during -- again, during the

 8      course of the evening not to have any discussions amongst

 9      yourselves, with other persons with respect to the case.

10      Please don't read or listen to any media accounts with

11      respect to the case.

12              And with all of that, have a good evening.

13              One other thing.  Don't carry out any personal

14      investigations.  You don't need to go over to 38th and

15      Chicago.  You don't even need to stop at Cup Foods tonight.

16      You can go to Cub Foods, but not Cup.

17              Okay.  With that, have a good evening.  We will

18      see you tomorrow morning at 9:30.  The jury may be excused.

19                  (Jury excused)

20                        **IN OPEN COURT**

21                     **(JURY NOT PRESENT)**

22              THE COURT:  Counsel, why don't we gather at 9:00

23      or just a few minutes after 9:00 to further discuss some of

24      these items.  Thank you.

25              MR. SLAUGHTER:  Understood, Your Honor.

1          THE COURT:  See you tomorrow.

2          You go ahead.  I have to clean up some things

3    here, so we're in recess.  We're done.

4          (Court adjourned at 4:45 p.m., 01-24-2022.)

5                        *   *   *

6               I, Renee A. Rogge, certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9               Certified by:  /s/Renee A. Rogge
                               Renee A. Rogge, RMR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25