UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )
United States of America,   )  File No. 21-cr-108
                              )              (PAM/TNL)
        Plaintiff,          )
                              )
v.                          )
                              )
Tou Thao(2),                )  Courtroom 7D
J. Alexander Kueng(3), and  )  St. Paul, Minnesota
Thomas Kiernan Lane(4),     )  Thursday February 17, 2022
                              )  9:24 a.m.
        Defendants.         )
                              )
------------------------------------------------------------


BEFORE THE HONORABLE PAUL A. MAGNUSON
UNITED STATES DISTRICT COURT SENIOR JUDGE


**(JURY TRIAL PROCEEDINGS - VOLUME XVIII)**


        Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1      APPEARANCES:

 2       For Plaintiff:           UNITED STATES ATTORNEY'S OFFICE
                                  BY:  ALLEN A. SLAUGHTER, JR.
 3                                     LEEANN K. BELL
                                       MANDA M. SERTICH
 4                                300 South 4th Street, #600
                                  Minneapolis, MN 55415
 5
                                  DEPARTMENT OF JUSTICE
 6                                CIVIL RIGHTS DIVISION
                                  BY:  SAMANTHA TREPEL
 7                                150 M Street NE
                                  Washington, D.C. 20530
 8
         For Defendant            ROBERT M. PAULE, PA
 9       Tou Thao:                BY:  ROBERT M. PAULE
                                  920 2nd Avenue South, #975
10                                Minneapolis, MN 55402

11                                PAULE LAW PLLC
                                  BY:  NATALIE PAULE
12                                5100 West 36th Street
                                  P.O. Box 16589
13                                Minneapolis, MN 55416

14       For Defendant            LAW OFFICE OF THOMAS C. PLUNKETT
         J. Alexander Kueng:      BY:  THOMAS C. PLUNKETT
15                                101 East 5th Street, #1500
                                  St. Paul, MN 55101
16
         For Defendant            EARL GRAY DEFENSE
17       Thomas Kiernan Lane:     BY:  EARL P. GRAY
                                  332 Minnesota Street, #W1610
18                                St Paul, MN 55101

19       Court Reporter:          RENEE A. ROGGE, RMR-CRR
                                  United States District Courthouse
20                                300 South 4th Street, Box 1005
                                  Minneapolis, MN 55415
21

22

23

24

25
```

3513

1          <u>**I N D E X**</u>

                                                        <u>PAGE</u>
2   **J. ALEXANDER KUENG**
        Continued Cross-Examination by Ms. Sertich    3518
3       Redirect Examination by Mr. Plunkett          3610
        Recross-Examination by Ms. Sertich            3622
4
5   **STEVE IJAMES**
        Direct Examination by Mr. Plunkett            3624
        Cross-Examination by Ms. Sertich              3664
6
7   **GARY NELSON**
        Direct Examination by Mr. Gray                3703
        Cross-Examination by Ms. Trepel               3719
8       Redirect Examination by Mr. Gray              3731

9

    DEFENDANT KUENG RESTS                              3702
10

11

    <u>DEFENDANT KUENG EXHIBITS</u>                          <u>REC'D</u>
12      K-Y                                           3611

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                **IN OPEN COURT**

3              **(JURY NOT PRESENT)**

4       (Defendants present)

5              THE COURT:  Good morning, everyone.

6              I had a couple things I wanted to ask you about.

7       One is I think way, way back, when we had our probably very

8       first session together, I had asked all of you to see if you

9       could come to agreement on verdict forms for the case.

10             I don't know if anything's ever been done about

11      that.  Obviously, the verdict form in a criminal case are

12      pretty simple.  But, nevertheless, if you have an agreement

13      on it, good; if you don't, why, I will give you one.

14             MS. BELL:  Judge, I don't think we ever actually

15      discussed having an agreement.  I know I submitted one.  I

16      can certainly --

17             THE COURT:  You submitted one.

18             MS. BELL:  I can check in with defense counsel and

19      see if we agree.

20             THE COURT:  Yeah, you're the only one who has a

21      submission.

22             MS. BELL:  Okay.

23             THE COURT:  Anyway, that's -- I just would ask

24      that you visit with one another about that.

25             I guess aside from that, I don't have a lot more.

```
 1    One question I might have, and this is just giving me some
 2    rough planning.  Ballpark, what kind of time would the
 3    prosecution think you need for final and rebuttal argument?
 4              MS. BELL:  Your Honor, I don't know that I thought
 5    about it in terms of time.  I imagine with three defendants,
 6    who have kind of what I call some different arguments --
 7              THE COURT:  Sure.
 8              MS. BELL:  -- I guess an hour and a half, two
 9    hours, somewhere in there, total, depending on what's going
10    on.
11              THE COURT:  Sure.  Okay.
12              Mr. Paule, what kind of time would you ballpark
13    guess that you're looking at?
14              MR. ROBERT PAULE:  Your Honor, I would say an hour
15    and a half at the most.
16              THE COURT:  Okay.  Mr. Plunkett?
17              MR. PLUNKETT:  I would hope an hour to an hour and
18    a half, Your Honor.
19              THE COURT:  Okay.  And Mr. Gray?
20              MR. GRAY:  I was hoping I wouldn't have to do
21    this.  I'm still waiting for my -- I wouldn't be that long,
22    judge.  I would probably be 40 minutes.
23              THE COURT:  Okay.  It would be a long day, but if
24    we can get that done in roughly the time you are talking
25    about, it would be about a six-hour day, which would
```

 1      probably mean starting a little earlier, probably mean a

 2      little shorter lunch hour.

 3                   MS. BELL:  That's what I was thinking.

 4                   THE COURT:  And see if we can make it, but we will

 5      work on that when the time comes.  It's -- that's a bridge

 6      that we're not at yet.

 7                   Ms. Sertich, you want to use a transcript?

 8                   MS. SERTICH:  Yes, Your Honor.  Would you like for

 9      me to put them on chairs or wait till they are in to hand

10      them out?

11                   THE COURT:  I think probably hand them out.

12                   MS. SERTICH:  Okay.

13                   THE COURT:  And, counsel, you're aware that

14      Ms. Sertich wants to use a transcript?

15                   MR. PLUNKETT:  The first I've heard of it, Your

16      Honor.

17                   THE COURT:  Okay.  I think you have the

18      transcript.

19                   MR. PLUNKETT:  Probably.

20                   THE COURT:  And I've permitted it -- I permitted

21      it to be used by the defense, so I will permit it to be used

22      by the government.

23                   MR. PLUNKETT:  I'd only ask if you're going to ask

24      Mr. Kueng questions based on a transcript, that he has a

25      transcript in front of him.

```
 1                THE COURT:  Okay.  That's fine.  Sure.

 2                MR. PLUNKETT:  One other thing, Your Honor.  I'm

 3     hoping the court would consider, if necessary, going till

 4     5 o'clock today.

 5                I've got an expert that would like to not stay in

 6     Minnesota anymore, as much as he has enjoyed it.

 7                THE COURT:  It's cold out today, isn't it?

 8                MR. PLUNKETT:  It's a little cool.

 9                THE COURT:  Yeah, if we need to go to 5:00, we

10     will.

11                MR. PLUNKETT:  Thank you, Your Honor.

12                MR. GRAY:  I have a witness here from Las Vegas.

13     I thought I would be starting today.  We couldn't go till

14     7 or 8 o'clock tonight?  I'm kidding, but --

15                MR. PLUNKETT:  I'm certainly open to --

16                THE COURT:  You bet you are kidding, yeah.

17                MR. GRAY:  I don't know what to tell him, I guess.

18                THE COURT:  Yeah, I think -- of course, I

19     obviously don't know.  You folks have a far better handle

20     than I do on the amount of time it's going to take, so we'll

21     leave that for -- leave that for the future as we get to it.

22                Okay.  Anything else before we call for the jury?

23                MS. BELL:  No, Your Honor.

24                THE COURT:  Okay.  Let's get the jury.

25
```

```
1                       IN OPEN COURT

2                       (JURY PRESENT)

3              THE COURT:  You may be seated.

4              Good morning, members of the jury, and welcome

5   back.  Good to have you here.

6              And, Ms. Sertich, do you want to continue, please?

7              Okay.  Members of the jury, Ms. Trepel is passing

8   out to you transcripts of Exhibit 7 from the camera of

9   Exhibit 7.  This is Exhibit 7-A.

10             Once again, like the transcripts you've seen

11  before, if there's any discrepancy between the transcript

12  and what you see on the actual video, you are bound by what

13  you see on the video and not the transcript, because the

14  transcript is somebody else's idea of what was said.  But it

15  is here for your convenience and your assistance.

16             Okay.  With that, Ms. Sertich, do you want to

17  continue?

18             MS. SERTICH:  Yes.  Thank you, Your Honor.

19                   J. ALEXANDER KUENG,

20  called on behalf of Defendant Kueng, was previously duly

21  sworn, was examined and testified further as follows:

22               CONTINUED CROSS-EXAMINATION

23  BY MS. SERTICH:

24  Q.  Good morning, Mr. Kueng.

25  A.  Good morning, ma'am.
```

```
1    Q.  You testified on direct examination that you took the
2    40-hour medical responder course the week before you started
3    at the academy, correct?
4    A.  Is that the EMR course you are referring to, ma'am?
5    Q.  That's right.
6    A.  Yes, ma'am.
7    Q.  And you got that big green book?
8    A.  Yes, ma'am.
9    Q.  You learned about rolling arrestees onto their side
10   during that course, didn't you?
11   A.  I don't recall it being in specific response to
12   arrestees, ma'am.  People in medical distress.
13   Q.  And -- but you testified that no one ever demonstrated
14   it or that you never had a scenario where you had to do it;
15   is that right?
16   A.  Not that I can recall, ma'am.
17   Q.  But you knew what it looked like, right?
18   A.  Yes, ma'am.
19   Q.  Okay.  It's just someone on their side and you make sure
20   that they can't tip back over, right?
21   A.  Yes, ma'am.
22   Q.  And obviously Officer Lane had been trained on it since
23   he brought it up on May 25th of 2020, right?
24             MR. PLUNKETT:  Objection.  Calls for speculation.
25             THE COURT:  Excuse me.
```

```
1              (Pause)
2              THE COURT:  Oh, I see.  Excuse me.  I didn't
3    understand the question at the beginning.  I overrule and
4    the witness may answer the question.
5              THE WITNESS:  That would be my assumption, ma'am.
6    BY MS. SERTICH:
7    Q.  Okay.  And you were in that same academy course as he
8    was?
9    A.  Yes, ma'am.
10   Q.  Okay.  Do you remember a call during your FTO period in
11   mid March of 2020 where you responded to a seemingly
12   intoxicated woman who was combative and fighting with her
13   family?
14   A.  Yes, ma'am.  Was this a young female, kind of maybe
15   teenage age?
16   Q.  Throwing things at her mom?
17   A.  Yes, ma'am.
18   Q.  Okay.  And you stopped her by putting her in handcuffs
19   to prevent her from injuring herself or others, right?
20   A.  Yes, ma'am.
21   Q.  And then she started hitting her own head against the
22   refrigerator, right?
23   A.  I believe so, ma'am.  She also started to vomit.
24   Q.  And you brought her down to the ground and placed her on
25   her side, right?
```

```
 1    A.  I did.  I didn't want her to choke on her vomit, ma'am.

 2    Q.  And so you put her on her side to prevent further injury

 3    to herself?

 4    A.  Yes, ma'am.

 5    Q.  Okay.  But in your testimony yesterday, you said that

 6    what you learned about the side recovery is that it was

 7    talked about mostly for people who were unconscious or

 8    unresponsive, right?

 9    A.  Yes, ma'am.  The reference specifically to Narcan is

10    what I recall the most talk about side recovery.

11    Q.  But this woman wasn't unconscious or unresponsive?

12    A.  No, ma'am, but she was in a puddle of her own vomit.

13    Q.  And you knew that was the way to keep her airway open?

14    A.  I assumed that would prevent her from inhaling her

15    vomit, yes, ma'am.

16    Q.  And the whole purpose of this EMR course, right, is to

17    allow you to address medical needs as they arise out in the

18    field, right?

19    A.  Yes, ma'am.  It's also to understand and try and balance

20    scene safety and when medical response is required.

21    Q.  So, specifically, you can provide that care before an

22    ambulance arrives, correct?

23    A.  If needed, yes, ma'am.

24    Q.  That includes anything from trauma care, like

25    tourniquets, right?
```

```
 1    A.  Yes, ma'am.

 2    Q.  CPR?

 3    A.  Yes, ma'am.

 4    Q.  And you learned that you have a duty to act to provide

 5    medical care within the scope of your medical training,

 6    right?

 7    A.  Yes, ma'am, when the scene is safe.

 8    Q.  So whether or not a person is an arrestee -- and I think

 9    this is what you what you were getting at earlier -- if an

10    MPD officer is out in public and someone needs medical care,

11    the officer has a duty to provide it, right?

12    A.  After securing the scene, yes, ma'am.

13    Q.  And that's to the best of their medical ability?

14    A.  Yes, ma'am.

15    Q.  And also includes people in the officer's custody and

16    care, right?

17    A.  It does, ma'am.

18    Q.  Okay.  And, yes, it's only for when you are safe, right?

19    A.  Yes, ma'am, when the scene is --

20        (Simultaneous indiscernible crosstalk)

21    Q.  -- officer?

22    A.  -- safe.

23            Sorry, ma'am, I talked over you.  Could you please

24    repeat?

25    Q.  Safe for the officer?
```

1    A.  Yes, ma'am.

2    Q.  Safe for the patient?

3    A.  Yes, ma'am.

4    Q.  Safe for paramedics when they are showing up, you'd

5    agree?

6    A.  Yes, ma'am.

7    Q.  And you had a unit in that EMR course on airway,

8    breathing, and oxygenation, correct?

9    A.  The ABCs, ma'am?

10   Q.  Well, the unit was called airway, breathing, and

11   oxygenation, not -- that was the whole unit, not just

12   talking about the ABCs?

13   A.  Understood, ma'am.  I don't recall that specific

14   verbiage, but I'll take your word for it, ma'am.

15   Q.  All right.  And yesterday you said that during the ABCs

16   of assessment, one of the things you learned was that if

17   someone is talking, their airway isn't obstructed, right?

18   A.  Yes, ma'am.

19   Q.  Okay.  So hearing that someone can talk means they

20   probably don't have to worry about -- you don't have to

21   worry and they don't have to worry about a complete

22   obstruction in their airway, right?

23   A.  Don't have to worry about obstruction in their airway,

24   correct, ma'am.

25   Q.  Okay.  But you said yesterday that hearing a person --

1    that a person can talk is the entirety of that "A," airway,

2    part of the ABCs, right?

3    A.  That was the main --

4              MR. PLUNKETT:  Objection.  Misstates the evidence.

5              THE COURT:  Sustained.

6    BY MS. SERTICH:

7    Q.  Do you think that hearing that a person can talk is the

8    entirety of that "A" part of the ABCs?

9    A.  My understanding, ma'am, is that is the main thing, yes,

10   ma'am, that if you can talk, your airway is not blocked.

11   Q.  But you learned with respect to that "A" in the ABCs

12   that there's different ways that you should assess or

13   position an airway for effective respiration, right?

14   A.  Yes, ma'am, in effect, if you believe the airway is

15   blocked.

16   Q.  Do you know what positional asphyxia is?

17   A.  I'm aware of the term, ma'am, yes.

18   Q.  So you understand that someone can have trouble

19   breathing even if there's not an obstruction down in their

20   airway, right?

21   A.  Yes, I do understand that the lung expansion seems to be

22   restricted when they're in the prone position, ma'am.

23   Q.  Or it might be that their upper airway around their neck

24   is restricted, right?

25   A.  That's not what I've understood it, ma'am.  More like

1   chest rise.

2   Q.  You haven't learned about repositioning someone's head

3   to open their airway?

4   A.  I understood that as being part of the tongue occluding

5   the airway, ma'am, to open up the airway wider.

6   Q.  But what you also learned during your EMR course is that

7   a talking patient may not be breathing adequately; is that

8   right?

9   A.  I don't specifically recall that, ma'am.

10  Q.  Okay.  I'm showing you page 109 of Government's

11  Exhibit 82.  This is a slide from your EMR training.  And

12  could you just read that top bullet point, please.

13  A.  It says, "Although a talking patient is a breathing

14  patient, breathing may not be adequate.  Check for:"

15  Q.  Okay.  And then it tells you a list of things that you

16  should assess to make sure that someone is breathing

17  adequately, correct?

18  A.  Correct, ma'am.

19  Q.  Would you take my word for it, so I don't have to pull

20  it out, that this is covered in greater depth on page 199 of

21  your EMR course book?

22  A.  I take your word for it, ma'am.

23  Q.  And we know that Mr. Floyd stopped talking just over

24  four and a half minutes into the restraint on May 25th,

25  2020, correct?

```
1    A.  I trust your timeline, ma'am.

2    Q.  Okay.  So you testified yesterday that you'd been

3    saying, you know, "He's talking, so he's breathing," right?

4    A.  I believe I mentioned that once, ma'am.

5    Q.  Okay.  And you heard others saying it on the scene?

6    A.  I did, ma'am.

7    Q.  Okay.  So four and a half minutes in, he stops talking.

8    You know that's a red flag, right?

9    A.  It is something to reassess for, ma'am, yes.

10   Q.  After that happened, though, you didn't change anything

11   you were doing with respect to Mr. Floyd, correct?

12   A.  Correct, ma'am.  I was still monitoring.

13   Q.  And neither did Officer Chauvin?  He stayed in the same

14   spot?

15           MR. PLUNKETT:  Objection.  Calls for speculation.

16           THE COURT:  Sustained.

17   BY MS. SERTICH:

18   Q.  Did you see or observe Mr. Chauvin change anything that

19   he was doing after Mr. Floyd stopped talking?

20   A.  Not to my understanding, ma'am, but I was not focussed

21   on his position very thoroughly.

22   Q.  And you also had a unit in that EMR course on CPR,

23   correct?

24   A.  Yes, ma'am.

25   Q.  You were certified as a result of that course?
```

1    A.  Correct, ma'am.

2    Q.  And, in fact, you learned that you should check

3    breathing and a pulse for no more than ten seconds before

4    you start performing CPR, right?

5    A.  I do recall that in the book, ma'am.

6    Q.  Okay.  And you maybe did some practicing that included

7    those instructions that you got evaluated on?

8    A.  Could you be a little more specific, ma'am?

9    Q.  Sure.  I'll show you Government's Exhibit 85, page 6.

10   Does this look like a sort of practice exam that you would

11   do and get scored on?

12   A.  It does look like that type of form, yes, ma'am.

13   Q.  Okay.  It's got your name on it and it's from July 2019,

14   right?

15   A.  Yes, ma'am.

16   Q.  That sounds about right for when you were in that

17   course?

18   A.  It does, ma'am.

19   Q.  Okay.  And right here in the middle where it says,

20   "Note," can you read what that says.

21             MR. PLUNKETT:  I'm going to object to the use of

22   this exhibit.  This is a cardiac arrest exhibit and we're

23   asking questions about CPR.

24             THE COURT:  Well, I can't read it, so I have no

25   idea what's being presented.

1    BY MS. SERTICH:

2    Q.  Cardiac Arrest Management.  And I just asked you,

3    Mr. Kueng, right, that if you are checking breathing and a

4    pulse, it's been more than ten seconds, that's when you

5    should start CPR, right?

6                MR. PLUNKETT:  So, Your Honor, now that we know

7    this is a cardiac arrest exhibit and not the CPR exhibit,

8    I'm going to renew my objection.

9                THE COURT:  Yeah, I'm going to sustain that

10   objection, counsel.  We're mixing apples and oranges here.

11               MS. SERTICH:  Well, it does say, "checking

12   breathing and a pulse for no more than ten seconds."

13               MR. PLUNKETT:  I'm not sure if that's a question,

14   Your Honor.  I don't think it is.

15               THE COURT:  I don't know if it is either, but I'm

16   going to sustain.

17               MR. PLUNKETT:  I'm asking that the cardiac arrest

18   be taken down.  There's a CPR one too.

19               THE COURT:  Please do.

20   BY MS. SERTICH:

21   Q.  All right.  I think you even said yesterday, though,

22   that you learned that when you can't find a pulse or you're

23   checking breathing and you can't find one, you've learned

24   that time is of the essence, correct?

25   A.  Yes, ma'am.

```
1    Q.  Okay.  You also testified yesterday that you suspected
2    Mr. Floyd had excited delirium, right?
3    A.  Yes, ma'am, that he may be experiencing excited
4    delirium.
5    Q.  And one of the things you said was that you thought he
6    might have excited delirium because he had, I think you
7    called it, an inert pain response; is that right?
8    A.  Yes, ma'am.
9    Q.  And you explained that -- you correct me if I'm wrong --
10   you were using a wrist lock when you were escorting him that
11   should have caused him pain when he dropped to the ground,
12   but he didn't seem to feel that pain or react to it or
13   mention it, right?
14   A.  Correct, ma'am.
15   Q.  So I'm going to now use Government's Exhibit 7-A, and
16   I'll pull it up on your screen for you right there,
17   Mr. Kueng.  I'm going to the bottom of the screen here by
18   20:14:03.
19            MR. PLUNKETT:  Your Honor, I just need a moment to
20   catch up to the page.  Can you tell me the page number,
21   please?
22            MS. SERTICH:  Yeah.  This is page 7 of 7-A.
23            MR. PLUNKETT:  And if we're going to ask questions
24   about a transcript, I've already made the request that
25   Mr. Kueng be provided the transcript.
```

Alexander - Cross

```
 1                MS. SERTICH:  Do you want a hard copy?

 2                THE WITNESS:  I can see it fine, ma'am.  Thank

 3      you.

 4                THE COURT:  Please do give him a copy of that

 5      transcript.  And would someone be kind enough to provide one

 6      for me, too?

 7                THE WITNESS:  Thank you.

 8      BY MS. SERTICH:

 9      Q.  Okay.  And you see there just before 20:14:03 that

10      Mr. Floyd says, "It was while I was sitting, Mr. Officer.

11      Look at my wrist.  Look at it."  And what did you respond?

12      A.  I responded with, "Yes, I got you.  We'll fix all that,"

13      in response to his handcuff complaints, ma'am.

14      Q.  Okay.  And then --

15                MR. PLUNKETT:  Are we on the same page?

16                MS. SERTICH:  Now we're on page 8, on the top.

17      BY MS. SERTICH:

18      Q.  And Mr. Floyd said, "Ah!"  And what did you respond?

19      A.  I said, "We'll fix all that, but you gotta walk with

20      me."

21      Q.  And Mr. Floyd said, "Ooo.  Ow!  Ouchie, man."  Right?

22      A.  Correct, ma'am.

23      Q.  I'm going to the next page, page 9, at 20:15:17.

24      Mr. Floyd says, "God man!  I won't do nothing like that

25      y'all.  Why is it going on like this!  Look at my wrist,
```

1     Mr. Officer. I'm not that kinda guy!" And what did you say

2     in response?

3     A. I told him to sit still.

4     Q. And this is now you've crossed the street and you are

5     over by the squad car?

6     A. I believe so, ma'am.

7     Q. I'm going down to the next page, page 10, near 20:16:25.

8     And what did you say to Mr. Floyd?

9     A. I asked him why he was having trouble walking.

10    Q. And he says, "Because it's off...because it's...my hands

11    are hurting." Right?

12    A. Yes, ma'am, in response to the handcuffs.

13    Q. And here on page 13, 20:18:09, Mr. Floyd says, "Please!

14    Ah! Ah!" And what did you say?

15    A. I said, "You're fine."

16    Q. And he said, "Ah! My wrist, man. My wrist, man.

17    Please." Right?

18    A. Yes, ma'am, again, in response to the handcuffs.

19    Q. Okay. And I'm going down one more page to page 14 at

20    20:19:11. And he says, "Ah! My wrist hurt. Ah." Correct?

21    A. Yes, ma'am.

22    Q. And so Mr. Floyd actually consistently complained of

23    that pain in his wrist, didn't he?

24    A. Only in regards to the handcuffs, ma'am, a common

25    complaint with people that do want handcuffs removed.

1    Q.  Okay.  But that would be in the same area as the

2    compliance pain?

3    A.  Could you be a little more specific?  I don't think I

4    understand, ma'am.

5    Q.  Well, you said that you were using a wrist lock on him

6    that should have caused him pain when he was dropping to the

7    ground.  And, in fact, one of the times there you're telling

8    him stop falling on the ground when he's talking about his

9    wrist hurting, right?

10   A.  Yes, ma'am, in response to the handcuffs.

11   Q.  I mean, he's talking about his wrist hurting.  You don't

12   know if it's because of handcuffs or pain compliance

13   technique or both, right?  You have no way of knowing that?

14   A.  No, ma'am.  I believe it was in response to the

15   handcuffs, as that was the line of questioning he stuck with

16   through the remainder of those complaints.

17   Q.  But since he's complaining about it all the time, right,

18   it could be hurting because of that technique too?

19   A.  No, ma'am.  The pressure is relieved when the wrist lock

20   ceases.  So for him to complain about his wrist hurting

21   despite not being in the wrist lock, which I believe one of

22   these was while he was in the back of the squad, where there

23   was no wrist lock pressure, means that he was complaining

24   about the handcuffs, ma'am.

25   Q.  So you are saying it couldn't be both?

1   A.  I don't believe it to be both, ma'am.

2   Q.  Okay.  I mean, the point you were making with that,

3   though, right, was that people who have excited delirium

4   don't feel pain?

5   A.  Don't feel pain, ma'am, I think is a little extreme.  I

6   would say, though, that they seem to not register pain, yes,

7   ma'am.

8   Q.  Okay.  But Mr. Floyd is registering pain here, right?

9   A.  No, ma'am.  He's complaining possibly about handcuffs,

10  and in my opinion because he wants them removed.

11  Q.  Okay.  So you also said you'd never experienced a

12  struggle like this before as you did with Mr. Floyd?

13  A.  Correct, ma'am.

14  Q.  And there was a time in December of 2019 -- and I should

15  note you actually were out on calls in your FTO period as

16  early as December 2019, correct?

17  A.  I believe that was the orientation phase, correct,

18  ma'am, if that's what it's known as.

19  Q.  Okay.  And in December 2019 do you remember responding

20  to a scene, I think near a bar, where there was an

21  intoxicated and bloodied person striking out and being

22  combative with people around him?

23  A.  Yes, I do recall that call, ma'am.  I believe it was a

24  white male that we arrived at, and I think we were called

25  there by the bouncers at the club.

```
1    Q.  Okay.  And he was swearing and saying things that didn't
2    make sense, right?
3    A.  I recall swearing.  I don't recall a lot of his dialogue
4    in terms of content.
5    Q.  You recognized him to be a person in crisis, right?
6    A.  Yes, ma'am, that's how I'd classify it, someone with a
7    mental illness.
8    Q.  Okay.  And so this person is someone out there, like,
9    throwing punches at people around him?
10   A.  That's what the call said.  When we arrived, he wasn't
11   physically assaulting or threatening or combative with
12   anyone at the time.
13   Q.  Okay.  But his conduct was so out of control that you
14   actually pulled out your Taser at some point, correct?
15   A.  I don't recall, ma'am, if it was me or my FTO that drew
16   their Taser.  I don't believe it was me.  I thought it was
17   the primary officer on the scene, ma'am.
18   Q.  If your report said it was you, but that you didn't use
19   it because someone got in the way at the last minute, would
20   that be accurate?
21   A.  That sounds fair, ma'am.
22   Q.  Okay.  And then you and officers from another squad went
23   hands on with this person, correct?
24   A.  Yes, ma'am.  I believe there was me, my FTO, and the
25   officer who was there first.  I don't recall his name.
```

```
 1    Q.  And so you and the other officers took this person to

 2    the ground to try to handcuff him, right?

 3    A.  Correct, ma'am.

 4    Q.  And that was three of you?

 5    A.  It was, ma'am.

 6    Q.  Okay.  And you and the other officers had to use your

 7    knees and your body weight to hold the guy down while you

 8    were handcuffing him, right?

 9    A.  Yes, ma'am.  I believe I was on the legs.  My FTO at the

10    time had him restrained.  I can't recall his exact position.

11    It might have been possibly with a knee on the neck.  And

12    the other officer was trying to get him to get his hands out

13    from underneath his stomach, so he was using knee strikes.

14    Correct, ma'am.

15    Q.  And then after -- you did get the handcuffs on him

16    eventually, right?

17    A.  I believe so, ma'am, yes.

18    Q.  And after he was handcuffed, that arrestee kept

19    resisting, right?

20    A.  I think so, ma'am, to some degree, yes.

21    Q.  Flopping around and kicking his legs?

22    A.  That sounds right, ma'am.

23    Q.  Okay.  And you and the other officers still were trying

24    to get him up into the seated position, right?

25    A.  I believe we were trying to get him to stand up to put
```

```
1    him in the back of the car, yes, ma'am.
2    Q.  Okay.  And he would flop and kick around, you'd put him
3    back down, and you'd try to get him back up again, right?
4    A.  That sounds right, ma'am, yes.
5    Q.  Okay.  And part of what you learned on that call is
6    you're trying to get people upright out of that downward
7    facing position even when they're still resisting to some
8    extent, right?
9    A.  No, ma'am.  My takeaway was that we were trying to get
10   him into the back of a squad, where he could be more secured
11   so he wouldn't cause harm to himself or others.
12   Q.  Okay.  But even if they start resisting and flailing
13   around again, you can just put them back down again if that
14   happens, right, that's what you did?
15   A.  It is an option, ma'am.
16   Q.  And, by the way, I think you testified yesterday that
17   during your FTO period, you were always working alone and
18   not learning how to work as a team; is that right?
19   A.  Not alone, ma'am.  Working able.
20   Q.  But this is one example, right, where you were working
21   with others and communicating with others on a call?
22   A.  Working with others, ma'am, as backup, correct.
23   Q.  And there were other -- a lot of other times in that
24   when you would show up to the same scene and have to
25   communicate with other officers, correct?
```

```
 1    A.  Yes, ma'am.  Being backup is not the same as being an
 2    able car.
 3    Q.  So we were talking about excited delirium just before
 4    this, and I want to close that loop.  We saw from that
 5    training session with the videos, I think everyone
 6    remembers, that there's lots of different symptoms to
 7    consider, right?
 8    A.  Yes, ma'am.
 9    Q.  Okay.  And I want to be clear on part of your testimony
10    yesterday.  I just want to be sure.  Were you telling the
11    jury that on May 25th of 2020 it was your thought that, as
12    Mr. Floyd was struggling to stay out of and then get out of
13    the back of that squad, that he was actually attracted to
14    the partition in the back where he hit his face?
15    A.  Ma'am, I was testifying that that is what I observed.
16    He did hit his face against the partition that separates the
17    front and backseat, so it was a possible sign that could
18    confirm excited delirium, ma'am.
19    Q.  So at that point, when you were having to use all of
20    this force to push him into the car and then he was just
21    struggling to get out, you considered it a possibility that
22    he was actually attracted to something on the inside of that
23    car?
24    A.  It was a possibility, ma'am.  I didn't want to rule out,
25    as he did do it at least twice.
```

1    Q.  And also you mentioned several times during your

2    testimony yesterday that you suspected Mr. Floyd may be

3    under the influence of narcotics, correct?

4    A.  I did, ma'am.

5    Q.  But your training told you that excited delirium was

6    usually paired with the use of stimulants, right?

7    A.  I don't recall a specific classification of drugs,

8    ma'am.  I just remember kind of drugs as an overall

9    category, ma'am.

10   Q.  I'm not going to play the videos, but I'll show you from

11   that training --

12              MR. PLUNKETT:  Can we have a clarification of what

13   that training is, Your Honor?

14              MS. SERTICH:  Yep.  This is Exhibit 87, page 11,

15   and this is the excited delirium training that has the

16   videos in it.

17   BY MS. SERTICH:

18   Q.  And so you see there it says, "Common drugs found in

19   excited delirium: Cocaine, LSD, methamphetamines."  Right?

20   A.  Correct, ma'am.  Common drugs, yes.

21   Q.  And you know these are stimulants, right?

22   A.  Yes, ma'am.

23   Q.  Okay.  Those are substances that have the opposite

24   effect of narcotics, in your experience, correct?

25   A.  Could you be a little more specific, ma'am?  When I hear

1     narcotics, I think of it as kind of an overall umbrella for

2     drugs in its entirety.

3     Q.  Okay.  But no matter -- well, yeah.  I would say downers

4     as opposed to stimulants?

5     A.  I've heard the term, ma'am, but I've never heard

6     narcotics referred to as anything but the overall

7     encompassing category of drugs as a whole, ma'am.

8     Q.  Okay.  But no matter what the symptoms are, the response

9     to a person with excited delirium was clear from your

10    training, right?

11    A.  Yes, ma'am, get EMTs as fast as possible, keep them

12    restrained, and get them help.

13    Q.  Okay.  I'm going to pull up page 31 of that same

14    exhibit, Exhibit 87.  Okay?  And could you read bullet

15    point 2 there.

16    A.  "Place the subject in the recovery position to alleviate

17    positional asphyxia."

18    Q.  Okay.  And then the third, which I think you were

19    addressing?

20    A.  Is that the one right beneath the --

21    Q.  Yes.

22    A.  "Once in handcuffs, get EMS on scene quickly to monitor

23    and transport."

24    Q.  Okay.  So you knew from your training that you want to

25    get the person restrained, get them in the side recovery

1    position, correct?

2    A.  When safe to do so, yes, ma'am.

3    Q.  Of course.

4         And, you know, I think you mentioned yesterday in

5    some instances you might have to restrain a person with

6    excited delirium until EMS arrives, right?

7    A.  That's my understanding from the training, ma'am.

8    Q.  Okay.  And the whole point of doing that is that EMS can

9    then sedate someone who is experiencing excited delirium,

10   right?

11   A.  That is also my understanding, ma'am.

12   Q.  Okay.  And I think even the next page, page 32, talks

13   about that, right?  Not about the restraint necessarily, but

14   controlling the suspect and getting some sedatives, right?

15   A.  Yes, ma'am, EMS's role.

16   Q.  Okay.  But sedation is not what you do if a person loses

17   consciousness or a pulse, right?

18   A.  I'm not sure, ma'am.  I'm not trained in sedation.  I do

19   not sedate people.  I'm a police officer, ma'am.  Not in my

20   power.

21   Q.  Have you ever observed EMS sedating an unconscious or

22   pulseless person?

23   A.  I have not, ma'am.

24   Q.  Just agitated people?

25   A.  That is my understanding, ma'am.  I don't recall any

1    personal experience.

2    Q.  So on the evening of May 25th, 2020, you had the -- you

3    and Mr. Lane had the initial encounter with Mr. Floyd at his

4    vehicle, and then you walked him over to your squad because

5    you were planning to at least temporarily detain him in your

6    squad, right?

7    A.  Yes, ma'am.  The plan was to put him in the back of the

8    squad and further conduct the investigation.

9    Q.  Okay.  And we all know he didn't want to get in the

10   vehicle, right?

11   A.  Very much not, ma'am.

12   Q.  Okay.  You believed it was necessary, for purposes of

13   your detention, to get him in the squad, right?

14   A.  Yes, ma'am, due to lack of physical control.

15   Q.  And you can use force to place someone under arrest,

16   correct?

17   A.  I don't think I quite understand your question, ma'am.

18   Could you rephrase?

19   Q.  Under the use of force policies and procedures, if

20   someone is resisting, you can use force in order to effect

21   that arrest of them, right?

22   A.  Yes, ma'am.

23   Q.  Okay.  So that's what you did?

24   A.  Yes, ma'am.

25   Q.  Okay.  And at one point in this process, you used your

1    forearm to try to push Mr. Floyd into the car, correct?

2    A.  I believe so, ma'am.

3    Q.  Okay.  And for a brief moment you put your forearm into

4    his neck, pushing him into the vehicle, correct?

5    A.  That's not how I recall it, ma'am.  About chest level.

6    He was sweating.  My arm did slip a few times, but I don't

7    think I reached his neck, ma'am.

8    Q.  Okay.  And we could look to the video for more

9    information on that?

10   A.  Understood, ma'am.

11   Q.  Okay.  At that point Officers Chauvin and Thao arrived?

12   A.  I'm not quite sure when they arrived.  From my

13   recollection, I went around to try and assist Lane and I saw

14   that Officer Chauvin was there, yes, ma'am.

15   Q.  Okay.  And when you went around to the other side of the

16   car, Officer Chauvin asked if Mr. Floyd was going to jail at

17   some point, right?

18   A.  Yes, I do believe he did ask that.

19   Q.  And you responded he was under arrest for forgery?

20   A.  Yes, ma'am.  An error on my part.  I should have told

21   him that he was being detained.

22   Q.  Okay.  And during this struggle Mr. Floyd said he wanted

23   to get on the ground, correct?

24        MR. PLUNKETT:  Object, Your Honor.  We've got a

25   transcript of these -- that conversation.  We should look at

```
1    the transcript if we're going to ask him questions about it.
2              THE COURT:  Well, no, I think counsel on
3    cross-examination can ask questions about the timeline of
4    things occurring or -- I think that's what we're dong.
5              MR. PLUNKETT:  That makes sense, Your Honor.  I'm
6    sorry.  Objection withdrawn.
7    BY MS. SERTICH:
8    Q.  So at some point Mr. Floyd said he wanted to get on the
9    ground; is that right?
10   A.  If the video says so.  At the moment I didn't recall
11   hearing that.  I recall Officer Chauvin saying we're going
12   to bring him down.  Or someone.  It may not have been him,
13   but I thought Officer Chauvin said that.
14   Q.  And then that's what happened next, right?
15   A.  Yes, he was brought down to the ground next to the
16   squad, ma'am.
17   Q.  So now you are on the ground and you are crouching down
18   between Officer Chauvin and Mr. Lane, correct?
19   A.  Yes, I am between Officer Chauvin and Officer Lane.
20   Q.  Okay.  And Officer Chauvin put his left knee on
21   Mr. Floyd's neck, correct?
22   A.  I wasn't sure at the time, ma'am.  Looking back at the
23   video, that does appear to be what he did.
24   Q.  Okay.  Eventually you saw his left knee on Mr. Floyd's
25   neck, correct?
```

1    A.  Yes, ma'am.

2    Q.  And yesterday you said you recognized that to be the leg

3    neck restraint that's mentioned in MPD policy, correct?

4            MR. PLUNKETT:  Objection.  Misstates the evidence.

5            THE COURT:  The jury will recall the evidence.

6    Continue.

7            THE WITNESS:  Sorry, ma'am.  Could you ask the

8    question again?

9    BY MS. SERTICH:

10   Q.  Yesterday you said you recognized that to be a neck

11   restraint using a leg that's mentioned in MPD policy?

12   A.  No, ma'am.  I didn't recognize the technique.  I was

13   saying that based on my interpretation of reading the

14   policy, that that is how I imaged the technique to be

15   applied.

16   Q.  So you hadn't seen it before, but you matched it up in

17   your mind with the policy you'd seen before?

18   A.  That is correct, ma'am.

19   Q.  Okay.  Thanks for that clarification.

20           And I'm going to pull up Government's Exhibit 130,

21   page 43.  And is this that policy that you were thinking

22   about?

23   A.  Yes, ma'am, on the neck restraint.

24   Q.  Okay.  And so, as you just mentioned, that leg restraint

25   wasn't trained, right, but this policy implies that if

1    someone is trained in it, they can use it, right?

2    A.  With the leg, ma'am, correct.  And, correct, I was not

3    trained or aware of the technique of using the leg.

4    Q.  So I think you said yesterday your thought was that

5    Officer Chauvin must have been trained in it because he was

6    using it, right?

7    A.  Correct, ma'am.  It seemed to be well described in the

8    neck restraint policy and he was applying it; therefore, a

9    senior officer must have been trained in it at some point.

10   Q.  And since you remembered that it was there, you must

11   have remembered those aftercare guidelines on the bottom as

12   well, correct?

13   A.  Not at the moment, ma'am, but I am aware of the

14   aftercare guidelines, yes.

15   Q.  So in that moment you remembered that there was a leg

16   restraint, but not that there were aftercare guidelines?

17   A.  In the moment, ma'am, that didn't cross my mind.  I was

18   concerned with my position monitoring and eventually scene

19   safety as well, ma'am.

20   Q.  But those aftercare guidelines also apply to the neck

21   restraints, correct?

22   A.  To my understanding, ma'am, yes, but I'm only trained in

23   an unconscious neck restraint.

24   Q.  Well, those aftercare guidelines apply equally to any

25   kind of neck or leg -- or neck restraint, correct?

1       MR. PLUNKETT:  This is the fourth time we've gone

2   through this line, Your Honor, I'm going to object on asked

3   and answered.

4       THE COURT:  Yeah, I'm going to sustain.

5   BY MS. SERTICH:

6   Q.  The aftercare guidelines require close observation by

7   MPD employees after using that restraint, right?

8   A.  They do, ma'am.

9   Q.  Okay.  And that's not limited to a neck restraint that

10  uses an arm?

11  A.  Was that a question, ma'am?  I'm sorry.  Yes, correct,

12  ma'am.

13  Q.  And it also requires officers to inform any individuals

14  who are accepting custody of the subject, that the technique

15  was used, right?

16  A.  Yes, ma'am.

17  Q.  They have to inform the transferees about the type of

18  force used, correct?

19  A.  In specific response to the neck restraint, yes, ma'am.

20  Q.  And any injuries sustained?

21  A.  Yes, ma'am.

22  Q.  And any medical aid rendered, correct?

23  A.  Yes, ma'am.

24  Q.  And you also learned, right, that that conscious neck

25  restraint should only be used when someone is actively

1    resisting, right?

2    A.  I learned that via policy, ma'am, yes.

3    Q.  You also learned it in training, though, correct?

4    A.  No, ma'am.  We never covered the conscious neck

5    restraint in training.  We were only taught the unconscious

6    version, ma'am, using an arm.

7    Q.  I'm going to show you Government's Exhibit 73, page 40.

8    And this is a PowerPoint from your use of force training,

9    correct, or defensive tactics?

10   A.  Yes, ma'am.

11   Q.  Okay.  And what does that top line say?

12   A.  It is the top line taken from the policy that says,

13   "Conscious neck restraint subject who is actively

14   resisting."

15   Q.  And that means that when there's passive or no

16   resistance, you can't use a conscious neck restraint, right?

17   A.  It's a good question, ma'am.  It doesn't say to not

18   apply it.  It just says that you at least have to meet that

19   level before using it.

20   Q.  Okay.  And the levels I mentioned were below actively

21   resisting, correct?

22   A.  If you could remind me.  What level did you mention,

23   ma'am?

24   Q.  Passive or no resistance.

25   A.  Correct, ma'am.

1    Q.  Okay.  And to be clear, when you were talking about, you

2    know, imagining that what Mr. Chauvin was doing was a neck

3    restraint using a leg, you meant conscious and not

4    unconscious?

5              MR. PLUNKETT:  Your Honor, this would be the fifth

6    time we've gone through that now.

7              MS. SERTICH:  I never asked that.

8              MR. PLUNKETT:  I renew my objection.

9              THE COURT:  Counsel, we've gone over this over and

10   over.

11             MS. SERTICH:  I'm just clarifying he didn't think

12   it was --

13             THE COURT:  Counsel, we've gone over it.

14             MS. SERTICH:  Okay.

15   BY MS. SERTICH:

16   Q.  Okay.  So you testified yesterday you really couldn't

17   see where Officer Chauvin's right knee was, correct?

18   A.  Ma'am, I testified that I didn't really focus on his

19   position.  I had tunnel vision, yes, ma'am.

20   Q.  And he stayed in that same position next to you for nine

21   minutes and 29 seconds?

22   A.  I'm not sure if his position adjusted, but he did stay

23   next to me for the entirety of the call, yes, ma'am.

24   Q.  And you took hold of Mr. Floyd's left wrist and held it

25   against his lower back, correct?

1    A.  No, ma'am.  I held his left wrist and maintained it down

2    below his waistline, ma'am, or about at his waistline.

3    Q.  So the distinction you are making there is waistline as

4    compared to lower back?

5    A.  And no pressure, ma'am.

6    Q.  I'm going to show you a very brief clip from your

7    body-worn camera, which is Exhibit 7.  It starts at 20:22:43

8    and runs to 20:22:57.

9        (Video recording played)

10   Q.  Okay.  That's your left hand there with the black watch

11   on the left-hand side of the screen?

12   A.  Yes, ma'am, the ungloved hand, yes.

13   Q.  Okay.  And your testimony here today is that you were

14   not pressing that left wrist into his waistline?

15   A.  No, ma'am.  I wouldn't be able to.  I had to maintain my

16   balance by holding onto the tire.  Most of my pressure was

17   dedicated to the rear, where my right leg was, and leaning

18   forward would have been difficult as I would have hit my

19   head on the squad.

20   Q.  Okay.  And you held a position similar to that on

21   Mr. Floyd for about seven minutes; is that right?

22   A.  I'd take your word for it, ma'am.  I don't recall how

23   the time frame at the moment I was there.

24   Q.  And then after those seven minutes, you intermittently

25   took a pulse, but then would put your hand back on the

```
 1    wrist, right?

 2              MR. PLUNKETT:  I'm going to object to the use of

 3    the term "intermittently took a pulse" because

 4    it misstates --

 5              THE COURT:  Okay, he took a pulse.  You may

 6    answer.

 7    BY MS. SERTICH:

 8    Q.  There were a couple times you took a pulse after those

 9    first seven minutes?

10    A.  Again, ma'am, I'm not sure on the time frame, but, yes,

11    I did take a pulse twice.

12    Q.  And then for those two minutes after the first seven

13    minutes, after you took a pulse you put your hand back on

14    the wrist, right?

15    A.  I'm sorry.  I'm a little confused, ma'am.  Could you

16    kind of get a little more specific with the timeline?  I

17    might have lost you there with the numbers.

18    Q.  Sure.  So there were the first seven minutes of the

19    restraint, and now I'm talking about the two minutes after

20    that.  And during those latter two minutes you tried taking

21    his pulse a couple of times, right?

22    A.  I did try and take his pulse twice, yes, ma'am.

23    Q.  And when you were not taking his pulse, you put your

24    hand back on his wrist, correct?

25    A.  I believe so, ma'am.
```

1    Q.  Okay.  And for some period of time you also had your

2    left knee near that wrist, correct?

3    A.  I'm not sure, ma'am.

4    Q.  Okay.  I'll show you a still image from Mr. Lane's

5    body-worn camera, which is Exhibit 5, from 20:20:02 and

6    that's just about 40 seconds into the restraint.  Do you see

7    your left knee sort of right under your left hand there?

8    A.  I do, ma'am.

9    Q.  Okay.  And do you know how long your left knee was in

10   that position?

11   A.  No, ma'am, I'm not aware.

12   Q.  Okay.  And then you testified yesterday that you put

13   your right knee initially on Mr. Floyd's buttocks, correct?

14   A.  Yes, ma'am.

15   Q.  And I think you testified that at some point you moved

16   your right knee down more towards his hamstrings?

17   A.  That is correct, ma'am.

18   Q.  Now, initially you were restraining Mr. Floyd because he

19   was flailing around and kicking when he was on the ground,

20   correct?

21   A.  Yes, ma'am, and because he had injured himself.

22   Q.  And so even though he's in handcuffs, you're still using

23   reasonable force when you're trying to get him to stop that

24   kicking, right?

25   A.  Reasonable force, ma'am, not to try to get him to stop

1   his kicking, but to keep him from hurting himself or others,

2   yes, ma'am.

3   Q.  But that didn't last very long, did it?

4   A.  I don't recall how long it went, ma'am.  Things were

5   moving kind of quickly when I was there, it felt like in my

6   mind.

7   Q.  So you know that Mr. Floyd was restrained on the ground,

8   according to the timeline, around 8:19:14, correct?

9   A.  Ma'am, is that in reference to the start of the

10  restraint?

11  Q.  Yes.

12  A.  Yes, ma'am.

13  Q.  Okay.  So I'm going to show you a clip from Officer

14  Lane's body-worn camera that starts at 8:20:19.  So that's

15  just about a minute after the restraint on the ground

16  started.

17  A.  Understood, ma'am.

18          MR. PLUNKETT:  Is that 8:19:14 or 20?

19          MS. SERTICH:  So 8:20:19 is when it starts.

20          MR. PLUNKETT:  I'm sorry.

21          MS. SERTICH:  And it will end at 8:21:50.

22      (Video recording played)

23          MS. SERTICH:  Sorry.  Did someone say something?

24  No.  Okay.  Just making sure.

25      (Video recording played)

1    BY MS. SERTICH:

2    Q.  Okay.  So at the very beginning of that clip, you could

3    see Mr. Floyd sort of lifting up his right shoulder,

4    correct?

5    A.  Yes, ma'am.  His body seemed to follow as well.

6    Q.  And -- but at this point he's not bucking, flailing,

7    kicking, anything like that anymore, right?

8    A.  I disagree, ma'am.  It does appear that he's still

9    flailing.

10   Q.  Okay.  And yesterday and then even again this morning

11   you were describing how you had to support yourself on the

12   squad tire when Mr. Floyd was thrashing, correct?

13   A.  Correct, ma'am.

14   Q.  But during this clip you took your hand down and you

15   didn't have to be doing that here, correct?

16   A.  No, ma'am.  I put my hand up on the squad multiple times

17   to reorient myself, but my arm was kind of sweaty and I

18   wasn't able to maintain a good friction grip, so I kept

19   falling off.

20   Q.  You're not doing that here, correct?

21   A.  No, ma'am.  I'm holding underneath the squad right above

22   the tire.  You can see my arm there.

23   Q.  And this is -- this clip started one minute into the

24   restraint, correct?

25   A.  That is my understanding, ma'am.

1    Q.  Okay.  And we couldn't see Mr. Floyd's legs the whole

2    time, but we could see at the end there that Mr. Lane's

3    hands were up and his knees were up and not on Mr. Floyd,

4    correct?

5    A.  I didn't see that, ma'am.  I was just watching his

6    hands.  It looked like Mr. Lane was rocking back and forth

7    as well and had to put his hand kind of on the open door on

8    the back of the squad to --

9    Q.  Right, and I'm talking again about the end here.

10   A.  It looks like he -- I'm not sure what position he's in,

11   but it does look like his left hand is on his left knee.

12   Q.  Okay.  Yesterday you testified that you were concerned

13   with Mr. Floyd's inability to decrease his thrashing and it

14   felt like the thrashing was pronounced for quite some time,

15   right?

16   A.  Yes, ma'am.

17   Q.  But this clip started just one minute into the

18   restraint, correct?

19   A.  Yes, ma'am.

20   Q.  Okay.  I'm going to show you a clip, again, from your

21   body-worn camera, Exhibit 7, and this is about three minutes

22   into the restraint, beginning at 20:22:02.

23            MR. PLUNKETT:  Your Honor, I'm going to request

24   that we take the volume and put it on off since we're just

25   talking about visuals.

```
 1              THE COURT:  Yeah, I think that's a good idea.  I'm
 2    going to sustain that.
 3              MS. SERTICH:  Okay.
 4    BY MS. SERTICH:
 5    Q.  So, again, this is Exhibit 7, beginning at about
 6    20:22:02.
 7        (Video recording played)
 8    Q.  Okay.  And so you saw yourself picking a rock out of the
 9    tire there?
10    A.  I did, ma'am.  A moment of OCD, yes.
11    Q.  Okay.  So this is no longer a situation where you're
12    feeling the stress of that struggle?
13    A.  No, ma'am.  You can still see me rocking off and then
14    he's still able to get his hips off the ground, and I still
15    retain my Arm underneath that tire to maintain balance,
16    ma'am.
17    Q.  And then I'm going to have to ask -- I need my own copy
18    of the transcript.  So this is the last clip I'm going to
19    play.  And this is from Officer Thao's body-worn camera,
20    Exhibit 9.
21              MR. PLUNKETT:  I'm going to once again ask the
22    volume be shut off.
23              And this was Thao's camera?
24              MS. SERTICH:  Yep.
25              MR. PLUNKETT:  Okay.  I only object to the Thao
```

```
 1    camera to the extent that it has a different -- complete
 2    different perspective than Mr. Kueng would have ever
 3    appreciated.
 4              THE COURT:  I think that's understood.
 5    BY MS. SERTICH:
 6    Q.  Okay.  So this is Government Exhibit 9, beginning at
 7    20:22:39.  And this is going to be a little bit challenging
 8    for the jury, but the video will end just after 20:22:46,
 9    which is on page 20 of the transcript.
10              MR. PLUNKETT:  Can you give me the beginning time
11    again?
12              MS. SERTICH:  20:22:39.  I can pull it up here as
13    well.
14              MR. PLUNKETT:  Thank you.
15              MS. SERTICH:  And looking at Mr. Kueng on the
16    bottom right-hand side of the screen.  Okay.
17         (Video recording played)
18    BY MS. SERTICH:
19    Q.  So that's stopped at 20:22:48.  And looking at the
20    transcript, Mr. Chauvin had just said, "Takes a heck of a
21    lot of oxygen," correct?
22    A.  Yes, ma'am, he said that in this instant, yes.
23    Q.  Okay.  And then you laughed at that, correct?
24    A.  Yes, ma'am, as he did reference a call we had three days
25    ago when I was still on FTO.  An individual we had in the
```

1     infirmary, who was being restrained by the nurses and was

2     screaming that he couldn't breathe, the nurse replied with

3     "Takes a heck of a lot of oxygen," and Officer Chauvin was

4     with me and he replied to the nurse and said, "I'm going to

5     use that next time."  And three days later he used it,

6     ma'am.

7     Q.  Okay.  This is three minutes into the restraint and fair

8     to say, if you're joking, not really feeling the stress of

9     that struggle anymore?

10    A.  No, ma'am.

11    Q.  Okay.

12    A.  I'd say it was a brief moment of levity.

13    Q.  And I want to talk about one particular point with the

14    way Mr. Floyd was being restrained.  I'm just going to show

15    you a still image from Mr. Lane's body-worn camera.  This is

16    at 20:25:25.  And again you are holding Mr. Floyd's left

17    wrist with your left hand, correct?

18    A.  Yes, ma'am.

19    Q.  And you talked about this a little bit yesterday, but

20    Officer Chauvin is sort of twisting Mr. Floyd's fingers?

21    A.  "Holding" is the word I'd use to classify what he's

22    doing, holding Mr. Floyd's fingers.

23    Q.  So throughout this restraint on the ground, you did not

24    see him twisting Mr. Floyd's fingers?

25    A.  I don't recall any twisting motions, ma'am, just

1    holding.

2    Q.  And I think you said yesterday that's not a type of

3    force that you are trained on, correct?

4    A.  I don't know about type of force, ma'am.  Restraint

5    techniques is kind of a broad category.  However, I do agree

6    I've never been trained to use what -- this finger hold that

7    he's doing.

8    Q.  Okay.  So the jury has heard a lot of testimony about

9    who controlled this scene outside of Cup Foods on May 25th,

10   2020.  And I believe you testified yesterday, that at least

11   under MPD policy, that was Officer Lane, correct?

12   A.  Under MPD policy, it would designate Officer Lane, yes.

13   Q.  And that's because the two of you were first on scene

14   and he's senior to you by a day, correct?

15   A.  Per policy, yes, ma'am.

16   Q.  And there was no higher-ranking officer on scene during

17   this period of the restraint?

18   A.  It's hard to say, ma'am.  On paper, no, but there's an

19   unofficial rule for seniority.  Seniority has first picks on

20   shifts.  They can go and pick whatever jobs they want to

21   apply for.  So it is commonly known that there is a

22   hierarchy within the same structure.

23   Q.  I understand that.  I'm just talking about your rank.

24   They're the same rank, officer, as you, correct?

25   A.  We are all officers, yes, ma'am.

```
1    Q.  Okay.  And you would agree with me, wouldn't you, that a
2    determination of which officer is controlling the scene
3    doesn't have an impact on any officer's duty to intervene?
4    A.  I would disagree, ma'am, as the person in charge may be
5    someone who is experienced and has knowledge that the others
6    do not.  And so deferring to somebody about something you
7    don't know is common.
8    Q.  So you're actually saying that that duty to intervene
9    that's MPD policy, constitutional law, that changes based on
10   who is coming in and taking charge on the scene?
11   A.  No, ma'am.  I'm saying that it's hard to define for
12   people what exactly is wrong when you're not aware of what
13   everybody knows or does not know.
14            MS. SERTICH:  I'm going to ask to strike that as
15   nonresponsive.
16            THE COURT:  It's overruled.
17   BY MS. SERTICH:
18   Q.  So we know, based on the policy, that even new officers
19   have a duty to intervene, correct?
20   A.  Yes, ma'am, that is the policy.
21   Q.  And that makes sense, right?
22   A.  It does make sense, ma'am.
23   Q.  Because otherwise, as a new officer, you wouldn't be
24   required to intervene with anyone except another new
25   officer, right?
```

1    A.  I'm sorry, ma'am.  Could you repeat the question?

2    Q.  Well, because otherwise, if you're a new officer, you

3    wouldn't be required to intervene with anyone other than

4    another new officer, right?

5    A.  Oh.  Yes, ma'am.

6    Q.  Okay.  And it can't be the case that if someone is

7    getting arrested and a senior officer is using unreasonable

8    force, this person only gets saved if there's another person

9    on scene who is the same seniority as that officer using

10   force, right?

11          MR. PLUNKETT:  Objection.  Argumentative and calls

12   for speculation.

13          THE COURT:  Counsel, you are being argumentative.

14   I sustain.

15   BY MS. SERTICH:

16   Q.  Well, you'd agree with me that arrestees out there in

17   the public don't get to pick which officers respond to a

18   scene, right?

19   A.  Correct, ma'am.

20   Q.  And their rights shouldn't change depending on who is

21   responding to the scene, right?

22   A.  Correct, ma'am.

23   Q.  Okay.  So, again, if there's a senior officer using

24   unreasonable force, it can't be the case that that person

25   can only get saved if there's another officer on scene who

```
 1    is of the same level of seniority that feels comfortable
 2    intervening, right?
 3                MR. PLUNKETT:  And I'm going to object again, Your
 4    Honor.  It's the same question.  I object --
 5                THE COURT:  It is.  Counsel, it's the same
 6    question that was sustained before.
 7    BY MS. SERTICH:
 8    Q.  And that's why this duty applies to each and every sworn
 9    officer individually on scene, correct?
10                MR. PLUNKETT:  Objection.  Calls for speculation.
11    This started out with a "that's why."  I guess I don't even
12    know what that's a reference to --
13                THE COURT:  Counsel --
14                MR. PLUNKETT:  -- the last question.
15                THE COURT:  -- my concern is that the line of
16    questioning that you are into is argumentative with this
17    particular client -- or particular witness, and I'm
18    reluctant to permit it unless you can rephrase it from the
19    argumentative side.
20    BY MS. SERTICH:
21    Q.  Every MPD officer with a badge and a gun and handcuffs
22    can arrest someone, right?
23    A.  Yes, ma'am.
24    Q.  And use force, right?
25    A.  Yes, ma'am.
```

1    Q.  And then has to stop unreasonable force if they see it,

2    right?

3    A.  Yes, ma'am, if they can understand the force is

4    unreasonable.

5    Q.  So back to this issue of control, yesterday you said

6    that things were moving quickly and you were following

7    Officer Chauvin's lead, right?

8    A.  I was deferring to Officer Chauvin's opinion based on

9    his position, yes, ma'am.

10   Q.  Okay.  I think yesterday you testified you were

11   following his lead.  Fair?

12   A.  Fair, ma'am.  Defer, follow his lead, yes, ma'am.

13   Q.  And Mr. Plunkett played that clip when Mr. Lane asked

14   you if he should be putting Mr. Floyd's legs up, right?

15   A.  Yes, ma'am.

16   Q.  Okay.  But then later Mr. Lane asked that question about

17   rolling Mr. Floyd on his side, right?

18   A.  I do recall that, ma'am.

19   Q.  Okay.  And he actually asked that question twice, right?

20   A.  I believe so, ma'am, yes.

21   Q.  So I'm going to go back to the transcript, Government's

22   Exhibit 7, at page 21.

23              MR. GRAY:  I'm sorry.  I didn't hear that.

24              MS. SERTICH:  Exhibit 7, page -- 7-A, page 21.

25              MR. GRAY:  Thank you.

1    BY MS. SERTICH:

2    Q.  And this is the transcript that the parties have agreed

3    to, correct?

4    A.  I'll take your word for it, ma'am, yes.

5    Q.  Okay.  And so if we look just beneath 20:23:46, Mr. Lane

6    says, "Roll him on his side?"  Right?

7    A.  Correct, ma'am.

8    Q.  And who is the first person to respond to Mr. Lane?

9              MR. PLUNKETT:  Objection.  The transcript

10   misstates the evidence.

11             THE COURT:  Oh, boy.  Members of the jury, this

12   brings up the very point we have a situation where the

13   parties have agreed to a transcript.  By the same token, if

14   there is any discrepancy with what you hear in the video

15   compared to what you see in the transcript, you are bound by

16   what you see in the video.  And whether or not these words

17   that are being spoken are in the correct order or not, the

18   jury will decide that.  That really is not a matter for the

19   rest of us to decide.

20   BY MS. SERTICH:

21   Q.  Okay.  So you would agree that you say, "No" to

22   Mr. Lane, correct?

23   A.  I did, ma'am, yes, as I did believe that given how quick

24   I felt the time went by at the time that Lane had asked that

25   question not too long ago and possibly did not hear Officer

1     Chauvin's answer the first time.

2     Q.  Oh, I'm sorry.  This is the first time he asked if we

3     should roll him on his side.

4     A.  Yes, ma'am, in response to his question from -- I

5     believe the first one he asked was "Should we get his legs

6     up?"

7     Q.  Okay.  "Should we get his legs up?" is at 8:20:48, so

8     about three minutes before this, correct?

9     A.  I'll take your timeline for it, ma'am.  It was hard to

10    measure the time in the moment.

11    Q.  Okay.  Mr. Chauvin also says, "No" to Mr. Lane, correct?

12    A.  He does, ma'am.

13    Q.  And then what did you say?

14    A.  I repeated what Officer Chauvin said during the question

15    of shall we get his leg up, "Leave him."

16    Q.  So Mr. Floyd was conscious for more than another minute

17    after this exchange, correct?

18    A.  I'm not sure, ma'am.  I believe you.

19    Q.  Okay.  You've been here and you heard physicians

20    testifying that if Mr. Floyd had been rolled on his side

21    before he lost consciousness, he would have lived, correct?

22    A.  I do recall their testimony, yes, ma'am.

23    Q.  But you said, "No.  Just leave him"?

24             MR. PLUNKETT:  Objection, Your Honor.  That's an

25    improper question.

```
 1              THE COURT:  That is.  I sustain.
 2   BY MS. SERTICH:
 3   Q.  And then moving to page 23 of 7-A.  This is at 8:25:39.
 4   I'm sorry.  Yeah, it's just on the bottom there.  And
 5   Mr. Lane says again, "Should we roll him on his side?"
 6   Correct?
 7   A.  Correct, ma'am.
 8   Q.  And going down to that next page, do you see any
 9   response to that question from either you or Officer
10   Chauvin?
11   A.  No, ma'am.
12   Q.  So fair to say Mr. Chauvin didn't give any sort of order
13   in response to Mr. Lane's question?
14   A.  Correct, ma'am.
15   Q.  And Mr. Chauvin is no longer your FTO at this point,
16   correct?
17   A.  That is correct.
18   Q.  He is not writing daily evaluations of your performance?
19   A.  He is not.
20   Q.  He's not grading you?
21   A.  I don't know.  Personally, at least not on an objective
22   scale that has to be turned in, correct, ma'am.
23   Q.  Okay.  He doesn't have control over your employment
24   status?
25   A.  I disagree with that, ma'am.  If he did find something
```

```
1    at fault with me, he could still report me and, to my

2    belief, get me terminated.

3    Q.  You think Officer Chauvin could terminate you

4    unilaterally, the way you were describing yesterday?

5    A.  Yes, ma'am.  I'm on probation.  My understanding is

6    terminated for any reason, is how it was described to me.

7    Q.  And, in fact, during this entire call Mr. Chauvin didn't

8    say much at all, correct?

9    A.  What would you define as "much at all," ma'am?

10   Q.  Not talking a lot through this.

11            MR. PLUNKETT:  Objection.  Calls for speculation.

12            THE COURT:  I think this is a discussion that I'm

13   going to sustain because I think we just -- what talking a

14   lot is and all that is hard to define.

15   BY MS. SERTICH:

16   Q.  Other than his response to the first question about

17   lifting the legs, you didn't hear any orders or even

18   direction from Officer Chauvin, correct?

19            MR. PLUNKETT:  First objection is vague because

20   we're talking about "his."  It could have been one of four

21   people or more.  And, plus, this is the same thing we just

22   objected to.

23            THE COURT:  Well, I think the witness can answer

24   this question, if he knows.

25            THE WITNESS:  I'm sorry, ma'am.  Could you ask the
```

1    question again?

2    BY MS. SERTICH:

3    Q.  I can try.  So other than Mr. Chauvin's first response

4    to Mr. Lane's question about lifting the legs, you didn't

5    hear him give any other orders or directions once Mr. Floyd

6    was restrained on the ground, correct?

7    A.  He did respond to Officer Lane's second mention of

8    rolling him -- I should say the first mention, the first

9    mention of Officer Lane suggesting we roll him on his side.

10   Q.  And that was after you said the same thing, correct?

11   A.  Define "same thing," ma'am.

12   Q.  "Just leave him here"?

13   A.  Yes, ma'am.  I was relaying Chauvin's answer.

14   Q.  So talking, again, about the duty to intervene policy,

15   we can agree that there could be circumstances where

16   protecting someone might not be possible; the policy says

17   attempt, correct, attempt to intervene?

18              MR. PLUNKETT:  Objection.  Vague.

19              THE COURT:  Well, it's overruled.  The word

20   "attempt" is in the policy, I think, and the witness can

21   answer if he knows.

22              THE WITNESS:  I do agree, ma'am, the word

23   "attempt" is in the policy.

24   BY MS. SERTICH:

25   Q.  There could be situations where force is used really

```
1    quickly and the officer can't respond fast enough, right?
2    A.  That is a possibility, ma'am.
3    Q.  An officer could be injured or otherwise incapacitated,
4    correct?
5    A.  That is another possibility, ma'am.
6    Q.  And in those instances, reasonable to think that the
7    policy would recognize an attempt even if the attempt wasn't
8    successful in stopping the force, right?
9    A.  I do agree, ma'am, "attempt" is a broad term.
10   Q.  But that was not the situation with Mr. Floyd, correct?
11   A.  I don't understand what you're referencing when you say
12   "that," ma'am.
13   Q.  Well, this wasn't a question of not having enough time
14   to respond, correct?
15   A.  I would agree, ma'am.  We have an understanding.
16   Q.  This was nine and a half minutes, correct?
17   A.  That's -- I trust you what the timeline is.
18   Q.  And five minutes after Mr. Lane said he had passed out?
19            MR. PLUNKETT:  Objection.  Vague.  What is five
20   minutes?
21            THE COURT:  Yeah, I sustain counsel.
22   BY MS. SERTICH:
23   Q.  The length of the -- sorry.
24            THE COURT:  I'm lost.  I have no idea what you are
25   talking about.
```

```
 1    BY MS. SERTICH:
 2    Q.  I'm just saying the length of this restraint lasted more
 3    than five minutes after Mr. Lane said he passed out,
 4    correct?
 5    A.  Again, ma'am I'll take your word for it on the timeline.
 6    I don't recall the length of time in the moment.
 7    Q.  And you were not injured or incapacitated?
 8    A.  No, ma'am.
 9    Q.  And, as far as you knew, neither was Mr. Lane?
10    A.  As far as I was aware.
11    Q.  As far as you know, neither was Officer Thao?
12    A.  I can't say that, ma'am.  I didn't know in the moment.
13    I was not aware of his position.
14    Q.  And another situation where an attempt might not work is
15    if the officer who is committing that crime, like,
16    physically overpowers a person who attempts to intervene,
17    correct?
18              MR. PLUNKETT:  Objection.  Relevance.
19              THE COURT:  Sustained and speculative too,
20    counsel.
21    BY MS. SERTICH:
22    Q.  Officer Chauvin never physically overpowered any other
23    officer on the scene on this day, correct?
24    A.  I don't believe he made any physical contact with any
25    other officer on the scene, ma'am, no.
```

1    Q.  And you were not having arguments amongst yourselves at

2    this time while Mr. Floyd is being restrained?

3    A.  Could you define "argument," ma'am?

4    Q.  Any heated conversations.

5    A.  No, ma'am.  I'd classify them as discussions.

6    Q.  And at no point did you make a move of any kind to get

7    Mr. Chauvin off of Mr. Floyd, correct?

8    A.  Correct, ma'am.  I was unable to recognize if his use of

9    force would constitute something I did not recognize.

10   Q.  And you didn't see Mr. Thao make a move of any kind to

11   get Officer Chauvin off of Mr. Floyd?

12   A.  I did not see.

13   Q.  Mr. Lane, as we've discussed, made some suggestions

14   about things you might do, correct?

15   A.  Yes, ma'am, he did make suggestions to roll him on his

16   side.

17   Q.  And you did not join your voice with Mr. Lane's?

18   A.  I disagree, ma'am.  He was vocalizing as my partner.  I

19   let that pass through.  I tried to rely Officer Chauvin's

20   answers to him, as I believed Officer Lane would not be able

21   to hear due to all the noise in the background.

22   Q.  I'll ask that question a little better.  You never said,

23   I agree with Officer Lane.  Can we do this?"

24   A.  I did not say that verbally, no, ma'am.

25   Q.  And you chose not to do that?

```
1              MR. PLUNKETT:  Objection.  Improper question.
2              THE COURT:  Sustained.
3    BY MS. SERTICH:
4    Q.  I want to see if I can clarify some points here from
5    your testimony yesterday.  I was left unsure about whether
6    or not you thought Mr. Floyd was experiencing a serious
7    medical need when he was being restrained on the ground.
8              So when Mr. Floyd was being restrained on the
9    ground, did you think he had a serious medical need at that
10   time?
11   A.  At which point in time, ma'am?
12   Q.  While he was on the ground.
13   A.  I can't say I did, ma'am.  I never really defined it as
14   a serious medical need.
15   Q.  Okay.  So let's go through some of the information you
16   had available to you.
17             You testified that you believed the situation with
18   Mr. Floyd was possibly an excited delirium incident,
19   correct?
20   A.  Possibly, yes, ma'am.
21   Q.  Okay.  And you've received training about excited
22   delirium?
23   A.  Yes, ma'am.
24   Q.  And based on that training, you recognize that as a
25   potentially dangerous medical problem, correct?
```

```
1   A.  Potentially dangerous problem, yes, ma'am.

2   Q.  Okay.  And you said yesterday that you were worried that

3   Mr. Floyd's medical situation could deteriorate, correct?

4   A.  I was worried that it could deteriorate, yes, ma'am.

5   Q.  And because of that, you wanted to provide the

6   paramedics with quick access to Mr. Floyd once they showed

7   up, right?

8   A.  Yes, ma'am.

9   Q.  You knew that Mr. Floyd said that he could not breathe,

10  correct?

11  A.  I was aware he was saying that, ma'am, yes.

12  Q.  He said it a lot.  More than 20 times?

13  A.  I take your number on how many.  I recall most of it

14  being before we got him to the ground.

15  Q.  You thought most of it was before on the ground?

16  A.  That's when I heard most of it, ma'am, was prior to

17  getting him on the ground.

18  Q.  And you were able to hear that Mr. Floyd's talking was

19  slowing, correct?

20  A.  Yes, ma'am.

21  Q.  Okay.  And then you were able to observe that he

22  completely stopped talking, correct?

23  A.  Yes, ma'am.

24  Q.  And you said yesterday that you were concerned about

25  inhibiting Mr. Floyd's breathing, correct?
```

1   A.  In regards to what testimony, ma'am?

2   Q.  You said you were holding onto his left hand to prevent

3   him from raising them above his lungs, which could inhibit

4   his breathing, right?

5   A.  Yes, ma'am.

6   Q.  And then at some point you were able to see that

7   Mr. Floyd stopped moving, correct?

8   A.  I believe so, ma'am.  I can't exactly recall when that

9   was.

10  Q.  Okay.  But at some point that was another piece of

11  information available to you?

12  A.  Yes, ma'am, at some point.

13  Q.  And Mr. Lane said that Mr. Floyd was passing out,

14  correct?

15  A.  I do recall him saying that, ma'am, yes.

16  Q.  I can put a time on that one, 8:24:56.  That was another

17  piece of information available to you, correct?

18  A.  Yes, ma'am.

19  Q.  And you took a pulse on Mr. Floyd's wrist?

20  A.  I did, ma'am.

21  Q.  You said you couldn't find one, correct?

22  A.  I did say that, ma'am.

23  Q.  You then continued trying to find a pulse?

24  A.  I tried a second time, yes, ma'am.

25  Q.  And because you were concerned Mr. Floyd didn't have a

```
1    pulse, you kept checking, right?

2    A.  I was concerned that I was not getting a proper reading,

3    ma'am, so I tried to see if I could get a better reading on

4    the other hand.

5    Q.  And you would view that as a serious medical need,

6    correct?

7    A.  I would view it as a concern, ma'am.  I don't have the

8    confirmatory carotid pulse to really define if he's in

9    cardiac arrest.

10   Q.  Well, even without that carotid pulse, you understood he

11   was saying he couldn't breathe, his talking slowed, he

12   stopped talking, stopped moving, fell unconscious, and that

13   you couldn't find a pulse, correct?

14   A.  That I couldn't find a pulse and he slipped into

15   unconsciousness, ma'am, yes.

16          MS. SERTICH:  I'm changing topics.  Would you like

17   to take a break?

18          THE COURT:  No, let's keep going.

19          MS. SERTICH:  Okay.

20   BY MS. SERTICH:

21   Q.  And you testified yesterday that swift medical care is

22   very important, right?

23   A.  Yes, ma'am.

24   Q.  You testified that you wanted the paramedics to be able

25   to treat Mr. Floyd quickly when they arrived, correct?
```

1    A.  Correct, ma'am.

2    Q.  But you didn't do anything to get Mr. Chauvin off of

3    Mr. Floyd when they arrived, correct?

4    A.  No, ma'am, I did not.  I was focused on the ambulance

5    arriving so that we could move Mr. Floyd onto the stretcher

6    as soon as possible if they needed any medical assistance on

7    that side.

8    Q.  Well, you didn't move out of the way either, correct?

9    A.  No, not out of the way, ma'am.  I was in position to

10   move him.

11   Q.  You would agree that the paramedic had to ask you to get

12   out of the way so he could bring the stretcher up to

13   Mr. Floyd?

14   A.  At the moment I didn't recall him saying anything, but I

15   do recall him placing the stretcher behind us.

16   Q.  In any event, at the time the paramedics show up,

17   Mr. Floyd is still handcuffed and restrained in the prone

18   position, correct?

19   A.  Yes, ma'am.

20   Q.  And, in fact, you said your force at that point was

21   merely to maintain the ability to still monitor Mr. Floyd,

22   correct?

23   A.  Correct, ma'am.

24   Q.  But you were not monitoring him, were you?

25   A.  I was, ma'am, and getting ready to move him.

1   Q.  Did you have any idea at that point how his airway was

2   doing?

3   A.  I did not, ma'am.  Paramedics came; and once they

4   touched the ground, they took over the scene.

5   Q.  And you didn't know if he had a pulse?

6   A.  I could not confirm that he did not have one, correct.

7   Q.  Okay.  And you seemed unclear yesterday about the last

8   time that you had noticed whether he was breathing or not,

9   correct?

10  A.  I might have sounded -- it might have sounded confusing,

11  ma'am.  I might have got mixed up with my attorney's

12  question, yes, ma'am.

13  Q.  So that's all the ABCs.  None of those are happening at

14  this point, correct?

15  A.  What do you mean by not happening, ma'am?

16  Q.  Well, you just said you didn't know if he had a pulse,

17  you didn't know the situation with his airway, and you

18  didn't know whether he was breathing at that point.

19          MR. PLUNKETT:  Objection.  That misstates what he

20  testified to.

21          THE COURT:  Counsel, the jury will recall what his

22  testimony was.

23          THE WITNESS:  Ma'am, I couldn't confirm the

24  airway, correct.  Last I checked on him I did see chest

25  rise, which would be breathing.  And I did take his pulse,

```
 1    yes, ma'am.

 2    BY MS. SERTICH:

 3    Q.  You couldn't find a pulse?

 4    A.  Correct, ma'am.

 5    Q.  You mentioned previously you were concerned about the

 6    excited delirium, but you didn't roll him on his side, like

 7    you'd been trained in that excited delirium situation,

 8    correct?

 9    A.  Correct.

10            MR. PLUNKETT:  Objection.  Asked and answered.

11            THE COURT:  It's been asked and answered about

12    four times.  I sustain.

13            MR. PLUNKETT:  Five is my count.

14    BY MS. SERTICH:

15    Q.  So after you didn't get that radial pulse, you didn't

16    lean over and try to check Mr. Floyd's carotid pulse,

17    correct?

18    A.  No, ma'am.  I relayed the information I had to Officer

19    Chauvin.

20    Q.  Okay.  You never said to Mr. Chauvin, "Sir, can you

21    check his carotid pulse, please?"

22    A.  I did not.

23    Q.  So you've mentioned a couple of times now during

24    testimony that you can only take steps when a scene is safe,

25    right?
```

```
1    A.  Yes, ma'am.

2    Q.  And there were people watching what was happening in

3    front of Cup Foods on the sidewalk, correct?

4    A.  That was my understanding, yes, ma'am.

5    Q.  And they couldn't physically do anything to Mr. Floyd,

6    right?

7              MR. PLUNKETT:  Objection.  Speculation.

8              THE COURT:  Yeah, it's -- excuse me.  My throat is

9    dry.  I sustain that.  This witness has disqualified himself

10   from commenting about observations of those on the sidewalk.

11   BY MS. SERTICH:

12   Q.  Well, let me ask you this.  There are four officers on

13   scene, correct?

14   A.  Yes.  Five if we count the Park Police, ma'am.

15   Q.  Right.  And Mr. Floyd is in your custody?

16   A.  Yes, ma'am.

17   Q.  So bystanders are not allowed to come and do anything to

18   Mr. Floyd, provide him with medical care or anything like

19   that, right?

20             MR. PLUNKETT:  Objection, Your Honor.  This is

21   asked and answered.  It's repetitive.

22             THE COURT:  Well, it has been asked in the past,

23   yes.

24             MS. SERTICH:  With this witness?

25             THE COURT:  What?
```

```
1                 MS. SERTICH:  With this witness?

2                 THE COURT:  Over a month I guess I kind of lose

3     track of that, but I thought it had been.

4                 MS. SERTICH:  Fair enough.

5     BY MS. SERTICH:

6     Q.  Bystanders are allowed to make recordings, correct?

7                 MR. PLUNKETT:  Objection, Your Honor.  Relevance

8     and -- yeah, relevance.

9                 THE COURT:  Okay.  He can answer the question.

10    It's been asked and answered by a lot of people.

11                THE WITNESS:  Yes, ma'am, they are allowed to.

12    BY MS. SERTICH:

13    Q.  Okay.  And they are allowed to make comments, correct?

14    A.  Yes, ma'am, they can say what they want.

15    Q.  But they do not have a right to interfere with what

16    you're doing, correct?

17    A.  Yes, ma'am.

18    Q.  They could actually be arrested for that?

19    A.  Yes, ma'am.  Obstruction, I believe, is the charge.

20    Q.  So if you felt like it's a dangerous situation to

21    provide medical care, that's a pretty serious situation to

22    be in; agreed?

23    A.  It's a possibility, yes, ma'am.

24    Q.  I mean, to feel as though you're being prevented from

25    providing lifesaving medical aid because the scene is so
```

```
 1    unsafe, that is a serious situation, correct?
 2               MR. PLUNKETT:  Objection.  Argumentative.
 3               THE COURT:  I think it is, counsel.  I don't
 4    understand what you are asking.  Are you asking this
 5    witness's action or are you talking about the people on the
 6    sidewalk?
 7               MS. SERTICH:  I'm asking him about how he felt the
 8    scene felt, which is something he's been talking about.
 9               MR. PLUNKETT:  Well, then it's asked and answered
10    repeatedly.
11               THE COURT:  Well, that's right.
12               MS. SERTICH:  Sorry?
13               THE COURT:  I sustain.  That has been covered.
14    BY MS. SERTICH:
15    Q.  Well, in a situation like that, you'd want to take steps
16    to improve the safety, correct?
17               MR. PLUNKETT:  Objection.  Calls for speculation.
18               THE COURT:  Yeah, counsel, it does.  You're trying
19    to impose on something that this witness has denied
20    knowledge.  You're trying to impose information from people
21    on the sidewalk that had been testified to yesterday with a
22    prior witness, but this witness has declined knowledge.
23               MS. SERTICH:  Well, he said --
24               THE COURT:  And I just -- I sustain the objection.
25               MS. SERTICH:  His testimony is that the scene
```

```
1    feels unsafe to him and that's why he didn't do certain

2    things, and I'm asking about his conduct and observations.

3              MR. PLUNKETT:  You're asking him to speculate

4    about things too, Your Honor.

5              THE COURT:  Counsel, it's all of those things.

6    We're passing through some periods of time.  And there is a

7    period of time that the testimony that you're suggesting

8    with respect to this witness is true.  There's a period of

9    time when this witness has declined knowledge.  And I think

10   you're asking the question as to the period of time to which

11   this witness has declined knowledge, and that's why I'm

12   sustaining this series of objections to this.

13   BY MS. SERTICH:

14   Q.  Did there come a point in time --

15              MR. PLUNKETT:  Asking for a direction to have

16   counsel move on to a new topic.

17              THE COURT:  No, no, no.  She can ask the question.

18   I don't want to prohibit that.  Go ahead.

19   BY MS. SERTICH:

20   Q.  Did there come a point in time when you felt the scene

21   started to become unsafe?

22   A.  I was not able to make that determination from my

23   position, ma'am.

24   Q.  You never called for backup, correct?

25   A.  No, ma'am.
```

1    Q.  And I think you testified yesterday you're wearing your

2    radio on your uniform, so you have that capability if you

3    wanted to?

4    A.  If radio was available, yes, ma'am.

5    Q.  Okay.  And you could hear what's going on on the radio,

6    correct?

7    A.  Here and there, ma'am.  I heard that -- I heard talk

8    coming from the radio.  I couldn't really make out what was

9    going on.

10   Q.  From what you did hear, you didn't hear any of your

11   partners calling for backup?

12   A.  Not from what I can recall, ma'am.

13   Q.  Did you have any conversations with Mr. Lane about

14   whether either one of you should go be over by Mr. Thao?

15   A.  No, ma'am.

16   Q.  Okay.  So I don't think I mentioned the time on this.

17   When we were talking before, I mentioned that just before

18   8:25 p.m. is when Mr. Lane told you Mr. Floyd was passing

19   out and then, just to clarify, it's in that minute

20   thereafter that you tried to find Mr. Floyd's radial pulse,

21   correct?

22           MR. PLUNKETT:  Objection, Your Honor.  Repetitive.

23   We've been through this.

24           MS. SERTICH:  Just clarifying the time period,

25   Your Honor.

```
 1              THE COURT:  Okay.  I'll overrule.  If he knows.
 2              THE WITNESS:  I trust your timeline, ma'am, yes.
 3    BY MS. SERTICH:
 4    Q.  And you said that you could not take a carotid pulse,
 5    correct?
 6    A.  I don't know if I said I cannot.  I didn't have access
 7    to it and I took a radial pulse that was closest to me, yes,
 8    ma'am.
 9    Q.  I'm going to show you Government's Exhibit 19, a still
10    shot from Ms. Hansen's camera.  Can you see yourself there?
11    A.  I do, ma'am.
12    Q.  All right.  And fair to say it would be physically
13    possible to take a carotid pulse from your position?
14    A.  I don't believe I could without Officer Chauvin moving,
15    ma'am.
16    Q.  Okay.  And you didn't ask him to move, correct?
17    A.  No, ma'am.  I relayed the information I had up to him at
18    the time.
19    Q.  And to be clear, you don't need to know about the
20    carotid pulse to perform CPR, correct?
21    A.  I disagree, ma'am.  My training is that the carotid is
22    the gold standard.  It is the kind of final measurement
23    needed to determine pulse activity.
24    Q.  So, in your training and experience, if you can't get to
25    the carotid pulse, you can just sit there while someone
```

1    deteriorates?

2    A.  No, ma'am.  The idea would be to get a carotid pulse.

3    Q.  Well, after you said you couldn't find a pulse, Officer

4    Chauvin held his knee on Mr. Floyd for another two minutes

5    and 44 seconds; is that right?

6    A.  I'll take you're time frame, ma'am.  I don't recall.

7    Q.  And you also didn't get up and go check his pulse the

8    way that the paramedic did a few minutes later, right?

9    A.  I did not, ma'am.  It seemed as if Officer Chauvin moved

10   his knee for the paramedic, after the paramedic arrived, to

11   check the pulse.

12   Q.  You think Mr. Chauvin moved his knee when the paramedic

13   arrived?

14   A.  I do believe he slid it back to allow the paramedic to

15   get a carotid pulse, yes.

16   Q.  And that's something you could have done too, correct?

17   A.  I could have -- I don't understand what --

18            THE COURT:  Counsel, I'm going to interrupt.

19   We've got to stop arguing.  Let's ask questions, not argue

20   with the witness.

21   BY MS. SERTICH:

22   Q.  And you could hear bystanders, correct?

23   A.  I could hear noise, yes, ma'am.

24   Q.  Sometimes you could hear words?

25   A.  I heard some expletives.

1    Q.  I mean, you heard some people say, "Check a pulse" right

2    before you check the pulse, correct?

3              MR. PLUNKETT:  Objection, Your Honor.  Asked and

4    answered.

5              THE COURT:  That's asked and answered.  I sustain.

6    We've been over it.

7              MS. SERTICH:  I haven't talked to him about

8    bystanders.

9              THE COURT:  Yes, you have.  I've seen all kinds of

10   objections with respect to bystanders.

11   BY MS. SERTICH:

12   Q.  You would agree that we can hear them on your body

13   camera?

14   A.  They are audible --

15             MR. PLUNKETT:  Objection.  Asked and answered.

16   Noting for the record prosecutorial misconduct and a

17   continuing objection to --

18             THE COURT:  Counsel, all you are doing by this is

19   arguing, and I sustain the objections to it.

20   BY MS. SERTICH:

21   Q.  You testified yesterday that you heard Officer Chauvin

22   unbutton his Mace and take that out, right?

23   A.  I did, ma'am.

24   Q.  You saw him or heard him shake his Mace?

25   A.  I looked up after hearing the button snap and saw him

1   draw his Mace and shake it, yes, ma'am.

2   Q.  To your knowledge, he didn't use the Mace, correct?

3   A.  To my knowledge, I don't believe it was deployed, no,

4   ma'am.

5   Q.  Okay.  Did you hear him say something like "Don't come

6   over here" while he was doing that?

7   A.  I do believe it was something along those lines, yes,

8   ma'am.

9   Q.  And then, to your knowledge, he put it away and didn't

10  use it again, correct?

11  A.  I can't recall when he put it away.  I didn't see him

12  with it in his hands when the EMTs showed up.

13  Q.  And you and Mr. Thao, like any other time on duty,

14  you're both armed, correct?

15          MR. PLUNKETT:  Objection.  Relevance.

16          THE COURT:  Sustained.

17          MS. SERTICH:  Your Honor, we're talking about the

18  safety of the scene.

19          THE COURT:  Counsel, I'll take judicial notice

20  that police officers are armed.  It's not relevant to this

21  case.

22  BY MS. SERTICH:

23  Q.  Mr. Thao hadn't told you that he needed help with the

24  bystanders, correct?

25  A.  I couldn't discern, ma'am.  He was off scene and I

Alexander - Cross

1    couldn't hear much of anything, couldn't make out whose

2    voices were in the crowd or if Mr. Thao's was mixed in or

3    not.

4    Q.  And I'm sorry.  Maybe that was unclear.  You never heard

5    him address you in that way, correct?

6    A.  In which way, ma'am?

7    Q.  Saying he needed help.

8              MR. PLUNKETT:  Objection.  Asked and answered.

9              THE COURT:  That's overruled.  You may answer.

10             THE WITNESS:  No, ma'am, he never addressed me.

11   BY MS. SERTICH:

12   Q.  So is it your testimony here today that you didn't know

13   that the bystanders were asking for medical attention for

14   Mr. Floyd?

15             MR. PLUNKETT:  Objection.  Asked and answered.

16   Repetitive.

17             THE COURT:  I sustain, counsel.

18   BY MS. SERTICH:

19   Q.  Is it fair to say that it's a possibility for you to

20   perform CPR in that same position on the ground where you

21   were restraining Mr. Floyd?

22             MR. PLUNKETT:  Objection.  Speculation.

23             THE COURT:  No, I'm going to overrule.  He may

24   answer that.

25             THE WITNESS:  Could you ask the question again,

1     ma'am?

2     BY MS. SERTICH:

3     Q.  Of course.  Is it fair to say that you could have

4     performed CPR in that same position on the ground where you

5     were restraining Mr. Floyd?

6     A.  By "position," strictly you just mean the fact that

7     Mr. Floyd was laying next to the squad car on the street?

8     Q.  Yeah, just that place.

9     A.  Yes, ma'am, if we did get him uncuffed and we got scene

10    security, we could.

11    Q.  And you testified yesterday that you thought that

12    everything must be fine because when the paramedic got

13    there, he exited the ambulance and walked over calmly,

14    correct?

15    A.  Yes, ma'am.  I believed that he did not perceive it as

16    much of an emergency as well because he seemed quite casual.

17    Q.  Well, he wasn't there when Mr. Floyd stopped talking,

18    correct?

19    A.  No, ma'am, he was not.

20    Q.  Or when he lost consciousness?

21    A.  No, ma'am, he was not.

22    Q.  Or when you couldn't find a pulse, correct?

23    A.  Correct, ma'am.

24    Q.  And we know that all that paramedic knew was that he was

25    responding to a Code 3 with information about a mouth

1    injury, correct?

2              MR. PLUNKETT:  Objection.  Calls for speculation.

3              THE COURT:  Sustained.

4    BY MS. SERTICH:

5    Q.  And when the paramedic arrived, he found someone in

6    cardiac arrest being restrained by three officers, correct?

7              MR. PLUNKETT:  Objection.  Calls for speculation.

8              THE COURT:  Sustained.

9    BY MS. SERTICH:

10   Q.  Now, you said that you had your radio and you didn't

11   call for any backup.  You also never got on your radio to

12   say that the arrestee was unconscious, right?

13   A.  Correct, ma'am.

14   Q.  And you never got on your radio to say I can't find a

15   pulse on this patient, correct?

16   A.  Correct, ma'am.  Not really something we're trained to

17   do very often.

18   Q.  But you testified that it is important to communicate

19   about safety issues like this, correct?

20             MR. PLUNKETT:  Objection.  Misstates the evidence.

21   Relevance.

22             THE COURT:  I don't know.  I'll overrule.

23   BY MS. SERTICH:

24   Q.  Well, yesterday you talked about the fact that it was

25   important for Mr. Lane, when he was getting Mr. Floyd out of

```
 1    the car, to say "Taking one out" for safety purposes, right?
 2              THE WITNESS:  Yes, ma'am, for the officers.
 3    BY MS. SERTICH:
 4    Q.  And that scene was a Code 4, right?
 5    A.  At the moment in time when Officer Lane called Code 4,
 6    it was Code 4 at that moment, yes.
 7    Q.  It never changed off of Code 4, correct?
 8    A.  Not on the display, but, ma'am, Code 4 is we're trained
 9    is a moment in time that can shift and change rapidly, and
10    it's very common to not uncode something for dispatch, but
11    for the situation to not be considered Code 4.
12    Q.  And just to remind the jury, "Code 4" means safe for EMS
13    to come?
14    A.  Scene is safe, ma'am.
15    Q.  Okay.  And no one ever told EMS in this case to stage
16    somewhere nearby until the scene was safe, correct?
17    A.  Correct, ma'am.
18    Q.  And when the paramedics arrived on the scene, you didn't
19    tell them, "Stay back, this isn't safe"?
20    A.  No, ma'am.  They determine that on their own.
21    Q.  And you didn't feel like it was necessary to, like, get
22    up and protect the paramedics as they approached Mr. Floyd?
23    A.  I don't understand, ma'am.  Protect Mr. Floyd from the
24    paramedics?
25    Q.  No.  Protect the paramedics from whatever might be
```

1    making this scene unsafe.

2    A.  I wouldn't know what that would be, ma'am, but my

3    understanding was Officer Thao was out of sight doing such a

4    thing.

5    Q.  And as it turned out, the scene was safe enough for the

6    paramedics to take the pulse and load Mr. Floyd onto the

7    stretcher, correct?

8    A.  They were able to do a load and go, yes, ma'am.

9    Q.  And they took his pulse and they put him on that

10   stretcher in that same spot where you were on the ground?

11   A.  The stretcher was behind us, ma'am, so we moved a few

12   feet to get him on the stretcher, yes.

13   Q.  And you just referenced this idea of who controls a

14   scene when the paramedics arrive, right?

15   A.  Yes, ma'am.

16   Q.  And you know, correct, that when paramedics arrive on a

17   scene, you don't stop patient care, right?

18   A.  Not if there's any being conducted at the time, correct,

19   ma'am.

20   Q.  The arrival of the paramedics doesn't change your duty

21   of care to whatever level or standard you can perform at,

22   right?

23   A.  Not duty of care, ma'am.  It just lets you know to prep

24   to transfer the custody over to the paramedics, ma'am.

25   Q.  Okay.  I'm going to show you Government's Exhibit 85,

1    page 14, and we're going to look at the third question here.

2    I'm just wondering if you could read the question and it

3    looks like the correct answer B that you circled.

4    A.  "When emergency medical technicians (EMTs) or paramedics

5    arrive at an emergency scene, the law enforcement responder

6    should:  B, provide them with a hand-off report and assist

7    as needed."

8    Q.  It looks like A isn't the right answer.  Can you read

9    that one.

10   A.  Sorry, ma'am.  Could you --

11   Q.  Could you read A, which appears to be a wrong answer.

12   A.  Yes, ma'am.  "Disengage from patient care and give them

13   room to work."

14   Q.  Okay.  So fair to say that when paramedics arrive on a

15   scene, you don't freeze and wait to get orders from them,

16   correct?

17   A.  Freeze and wait?

18           MR. PLUNKETT:  Objection.  We're asking about this

19   question now or are we asking about his training and

20   experience?

21           MS. SERTICH:  Training and experience.

22           MR. PLUNKETT:  Then let's remove this question.

23           THE WITNESS:  Sorry, ma'am.  Could you ask that

24   again?

25   BY MS. SERTICH:

```
 1    Q.  So when paramedics arrive on a scene, you don't freeze
 2    and await orders from a paramedic, correct?
 3    A.  Ma'am, the correct answer says, "and assist as needed,"
 4    which the paramedics can request orders for us to assist.
 5    Q.  But you keep providing care, correct?
 6    A.  And getting ready to transfer custody, yes, ma'am.
 7    Q.  And continuing to provide care assumes that patient care
 8    is properly started by law enforcement officers while
 9    waiting for the ambulance, correct?
10            MR. PLUNKETT:  Objection.  Calls for speculation.
11            THE COURT:  Sustained.  And repetitious.
12            MS. SERTICH:  Your Honor, would this be a good
13    time for a break?
14            THE COURT:  No.
15            MS. SERTICH:  Okay.
16    BY MS. SERTICH:
17    Q.  So I think you testified that after you didn't find a
18    pulse, you knew because of radio traffic that the ambulance
19    was nearby, correct?
20    A.  No, ma'am.  I heard them physically.  At the time I
21    heard their sirens in the background.
22    Q.  Okay.  Even if you hear sirens, though, you don't know
23    exactly when an ambulance will arrive, correct?
24    A.  No, ma'am.  It's a proximity.  It assumes that they are
25    close.
```

1    Q.  But you don't know if traffic or a person or any number

2    of things can slow down an ambulance, correct?

3    A.  Correct, ma'am, I don't know that information.

4    Q.  And hearing sirens doesn't give you a number of seconds

5    or minutes that you know the ambulance will arrive, correct?

6    A.  It indicates close, ma'am.  Close is a proximity.  I

7    can't give a definite number to it.

8    Q.  So afterwards we have seen video that Sergeant Pleoger

9    arrived at the scene, correct?

10   A.  Yes, ma'am.

11   Q.  Okay.  And I think you testified you actually recognized

12   he was conducting what's called a use of force review when

13   he showed up to the scene?

14   A.  That was my understanding of his purpose for being

15   there, yes, ma'am.

16   Q.  Okay.  And we just watched that interview yesterday, so

17   we don't need to watch it again, correct?

18   A.  Correct, ma'am.

19   Q.  Okay.  And Sergeant Pleoger asked you and Mr. Lane what

20   happened, right?

21   A.  He asked in a general sense.  My recollection is he was

22   looking at Chauvin when he asked, but we gave him the

23   debrief, yes, ma'am.

24   Q.  Okay.  So Officer Lane described what happened when he

25   first approached Mr. Floyd's car, correct?

1    A.  I believe so, ma'am.

2    Q.  And then you provided details about what happened after

3    you and Mr. Lane took Mr. Floyd out of his car, correct?

4    A.  I believe mine started about the time he was sat down

5    next to the Dragon Wok, as I believe it's called.

6    Q.  Okay.  And you walked Sergeant Pleoger through from the

7    wall across the street, not listening, to getting in the

8    car, putting up a fight, all of those things, correct?

9    A.  That's correct, ma'am.

10   Q.  Okay.  You talked about the struggle that happened in

11   the squad and what eventually lead up to Mr. Floyd being on

12   the ground, correct?

13   A.  Correct, ma'am.

14   Q.  And you said Mr. Floyd was fidgeting really hard, right?

15   A.  Yes, ma'am, a term like that.  I don't know if it was

16   exactly fidgeting, but yes, ma'am.

17   Q.  And you said that you called for EMS and held him there

18   until EMS arrived, correct?

19   A.  Correct, ma'am.

20   Q.  And you chose not to say anything about Mr. Chauvin

21   kneeling on Mr. Floyd's neck, correct?

22   A.  I didn't choose not to, ma'am.  Our report writing

23   teaches us that we are not to explain another officer's

24   perspective, and Officer Chauvin was right there.  If he

25   wanted to explain his use, he was very welcome to.

1    Q.  Well, you were standing there too and he didn't provide

2    that information, correct?

3    A.  Correct, he did not.

4    Q.  Okay.  So you knew that this use of force review was

5    happening without knowledge of the force that was used on

6    the ground, correct?

7              MR. PLUNKETT:  Objection.  Speculation.

8              THE COURT:  I sustain.  It's not his job to

9    testify for Officer Chauvin.

10   BY MS. SERTICH:

11   Q.  But you also didn't tell Sergeant Pleoger that Mr. Floyd

12   had passed out, correct?

13   A.  Correct.

14   Q.  And you didn't tell him that you couldn't find a pulse?

15   A.  Correct.

16   Q.  Let me set Officer Chauvin aside.  You didn't tell him

17   about the sort of force you were using, correct?

18   A.  Can you be a little more specific, ma'am?  I let him

19   know that restraints were used.

20   Q.  Okay.  The -- so the hand, the knee, you didn't talk

21   about those specifics, correct?

22   A.  No, not in specifics, ma'am.

23   Q.  Okay.  And you didn't talk to him about how long

24   Mr. Floyd was on the ground?

25   A.  Correct, ma'am.  I did not have a timeline.  I was not

1    keeping track of how long it went on.

2    Q.  And you said to Sergeant Pleoger, "He kind of stopped

3    moving and," again, I think, "kind of stopped fidgeting,"

4    right?

5    A.  Yes, ma'am, I believe that is what I said.

6    Q.  And Sergeant Pleoger asked, to clarify, "After EMS got

7    there?"  And you said, "Yeah."  Correct?

8    A.  I'll take your word for it, ma'am, yes.

9    Q.  So Sergeant -- the report Sergeant Pleoger received was

10   that Mr. Floyd stopped moving after EMS arrived on the

11   scene, correct?

12   A.  I'm not sure what he put in, ma'am, but that would be

13   what I said, yes.

14   Q.  Okay.  But that was not true, correct?

15   A.  Correct, ma'am.

16   Q.  Lieutenant Zimmerman also came to the scene later,

17   correct?

18   A.  Correct, ma'am.

19   Q.  And he also asked you about what had happened?

20   A.  Yes.  I believe that was what's going on, something

21   along those lines, ma'am.

22   Q.  And Officer Lane was there with you?

23   A.  He was.

24   Q.  Okay.  Again, both of you talked to Lieutenant

25   Zimmerman?

```
 1    A.  Yes.  I believe Lane started and then I came in at some
 2    point, yes.
 3    Q.  Okay.  Again, we don't need to watch that one again?
 4    A.  I agree, ma'am.
 5    Q.  Okay.  And I think you testified yesterday that at that
 6    point you thought this was a critical incident and that you
 7    were just providing a public safety interview; is that
 8    right?
 9    A.  That was my understanding, ma'am.
10    Q.  And a public safety interview -- correct me if I'm
11    wrong -- that means that you're just going to tell the
12    sergeant if there's a suspect at large or a threat in the
13    area, a public safety concern, correct?
14    A.  That is my understanding of the report, yes, ma'am.
15    Q.  But you and Officer Lane provided a lot more information
16    than that, correct?
17    A.  At Lieutenant Zimmerman's request, yes, ma'am.
18    Q.  Okay.  And I guess similar to your statement to Sergeant
19    Pleoger, you provided a lot of details about what happened
20    at Mr. Floyd's vehicle and then what happened when you were
21    trying to get Mr. Floyd into the squad, correct?
22    A.  Correct, ma'am.
23    Q.  And when you got to the part about where Mr. Floyd was
24    restrained, you said that you all decided to keep him pinned
25    to the ground, correct?
```

1    A.  I believe that is what I said, yes, ma'am.

2    Q.  To hold him there until EMS showed up, correct?

3    A.  Correct, ma'am.

4    Q.  And you said he was communicative and very mobile for a

5    good three to four minutes there?

6    A.  I believe that is what I said, yes, ma'am.

7    Q.  Okay.  And you said he kind of stopped talking, but was

8    still moving, right?

9    A.  Yes.

10   Q.  You said he was still breathing, we could see his chest

11   rising, and then EMS showed up and we rolled him onto the

12   cot, correct?

13   A.  Correct, ma'am.

14   Q.  And you know from your MPD training that officers cannot

15   knowingly omit pertinent information pertaining to official

16   duties, correct?

17   A.  I am aware, ma'am.

18   Q.  Okay.  And you are aware that that applies to verbal

19   statements as well, correct?

20   A.  I am aware that applies to verbal statements as well,

21   ma'am.

22   Q.  And, again, you did not tell Lieutenant Zimmerman that

23   Mr. Floyd lost consciousness before EMS showed up?

24   A.  I did not, ma'am, as I did believe it was a public

25   safety statement.  It was not on the forethought of my mind

1    when he was asking for a debrief, ma'am.

2    Q.  Okay.  But you thought all these other items were

3    relevant to public safety that you did mention?

4    A.  He asked for the details and I provided.  He's a

5    lieutenant.  He was giving me commands to give him a more

6    detailed report from start to finish, and I complied.

7    Q.  And Mr. Chauvin wasn't there for this statement, right?

8    A.  I do not believe so.

9    Q.  But you still did not report to Lieutenant Zimmerman

10    that Mr. Chauvin had held Mr. Floyd in this knee on the neck

11    restraint, correct?

12    A.  Again, ma'am, it's not my duty to report another

13    officer's perspective.

14    Q.  Well, what about your perspective of what you saw?

15    A.  I can attest that I thought Lieutenant Zimmerman, if he

16    was going to continue with this questioning, that he would

17    contact the other squad involved and get their perspective

18    firsthand.

19    Q.  And, again, you didn't tell Lieutenant Zimmerman that

20    Mr. Floyd was restrained for minutes after he stopped

21    talking?

22           MR. PLUNKETT:  Asked and answered, Your Honor.

23           THE COURT:  Sustained.

24    BY MS. SERTICH:

25    Q.  I'd like to discuss a hypothetical with you.

```
 1            MR. PLUNKETT:  Objection.  Hypothetical.  Also
 2    calls for speculation.
 3            THE COURT:  That does call for speculation.  I
 4    need to know what this is about, counsel.  Let's go to
 5    sidebar.
 6        (At sidebar)
 7            MS. SERTICH:  Your Honor, can you hear me?
 8            THE COURT:  I can hear you.
 9            MS. SERTICH:  Your Honor, I want to pose a
10    hypothetical to Mr. Kueng that shows that, based on his
11    training, he is aware of how to intervene when crimes are
12    being committed as a way to explain for the jury how
13    intervention in crimes works.
14            MR. PLUNKETT:  She certainly can ask him what his
15    specific training is on intervention, Your Honor, but beyond
16    that you're asking him to speculate about, well, a
17    hypothetical.
18            THE COURT:  I'm going to sustain.  First of all, I
19    think we've covered what his training is already.  And I
20    just don't think this kind of thing is appropriate for
21    cross-examination.  I'm going to sustain the objection.
22            MR. PLUNKETT:  Thank you, Your Honor.
23            MS. SERTICH:  Your Honor, some of my co-counsel
24    are asking for a restroom break.
25            MR. PLUNKETT:  I think we should finish.
```

1       THE COURT:  No, I think it is time to take a

2    break.  I don't know how long we're going to be with him,

3    but it is time to take a break.  We will take a recess.

4       **(In open court)**

5       THE COURT:  Members of the jury, we're going to

6    take a morning break at this time.  I would caution you not

7    to discuss the case during the recess.

8       We are in recess for our morning break.

9    (Recess taken at 11:26 a.m.)

10                    * * * * *

11   (11:41 a.m.)

12                **IN OPEN COURT**

13                **(JURY PRESENT)**

14       THE COURT:  Continue, Ms. Sertich.

15       MS. SERTICH:  Thank you, Your Honor.

16   BY MS. SERTICH:

17   Q.  Mr. Kueng, tactically speaking, placing someone on their

18   side rather than in the prone position would not change

19   anything about the security of a scene, correct?

20   A.  I disagree, ma'am.  It depends.  Ideally the prone

21   position is when they're isolated with nothing to be able to

22   press their body against.  In this specific case, Mr. Floyd

23   was next to a squad car.  It gives him something to push

24   himself off of.

25   Q.  Let me ask you that a different way.  In terms of what

1      was going on around Mr. Floyd, not with Mr. Floyd, rolling

2      him on his side would not change that security situation,

3      correct?

4                 MR. PLUNKETT:  Objection.  Speculative.  Asked and

5      answered.

6                 THE COURT:  It is.  I sustain.

7      BY MS. SERTICH:

8      Q.  Yesterday you testified that, in your observation and

9      experience, body-worn cameras actually capture more than

10     what a person can see because of, I think you said, some

11     sort of fish eye effect, right?

12     A.  Yes, ma'am.

13     Q.  But that's not actually true, that you can see less with

14     your eyes than via a body-worn camera, correct?  And let me

15     just say it this way.  Because on a really basic level --

16                MR. PLUNKETT:  Objection, Your Honor.  There's a

17     question before this man.  He needs to answer it before we

18     go on to another one.

19                THE WITNESS:  I'm sorry, ma'am.  Could you --

20                THE COURT:  Start over.  Start your question

21     again.

22     BY MS. SERTICH:

23     Q.  It's not true that you can see less with your eyes than

24     via a body-worn camera, is it?

25     A.  In totality, ma'am, I'm not certain.  I've never really

1    measured the two against one another.  In my experiences,

2    I'd say that in relation to the fact that the camera doesn't

3    have to focus or readjust based on stress levels.

4    Q.  But at a most basic level, you have a neck and you can

5    turn your head, right?

6              MR. PLUNKETT:  Objection.  He's answered the

7    question.

8              THE COURT:  He has answered the question.  And,

9    counsel, this is being argumentative and we are going over

10   and over this same argumentative-type discussion and we just

11   don't need to do it.

12             Proceed.

13   BY MS. SERTICH:

14   Q.  Fair to say that there are times on the video where your

15   body-worn camera is just facing the tire for long periods of

16   time, but you're actually looking around?

17             MR. PLUNKETT:  Objection.  Relevance.

18             THE COURT:  I'll overrule.  He may answer if he

19   knows.

20             THE WITNESS:  Yes, ma'am.

21   BY MS. SERTICH:

22   Q.  You've testified that you did not have any specific

23   scenario training with respect to the duty to intervene,

24   correct?

25   A.  Yes, ma'am.

```
1    Q.  But you did receive a wide variety of use of force

2    training throughout skills and academy and FTO, correct?

3    A.  What would you classify as "a wide variety," ma'am?

4    Q.  Well, we talked about all of your training and

5    experience yesterday, correct?

6    A.  In relation to use of force, ma'am?

7    Q.  Yes.

8    A.  Yes, ma'am, for defensive tactics.

9    Q.  Okay.  Would you agree with me that you don't need a

10   specific scenario to know that you need to get an officer

11   off a person who is unconscious?

12   A.  No, ma'am, I would disagree, not for that specific

13   scenario, but I believe a duty to intervene scenario would

14   help new officers identify things that could be perceived

15   that way, especially in instances where they're not sure of

16   the technique or not familiar with it.

17   Q.  Well, through your training and experience, you do have

18   training in how to stop someone from committing a crime,

19   correct?

20   A.  Correct, ma'am.

21   Q.  And unreasonable force is a crime?

22   A.  Yes, ma'am, if it's perceived.

23   Q.  If it's what?  Sorry.

24   A.  Perceived.

25   Q.  Fair to say that you don't need a specific scenario to
```

```
 1    know that you need to get an officer off a human with no
 2    pulse?
 3    A.  It depends on what the officer is doing, ma'am.
 4    Q.  You don't believe that that's common sense?
 5    A.  Well, ma'am --
 6             MR. PLUNKETT:  Objection.  Argumentative.  Now
 7    it's --
 8             THE COURT:  It's argumentative.  I sustain.  And
 9    it's repetitious, and I sustain that part too.
10    BY MS. SERTICH:
11    Q.  You testified both yesterday and today about some
12    ramifications you thought you could face if Officer Chauvin
13    were to get mad at you, correct?
14    A.  If he -- I wouldn't say mad, ma'am.  If my status was --
15    or not my status.  If my conduct was not approving of the
16    specific measurements that he's evaluating me on, yes,
17    ma'am.
18    Q.  And you suspected that intervening could lead to that
19    type of assessment, correct?
20             MR. PLUNKETT:  Objection.  Misstates the evidence.
21             THE COURT:  It does.  Sustained.
22    BY MS. SERTICH:
23    Q.  You thought that if you chose to do something in that
24    moment while restraining Mr. Floyd, that that could possibly
25    result in Mr. Chauvin assessing you in the way you just
```

```
1    described?
2            MR. PLUNKETT:  Objection.  Misstates the evidence.
3            THE COURT:  It does, counsel.  I sustain.
4            MR. PLUNKETT:  I'm renewing the record again for
5    prosecutorial misconduct.
6            THE COURT:  He's testified, counsel, as to what he
7    believes that senior officers can do with respect to a
8    probationary person.  He has not gone into any specifics of
9    this particular incident, and I don't think it's relevant to
10   do so.
11   BY MS. SERTICH:
12   Q.  Would you agree that fear of those types of
13   repercussions is not an exception to the duty to intervene?
14   A.  Yes, ma'am, I would agree.
15   Q.  And yesterday you talked about a wide range of scenarios
16   you did at the academy.  I think you mentioned domestic
17   violence, sexual assault, mental illness, things like that,
18   correct?
19   A.  Things of that nature, yes, ma'am.
20   Q.  And, in fact, those are some of the more common calls
21   you face as an MPD officer, correct?
22   A.  That was the understanding at the time, yes.
23   Q.  And you faced just about all of those, if not all of
24   those, during your first five months of your FTO period,
25   correct?
```

1    A.  Those three that were just described, ma'am?

2    Q.  Yes.

3    A.  Yes, ma'am.

4    Q.  Okay.  And so you'd agree with me that it makes sense

5    for the MPD to provide scenarios on situations that a cadet

6    is likely to see once they become an officer?

7    A.  Yes, ma'am, as they do filter out which ones they find

8    most important and common is important.

9    Q.  And you testified that there were some scenarios where

10   the whole point of the scenario is that at the end of the

11   day you're supposed to do nothing, correct?

12   A.  Yes, ma'am, there are ones where you determine if a

13   crime has been committed.

14   Q.  And so the point of some of those scenarios could be to

15   recognize when a subject's action should not result in

16   arrest, should not result in force, that sort of thing?

17   A.  Not that --

18              MR. PLUNKETT:  Speculation and relevance.

19              THE COURT:  I sustain.

20              MS. SERTICH:  Your Honor, can we have a sidebar?

21              THE COURT:  I see no reason for a sidebar.

22   BY MS. SERTICH:

23   Q.  So, according to your testimony, the example you were

24   given for when intervention needs to occur is, for example,

25   someone -- an officer kicking someone who is handcuffed,

1    correct?

2    A.  I believe I said punching, stomping, and kicking, yes,

3    ma'am.

4    Q.  All right.  And that's, you believe, obvious, correct?

5    A.  Yes, ma'am.  That was the point of the example, was to

6    illustrate that for the duty to intervene to exist within

7    the mind of the person perceiving it, that the use of

8    force -- excessive use must be obvious.

9    Q.  Okay.  And so what you are saying is that it is more

10   obvious that you have to intervene when an officer is, say,

11   kicking a handcuffed but conscious person than an officer

12   pressing his knee into the neck of a handcuffed,

13   unresponsive person?

14   A.  When on the ground and in certain situations, ma'am,

15   yes, but that's the point of attempt.  And the policy in

16   general is -- it's wide.  It's not definitive.

17          MS. SERTICH:  Just one moment, Your Honor.

18      (Pause)

19          MS. SERTICH:  Nothing further at this time, Your

20   Honor.

21          THE COURT:  Thank you.

22          Mr. Plunkett.

23          MR. PLUNKETT:  Thank you, Your Honor.

24

25

```
 1                      REDIRECT EXAMINATION

 2   BY MR. PLUNKETT:

 3   Q.  Well, it's still good morning, Mr. Kueng.

 4   A.  Good morning, sir.

 5   Q.  Yesterday you were asked some questions about a

 6   checklist that was used.  Do you remember those questions?

 7   A.  I do, sir.  Checklist with my FTO in the beginning

 8   phase.  I believe it was Officer Ketchmark.

 9   Q.  Probationary officer skills checklist?

10   A.  Yes, sir.

11               MR. PLUNKETT:  May I approach the witness, Your

12   Honor?

13               THE COURT:  You may.

14   BY MR. PLUNKETT:

15   Q.  Showing you a document that's been marked as Defense

16   Exhibit K-Y, Y as in Yankee.  Do you recognize that?

17   A.  I do, sir.

18   Q.  What does it say at the top?

19   A.  It says, "Probationary Officer Skills Checklist."

20   Q.  Is that the probationary officer skills checklist that

21   you were being asked questions from yesterday?

22   A.  It is, sir.

23   Q.  All right.  Is it a true and correct copy?

24   A.  I believe so, sir.

25               MR. PLUNKETT:  Your Honor, at this time I would
```

1    offer Exhibit K-Y.

2              MS. SERTICH:  No objection.

3              THE COURT:  K-Y is received.

4    BY MR. PLUNKETT:

5    Q.  And I'm turning to page 2 of document K-Y, because I

6    think that's the specifics that you were asked about, which

7    was D and E, which is duty to intervene and de-escalation.

8    There's a reference to, it looks like, a couple of policies;

9    is that right?

10   A.  Yes, sir.

11   Q.  It was suggested that you actually -- that this is part

12   of your training on duty to intervene, and I would just like

13   to find out from you.

14             I see that all four sets of initials occurred on

15   the same day; is that correct?

16   A.  Correct, sir.

17   Q.  When we look at page 1 of it, we find out that the four

18   columns are FTO Explain, FTO Perform, Trainee Explain,

19   Trainee Perform; is that right?

20   A.  Yes, sir.

21   Q.  Tell me about the realities of that, please.

22   A.  Well, sir, this probationary skills checklist is a

23   mandatory requirement in order to finish the phase you're

24   on.  And so you present it to your FTO.  The idea is your

25   FTO goes through it, explains it to you.  The reality is,

1    though, at least for me, I handed it to my FTO and he just

2    signed on all the lines, told me to sign it, turn it in.  No

3    review.

4    Q.  So it was a little misleading to say that this was

5    additional training?

6    A.  Yes, sir.

7    Q.  I think you were asked you some questions from

8    Exhibit 131, which I believe was a test that you took

9    sometime during training, probably at the end of training;

10   is that right?

11   A.  I need a little more specific, sir.  There were a lot of

12   exams.

13   Q.  Okay.  Do you remember that they put a test up there and

14   said, you know, what is this question and what did you

15   answer?  Do you remember that test?

16   A.  Yes, sir.  I believe that was the multiple choice, A, B,

17   and C, one.

18   Q.  Yes.  And you said it's an open classroom test.  Just

19   tell us -- do they teach you the test?

20   A.  I don't quite understand the question, sir.

21   Q.  Tell me about the process of taking that test.

22   A.  Yes, sir.  So you have a certain amount of policy tests

23   you have during the academy, and you take them all in your

24   classroom.  You are all sitting together.  The instructor

25   comes in.  They give you the test and they leave, and their

```
 1    hint before they leave is if you guys work together, no one
 2    will know.
 3    Q.  Okay.  So it's essentially an open book, open classroom
 4    test?
 5    A.  Correct, sir.
 6    Q.  You were asked about -- a question about an FTO
 7    experience with a vomiting woman or younger person.  Do you
 8    recall those questions?
 9    A.  I do, sir.
10    Q.  And you indicated you had some concerns that she may
11    inhale her vomit?
12    A.  Yes, sir, that was my concern.
13    Q.  And aspirate on it?
14    A.  Correct, sir.
15    Q.  Was that anything that was remotely in any way related
16    to your experience on the 25th of June [sic]?
17              MS. SERTICH:  Objection.  Leading.
18              THE COURT:  It's overruled.  It's introductory.
19              THE WITNESS:  No, sir, no relation.
20    BY MR. PLUNKETT:
21    Q.  You were asked about page 109.  I think that was a
22    PowerPoint slide from your EMR class.  Do you remember that?
23    A.  Yes, sir.
24    Q.  How many PowerPoint slides do you think you saw during
25    your training?
```

```
1    A.  A lot, sir.  I don't think I could ballpark a number,
2    but I would guess 50, maybe more.
3    Q.  Fifty different PowerPoints?
4    A.  Yeah, 50 different ones, sir.
5    Q.  Each one consisting of multiple slides?
6    A.  Yes, sir.
7    Q.  Did you have any recollection of that particular slide?
8    A.  No, sir.
9    Q.  And I think they were talking about positional asphyxia
10   at that -- on that slide.  I could be mistaken.
11        You were asked some questions about pain response
12   because you had used the term "inert to pain" or something
13   like that.  Do you recall those questions?  I think this is
14   today now.
15   A.  I do, sir.
16   Q.  And I sense that -- they were asking questions about
17   handcuffs, and I sense you were thinking, when you answered
18   the question yesterday, it was escort hold.
19        MS. SERTICH:  Objection.  Leading.
20        THE COURT:  Again, it's introductory.
21   BY MR. PLUNKETT:
22   Q.  Tell me about -- just tell me about that.  What did you
23   talk about yesterday and what were you questioned about
24   today?
25   A.  Yesterday I was referencing an escort hold that we are
```

1    taught, which consists of an arm that goes in between the

2    crux of the elbow to hold position there, and then you use

3    your other hand to grab a wrist, typically the same wrist

4    that's connected to the arm that you're holding with your

5    other arm, and you will kind of, as we call it, goose neck

6    it, which is bending the wrist at an angle so that if any

7    pressure is put or if they try and fight back against the

8    pressure by turning towards you in any way, it applies kind

9    of a pain response to discourage them from doing that.

10   Q.  Is that the pain response you were talking about

11   yesterday?

12   A.  Yes, sir.

13   Q.  How would you differentiate that from the discussion

14   about pain related to handcuffs?

15   A.  Handcuff pain is a very common complaint you can get

16   from individuals who just don't like to be in handcuffs.

17   Some of them are experienced and aware that if they complain

18   about handcuffs, we adjust them.

19        And to adjust them, you essentially have to unlock

20   them and sometimes even free up an arm in order to readjust.

21   It gives them a moment of a thought of freedom or

22   potentially an attempt to do something else.

23        But the complaints related to handcuffs tend to be

24   very continuous when people complain about them.  They don't

25   seem to cease.  It doesn't really matter how much you adjust

1    them.  In my experience, people just -- they don't want them

2    on and that's kind of why they're complaining.

3            As opposed to complaints about wrist restraints or

4    joint locks, people tend to be complaining very severely

5    about the pain they're in the moment it's applied and then

6    they cease very quickly when that joint lock has ceased and

7    the relief has now begun.

8    Q.  And you didn't see that with Mr. Floyd?

9    A.  No, sir.  His complaints were continuous.  It seemed to

10   focus specifically on handcuffs.  He kept saying, "Look at

11   my wrist," even at times when I was not even in contact with

12   him physically.

13   Q.  Okay.  You were asked -- you were showed -- shown,

14   pardon me, a slide from the excited delirium training and it

15   talked about what I think you termed narcotics and

16   Ms. Sertich termed stimulants.  Do you remember those

17   questions?

18   A.  I do recall, sir.

19   Q.  Do you recall looking at that list of narcotics and

20   seeing LSD as one of those narcotics?

21   A.  I do, sir.

22   Q.  In obviously your training, but not necessarily your

23   experience, is LSD either a stimulant or a sedative?

24   A.  In my training and experience, sir, I'm actually not

25   sure.

1    Q.  Okay.  Or hallucinogen?

2            MS. SERTICH:  Objection.  He answered the

3    question.

4            THE COURT:  Yeah, he did.  I sustain.

5            MS. SERTICH:  Leading.

6            THE COURT:  I sustain it.

7    BY MR. PLUNKETT:

8    Q.  They asked you some questions about a statement that you

9    purportedly made to Mr. Chauvin, that he's under arrest for

10   forgery.  Do you remember those questions?

11   A.  I do, sir.

12   Q.  Did they leave out the second part of what you said?

13   A.  Yes, sir.

14   Q.  What was the second part of what you said?

15   A.  I don't recall offhand, sir.  May I refer to the

16   transcript?

17   Q.  If you have it in front of you.

18   A.  I do, sir.

19   Q.  Okay.

20       (Pause)

21   Q.  It could be on page 14 of the transcript around

22   20:18:55.  Did you find it?

23   A.  I did, sir.

24   Q.  What was the rest of what you said?

25   A.  The rest of what I said in connection to that question

1    was:  "He's under arrest right now for forgery till we

2    figure out what's going on."

3    Q.  What does that mean?

4    A.  It means that right now he's in our custody under

5    detainment while we conduct and further the investigation

6    into the behavior and the crime that is -- we were being

7    called to.

8    Q.  You were asked some questions about your training on I

9    think it was neck restraints, and I want to understand if

10   there's a difference between what you consider training and

11   looking at a PowerPoint.  Are those -- what's the

12   difference, if there is?

13   A.  In my experience, sir, training is kind of the

14   emphasized points that the instructors put you through,

15   where they actually will take you out to either the gyms or

16   the mats or have a scenario that you participate in in order

17   to experience what they're explaining for themselves, as

18   opposed to PowerPoints, which are very much just quick

19   tidbits of information that they scroll through quickly.

20   It's kind of like a streamlined version of education.

21   Q.  Okay.  And you were asked some questions about whether

22   or not the bystanders have a right to interfere with police

23   officers.  Do you remember those questions?

24   A.  I do, sir.

25   Q.  I think you said they don't have a right to interfere.

1    Can that still happen?

2    A.  Yes, sir, it can still happen.

3    Q.  Tell me about that.

4    A.  Sir, my understanding is, whether they have a right or

5    not, some people do feel the need or are compelled to

6    intervene, whether against the officer's orders or sometimes

7    I've been told in my skills that there is --

8              MS. SERTICH:  Objection.  Hearsay.

9              THE COURT:  I sustain.  It does sound like hearsay

10   is coming.

11             MR. PLUNKETT:  Okay.

12   BY MR. PLUNKETT:

13   Q.  Moving on, then, you were asked some questions about the

14   medic who checked the carotid pulse.  Do you remember those

15   questions?

16   A.  I do, sir.

17   Q.  And about his casual approach to things.  Do you

18   remember those questions?

19   A.  Yes, sir.

20   Q.  Was he just as casual before he took the pulse, carotid

21   pulse, as after he took the carotid pulse?

22   A.  He was, sir.  His taking of the pulse did not seem to

23   change his demeanor or his casualness about the situation.

24   Q.  You were asked some questions about scene safety and the

25   fact that the medics came up to the scene.  Do you recall

1    that?

2    A.  Yes, sir.

3    Q.  And immediately when they left, do you know where they

4    took him, do you know where they took Mr. Floyd to?

5    A.  So as they were loading up Mr. Floyd, I overheard the

6    paramedic speak to his partner and say, "Just get us out" --

7           MS. SERTICH:  Objection.  Hearsay.

8           THE COURT:  Overruled.

9           THE WITNESS:  I heard him say -- tell his partner,

10    "Just get us out of here, take us to like 40th," I believe

11    is what I heard.

12    BY MR. PLUNKETT:

13    Q.  A place of safety?

14    A.  Yes, sir.

15    Q.  There was a series of questions that were a little hard

16    to understand about the amount of time it takes from the

17    time that you hear a siren to the time an ambulance arrives.

18    Do you remember those questions?

19    A.  Yes, sir.

20    Q.  Have you heard sirens before?

21    A.  I have, sir.

22    Q.  And subsequently did an ambulance arrive?

23    A.  Yes, sir.

24    Q.  Did you get out a stopwatch?

25    A.  No, sir.

```
1    Q.  Was it quick?

2    A.  Typically, yes, sir, in my experience.

3    Q.  Could you estimate how much time it takes?

4    A.  Seconds, sir.

5    Q.  But you couldn't say the number of seconds?

6    A.  Correct, sir.

7    Q.  You were asked some questions about your conversations

8    with Lieutenant Zimmerman.  Okay?  I want to talk to you

9    about that.

10              When you spoke to Mr. Zimmerman -- Lieutenant

11   Zimmerman, how many full shifts had you completed?

12   A.  Including my first shift on the desk, I had two full

13   shifts.

14   Q.  Okay.  You were in your third shift?

15   A.  Yes, sir, the middle of my third.

16   Q.  All right.  And does a lieutenant outrank an officer?

17   A.  Yes, sir.

18   Q.  Does a lieutenant outrank a sergeant?

19   A.  Yes, sir.

20   Q.  Does a lieutenant outrank a rookie?

21   A.  By a long shot, sir.

22   Q.  Did you knowingly omit information when you spoke to

23   him?

24   A.  That was not my --

25              MS. SERTICH:  Objection.  Leading.
```

1    THE COURT:  Overruled.  He may answer.

2    THE WITNESS:  That was not my intention, sir.

3  BY MR. PLUNKETT:

4  Q.  They asked you some questions about stopping crimes,

5  correct?

6  A.  Yes, sir.

7  Q.  And is it your training to stop crimes that haven't

8  happened yet?

9  A.  No, sir.

10  Q.  Before you can stop a crime, do you have to know it's

11  happening?

12  A.  Yes, sir.

13    MR. PLUNKETT:  Nothing further, Your Honor.

14    THE COURT:  Thank you.

15    Anything further, Ms. Sertich?

16    MS. SERTICH:  Just a couple of questions, Your

17  Honor.

18                    RECROSS-EXAMINATION

19  BY MS. SERTICH:

20  Q.  Mr. Kueng, you provided a little bit more testimony

21  about the risks and about how sometimes people just want to

22  get out of their handcuffs and so they complain about them.

23    But in this case, you actually testified yesterday

24  that Mr. Floyd's wrists were significantly bloodied once you

25  got on the ground, correct?

1    A.  Yes, ma'am, after the struggle in the backseat of the

2    squad.

3    Q.  And you also talked about the bystanders and how you

4    have encountered situations where they try to physically

5    intervene in a scene, correct?

6    A.  I don't recall saying I've experienced any encounters

7    like that, ma'am, no.

8    Q.  Okay.  You discussed how you might not remember some

9    training if it's just in a PowerPoint or in a policy,

10   correct?

11   A.  Correct, ma'am.

12   Q.  But you did remember that untrained neck restraint using

13   a leg, correct?

14   A.  No, ma'am, I've never used a leg neck restraint.

15   Q.  You remembered that that was in a PowerPoint in the

16   policy, correct?

17   A.  Correct, ma'am.

18            MS. SERTICH:  No further questions.

19            MR. PLUNKETT:  Nothing further, Your Honor.

20            THE COURT:  Okay.  Thank you very much.  You may

21   step down.

22            THE WITNESS:  Thank you, Your Honor.

23            MR. PLUNKETT:  May I approach madam court

24   reporter, Your Honor?

25            THE COURT:  You may.

```
 1            (Exhibit K-Y handed to court reporter)

 2            MR. PLUNKETT:  Your Honor, at this time I'd like

 3      to call Steve Ijames.

 4            THE COURT:  If you'd stop there and raise your

 5      right hand to be sworn.

 6                         STEVE IJAMES,

 7      called on behalf of Defendant Kueng, was duly sworn, was

 8      examined and testified as follows:

 9            THE COURT:  Take the witness stand, remove your

10      mask, and give and spell your last name.

11            THE WITNESS:  My name is Steve Ijames.  And my

12      last name is spelled like I-James, I-J-A-M-E-S.

13            MR. PLUNKETT:  May I inquire, Your Honor?

14            THE COURT:  You may.

15                      DIRECT EXAMINATION

16      BY MR. PLUNKETT:

17      Q.  So, Mr. Ijames, let's start by explaining to the jury

18      why you are here.  Have you been hired as an expert to

19      provide expert opinions related to the use of force and

20      medical aid as it pertains to properly trained police

21      officers for the jury?

22      A.  Yes, sir.

23      Q.  In preparation were you provided with materials to

24      review?

25      A.  Yes, sir.
```

1    Q.  And did those include video evidence, like body-worn

2    cameras, surveillance recordings, and recordings from

3    bystanders?

4    A.  Yes, sir, a very large file.

5    Q.  In fact, were you given complete access to all of the

6    discovery in this matter?

7    A.  That I'm aware of, yes, sir.

8    Q.  I'm assuming you did not review each and every piece of

9    discovery?

10   A.  I didn't open them in detail.  Certain things I knew

11   would not be important to me, but I did look through the

12   entire list and registry.

13   Q.  What things didn't appear to important to you?  Just one

14   or two examples.

15   A.  Certain things that relate to medical procedures, things

16   that happened after the ambulance had left the scene, that

17   sort of thing.

18   Q.  Okay.  Why is it important to you, as an expert, to have

19   access to all of the discovery?

20   A.  I've learned through long experience that oftentimes

21   things that may not be important to the person giving it to

22   me are, in fact, important to me.  So I've always requested

23   without exception that the entire file be provided, though I

24   may not look at, examine deeply much of it.

25   Q.  So if I cherry-picked the file, your expert opinion

1   could be flawed?

2   A.  Yes, sir.  That's why I don't allow that to happen.

3   Q.  I want to talk about your background.  And how old are

4   you -- you don't have to say how old you are.  Where are you

5   from?

6   A.  I'm from Springfield, Missouri.

7   Q.  Education?

8   A.  A bachelor's degree in criminal justice, a master's

9   degree in public administration.

10  Q.  Have you -- I'm sorry.  Did I cut you off?

11  A.  And I'm a graduate of the 186th FBI National Academy.

12  Q.  Okay.  Have you had a career in law enforcement?

13  A.  I'm entering my 44th year, yes, sir.

14  Q.  And have you attended any law enforcement academies?

15  A.  Yes, sir.

16  Q.  Tell me about those.

17  A.  The Missouri State Highway Patrol Academy in 1979 and

18  then the Springfield, Missouri, Police Department Academy in

19  1982.

20  Q.  You said 40 years.  Was that 40 years working as a

21  police officer?

22  A.  Yes, sir.  I've been commissioned since November of

23  1978, and I've had periods of full-time employment after my

24  original retirement, but I remain commissioned and continue

25  to work as an active police officer in some capacity since

3627

1    1978.

2    Q.  Have you had specific training in use of force?

3    A.  Yes, sir, extensive.

4    Q.  Have you been an instructor for use of force?

5    A.  In thousands of cases.

6    Q.  Have you written curriculum for use of force?

7    A.  Yes, sir.

8    Q.  Have you taught use of force?  I may have already asked

9    that.

10   A.  Yes, sir.

11   Q.  Sorry.  Have you been accepted as a use of force expert

12   in any jurisdictions in the United States?

13   A.  Most states in the union, I can't think of any that I

14   haven't, and then a couple of cases overseas.

15   Q.  Okay.  You said you went to the FBI Academy.  Could you

16   tell me about that.

17   A.  Yes, sir.  The FBI Academy, the national academy, is a

18   command finishing school that most police administrators

19   would like to attend.  It's a ten-week program at Quantico

20   that -- I went in the 186th Academy, which is in 1996.

21   Q.  Did you go to the DEA Academy?

22   A.  I did that also, yes, sir.

23   Q.  Can you tell us about that.

24   A.  Various times in my career I've done drug investigations

25   and been a part of both investigations and supervising

 1    investigations.  Like the FBI Academy, when you can go, you

 2    try to go to the DEA Academy as well.

 3    Q.  Just give me an overview of your career as a law

 4    enforcement officer, where you've been, what you did, that

 5    sort of thing.

 6    A.  Like every one in policing, you begin as a basic

 7    patrolman.  I've pretty much done every job within a large

 8    police department you could do, from patrol officer, to

 9    corporal as an investigator in the field.  I worked

10    undercover narcotics for about four years total; was a

11    supervisor over a narcotics unit.  I ran a full time SWAT

12    team for about six years with nothing but SWAT operations,

13    ten hours of training every week, nothing else but search

14    warrants, barricades, and the rare hostage rescue.

15    Commanded K-9 units, commanded patrol divisions.

16              I retired as the assistant chief of police in

17    Springfield, Missouri, third largest city in the state; was

18    chief in two departments after that and continued today --

19              I've worked as recent as September doing uniform

20    patrol work for the State Park Police, which in some cases

21    when you get policing in your blood, you really can't do

22    anything else.  So driving a patrol car is really my

23    preference, but I had to discontinue that for a health

24    reason in late September.

25              And I continue to be commissioned with the Greene

1    County Sheriff's Office today, primarily doing SWAT training

2    and certification for them.

3    Q.  Okay.  You talked a lot about your work in the United

4    States.  Have your talents or skills ever been applied

5    anywhere outside of the United States?

6    A.  I've taught in about 30 countries for the State

7    Department and the Department of Justice.

8    Q.  What have you taught in these various countries?

9    A.  It's almost exclusively public order management as it

10   relates to force, crowd control, chemical munitions, some

11   counterterror work, but primarily force from our

12   perspective, which is different than a lot of other

13   countries, where we value individuals differently, and a key

14   part of that is trying to get those entities to understand

15   there's reasons we do things here a little different than

16   other parts of the world.

17   Q.  Do you have particular familiarity with -- in use of

18   force, but the idea of the need for officers to provide

19   medical care?

20   A.  Yes, sir.  The force application process brings with it

21   the absolute obligation to take care of your prisoner once

22   the scene is secure and it's safe and effective.

23   Q.  Have you taught those concepts to other officers?

24   A.  I don't teach medical stuff specifically, but the

25   concept that we have that obligation, yes, sir.

```
 1    Q.  Are you familiar with what officers should know how to

 2    provide?

 3    A.  What particular emergency medical attention?

 4    Q.  Yes.

 5    A.  Yes, sir, the basic first aid protocol.

 6    Q.  Okay.  Are you being paid for your work on behalf of

 7    Mr. Kueng?

 8    A.  No, sir.

 9    Q.  If you weren't here today, do you have paid work you

10    could be doing?

11            MS. SERTICH:  Objection.

12            THE COURT:  I'll overrule.  It's background.

13            THE WITNESS:  Yes, sir.

14    BY MR. PLUNKETT:

15    Q.  Do you take every single case that some lawyer or person

16    approaches you on?

17            MS. SERTICH:  Objection.  Relevance.

18            THE COURT:  It's overruled.

19            THE WITNESS:  About 30 percent of the cases I

20    review, there's nothing that I can offer that would help the

21    person calling me.  So, no, sir, I don't take every case.

22    BY MR. PLUNKETT:

23    Q.  Do you always work on behalf of or for the benefit of

24    police officers?

25    A.  No, sir, especially not from a criminal perspective.
```

```
 1   The numbers are right now more, I guess you would
 2   characterize it as, against police officers than for them.
 3   Q.  Tell me about that.
 4   A.  I think I've got six criminal cases right now, and only
 5   two of them would be what you would consider defending an
 6   officer.  The other four would be opinions that are counter
 7   to the officers.
 8   Q.  What were you asked to do in this case?
 9   A.  To take a look at the facts, the information provided,
10   and offer some opinions concerning Officer Kueng's actions
11   specifically as it relates to intervening and/or providing
12   medical care.
13   Q.  Now, every opinion that you give us today, are they all,
14   your opinions, to a reasonable degree of professional
15   certainty?
16   A.  Yes, sir.
17   Q.  Have you formed opinions in this case as to Mr. Kueng's
18   use of force, duty to intervene, and the reasonableness of
19   Mr. Kueng's seizure of Mr. Floyd?
20   A.  Yes, sir.
21   Q.  What is that opinion?
22   A.  Beginning with the seizure, the arrest or detention,
23   depending on how it's characterized, appeared to be clearly
24   on the basis of probable cause.  Continue from there?
25   Q.  Yes, please.
```

1    A.  So the issue of arrest and detention, in my opinion, was

2    completely within contemporary police training, policy, and

3    practice.

4             The process of lack of control that ultimately

5    resulted in the grounding when the second car arrived, the

6    video speaks for itself.  The force used to try to control

7    Mr. Floyd was very minimal, no strikes.

8             Just to be candid, quite often when someone pushes

9    back as long and as hard as he did, you tend to see some

10   officers get a little bit rougher.  None of the officers

11   indicated, in anything I saw, strikes or kicks or anything

12   like that.

13            The grounding is very common in that type of

14   scenario, just safer for everyone.  And the process of just

15   holding and stabilizing until the ambulance got there would

16   have been the correct thing to do.

17   Q.  Any concerns about the duration of the grounding?

18   A.  Well, he needed to be controlled, however long it took,

19   for the ambulance to get there.  So that really wasn't the

20   officers' -- something they controlled.

21   Q.  And explain to us the role of Mr. Kueng's training in

22   this case.  We'll go preacademy, academy, and postacademy.

23   What was the role of your review of Mr. Kueng's preacademy

24   training?  What role did that training play in

25   your assessment?

 1    A.  Preacademy or --

 2    Q.  Preacademy.  We'll start with preacademy.

 3    A.  It laid a foundation for him as to what the basic

 4    requirements are for an officer to use force, to interact

 5    with someone medically.  I think that was just advanced when

 6    he went into the academy.

 7    Q.  And academy.

 8    A.  Specifically for the issues I was focusing on in this

 9    case, the academy training in some areas was pretty detailed

10    and in other areas it was not really training at all and

11    that ultimately played a pretty significant role, in my

12    perception, on how this situation was resolved.

13    Q.  Tell us about that.

14    A.  On the issue of duty to intervene, a primary focus of

15    what I do today and have for about 35 years is teach.  And

16    I've learned through long experience that, especially in

17    policing, a lecture forum type of environment, where someone

18    just reads something to you and then really does nothing to

19    validate learning, is not only counterproductive, it's not

20    the standard that we should be using to train officers.

21           We've heard *Graham v. Connor* talked about a little

22    bit as far as force.  And in my teaching, *Graham* is to force

23    what a case called *Canton v. Harris* is to training.  It's

24    the guide for academies, it's the guide for trainers as to

25    what's really important in training.

1          And there's three prongs to that.  The first is

2     that managers, bosses believe very likely officers will face

3     it.  The actual language was moral certainty, where just for

4     sure officers will face a scenario.  The second is are the

5     choices in that scenario difficult to where training and/or

6     supervision would help them make a good decision.  And then

7     the third prong is if they get it wrong, does somebody get

8     hurt.

9          And when you look at the issue of intervention, if

10    I just read to you you have a duty to intervene if -- or

11    attempt to intervene if an officer is perceived to be doing

12    excessive force, unreasonable force, and then give an

13    example that is -- it's actually the default example that I

14    hear from agencies nationwide, you are beating a handcuffed

15    prisoner.  This overly simplistic example does nothing to

16    train an officer.

17         Specifically, officer centric training, where you

18    have them involved, where you do demonstrations, when you do

19    role playing is what you have to do for things that really

20    matter.  You don't have to do that for the break policy,

21    where you go take lunch.

22         But if you're talking about force or something as

23    complicated as an intervention, it has to be taught to a

24    level and then you have to validate the learning.  You have

25    to know they know.

1           And if you don't test them or have them

2      demonstrate it -- and this is exactly how I teach it to

3      academies -- expect them to get it wrong.  If they don't

4      play it back to you that they get it, especially on complex

5      issues, they'll get it wrong more often than right.

6      Q.  I know this -- I want to know if in your professional

7      assessment that the Minnesota -- Minneapolis Police

8      Department academy training on the duty to intervene, does

9      that meet the contemporary standards in law enforcement?

10     A.  Absolutely not.

11     Q.  Why not?

12     A.  For what I just explained, that if you simply read a

13     policy to someone and then give them an example that is not

14     reflective of the likely complicated situations you are

15     going to face, you are almost guaranteed failure.

16          And then to not even test or to prod the student

17     and determine whether or not they actually get it, you get

18     the context of what we're saying here, what is expected of

19     you, in my opinion, is way more likely to have a failure

20     than a positive outcome.

21     Q.  What is an FTO?  We are going to move to postacademy

22     training now.  Okay?

23     A.  Field training officer or a field training officer

24     program, the two terms are thrown out there quite often

25     together.

1    Q.  Were you in the courtroom when I put Exhibit K-Y, K as

2    in kilo, Y as in Yankee, on this -- we'll call this an ELMO

3    device?

4    A.  Just this morning?

5    Q.  Just this morning.

6    A.  Yes, sir.

7    Q.  And that was a FTO checklist; is that right?

8    A.  That's what they call it, yes, sir.

9    Q.  Mr. Kueng testified about that.  Were you present for

10   Mr. Kueng's testimony?

11   A.  I was, sir.

12   Q.  It said in there FTO -- I think it's FTO demonstrate,

13   FTO perform, recruit demonstrate, recruit perform all

14   happened on the same date, the 24th, I think.  Is that

15   training?

16   A.  Two problems with that.

17          The primary one is I noticed in the material I

18   reviewed a specific disconnect between FTOs and academy

19   training.  I found nothing in the material that indicated --

20   in fact, I found the opposite -- that the trainers actually

21   ever go to the academy.  So they're disconnected from what

22   the academy is attempting to teach the officers.

23          And so if we hypothetically believed that that FTO

24   actually went over intervention with Kueng, on what basis

25   was he teaching?  He's not connected to the academy,

1    theoretically.  And even if he had been, it appears what the

2    academy would have done is just handed him the policy and

3    given him the example of beating a person in handcuffs,

4    because that's all they teach the recruits.

5    Q.  Mr. Kueng, I believe, testified that they just sat down

6    one day and initialled that.  Does that surprise you?

7    A.  It doesn't surprise me.  It's, regrettably, something

8    I've seen time and again, where people, when you ultimately

9    peel the layer of the onion back and they honestly talk

10   about what they do in some circumstances, they just rip

11   through it.  In most cases they'll give it some superficial

12   attention, but in other cases they simply just mark it and

13   have the student mark it and they move on.

14   Q.  So what is the role of an FTO?

15   A.  The academy training is in many cases good training.  In

16   other cases it's more of a ticket punch.  We've learned a

17   lot in police training, especially since Rodney King, which

18   was a watershed event for police trainers.  And the key

19   takeaway from Rodney King was that just because you sit

20   through a class doesn't mean you learned anything.

21          And so the academy training is designed to lay

22   foundational knowledge upon the officers, and then the FTO

23   is to take that foundational knowledge and transfer it into

24   effective policing.  That's the first thing that they

25   primarily do.

1              The second thing is to teach them organizational

2      culture and how we do police work, and that is as varied as

3      the community that you and I come from.  There are 18,800

4      police departments in America and they are dramatically

5      different.

6              And so the culture of how you police in a

7      particular department is, in my experience, set by the FTO

8      that later can get modified by a squad leader, but the first

9      opportunity that a police officer has to kind of figure out

10     how we do police work here comes from the FTO.

11     Q.  In your review of materials, did you review -- and I

12     apologize, I can't think of the exhibit number, but it was a

13     Survey Monkey.  Do you know what I'm talking about?

14     A.  Oh yes, sir, of the FTOs.

15     Q.  All right.  Did you review that?

16     A.  I did.

17     Q.  Based on that, in 2018 what was the state of the FTO

18     program in Minneapolis?

19     A.  You can't say for every --

20              MS. SERTICH:  Objection.  Speculation.

21              THE COURT:  I apologize.  I was inattentive as to

22     this specific question.

23              MR. PLUNKETT:  I'd asked if he had reviewed that

24     Survey Monkey that's in evidence, Your Honor, that was

25     performed in 2018 regarding the FTO program and what his

```
 1    observations, based on that exhibit, of the state of the FTO
 2    program.
 3              MS. SERTICH:  Objection as to relevance and
 4    speculation from testifying off of a survey from 2018.
 5              THE COURT:  Okay.  It's overruled.  You may
 6    answer.
 7              THE WITNESS:  The FTO survey indicated it was in
 8    big trouble.
 9    BY MR. PLUNKETT:
10    Q.  Systemic failures?
11    A.  That's what the survey indicated, yes, sir.
12    Q.  Did you also know that there was a 40-hour FTO class put
13    on after that?
14    A.  I believe the commander of the training unit said that
15    was something she implemented, yes, sir.
16    Q.  Did you understand there were no tests in that program?
17    A.  That's my understanding.
18    Q.  In your experience and training, is a 40-hour class
19    enough to counteract such systemic failures?
20              MS. SERTICH:  Objection.  Leading.
21              THE COURT:  You are leading, counsel.  Please
22    restate.
23              MR. PLUNKETT:  Certainly, Your Honor.
24    BY MR. PLUNKETT:
25    Q.  You're aware of the class?
```

1    A.   I am.

2    Q.   What impact would a class like that have on the systemic

3    failures in the Minneapolis FTO program?

4    A.   It would depend specifically on the curriculum and what

5    the training goals were.  I mean, in 40 hours you could get

6    a lot done if you had some very clear objectives and then

7    you tested your students, your FTOs, to understand that they

8    had mastered the issues you wanted to teach them.

9    Q.   Did the fact that there were no tests involved in that

10   40-hour class impact your opinion?

11   A.   If you don't test, I don't know that it's worth the time

12   to come.

13          In my experience -- all I've done since I was 20

14   as a police officer, so maybe it's unique to policing -- if

15   you don't hold the students accountable to prove they know

16   something, they tend to find something else to think about

17   and do.  And so that's why testing is absolutely imperative

18   if you care that they actually learn.

19          If you're just trying to punch a ticket to say we

20   met a POST standard -- I'm not saying that's okay, but I'm

21   saying that's what happens a lot -- then that's one thing,

22   but if you, as the person, for example, over in academy,

23   want to ensure that those who are teaching new officers get

24   it, that they actually understand what they're supposed to

25   do, there's no way of knowing that unless you test them.

```
 1    Q.  We've had testimony and even some exhibits that show

 2    that at the start of certain classes people were present.

 3    Are you aware of that?

 4    A.  It's a sign-in sheet.

 5    Q.  The sign-in sheets.  Thank you.  Lawyers can't say

 6    things clearly sometimes.

 7             Is a sign-in sheet an effective method of

 8    assessing learning?

 9    A.  Absolutely not.

10    Q.  Why not?

11    A.  Because if you don't have a sign-out sheet, you don't

12    have an indication of who actually stayed, and that's not

13    for certain because I've had cases where students have

14    signed for other students.

15             The assessment of effectiveness of training is

16    not part of the academy -- may be harsh language -- butt in

17    seat times hours.  That's how many academies calculate

18    learning.  If we can just prove you were sitting here for

19    this amount of time, you've been trained.

20             And we've -- Rodney King, again, was the perfect

21    example of where students had sat through a class literally

22    by sign in and ultimately proved on video that they didn't

23    get the training.  They did things completely different than

24    the class presented.

25    Q.  Based on your experience, were you able to develop an
```

1    understanding of Mr. Kueng's FTO experience?

2    A.  Yes, sir.

3    Q.  Could you tell us about that.

4    A.  I looked at the ROPEs, the things that he did.  It

5    appeared to be pretty thorough if we assume that the things

6    were checked off had, in fact, all occurred.  I spoke with

7    him personally about it and got his perceptions on it.

8              MS. SERTICH:  Objection.  Hearsay.

9              MR. PLUNKETT:  It's an expert, Your Honor.

10             THE COURT:  No, it's not hearsay yet.  Continue.

11             THE WITNESS:  The answers to the questions he gave

12   me concerning what things were taught to him seemed to be

13   consistent with a contemporary FTO program.

14             MS. SERTICH:  Objection.  Hearsay, Your Honor.

15             THE COURT:  Overruled.

16   BY MR. PLUNKETT:

17   Q.  You can go on.

18   A.  I'm done.

19   Q.  All right.

20             THE COURT:  Counsel, let's interrupt and --

21             MR. PLUNKETT:  Yes, sir.

22             THE COURT:  -- take a noon break.

23             Members of the jury, we're going to stand in

24   recess at this time for a noon break.  I caution you not to

25   discuss the case during the course of the recess.

1          We are in recess.

2          And, Ms. Bell and Mr. Gray, if I could see you up

3    here, please.

4      (Lunch recess taken at 12:32 p.m.)

5                        *  *  *  *  *

6      (1:57 p.m.)

7                      **IN OPEN COURT**

8                    **(JURY NOT PRESENT)**

9          THE COURT:  Somebody wanted me.

10         MS. TREPEL:  Yes, Your Honor.  We wanted to

11   re-raise one of our motions in limine regarding the limit to

12   expert testimony and opining on ultimate legal conclusions.

13   We wanted to alert the court to that in advance because this

14   witness has some conclusions in his report linking his

15   opinions about the inadequacy of training directly to

16   willfulness.

17         And so we'd ask this court for a ruling limiting

18   this witness's opinions to things that don't go to the

19   ultimate legal conclusion, so no opinions on willfulness of

20   the defendant or the reasonableness of the use of force, for

21   example, under the Fourth Amendment.

22         THE COURT:  Mr. Plunkett.

23         MR. PLUNKETT:  I might be over halfway through his

24   testimony, Your Honor.  I mean, I think that ultimately the

25   court should handle things with trial objections.  You know,

```
 1      I thought we were going to have -- I don't want to raise

 2      anyone's ire, but they --

 3              THE COURT:  Well, I have spent and you have spent,

 4      all of us have spent about a month, a large portion of which

 5      has contained various expert opinions that I think were

 6      received without objection.  If they weren't, the objections

 7      were overruled.

 8              It doesn't quite come as a surprise to me in

 9      litigation and adversarial presentations that there might be

10      an opposing opinion that would come forward.  I would be a

11      little surprised if the opinions are not received, but we'll

12      see what comes when the opinion questions are asked.

13              MS. TREPEL:  Your Honor, the other issue I would

14      like to raise with Your Honor -- we are just attempting to

15      be efficient here rather than doing this on the sidebar

16      machine, and that's why we're raising it now.  The other

17      issue is just as to hearsay.  Based on the report --

18              THE COURT:  Counsel, expert opinions -- I

19      shouldn't say expert opinions.  Experts are entitled in

20      their development of their opinions to use hearsay

21      information.

22              MS. TREPEL:  Completely understood, Your Honor.

23      This was a very particular issue I wanted to raise, which

24      was simply that in the expert's report he based some of his

25      conclusions specifically --
```

```
 1            THE COURT:  Counsel, I don't have his report.  I
 2    haven't seen his report.  I don't even know if he wrote a
 3    report.
 4            MS. TREPEL:  Yes, Your Honor.  This is just about
 5    the defendant's statements, and I would just ask the court
 6    to limit the opinion to be based on the defendant's
 7    statements here in court and not prior hearsay statements of
 8    the defendant, which the defense cannot elicit under the
 9    hearsay rules.
10            THE COURT:  I think everything that we've had so
11    far is just fine.  And we'll see what the requests are in
12    the future, but I would guess that the witness is going to
13    be entitled to do his opining.  And what's in the report and
14    isn't in the report, I don't know.
15            So I think we should just get a jury and get
16    going.
17        (2:04 p.m.)
18                        IN OPEN COURT
19                       (JURY PRESENT)
20            THE COURT:  You may be seated.  Good afternoon,
21    members of the jury.
22            And, Mr. Plunkett, do you want to continue?
23            MR. PLUNKETT:  Thank you, Your Honor.
24    BY MR. PLUNKETT:
25    Q.  Mr. Ijames, you've already testified, but I just want to
```

1    reiterate and focus in on the inadequacies.

2          So if the training is inadequate and fails to meet

3    the contemporary police practices, which I think you've

4    testified to --

5    A.  In reference to intervention, sir?

6    Q.  Yes, sir.

7    A.  Yes, sir.

8    Q.  -- how would it need to change in order to meet those

9    contemporary police practices?

10   A.  The simplest thing to do is what we are familiar with in

11   any class we have ever taken in school; you don't get a

12   passing grade if you don't take a test.

13         So you would have to create a structure in that

14   particular block of teaching that would cause the students

15   to become involved.  Best is demonstrations, where you

16   actually give a scenario or two or three where officers are

17   challenged on whether or not this scenario requires them to

18   take some action.  That's a demonstrative test.

19         We've seen examples the last three days of many

20   written tests.  In my experience, practical or demonstrative

21   tests are far more effective at communicating true learning.

22   A person can study the four corners of a paper and guess and

23   do well, but in a live scenario.

24         In this particular topic area, one of my favorites

25   is spitting in someone's face.  You have officers in a

1   scenario where a person, a role player, spits in an

2   officer's face.  And contrary to what some may think, that's

3   not something we would strike -- use physical force beyond

4   control, turning them away, that sort of thing.  But it's

5   very, very inflammatory and it's a very good example of

6   cases where officers historically have not reacted

7   appropriately.

8           So that type of scenario that is just thrown into

9   a block of instruction will demonstrate whether an officer

10  understands the appropriate response and then whether a peer

11  understands, if that officer acts inappropriately, if they

12  have an obligation to stop it.

13  Q.  Could you determine if that problem was known prior to

14  June 25th, 2022 [sic], by the Minneapolis Police

15  administration?

16  A.  Yes, sir.

17          MS. SERTICH:  Objection.

18          THE COURT:  I'm sorry.  Was there an objection?

19          MR. PLUNKETT:  I think it was Ms. Bell said,

20  "Objection," Your Honor.

21          MS. SERTICH:  Nope.  I did, Your Honor.

22          THE COURT:  Okay.

23          MS. SERTICH:  I didn't have my mask on.

24          THE COURT:  Would you start over, Ms. Sertich?  I

25  didn't hear you.

```
 1            MS. SERTICH:  Can we have Mr. Plunkett re-ask the

 2    question, please?

 3            THE COURT:  If you can remember what was.

 4            MR. PLUNKETT:  Pardon me?

 5            THE COURT:  If you remember what the question was.

 6            MR. PLUNKETT:  I'll do my best.

 7            THE COURT:  Okay.

 8    BY MR. PLUNKETT:

 9    Q.  So could you determine if that problem was known prior

10    to June 25th, 2022 [sic]?

11    A.  Yes, sir.

12    Q.  How could you tell that?

13    A.  In the material I was provided, I had the minutes of a

14    series of meetings that a local group formed to address the

15    issue of police brutality --

16            MS. SERTICH:  Objection.  Hearsay.

17            THE COURT:  That's overruled.  He's entitled to

18    testify to what he observed.

19            THE WITNESS:  The minutes of this meeting, and

20    I'll -- I don't recall the acronym, but it's a citizens

21    group against police brutality had a series of meetings.  As

22    I recall from the minutes I was given, the first one was

23    August 2017; the second one, November; next one,

24    January 2018.  There were six meetings.  The last one that I

25    reviewed was in July of 2018.
```

```
1              And this group brought up to the chief -- I don't

2       believe he was in all of the meetings, but he or chief --

3              MS. SERTICH:  Objection.  Hearsay.

4              THE COURT:  It's overruled.

5              THE WITNESS:  He or Chief Halvorson were

6       referenced in, one or both of them, in each of the meetings.

7       And this group brought up a program in New Orleans called

8       EPIC, which is Ethical Policing Is Courageous.  Several

9       hundred police departments in America are doing it now.  I

10      believe St. Paul is doing it.  I believe Minneapolis is now

11      involved in it in 2021.

12             MS. SERTICH:  Objection.  Relevance, Your Honor.

13             THE COURT:  That I sustain.  This is a post

14      reference at this point.

15      BY MR. PLUNKETT:

16      Q.  Focusing only on --

17             MS. SERTICH:  Could we get a clarity on the dates,

18      Your Honor?

19             MR. PLUNKETT:  Pardon me?

20             THE COURT:  Well, counsel, the testimony was to

21      things occurring now in St. Paul and Minneapolis and I

22      sustained the objection to that, but I did not overrule

23      anything that had occurred prior to the date in question.

24      BY MR. PLUNKETT:

25      Q.  And I was just reminding you, Mr. Ijames, to only talk
```

1    about things occurring prior to June [sic] 25th, 2020.

2    A.   2020, yes, sir.

3    Q.   Fair?

4    A.   Yes, sir.

5    Q.   Now, please go ahead.

6    A.   The minutes of those six meetings in 2017, 2018

7    reflected this program that this group brought to the chief

8    and the assistant chief concerning their desire to see it

9    implemented here, and they gave a number of references about

10   how effective it had been.  There was very positive

11   commentary back from administration, literally statements

12   concerning this would have saved many careers over the years

13   if officers had had peer-on-peer training, that sort of

14   thing.

15            As the meetings went on, there were continuous

16   questions.  Ultimately Chief Halvorson went, according to

17   the minutes, and participated in the program.  He returned

18   back.  The board and committee talked with him again.  I

19   don't recall exactly which in 2018, but the March or May

20   meeting he said that the culture of Minneapolis PD was such

21   that that program wouldn't work here.

22            MS. SERTICH:  Objection.

23            MR. PLUNKETT:  I need a -- pardon me.  Objection

24   to what?

25            THE COURT:  I don't know what the objection is.

```
 1              MS. SERTICH:  Your Honor, there's no relevance of

 2      the culture here.

 3              THE COURT:  Oh, that's overruled.  We've been

 4      talking about police culture throughout this.  Proceed.

 5      BY MR. PLUNKETT:

 6      Q.  Sorry for the interruption.  Please --

 7      A.  Sure.  I'm just referencing what was in the minutes.  I

 8      don't know that it's true or not.  But his ultimate

 9      conclusion was enthusiasm for the program, but that he felt

10      that the culture of one organization compared to this one

11      was such that it wouldn't work here.

12              The last minutes, the July of 2018, expressed a

13      lot of dismay, that they felt like the committee -- the

14      program was dead here.  They had seen --

15              MS. SERTICH:  Your Honor, I'm going to note a

16      continuing objection to the hearsay.  If it's not for the

17      truth of the matter, there's no relevance here.

18              THE COURT:  Well, I overrule the objection because

19      the witness can testify, but I'm a little bit confused as to

20      what the New Orleans program is.

21      BY MR. PLUNKETT:

22      Q.  Tell me what the New Orleans program is.

23      A.  Yes, sir.  I think the Bates was 88730 on the minutes

24      I'm talking about.  And the EPIC program is Ethics in

25      Policing is Courageous -- or Ethical Policing is Courageous
```

1    is the acronym they use, and it is an eight-hour training

2    class.

3            And I think that -- again, your earlier question,

4    sir, concerning how you improve a training program.

5    Contrast an eight-hour training class that involves testing

6    and demonstrated performance, contrast that with reading a

7    policy and giving one example that's not relevant.

8            So the EPIC program picked up first, sir, in

9    New Orleans and now in about -- first picked up in New

10   Orleans and is designed to give a very intensive block of

11   training to officers on their obligation to intervene when

12   peer officers are doing things that are inappropriate.

13   Q.  Without specifically adopting the EPIC program, is it

14   possible for the department to create their own?

15   A.  In my experience, most have.  They actually don't adopt

16   the exact same program as New Orleans.  There's a number of

17   reasons why New Orleans --

18           MS. SERTICH:  Relevance as to other police

19   departments.

20           THE COURT:  Yeah, I think, counsel, that does

21   start to strain relevance.

22   BY MR. PLUNKETT:

23   Q.  And there's other programs with other names that are

24   available?

25   A.  And you can do your own in-house.  You don't need to --

```
 1                MS. SERTICH:  Objection.  Vague.

 2                THE COURT:  Overruled.

 3     BY MR. PLUNKETT:

 4     Q.  Finish your answer and then I'll move on to the next

 5     area.

 6     A.  You could certainly do something in-house.  The issue is

 7     not that you have to take someone else's program to have

 8     effective training.  You have to have a training process

 9     that brings out validated results.  You have to know that

10     people know.  So however you structure that, that's what has

11     to occur.

12     Q.  Okay.  Kind of transitioning to another area, could you

13     determine Chief Arradondo's understanding of the

14     intervention policy and training at the Minneapolis Police

15     Department?

16                MS. SERTICH:  Objection.  Speculation and hearsay.

17                THE COURT:  Well, first of all, I don't --

18     speculation I don't know because I don't know what the

19     policy is.  But I -- this witness, if he's reviewed the

20     policy, can testify to it.

21     BY MR. PLUNKETT:

22     Q.  I'll ask the question again.  In your review and in your

23     work, could you determine Chief Arradondo's understanding of

24     the intervention policy and training?

25                MS. SERTICH:  Objection.  Speculation as to Chief
```

1       Arradondo's understanding of something.

2                   THE COURT:  That is sustained.  What is it?

3                   MR. PLUNKETT:  I'm sorry, Your Honor?

4                   THE COURT:  I say it's sustained.  The objection

5       is to his understanding.  I think the --

6                   MR. PLUNKETT:  The question was if he reviewed

7       materials that reflected the chief's understanding.

8                   THE COURT:  Okay.  That you may answer.

9                   THE WITNESS:  Yes, sir, I read his interview.

10      BY MR. PLUNKETT:

11      Q.  What did you learn?

12      A.  That he believed --

13                  MS. SERTICH:  Objection.  Hearsay.

14                  THE COURT:  Overruled.

15                  THE WITNESS:  That he believed that all officers,

16      regardless of tenure, were required to intervene in

17      inappropriate behavior and he referenced an example,

18      actually two examples.

19                  He said, for example, to the interviewer, if an

20      officer is beating a prisoner in handcuffs or if you see a

21      supervisor steal a cell phone, he gave those two examples,

22      that his expectation would be, regardless of tenure or

23      experience, an officer should intervene to deal with that.

24      BY MR. PLUNKETT:

25      Q.  Did that -- did you review materials from Minneapolis

```
 1     Police personnel who were actually involved in the training

 2     themselves?

 3     A.  Yes, sir.

 4     Q.  What were you able to determine from your review of

 5     those materials?

 6                MS. SERTICH:  Objection.  Hearsay.  Relevance.

 7                THE COURT:  It's overruled.

 8                MS. SERTICH:  We don't know who these people are

 9     yet.

10     BY MR. PLUNKETT:

11     Q.  Start your answer with who the people are, then.

12     A.  If I'm pronouncing it correctly, Officer Dinh.

13     Q.  I'm going to step in and correct you, more for the court

14     reporter than anyone else.  First name Hien, last name Dinh,

15     H-I-N-H [sic], D-I-N-H.

16     A.  Thank you.

17     Q.  Please continue.

18     A.  I read his interview and he stated that he was familiar

19     with the training at the academy that involved --

20                MS. SERTICH:  Your Honor, objection.  The witness

21     can testify about his opinions, but not just as to the

22     statements of these out-of-court individuals.

23                THE COURT:  It's overruled.  He can testify to the

24     materials he reviewed.  Proceed.

25                THE WITNESS:  This officer was one of the
```

1    defensive tactics and force instructors, a Jiu Jitsu

2    instructor, and he said that the training involved the

3    reading of the policy and the giving of an example, and the

4    example was if a prisoner was beaten in handcuffs.  That is

5    the default, in my experience, overly simplified default

6    example, someone being beaten in handcuffs.  He said there

7    was a scenario created for this, but that it was not used.

8    BY MR. PLUNKETT:

9    Q.  And were you able to develop an understanding of the

10   application of the duty to intervene, the understanding of

11   the application from the trainers?  You know, I'll move on

12   to a different area.

13          We heard testimony, and you are familiar with that

14   testimony, from Lieutenant Zimmerman?

15   A.  Yes, sir.

16   Q.  Was there any significance to Lieutenant Zimmerman's

17   lack of knowledge on the fact of an intervention policy?

18          MS. SERTICH:  Objection.  Leading.

19          THE COURT:  That is, counsel.  That's a leading

20   question.

21   BY MR. PLUNKETT:

22   Q.  In your review of the materials, were you able to

23   determine Lieutenant Zimmerman's knowledge or lack of

24   knowledge about the intervention policy?

25   A.  Yes, sir.

1    Q.  What did you determine?

2    A.  In his interview, initially he said he wasn't aware

3    there was a policy.  He said that he just knew historically

4    ethically that you have to intervene when officers do

5    wrongdoing, but he was not aware of a policy and said he had

6    not received any training on that.

7    Q.  What was the significance of that to you?

8    A.  We have a senior officer, the most senior officer in

9    this case, who literally has no knowledge of a policy that

10   is the crux of one of our key issues in American policing,

11   and that is that officers have to stand up and do what's

12   right when other officers are not.

13        And for a senior officer -- in the face of the

14   training commander saying that policies are run up the

15   chain, everyone's familiar with them, they are exposed to

16   them, and then you find factually that's not true, it just

17   indicates that that degree of training is not, in fact,

18   going from officer to officer or even those who supervise

19   them.

20   Q.  Today you heard the government, the people over here,

21   asking questions about Mr. Kueng's failure to ask Chauvin,

22   "What are you doing?"  Do you remember that testimony?

23   A.  I do.

24   Q.  What is your assessment of that possibility of saying,

25   "What are you doing?"

1    A.  The practical reality is that police officers have a

2    culture of how they work with each other, and it does vary

3    by department, but not much in my experience.

4            And a senior officer, one who is entrusted by the

5    department, as in this case, to be a teacher of others, has

6    tremendous respect.  Unless an officer was seeing something

7    that was clearly inappropriate and unexplainable, in my

8    experience there would not be any challenge in the middle of

9    an operational environment like this at all.

10   Q.  In your review of the materials and testimony, what is

11   your determination about whether the force employed here was

12   actually reasonable?

13           MS. SERTICH:  Objection.  Calls for a legal

14   conclusion if this is as to any of the defendants in this

15   case.

16           THE COURT:  It's overruled.  You may answer.

17           THE WITNESS:  The force, to the point of getting

18   Mr. Floyd to the ground and initially controlled, was

19   consistent with contemporary police training, policy, and

20   practice.  Once he was under control, it was then more force

21   than reasonably necessary.

22   BY MR. PLUNKETT:

23   Q.  Okay.  Can you opine on what factors led to Mr. Kueng's

24   failure to perceive and react to that?

25           MS. SERTICH:  Objection.  Speculation.

1        THE COURT:  Overruled.

2        THE WITNESS:  An officer with one and a half

3   patrol shifts under his belt in a scenario like this is

4   going to defer to a person -- a senior officer that he has

5   no reason to believe would be doing something inappropriate

6   or illogical.

7        Officers are trained, even new officers, that

8   there is something called the fellow officer rule, that in

9   many circumstances other officers may be aware of things

10  we're not.

11       For example, if you're looking around a car and

12  you're seeing things that I'm not seeing and you're then not

13  doing something, such as rolling a person over on their side

14  that my training says we should be doing, it is not

15  unreasonable, if the person who is not taking that action is

16  someone you would have respect for their decisions, their

17  practices, to believe that they know something you don't

18  know.  And it would not be unreasonable to defer to that

19  senior person, believing they're doing the right thing for

20  the right reason that you just don't understand.

21  BY MR. PLUNKETT:

22  Q.  Moving into a different opinion, have you formed an

23  opinion as to Mr. Kueng's failure to provide medical aid to

24  Mr. George Floyd?

25  A.  Yes, sir.

1     Q.  What is that opinion?

2     A.  It's similar to the force opinion.

3           I believe the training that I reviewed and what

4     I've heard here is that at the point that Mr. Floyd could

5     have been moved to his side with additional and ongoing

6     assessment being done, that should have absolutely been

7     done.

8           The reason, in my opinion, that it was not done

9     was the same reason that there was no intervention on the

10    force, that if training caused you to believe that he should

11    be rolled over, that we should be doing additional medical

12    process, conceivably CPR, and were not, that there are

13    things that this senior officer is aware of that I'm not

14    that would be justified and, accordingly, that would be a

15    reason that he did not do first aid that I think the

16    training suggested was appropriate.

17    Q.  Focusing on Mr. Kueng's knee placement, his right knee

18    placement, what opinions do you have about that specific

19    act --

20    A.  That --

21    Q.  -- placement of the knee?

22    A.  Yes, sir.  Assuming that the point in time in which

23    we're holding him, the first about four to five minutes when

24    we had some -- still movement from Mr. Floyd, completely

25    appropriate.  The hips are very powerful, and to put some

1    downward pressure on a hip, upper legs would be consistent

2    with contemporary police training and practice.

3    Q.  What if he put his pressure up above the belt line?

4    A.  It would just depend on the circumstances, but the

5    higher you get, the greater the chance you could have a

6    negative physiological outcome.  Any kind of mechanical

7    compression on a back is risky.  It does have to happen in

8    many cases, but not for a prolonged period of time.

9    Q.  You observed that Mr. Kueng moved his knee from the

10   buttocks, what's been called the buttocks, to below the

11   buttocks.  Was there any significance to the fact that he

12   changed that position to you?

13   A.  In my mind, the farther we get away from things that

14   count, internal organs, the better.  We teach officers

15   extremities are always safer.  So if the resistance is

16   reduced and you can get the level of control you need by not

17   putting pressure down on the pelvic girdle or something like

18   that, that's the appropriate thing to do.

19   Q.  Mr. Kueng -- pardon me.  Mr. Lane initially said,

20   "Should we put his legs up?"  Do you recall that?

21   A.  Yes, sir.

22   Q.  And I think Mr. Chauvin responded.  Do you recall?

23   A.  I think, "Leave him right here," something like that.

24   Q.  And Mr. Kueng parroted that?

25   A.  He did.

1    Q.  What was your opinion about the use of force right at

2    that moment?

3    A.  Yeah, at that moment that was the right thing to do, to

4    not bring the legs up.  When you have someone that's

5    actively mechanically levering like that, the legs pulled up

6    helps with breathing in the rescue position, but when

7    they're still actively moving, it's too early to do that.

8    Once you reach a point where it's more stabilized, then that

9    is a better recovery position.

10   Q.  Do you have an opinion about the propriety of hearing

11   your partner say something and not repeating it yourself?

12   A.  Sure.

13   Q.  When Mr. Lane says something, does Mr. Kueng have an

14   obligation to repeat it?

15   A.  Not in my opinion.  I mean, the question is has the

16   message been communicated.  And if you have no reason to

17   believe that the recipient didn't hear it, there would be no

18   reason to repeat it.

19   Q.  Mr. Kueng checked a pulse at some point in time.  You're

20   aware of that?

21   A.  I am, sir.

22   Q.  And just explain to us the significance of the location

23   of the pulse check and Mr. Kueng's subsequent actions.

24   A.  Right.  The pulse check is an okay pulse check, but it's

25   nowhere -- I'm sorry.  The wrist check is okay, but it's

1    nowhere near as reliable as a carotid, but you do what you

2    have access to.  So him checking the wrist was the

3    appropriate thing to do.  It's the best option he had right

4    there in front of him.

5    Q.  I think he verbalized, "He doesn't got one."  Is that

6    your recollection?

7    A.  Correct.

8    Q.  What is your observation of that in this context?

9    A.  I believe Mr. Chauvin said something like, "What?" or

10   "Huh?"  And that's what -- he repeated, that he didn't have

11   one or "No."  And then we had a period of about 30 seconds

12   of not much activity.

13   Q.  Can you opine on what factors led to that lack of

14   activity.

15   A.  I just think that the statement by the officer who has

16   the wrist that "I don't have a pulse," from a training

17   perspective, the expectation would be something would happen

18   immediately, and that would include a verification with the

19   carotid, potentially repositioning or removing cuffs,

20   beginning CPR, if safe and practical.

21        But if you say, "I don't have a pulse" and the

22   person who you are expecting to go to the carotid and check

23   doesn't, for a one and a half shift officer to be expected

24   to look at a senior officer and not assume there's a reason

25   why we're not doing that I don't think is appropriate.

1    Q.  To be clear, the failure to provide medical care -- it

2    would have been reasonable to provide that care?

3    A.  Absolutely.  Earlier, yes, sir.

4    Q.  Okay.  And then just to reiterate, what is your opinion

5    on what factors led to Mr. Kueng's failure to see, perceive,

6    and react to that?

7    A.  His lack of experience as it relates to what he was

8    expected to do and training in a scenario like that, in

9    conjunction with his interaction with Mr. Chauvin and what

10   that role was, where you defer to a senior officer in the

11   absence of any reason not to, considering your past

12   experience, knowledge, and training.

13              MR. PLUNKETT:  No further questions, Your Honor.

14              THE COURT:  Thank you.

15              Ms. Sertich.

16              MS. SERTICH:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18   BY MS. SERTICH:

19   Q.  Good afternoon.  It's Mr. Ijames; is that right?

20   A.  Yes, ma'am.

21   Q.  Okay.  I'd like to follow up with you on some of these

22   points you've made in the last several hours, I guess, over

23   the lunch break.

24              You were just talking about statements by some

25   individuals who work for the MPD.  I think you mentioned a

1    Lieutenant Zimmerman and an Officer Dinh, correct?

2    A.  Yes, ma'am.

3    Q.  Okay.  And you said that Officer Dinh mentioned that

4    there actually was a training on the duty to intervene that

5    was scenario based, correct?

6    A.  No, ma'am.

7    Q.  But that it wasn't used; is that what you said?

8    A.  I said that he reported the training involved the

9    reading of the policy and then an example, that was the

10   handcuffed beating of the prisoner, and that there was a

11   scenario, I don't recall whether he said developed or

12   created for this, but they never used it.

13   Q.  He didn't say that it was used in a different year?

14   A.  I think exactly what he said was it wasn't used for this

15   year, this academy.

16   Q.  Right.  So it wasn't used for the year of Officers Lane

17   and Kueng, but he was saying it had been used at some other

18   time?

19   A.  I'd just have to look, ma'am, at the transcript, but

20   that was my understanding, that there was one created

21   that -- I don't think he said was used last year or the year

22   before, but I think he said there was one created, but it

23   wasn't used for this academy.  So it may have been used five

24   times.  He didn't give a number.  But that's how I recall

25   it.

1    Q.  Okay.  And then you were talking about Lieutenant

2    Zimmerman, correct?  And he actually did say that he had a

3    long-standing understanding that police have a duty to

4    intervene, correct?

5    A.  Absolutely.  He said he didn't need a policy or a class.

6    He knew that ethically is what -- I think the term he used,

7    ma'am.

8    Q.  And that makes sense, doesn't it?

9    A.  Depend on the scenario.  I mean, some scenarios, like a

10   handcuffed prisoner being beaten, you don't need a class for

11   that one, no, ma'am.

12   Q.  He's known about this policy for his entire career,

13   correct?

14   A.  No, ma'am, that's not what he said.  He said he didn't

15   know there was a policy, in the 302 I read.

16   Q.  I'm sorry.  Not about the policy, just about the duty to

17   intervene?

18   A.  Yes, ma'am, I think that's what he said.

19   Q.  Okay.  And he, in fact, said that he had intervened in

20   his career in the past, correct?

21   A.  I recall that one in --

22           MR. PLUNKETT:  Objection.  It's inappropriate,

23   Your Honor, improper and also violates a pretrial order.

24           THE COURT:  I'll overrule.  It's

25   cross-examination.

```
 1                   MR. PLUNKETT:  Your Honor --

 2                   THE COURT:  The witness gets to answer the

 3      question, though.

 4                   MR. PLUNKETT:  Your Honor, I would like to have a

 5      sidebar.

 6                   THE COURT:  No thank you.

 7                   You may answer the question if you know what it

 8      is.

 9      BY MS. SERTICH:

10      Q.  He did say that he --

11      A.  I know the scenario and I recall exactly what he said,

12      yes, ma'am.

13      Q.  Okay.  Now, when it came to the medical aid that you

14      were just talking about, it's your opinion that Mr. Floyd

15      could and should have been moved into that side position,

16      correct?

17      A.  Absolutely, yes, ma'am.

18      Q.  And you agree that the training was appropriate with

19      regard to moving someone onto their side?

20      A.  Yes, ma'am.

21      Q.  Okay.  You would agree, then, that Mr. Kueng made a

22      choice not to do that in that moment?

23      A.  The only way I can best answer that, ma'am, is he would

24      have had to have done it at the expense of Mr. Floyd's neck

25      because Mr. Chauvin had him pinned to the ground.  But, yes,
```

1   he did not grab him and wrench him against that leverage on

2   his neck, that's true.

3   Q.  Or he didn't ask Mr. Chauvin or tell Mr. Chauvin that he

4   was going to do this maneuver, correct?

5   A.  He didn't do that.  He could have, sure, but he did not.

6   Q.  And you were talking about Mr. Kueng checking a pulse

7   and you said, you know, the radial pulse is okay, but it's

8   not as reliable as the carotid pulse; the radial pulse was

9   the best option he had, correct?

10  A.  He simply had the hands, yes, ma'am, and that's where he

11  could check.

12  Q.  But he had other options, correct?

13  A.  I mean, conceivably there's lots of options, sure.

14  Q.  Right.  And he did not exercise any of those other

15  options, correct?

16  A.  That's true.

17  Q.  And he could have actually done that without disturbing,

18  moving, saying a word to Mr. Chauvin, correct?

19  A.  I'm not sure how he could have accessed the carotid on

20  the -- on the ground side, is that what you're suggesting?

21  He would have gone up and tried to get a carotid --

22  Q.  Well, you watched the whole video, right?

23  A.  Yes, ma'am.

24  Q.  And the paramedic came up and took the pulse?

25  A.  You're talking about there at the very end.

1    Q.  Yeah.

2    A.  Okay.

3    Q.  He came up and took the pulse with Mr. Chauvin's knee

4    still on Mr. Floyd's neck?

5    A.  Right.  I'm just saying that's very complicated, to let

6    go of a holding position and crawl across the body, but I

7    guess it's conceivable.

8    Q.  I mean, he could have just stood up and did the same

9    thing the paramedic --

10   A.  Walked around, sure.  He could have done that, sure.

11   Q.  Okay.  And, again, that would not have involved moving,

12   talking to, disturbing Officer Chauvin, correct?

13   A.  True.

14   Q.  And in terms of talking about the medical training, you

15   would agree that in the materials you reviewed there is the

16   hands-on, scenario-based training at the MPD with this

17   medical training?

18   A.  I just don't recall specifically the moving of the

19   person on the side.  I didn't see any concern about the

20   training.  I thought it was adequate.  I just don't recall

21   that exact scenario.

22   Q.  And you were talking about Mr. Kueng's statement that he

23   couldn't find a pulse and that -- I think what you said was

24   that the training would dictate that medical aid then would

25   be something that should happen immediately, correct?

```
 1    A.  If safe and practical, but generally, yes, ma'am, that's

 2    the default, immediately.

 3    Q.  Okay.  Might you use the phrase unquestionably

 4    inappropriate to not perform CPR or other medical aid at

 5    that point?

 6    A.  Not in that circumstance, no, ma'am, I couldn't say

 7    that.

 8    Q.  Okay.  And I'm not going to go through all the

 9    background again.  It sounded like you reviewed a great deal

10    of materials for this case.

11              And you believe you reviewed all the training

12    materials that you had access to for the three officers who

13    are the defendants in this case?

14    A.  For these issues, ma'am.  I didn't read every training

15    file that had nothing to do with the facts at hand.

16    Q.  And you would agree that all of that training, those are

17    sources of information that should inform your opinion about

18    the police officers' conduct, correct?

19    A.  Yes, ma'am, that's a part of it.

20    Q.  It would provide an objective indicator of what's

21    expected in their profession?

22    A.  It would be one of the factors, yes, ma'am.

23    Q.  Okay.  And by "expected," I mean what is supposed to

24    occur in certain situations.  Do you agree with that?

25    A.  Yes, ma'am, again, considering the totality of the
```

1    unique circumstance you are talking about.  Every

2    circumstance is not the same.

3    Q.  And you agree that a police department expects officers

4    to behave consistently with its policies and training?

5    A.  Assuming the policies and training are presented to them

6    in a way that they actually understand them, of course.

7    Q.  And do you agree with the concept of in your custody, in

8    your care?

9    A.  Yes, ma'am, I do.

10   Q.  What does that concept mean to you?

11   A.  That means that a prisoner, someone you have control

12   over, is unable to generally take care of their own needs

13   and that, because you have the lawful authority to arrest

14   them, you also bring with that the responsibility to take

15   care of them to the best of your ability.

16   Q.  Okay.  And would you also agree that the FTO period is a

17   period of training?

18   A.  Yes, ma'am, it is.

19   Q.  And so you, in providing opinions today, reviewed

20   Mr. Kueng's FTO records?

21   A.  The ROPEs records and -- yes, ma'am, I did.

22   Q.  And particularly some of the training during that FTO

23   period, some of that related to issues that Mr. Kueng then

24   would recognize in this case; would you agree?

25   A.  Yes, ma'am, I think some of them.

1    Q.  Those reports might inform you about whether the

2    training about whether putting someone in the side position

3    was adequate; would you agree?

4    A.  During the ROPEs program?

5    Q.  During the FTO, looking at the FTO records.

6              MR. PLUNKETT:  I'm going to have to object.  We've

7    gone from records, to reports, to something else.  If we

8    could just identify what we're questioning Mr. Ijames on, I

9    would --

10             MS. SERTICH:  Sure.

11   BY MS. SERTICH:

12   Q.  So reviewing records of Mr. Kueng's FTO time period,

13   those might inform you about whether the training was

14   adequate in certain areas, like the use of the side recovery

15   position?

16             MR. PLUNKETT:  Objection.  Vague.  The record

17   hasn't been specified that was reviewed.

18             THE COURT:  I think we need a little more

19   foundation what you are talking about.

20   BY MS. SERTICH:

21   Q.  You just said that you reviewed his FTO records,

22   correct?

23   A.  Yes, ma'am.

24   Q.  You said the ROPEs reports?

25   A.  Yes, ma'am.

1    Q.  Did you review the PIMS reports that Mr. Kueng would

2    write?

3    A.  Yes, ma'am.

4    Q.  Okay.  So, in reviewing those reports, might those

5    inform you of whether the training was adequate for

6    Mr. Kueng on certain things, like the training on the side

7    recovery position?

8    A.  My answer, ma'am, would be that I do recall, I think,

9    one scenario where he did end up rolling someone over, and

10   one way to determine whether training is effective is if

11   someone does what they were taught.  So in that case he did

12   roll someone over, which I think would be reflective of him

13   being adequately trained in that area.

14   Q.  Would you agree that as of May 25th, 2020, Mr. Kueng was

15   authorized to perform the same duties that Officer Chauvin

16   was authorized to do as a full-time police officer?

17   A.  He was authorized, yes, ma'am.

18   Q.  And by that same token, then he would have to uphold the

19   same duties as Mr. Chauvin as a full-time police officer,

20   correct?

21   A.  Well, that would be his effort and attempt, but no new

22   police officer can perform like an experienced police

23   officer, but they would try.  They would do the best they

24   could, I would assume.

25   Q.  What about the duties that police officers owe to

1    citizens, like the duty to intervene or the duty to not

2    engage in deliberate indifference, Mr. Kueng would have to

3    uphold those same duties as Officer Chauvin, correct?

4    A.  In scenarios where he was adequately trained to

5    recognize those specific examples you gave me, I would

6    completely agree.

7    Q.  Okay.  And the same goes for Officer Thao, Officer Kueng

8    had the same authorization to perform those duties and the

9    same requirement to uphold those duties as Officer Thao,

10   correct?

11            MR. PLUNKETT:  Objection.  Scope, Your Honor.

12            THE COURT:  That is beyond the scope.  I sustain.

13            MR. ROBERT PAULE:  And, Your Honor, I don't mean

14   to step in anyone else's case, but I'd ask the answer with

15   regard to my client be stricken and the jury be instructed

16   to disregard it.

17            THE COURT:  Well, there was no answer, so we don't

18   have to strike it.

19   BY MS. SERTICH:

20   Q.  Mr. Ijames, would you agree with me that checking for a

21   pulse is not medical aid?

22   A.  It's not medical aid, no, ma'am.  It's checking for a

23   symptom of the need for medical aid.

24   Q.  And you would agree that physical restraint is force?

25   A.  Be unquestioned, yes, ma'am.

3675

1    Q.  So you would agree that Mr. Kueng used force on

2    Mr. Floyd at times when Mr. Floyd was not resisting?

3    A.  I would agree.

4    Q.  And that would be an unreasonable use of force, correct?

5    A.  No, ma'am.

6    Q.  So it is your opinion that Mr. Kueng can use force on

7    Mr. Floyd when he is in handcuffs, in the prone position,

8    and unresisting?

9    A.  If we are using that limited description you did of

10   holding someone, then the answer would be certainly.  We

11   always maintain physical control of a prisoner.  And if

12   you're defining me holding you as force, then beyond

13   question as long as you're my prisoner.  The issue of care

14   in this kind of scenario involves me touching you and

15   holding onto you.  And so the answer would be, yes, you

16   would do that.

17   Q.  How about if there were pressure being placed on

18   Mr. Floyd's left wrist by Officer Kueng?

19   A.  You mean pressure like pushing down?

20   Q.  Correct.

21   A.  I would just have to know the reason he was doing that.

22   I mean, are we just off balance and holding down?  It would

23   just depend on the circumstance.

24   Q.  Let's say he's not off balance and he's pushing down on

25   that wrist during a time when Mr. Floyd is prone and not

1    resisting and in handcuffs.

2    A.  Are we pushing hard with malice?  Are we trying to hurt

3    him or are we just maintaining control to feel breathing?

4    I'd have to have a little more information to tell you

5    whether I think it would be unreasonable.

6    Q.  Okay.  How about that same circumstance but if Mr. Floyd

7    were unconscious?

8    A.  Again, I would have to know why you would be exerting

9    any pressure at all.  The point is we do have to have

10   physical contact, not only for the care perspective, but

11   also for an assessment perspective.  You can feel breathing.

12   You can see things.

13          So clearly there's no logical reason to use force

14   on an unconscious person if we define "force" as pain

15   compliance or something like that, but as far as exerting

16   enough pressure to feel is someone moving or something like

17   that, I can't imagine how that would be inappropriate.

18   Q.  And I believe you already testified as to this.  You

19   agree that Officer Chauvin's use of force on Mr. Floyd was

20   unreasonable on May 25th of 2020?

21   A.  At which point in time, ma'am?

22   Q.  At the point in time at which -- after Mr. Floyd was not

23   resisting.

24   A.  Or before then, in my opinion, but not much before then.

25   As long as he was fighting, the leg, the neck position is

1    completely illogical to me.  I've never seen it in any other

2    department.  But at the point that we have control of him,

3    any more force than is necessary is unreasonable.

4    Q.  Okay.  And it sounds like that was obvious to you,

5    correct?

6    A.  Beyond question.

7    Q.  So your first opinion that you articulate in this case,

8    as I understand it, is that Mr. Kueng lacked the training

9    and experience to recognize Mr. Chauvin's excessive use of

10   force; is that correct?

11   A.  Yes, ma'am.

12   Q.  But you agree that Mr. Kueng was repeatedly trained on

13   the use of force continuum as it relates to reasonable

14   versus unreasonable force?

15   A.  I believe so, yes, ma'am.

16   Q.  And you agree that he was trained on the appropriate use

17   of force for an individual who is not resisting?

18   A.  I believe so, yes, ma'am.

19   Q.  And you agree he was trained on the appropriate use of

20   force for an individual who is passively resisting?

21   A.  Yes, ma'am.

22   Q.  Actively resisting?

23   A.  I think the whole spectrum, yes, ma'am.

24   Q.  Those are pretty straightforward concepts?

25   A.  Well, it depends on how they are taught, but they are to

1    me, yes, ma'am.

2    Q.  And in this particular case it was clear to you that

3    Mr. Kueng understood the use of force continuum and the

4    appropriate levels of force, correct?

5    A.  From the material I reviewed, yes, ma'am, I think he

6    understands that well.

7    Q.  Okay.  So you talked -- it's your opinion that he

8    engaged in different uses of force or control and even

9    de-escalation leading up to the point where Mr. Floyd was on

10   the ground, which demonstrated his understanding of these

11   concepts, correct?

12   A.  I agree with the first part, and I think that would be a

13   demonstration.  I haven't heard any testimony from him as to

14   why he did that, but he did do what you said.

15   Q.  And what you saw that he did, that was consistent with

16   officers who are familiar with use of force training,

17   correct?

18   A.  Yes, ma'am.

19            MR. PLUNKETT:  Objection, Your Honor.  Vague.  I

20   don't even know what point in time we're talking about.

21            THE COURT:  Yeah, I'm not sure what you're talking

22   about, counsel.  I --

23            MS. SERTICH:  I was talking about --

24            THE COURT:  And I also think it's repetitious,

25   quite frankly, but.  You went over an awful lot of territory

1   here.

2   BY MS. SERTICH:

3   Q.  You would agree with me that just because an officer

4   takes over a scene does not relieve the other officers of

5   their duty to intervene if the controlling officer uses

6   unreasonable force?

7   A.  If they perceive that, that's my opinion, yes, ma'am.

8   Q.  And same question with respect to medical care.  Just

9   because an officer is, quote, unquote, taking over a scene,

10  that doesn't relieve the officers of their duty to provide

11  medical care?

12  A.  It does not, ma'am.

13  Q.  And there's no exception like that in MPD policy?

14  A.  No, ma'am.  Not in the specifics you asked me, no,

15  ma'am.

16  Q.  In the constitution?

17  A.  Not that I'm aware of.

18  Q.  Or in contemporary police training, policy, and

19  practice?

20  A.  No, ma'am.

21  Q.  And you articulated your belief that new officers often

22  defer to senior officers absent behavior that is

23  unquestionably inappropriate, correct?

24  A.  That's my opinion.  And unquestionably, I have to

25  clarify, for them.  It may be different for different

1    officers, but a brand-new officer would be different than a

2    veteran officer, in my experience.

3    Q.  And one example of unquestionably inappropriate behavior

4    is the use of unreasonable force, correct?

5    A.  If that unreasonable force is accurately perceived by

6    the person in question, yes, ma'am.

7    Q.  And another example of unquestionably inappropriate

8    behavior is the failure to provide needed medical care to

9    someone in your custody, correct?

10   A.  If it's safe and practical to do so, I would agree.

11   Q.  And it is your belief that new officers or even academy

12   recruits should not just act robotically and defer judgment

13   in every interaction with those officers that are senior to

14   them, correct?

15   A.  That is my opinion, yes, ma'am.

16   Q.  And would you agree that that's even more so in

17   life-or-death situations?

18   A.  It would just depend not so much on the life-and-death

19   situation, but the officer's perception of what's right and

20   wrong in that set of facts.  I mean, I would expect them to

21   do what's appropriate in a life-and-death situation, but

22   also something lesser if they perceive that there was a need

23   to act.

24   Q.  But you understand it's more critical in a life-or-death

25   situation?

1    A.  That's about as big as it gets.  But, to me, the

2    decision-making process, you are obligated to do what's

3    right regardless of the severity.

4    Q.  And that can be a hard thing, but a necessary thing,

5    correct?

6    A.  Agreed.

7    Q.  And one belief that you have that I think you talked

8    about earlier today to make it easier for new officers is to

9    provide them with training to recognize when force is being

10   inappropriately applied or is no longer needed, correct?

11   A.  Yes, ma'am, that's true.

12   Q.  And did you hear Officer Kueng testify yesterday that he

13   had a number of scenario trainings where the correct

14   response was that no police action was necessary?

15   A.  That's one good example of a scenario program that's

16   valid, because in many, many cases the police don't arrest

17   anybody or do anything other than talk and take a report.

18   Q.  Okay.  And so by design, those types of scenarios that

19   Mr. Kueng was talking about engaging in with the MPD, those

20   help officers learn when to act or not act, use force, not

21   use force?

22        MR. PLUNKETT:  I have to object.  Vague.  It's

23   just multiple questions.

24        THE COURT:  Yeah, I sustain.  That is multiple

25   questions, counsel.  I think it's also territory that we've

1    been over.

2    BY MS. SERTICH:

3    Q.  The question is:  Those types of scenarios that we were

4    just talking about help officers learn when force is

5    inappropriately applied, correct?

6               MR. PLUNKETT:  Objection.  Vague.  "Those types of

7    scenarios" is --

8               MS. SERTICH:  We just talked about them.

9               THE COURT:  No, counsel, I sustain because

10   we're -- if I remember right, we were talking about the

11   scenarios where no action is to be taken and then all of a

12   sudden we're into this other side.  That's --

13   BY MS. SERTICH:

14   Q.  Is it your opinion that when officers are trained about

15   when they don't have to take action, it helps them learn

16   about how force can be inappropriately applied?

17   A.  Well, ma'am, the way I would answer that is a scenario

18   where officers take no action is helpful because it

19   demonstrates that in many cases, most cases we don't do

20   anything but help people.

21               Likewise, if we don't give scenarios that are

22   clear as it relates to this level of force is appropriate or

23   this level of force, I don't think it helps you determine

24   when force is appropriate by doing a scenario where you

25   don't use any at all.

```
1              If you add scenarios to that, it would be very

2     helpful, but we actually have to have some that are -- for

3     example, the analogy is shoot, don't shoot or a Taser or no

4     Taser.  You have to give those kind of examples in scenarios

5     as well.

6     Q.  And I guess what I'm trying to say is:  Sometimes when

7     they're in those scenarios, some of the recruits are going

8     to get it wrong, right?

9     A.  Yes, ma'am, they do.

10    Q.  And then that's how they're going to learn about times

11    that force is inappropriately applied, correct?

12    A.  If we're doing force scenarios.  But just to be clear,

13    I've never seen a recruit get it wrong on the take the theft

14    report call.  If they use force in that scenario, we've got

15    big problems.  It's the force on force scenarios that are

16    most reflective of what their decision-making process is and

17    where they may get it wrong, yes, ma'am.

18    Q.  Your opinion about Mr. Kueng's conduct in this case was

19    bolstered by Chauvin's, as you said in your report, specific

20    denial of multiple suggestions by Kueng's partner to put

21    Mr. Floyd on his side, correct?

22    A.  Yes, ma'am.

23    Q.  But you've been here while we've gone through this

24    evidence this morning, and you know that Officer Chauvin

25    didn't actually specifically deny multiple suggestions by
```

1    Mr. Lane to put Mr. Floyd on his side, correct?

2    A.  I think it was two or three that he said, "Shouldn't we

3    roll him over?"  He made suggestions to take some action two

4    or three times.  And when you say "deny," you mean literally

5    speaking or just by inaction?

6    Q.  I mean -- well, specific denial, to me, means saying

7    "No."

8    A.  Oh, yeah, I agree he doesn't speak much.  That's one

9    thing I've seen in this material.  But his inaction would

10   certainly be reflective of a denial.

11   Q.  But not really reflective of control, right?

12           MR. PLUNKETT:  Objection.  Asked and answered.

13   Repetitive.

14           THE WITNESS:  I'm not sure I understand you, ma'am

15   I'm sorry.

16           THE COURT:  I'm sorry.  I don't understand either.

17   BY MS. SERTICH:

18   Q.  Okay.  Well, in fact, one of the times that Mr. Lane

19   asked to roll someone on his side was Mr. Kueng who said,

20   "No" first, correct?

21           THE COURT:  Now, just a minute.  I'm sorry,

22   counsel, but that is not necessarily a correct quotation of

23   that -- what do you call it? -- discussion.

24           MS. SERTICH:  It's a stipulated --

25           THE COURT:  These are things that occurred at the

1    same time, and we covered that this morning and I think we

2    made it very clear that that was the situation that the jury

3    is to be bound by what they see on the video and not what's

4    in the transcript with respect to it.

5                    MR. PLUNKETT:  Just noting an objection for

6    ongoing prosecutorial misconduct.

7                    THE COURT:  Now, I deny that, but.

8    BY MS. SERTICH:

9    Q.  Now, your second opinion in this case is that Mr. Kueng

10   did not provide needed medical assistance to someone in his

11   custody and care for those same reasons as we just discussed

12   with regard to the duty to intervene, correct?

13   A.  Yes, ma'am.

14   Q.  But it's your opinion, based on policy, law, and

15   generally accepted police practices, that as soon as it's

16   safe and practical, a prisoner should be turned on their

17   side or placed in a sitting position, correct?

18   A.  There's exceptions, but the general answer would be,

19   yes, ma'am, correct.

20   Q.  So as soon as Mr. Floyd was no longer actively

21   resisting, Officer Chauvin should have removed his knee from

22   Mr. Floyd's neck, correct?

23   A.  I don't know --

24                    MR. PLUNKETT:  Objection.  Relevance.

25                    THE COURT:  Yeah that is not a part of this case

1    counsel.  I sustain as it relates to Mr. Chauvin.

2    BY MS. SERTICH:

3    Q.  And it's your belief that upon determining that a radial

4    pulse was not present, that contemporary police training and

5    practice would involve repositioning the suspect onto his

6    back, considering removal of the handcuffs to facilitate

7    treatment, and reassessing the subject for a carotid pulse

8    and respiration, correct?

9    A.  If safe and practical, yes, ma'am.

10   Q.  And you agree that Mr. Kueng had sufficient training to

11   understand this?

12   A.  Ma'am, I don't recall specifically the statement you

13   reference from my report, that being in any material

14   exactly, but I think his medical training was adequate.

15   That's my best answer.

16   Q.  And, again, that was your opinion of what you should do

17   if you can't find a radial pulse, correct?

18   A.  Yes, ma'am.

19   Q.  Other than the two opinions you've testified about

20   today, you have additional opinions about this case,

21   correct?

22   A.  I think that's the only two opinions.  I may have had

23   some just collateral information concerning that, but I

24   think that was the two opinions.

25   Q.  Well, you do have an opinion that Mr. Floyd was behaving

1    consistent with someone in medical distress, including

2    possible excited delirium or someone under the influence of

3    mind-altering substances, correct?

4    A.  That is true.  I just don't recall I had that as a

5    separate opinion, but yes, ma'am, that's true.

6    Q.  Well, you also drafted a report about this case on

7    February 22, 2021, correct?

8    A.  Yes, ma'am, but not for us sitting here today.  It was

9    for a different venue.  I didn't think you were asking me

10   about that.  I thought you were talking about the report for

11   this case.

12              MR. PLUNKETT:  Objection.  Scope.

13              THE COURT:  Sustained.

14   BY MS. SERTICH:

15   Q.  So it was obvious to you that Mr. Floyd was in medical

16   distress?

17   A.  I think I go back to what you read from my earlier

18   report and that opinion --

19              MR. PLUNKETT:  Objection, Your Honor.  This is --

20   scope.

21              THE COURT:  I don't know what this earlier report

22   is, but I sustain the objection.  That other proceeding is

23   not applicable to this proceeding.

24              MS. SERTICH:  It's a statement that he's made

25   about his opinions in this factual case, Your Honor.

1           THE COURT:  No, I'm going to sustain it.  I just

2      think we're -- we would end up mixing apples and oranges

3      that I don't see that we should be doing.  Let's stay with

4      this case.

5      BY MS. SERTICH:

6      Q.  Would you agree that the types of medical distress in

7      this case were that Mr. Floyd was having trouble breathing

8      and he was saying so?

9      A.  He was saying so.  I don't know for certain --

10          MR. PLUNKETT:  Objection, Your Honor.  Beyond his

11     scope of expertise.  They are asking for a medical diagnosis

12     now.

13          THE COURT:  Oh, I don't know if it's that or not,

14     but the objection, I guess, is overruled.  It's pretty

15     obvious that he was making those statements.

16     BY MS. SERTICH:

17     Q.  But also even if Mr. Floyd were not actually having

18     trouble to breathe, officers can't ignore complaints like

19     that, correct?

20     A.  Beyond question, no, ma'am.  We take that complaint

21     serious.

22     Q.  Especially when someone has a knee on their neck in the

23     prone position?

24     A.  I've never experienced that, but I would take it

25     seriously in any --

```
1              MR. PLUNKETT:  Objection.  The answer is
2    nonresponsive because he's disqualified himself.
3              THE COURT:  I'll let it stand.
4    BY MS. SERTICH:
5    BY MS. SERTICH:
6    Q.  And another form of medical distress was that Mr. Floyd
7    had lost consciousness, correct?
8    A.  Yes, ma'am.
9    Q.  And would you agree that MPD training and contemporary
10   police training, policy, and practice say that if an
11   arrestee is in medical distress and is restrained, an
12   officer should begin assessing the patient?
13   A.  Yes, ma'am, I agree with that.
14   Q.  Using, for example, the ABCs of assessment?
15   A.  Yes, ma'am.
16   Q.  And would you agree that MPD training and generally
17   accepted police practices say that if someone is exhibiting
18   symptoms of excited delirium and need to be restrained, they
19   should be rolled onto their side when they are no longer
20   resisting?
21   A.  When safe and practical, yes, ma'am.
22   Q.  One of your opinions is that you believe that an
23   individual with Mr. Floyd's characteristics should be
24   restrained and then provided with immediate medical
25   assessment and treatment, correct?
```

1   A.  Was that in this report or the '21 report?

2   Q.  This one, page 4.

3   A.  Okay.  I agree with that.

4   Q.  But assessment in this case didn't happen until after

5   Mr. Floyd lost consciousness, correct?

6   A.  I don't know exactly at what point he lost

7   consciousness, when the attempt was made with the pulse, I

8   just don't know, but it was late in the restraint, yes,

9   ma'am.

10  Q.  And treatment by the police officers never happened in

11  this case until Mr. Floyd was in the ambulance, correct?

12  A.  Yes, ma'am.

13  Q.  You would agree that Mr. Floyd was either barely moving

14  or not moving at all after the four-minute mark of restraint

15  in this case?

16          MR. PLUNKETT:  Objection.  Asked and answered.

17  Repetitive.

18          THE COURT:  Sustained.  Counsel, we are just going

19  over the same territory over and over again.  I sustain.

20          MS. SERTICH:  I haven't asked that with this

21  witness, Your Honor.

22          THE COURT:  Okay, you argued with me, but I

23  sustain the objection.

24  BY MS. SERTICH:

25  Q.  And it is your opinion in this case that Mr. Floyd was

 1     not controlled, assessed, or medically cared for in a manner

 2     that was consistent with contemporary police training,

 3     policy, and practice, correct?

 4              MR. PLUNKETT:  Objection.  Asked and answered.

 5              THE COURT:  I sustained.  I think that's been

 6     asked and answered.

 7              MS. SERTICH:  This is a separate opinion of this

 8     witness, Your Honor, on page 5 of his report.

 9              THE COURT:  It may be on page 5, but I think we've

10     been over this very same territory.

11              MS. SERTICH:  We have not.

12     BY MS. SERTICH:

13     Q.  So let's go back to this idea that you've posited that

14     Mr. Kueng had belief in Officer Chauvin's judgment and

15     abilities based on the fact that he was his field training

16     officer and he's in this senior officer position.

17              MR. PLUNKETT:  Objection.  Asked and answered.

18     Repetitive.

19              MS. SERTICH:  I'm not at the question yet.

20     BY MS. SERTICH:

21     Q.  Are you saying that Officer Kueng trusted that -- or

22     Mr. Kueng trusted that Officer Chauvin had some view of the

23     situation that Mr. Kueng could not see or appreciate that

24     must have justified what he was doing?

25     A.  I don't know, ma'am, that literally view would be the

1    best answer, but I think the totality of what Chauvin knew

2    or perceived was such that it was not unreasonable for Kueng

3    to have confidence that his decision to not take action or

4    do something was justified.  It's not necessarily sight.

5    Chauvin never testified.  I don't know what he saw or

6    perceived and the totality of that.

7            But for the officer to see Mr. Chauvin not react

8    to things that were said that he believed he should react

9    to, it was not unreasonable in that circumstance for him to

10   have confidence that there was a legitimate basis for that.

11   Q.  But you would agree that there would be any number of

12   situations an officer could be in where he could say I

13   didn't have the exact view of the officer who used force, so

14   I couldn't substitute my judgment for his in this moment?

15   A.  There could be any number of cases like that, some in

16   which it would be appropriate not to intervene and some in

17   which it would be inappropriate.

18   Q.  You've heard of cases like that before?

19            MR. PLUNKETT:  Objection.  Scope.

20            THE COURT:  I don't know.  I'll overrule.

21            THE WITNESS:  Could you ask me again, please?  I'm

22   sorry.

23   BY MS. SERTICH:

24   Q.  Have you seen cases like that before, where an officer

25   says, well, I can't be in that exact officer's shoes, so I

1    can't tell if he was basing his decision on something else?

2    A.  I have seen that before, yes, ma'am.

3    Q.  Okay.  But you would agree that that idea flies in the

4    face of the duty to intervene, right?

5    A.  No, ma'am.  It would be unique to the circumstance.  You

6    could give me a circumstance that I would agree with you,

7    and then I could give you another one where I wouldn't.  It

8    just depends on the exact facts that officer is seeing as to

9    whether that conclusion was reasonable or not.

10   Q.  So if you had time to, what you should do is inquire of

11   that officer about what their justifications are, correct?

12            MR. PLUNKETT:  Objection.  Scope.  Speculation.

13   Relevance.

14            THE COURT:  I sustain.  And argumentative.

15   BY MS. SERTICH:

16   Q.  Do you think an officer in that situation should at

17   least attempt to try to get some understanding of why that

18   use of force is happening, if they have the time?

19            MR. PLUNKETT:  Objection.  Scope.  Repetitive.

20   Relevance.

21            THE COURT:  Counsel, I'm just going to continue to

22   sustain these objections.

23   BY MS. SERTICH:

24   BY MS. SERTICH:

25   Q.  Well, in this case it wasn't just a moment that

```
 1    Mr. Kueng had to make that assessment of Officer Chauvin's

 2    force, correct?

 3              MR. PLUNKETT:  Objection.  Speculation.  Scope.

 4    Relevance.

 5              THE COURT:  It's repetitious, counsel.  We've been

 6    over and over it.

 7    BY MS. SERTICH:

 8    Q.  And you didn't see or hear Mr. Kueng do anything to try

 9    to stop Officer Chauvin's use of force, correct?

10              MR. PLUNKETT:  Objection.  Repetitive, scope, and

11    relevance.

12              THE COURT:  I'm going to overrule.  He can answer

13    it "yes" or "no."

14              THE WITNESS:  Could you ask me again, please?

15    BY MS. SERTICH:

16    Q.  Of course.  You didn't see or hear Officer Kueng do or

17    say anything to get Officer Chauvin to stop his use of force

18    on Mr. Floyd, correct?

19              THE WITNESS:  It's a "yes" or "no" answer, sir?

20              THE COURT:  Go ahead and answer it however.  You

21    can answer the question.

22              THE WITNESS:  The answer is no.

23    BY MS. SERTICH:

24    Q.  And that was over the course of nine and a half minutes,

25    correct?
```

1    A.  Yes, ma'am.

2    Q.  Did you see during Mr. Kueng's testimony the image of

3    Mr. Chauvin holding Mr. Floyd's fingers --

4    A.  Yes, ma'am.

5    Q.  -- of his left hand?

6    A.  Yes, ma'am.

7    Q.  And is that a use of force move that you are familiar

8    with?

9              MR. PLUNKETT:  Objection.  Relevance.

10             THE COURT:  That's overruled.  It was asked.

11             THE WITNESS:  I've never seen it to where he

12   appeared to be just holding the fingers.  I didn't see any

13   movement that appeared to be, you know, energy, mechanical.

14   It just -- I don't really get it, but no, ma'am, I've not.

15   BY MS. SERTICH:

16   Q.  Did you observe Officer Chauvin twisting Mr. Floyd's

17   fingers?

18   A.  I don't recall that.

19   Q.  And that still image was from about 30 seconds after the

20   point that Mr. Lane said that Mr. Floyd had passed out.  At

21   that point, then, Mr. Chauvin is using force on someone who

22   is unconscious, correct?

23             MR. PLUNKETT:  Objection.  Relevance.

24             THE WITNESS:  I'm just not sure, ma'am, of the

25   timing of that.  I'm not disputing it.  I just don't recall.

1    BY MS. SERTICH:

2    Q.  If he was twisting Mr. Floyd's fingers more than

3    30 seconds after Mr. Floyd passed out --

4            THE COURT:  Just a minute, counsel.

5            MS. SERTICH:  Sorry?

6            THE COURT:  He has just denied seeing whether

7    there was twisting of the fingers.  You're assuming a fact

8    that is in direct opposition to his testimony.

9            MS. SERTICH:  He said he didn't know, and I

10   started with "if."

11           THE COURT:  Okay.

12   BY MS. SERTICH:

13   Q.  Mr. Chauvin was twisting Mr. Floyd's fingers more than

14   30 seconds after Mr. Floyd became unconscious, that would be

15   an unreasonable use of force, correct?

16   A.  And did you say "if" at the beginning?

17           THE COURT:  I didn't hear the "if" that time.

18           THE WITNESS:  So that's the question, "if"?

19   BY MS. SERTICH:

20   Q.  Mm-hmm.

21   A.  I don't know any reason to twist his fingers, whether

22   he's conscious or not.  So the answer would be that would be

23   inappropriate, in my opinion.

24   Q.  And that was happening directly in front of Mr. Kueng,

25   correct?

```
1                  MR. PLUNKETT:  Objection.  Argumentative.  Asked

2         and answered.

3                  THE COURT:  Sustained.

4         BY MS. SERTICH:

5         Q.  So a lot of what you've been saying today with your

6         opinions is that action should be taken when it's safe to do

7         so, correct?

8         A.  Safe and practical, yes, ma'am.

9         Q.  And there was nothing safe or unpractical about rolling

10        Mr. Floyd on his side, correct?

11        A.  You mean there's no reason he should not have been

12        rolled onto his side?

13        Q.  Correct.

14        A.  I agree with that.

15        Q.  Similarly, there was no reason that CPR could not have

16        been performed, correct?

17        A.  With the same safe and practical, I mean, conversation,

18        it physically could have been done in that position he was

19        in, yes, ma'am.

20        Q.  Safe and practical to do so?

21                  MR. PLUNKETT:  Objection.  Asked and answered.

22        Repetitive.

23                  THE COURT:  Sustained.

24        BY MS. SERTICH:

25        Q.  And you also observed in the video that the officers on
```

1    scene on May 25th, 2020, did not appear to be threatened by

2    the bystanders, correct?

3    A.  I would agree with that.

4    Q.  And you would also agree that none of the officers would

5    have to -- would have had to have turned their backs on

6    those bystanders to give medical aid to Mr. Floyd, accurate?

7              MR. PLUNKETT:  Objection.

8              THE WITNESS:  I just can't tell you exactly where

9    they would position themselves, but, I mean, they may have

10   or may not have.  I just can't say for sure.

11   BY MS. SERTICH:

12   Q.  They wouldn't have to, though, to --

13             MR. PLUNKETT:  Objection.  Argumentative.

14             THE COURT:  That is argumentative.

15   BY MS. SERTICH:

16   Q.  You heard from watching the videos that those bystanders

17   were, in fact, requesting that the officers provide medical

18   assessment and assistance to Mr. Floyd?

19   A.  Some of them were, yes, ma'am.

20   Q.  And so providing that assessment and assistance could

21   have served to de-escalate that situation, correct?

22             MR. PLUNKETT:  Objection.  Asked and answered.

23             MS. SERTICH:  I have not asked that question.

24             MR. PLUNKETT:  It's repetitive.

25             THE COURT:  It has not been asked.

1          THE WITNESS:  It's conceivable, sure.

2    BY MS. SERTICH:

3    Q.  And it's not reasonable, is it, for law enforcement

4    officers to cause agitation in a group of bystanders by

5    failing to perform medical assistance and then use the

6    agitation of those bystanders as a reason for not providing

7    medical aid?

8          MR. PLUNKETT:  Objection.  Scope.  Relevance.

9          THE COURT:  Yeah, I sustain, counsel.  That's also

10   argumentative.

11   BY MS. SERTICH:

12   Q.  Did you review Mr. Kueng's statements to Sergeant

13   Pleoger and Lieutenant Zimmerman?

14   A.  The videos, ma'am?

15   Q.  Yes.

16   A.  Yes, ma'am, I did.

17   Q.  And you would agree with me that those statements do not

18   meet the standards of completeness and truthfulness set

19   forth in MPD policy and as a part of contemporary police

20   training, policy, and practice?

21   A.  No, ma'am.

22   Q.  So you think those were complete and truthful statements

23   even where Officer Kueng didn't mention the nine and a half

24   minutes of force in the form of a neck restraint during a

25   use of force review?

```
 1              MR. PLUNKETT:  Improper question.  Argumentative.
 2              THE COURT:  I think it's all of those things,
 3     counsel.
 4              MR. PLUNKETT:  I'm also noting at this point in
 5     the record another assertion of prosecutorial misconduct.
 6              THE COURT:  Overruled.
 7     BY MS. SERTICH:
 8     Q.  Would you --
 9              THE COURT:  Let's take an afternoon recess.
10     Members of the jury, we're going to stand in recess for an
11     afternoon break.  Please don't discuss the case during the
12     recess.
13              And we are in recess.
14          (Recess taken at 3:15 p.m.)
15                              *  *  *  *  *
16          (3:29 p.m.)
17                          IN OPEN COURT
18                          (JURY PRESENT)
19              THE COURT:  Proceed, Ms. Sertich.
20              MS. SERTICH:  Thank you.
21     BY MS. SERTICH:
22     Q.  Just one final clarification here, Mr. Ijames.  You
23     provided a report in this case that provides your opinions
24     as a seasoned law enforcement officer, correct?
25     A.  Yes, ma'am.
```

1    Q.  And that report is the basis of your testimony here

2    today?

3    A.  And in responding to your questions.  I think some of

4    them are not in the report, but yes, ma'am.

5    Q.  And that report contains a couple of paragraphs copied

6    from a blog post at benchmarkanalytics.com; is that right?

7    A.  I reference some footnotes concerning FTO programs and

8    things like that, yes, ma'am.  I'm not sure which one that

9    was.

10   Q.  A blog post titled How Field Training Officers Influence

11   Police Department Culture?

12   A.  That would be one of them, yes, ma'am.

13   Q.  Okay.  And that was written by someone named Bob Tulini;

14   is that right?

15   A.  I don't recall.

16   Q.  Okay.  Do you know if Mr. Tulini is a law enforcement

17   expert?

18          MR. PLUNKETT:  Objection, Your Honor.  He has

19   already explained he doesn't even know that Mr. Tulini wrote

20   the article.

21          THE COURT:  That's sustained.

22   BY MS. SERTICH:

23   Q.  So if I told you he is the executive director of sales

24   and a seasoned marketing pro, would you believe me?

25          MR. PLUNKETT:  Objection.  Improper.  He's already

```
1     disqualified himself.

2              THE COURT:  Yeah, he's disqualified himself,

3     counsel.  Drop that subject now.

4              MS. SERTICH:  Okay.  No further questions, Your

5     Honor.

6              THE COURT:  Thank you.

7              MR. PLUNKETT:  No further questions, Your Honor.

8              THE COURT:  Thank you very much.  Step down.  You

9     live in a nice town, so go on home.

10             THE WITNESS:  Thank you, sir.

11             MR. PLUNKETT:  Just one moment, Your Honor, if I

12    may?

13             THE COURT:  Sure.

14             MR. PLUNKETT:  No further witnesses, Your Honor.

15             THE COURT:  Okay.  You have rested.

16             MR. PLUNKETT:  I renew my Rule 29 motion.

17             THE COURT:  Okay.  And I can now claim 29(b).

18             I think, members of the jury, that in light of the

19    circumstances, unless there's something different --

20             MR. GRAY:  I did get a witness.

21             THE COURT:  You do?

22             MR. GRAY:  Yeah.

23             THE COURT:  Okay.

24             MR. GRAY:  He's not real long.

25             THE COURT:  Okay.  Then let's take the witness.
```

```
1              MR. GRAY:  Okay.  Thank you, Your Honor.
2         (Pause)
3              THE COURT:  Mr. Gray.
4              MR. GRAY:  Your Honor, Thomas Lane calls Gary
5    Nelson as a witness.
6              THE COURT:  Okay.  If you'd step up here,
7    Mr. Nelson.  Raise your right hand.
8                          GARY NELSON,
9    called on behalf of Defendant Lane, was duly sworn, was
10   examined and testified as follows:
11             THE COURT:  You may take the stand, please.
12             THE WITNESS:  Thank you.
13                      DIRECT EXAMINATION
14   BY MR. GRAY:
15   Q.  Mr. Nelson, could you state your full name, please.
16   A.  My name is Gary Robert Nelson.
17   Q.  And do you presently reside in Las Vegas somewhere?
18   A.  Yes, sir.
19   Q.  And have you been requested by myself to come here to
20   testify?
21   A.  I have.
22   Q.  And let's go through your background a little bit.  You
23   were a Minneapolis Police Department --
24             MS. TREPEL:  Objection.  Leading.
25             THE COURT:  It's introductory, counsel.  Come on.
```

```
1     BY MR. GRAY:
2     Q.  Where, if anything -- were you working 25 years ago, if
3     anywhere?
4     A.  I worked for the City of Minneapolis, Minneapolis Police
5     Department.
6     Q.  Okay.  And when did you start --
7     A.  I started --
8     Q.  -- if you started?
9     A.  I started with the Minneapolis Police Department in June
10    of 1995.
11    Q.  And in addition to working as a Minneapolis Police
12    Department officer, did you also have another career?
13    A.  Yes.  I was a citizen soldier with the Minnesota
14    National Guard for approximately 22 years.
15    Q.  And when did that end?
16    A.  That ended in approximately 2008.
17    Q.  All right.  And going back to your career as a
18    Minneapolis Police Department police officer, tell the jury
19    what you did once you got into the police department, how
20    you worked your way up.
21    A.  Yes, sir.  I started with the Minneapolis Police
22    Department in 1995.  I went through the Minneapolis Police
23    Academy.
24    Q.  And talk slow because that lady there has to take down
25    everything.
```

```
 1    A.  I went through the academy in summer of 1995.  Upon

 2    completion of the academy, I went through what is called a

 3    training period, where I was assigned a senior officer that

 4    was a field training officer.  Once I completed the field

 5    training process, my first assignment with the City of

 6    Minneapolis --

 7    Q.  Stop there a minute.  How long was the field training

 8    process back when you worked your way in?

 9    A.  It was five months.  Typically it was five months.

10    Q.  Go ahead.

11    A.  And after that process, my first assignment was with the

12    Fourth Precinct up on the north side of Minneapolis.  And

13    throughout my career as a patrol officer, I ended up

14    segueing over into a community policing unit, a crime

15    prevention unit that at the time we called our SAFE unit.

16         And eventually as I became more of a seasoned

17    officer with the department, other opportunities came up and

18    I had quite a diverse assignment -- history of assignments.

19    I worked also on what we call our Community Response Team,

20    which addresses liveability issues in the neighborhoods.

21    Mainly at the time it was narcotics complaints,

22    prostitution, liveability kind of crimes.

23         I was also a beat officer down around the

24    University of Minnesota for a period of time.  And then I

25    eventually, around that 2008 mark, got promoted to the rank
```

1    of sergeant on the Minneapolis Police Department.

2    Q.  Okay.  And as a sergeant, where did you work?

3    A.  I started out supervising a shift in downtown

4    Minneapolis, the night shift.  I was kind of a junior

5    sergeant.  And eventually spent some time as an investigator

6    with our internal affairs unit, which did internal mainly

7    administrative investigations of MPD personnel.

8    Q.  What is internal affairs?  You do the investigations of

9    citizen complaints of other police officers?

10   A.  Yes, yes, and they're mainly policy and procedural

11   violations.  I didn't have any -- we typically don't

12   investigate criminal matters involving police officers.

13   It's just more administrative matters with policy

14   violations.

15         And then I spent some time as a -- what they call

16   a task force officer with the U.S. Marshal Service right

17   here in the Twin Cities and, in fact, in this building at

18   the time.

19         And then I ended up going back downtown, where I

20   was a -- supervised our beat team downtown.  And I mean

21   downtown -- right downtown Minneapolis, you know, mainly

22   along Nicollet Mall, Hennepin Avenue, just doing a lot of

23   beat community presence down there, working with the police,

24   working with businesses and the stakeholders in the

25   community, you know, to address issues that we were facing

1    downtown.

2    Q.  Were you at some time promoted to lieutenant?

3    A.  Yes.

4    Q.  When was that?

5    A.  Just before the All Star game in 2014 I was promoted to

6    the rank of lieutenant with the Minneapolis Police

7    Department.  My first assignment was actually up in

8    northeast Minneapolis.  I was assigned as our -- property

9    crimes supervisor of our property crimes unit up there.  It

10   was a unit that mainly involved, you know, property crimes,

11   things related to property, like burglaries, thefts of

12   property, that type of thing.  And then eventually I was

13   assigned to the Third Precinct in a supervisory position.

14   Q.  Was that on Lake Street?

15   A.  Yeah, it was at Lake Street at the time.

16   Q.  Okay.

17   A.  Yeah.

18   Q.  And so I take it you'd be quite a -- you're quite an

19   experienced ex-police officer; would that be a fair

20   statement?

21   A.  Yeah.  I had, like I said, a very good history with

22   diversity of different assignments and had been with

23   Minneapolis for 25 years.

24   Q.  Were you -- are you familiar with while working there --

25   you retired in 2020; is that right?

```
1    A.  That's correct, the summer of 2020.

2    Q.  And that was after the George Floyd incident?

3    A.  Yes, it was after that incident and the civil unrest

4    that followed.

5    Q.  And during your career did you become familiar with the

6    relationship between field training officers and the

7    recruits?

8    A.  Yes.  So over my experience with the police department,

9    both being in that position and also being in a supervisory

10   position, I was aware --

11   Q.  Did you --

12   A.  -- of it.  When I was in -- when I was going through

13   that, you know, as a young, you know, officer myself as an

14   FTO and then throughout the years, especially as I got into,

15   you know, a position of supervising, you know, bringing

16   different recruit officers in, you know, getting them set up

17   with -- you know, basically welcoming them to the precinct,

18   getting them set up with lockers, administrative type

19   things, you know, being part of that introduction with the

20   sergeants that are on the shift, sometimes with their new

21   FTO officer, just trying to make that transition smooth.

22   Q.  And so would it be fair to say that in the years that

23   you were a police officer you were able to observe the

24   relationship between field training officers and recruits?

25   A.  Yes, sir.
```

1    Q.  And with respect to recruits going through the academy,

2    how would you describe that based on your knowledge as a

3    National Guard and a police officer, how would you describe

4    the academy?  Was it a military situation?

5    A.  I would describe it as a paramilitary situation.

6    Q.  And what does "paramilitary" mean?

7    A.  You know, it's similar -- the police departments,

8    civilian police departments in this country, I mean, we are

9    not military organizations, and for good reason, but we do

10   share a lot of traits that you would see similar in a

11   military organization.  That's why I refer to it as a

12   paramilitary organization.

13          There is certainly -- there is a rank structure.

14   We wear uniforms, typically.  There are rank identifiers on

15   uniforms that are very consistent with military, you know,

16   kind of identifiers as far as rank, you know, sergeants,

17   lieutenants.  You know, we have other, you know, rank within

18   the department.

19          But even when these -- when our folks come on and

20   go through the academy, it is an indoctrination process, in

21   my opinion, that was very similar to my experience as a

22   soldier and for basic training when I attended Fort

23   McClellan, which was a military police school and basic

24   training school with the U.S. Army.  It is a very

25   disciplined environment, and one example that I can think of

```
 1    is --

 2              MS. TREPEL:  Objection.  Narrative.

 3    BY MR. GRAY:

 4    Q.  Can you think of an example, sir, going back to the time

 5    of being in the academy?

 6              MS. TREPEL:  Your Honor, I'd also just object in

 7    terms of foundation.  It's vague as to time.  I'd ask for a

 8    clarification on that point.

 9              MR. GRAY:  What time would you like?

10              THE COURT:  Find out when he went through --

11              MR. GRAY:  Yes.

12              THE COURT:  -- the military academy.

13    BY MR. GRAY:

14    Q.  When did you go through --

15    A.  Through the military academy?

16              THE COURT:  I think that's what he asked.

17              THE WITNESS:  Are you referring to --

18    BY MR. GRAY:

19    Q.  The police academy.

20    A.  The police academy would have been in June 1995 through

21    about October of 1995.

22    Q.  During the 25 years that you were a police officer in

23    Minneapolis, did anything change based on what you knew

24    about the academy?

25    A.  You know, I think, you know, the training has evolved
```

1    and has been different, but that --

2    Q.  What about the military part of it that --

3    A.  No, that really hasn't changed.  And I've seen -- my

4    last assignment I was actually assigned up in the building

5    that's called our Special Operations Center.  That's where

6    the academy is actually conducted at.  And I was familiar

7    you know, with our cadre there and I was just -- you know, I

8    was at the same building, so I --

9    Q.  When you --

10   A.  I would see what was going on there a lot.

11   Q.  Okay.  When you would walk by one of the recruits, what

12   would they have to do --

13   A.  They would --

14   Q.  -- because you are a lieutenant?

15   A.  Being a lieutenant or any sworn employee, for that

16   matter, they would -- they were required to stop what they

17   were doing, put their back up against a wall, and stand at

18   the position of attention and then they would greet that

19   officer with the greeting of the day, good morning, sir or

20   ma'am, good morning or afternoon, ma'am, until you

21   acknowledged them or left the area.

22   Q.  Going now to field training officers.  You had a field

23   training officer too; is that right?

24   A.  I did.  I had five of them.

25   Q.  Five of them.  And that's not unusual from what we've

1    heard in this case, is it?

2    A.  No, that was not unusual.

3    Q.  And as far as a field training officer would go and as a

4    recruit, would a field training officer ever -- strike that.

5         Would a recruit ever question a field training

6    officer about --

7         MS. TREPEL:  Objection.  Leading.

8    Q.  -- something he's doing?

9         MR. GRAY:  Can I finish the question?

10   BY MR. GRAY:

11   Q.  In your perception of the relationship between field

12   training officer and the recruit, does the recruit question

13   the field training officer about what he's doing?

14        MS. TREPEL:  Objection.  Vague and foundation.

15        THE COURT:  I'm going to overrule.  I think he can

16   answer if he knows.

17        THE WITNESS:  No, it would not be typical and I'm

18   not really aware of any situation where a recruit officer

19   would question their field training officer.

20   BY MR. GRAY:

21   Q.  Okay.  And with respect to the field training officers,

22   after you become a police officer, does that police officer,

23   based on your experience, if you know, does that police

24   officer go back and contact the field training officer on

25   occasion to get advice?

1              MS. TREPEL:  Objection.  Vague.  Foundation.

2       Opinion testimony.  I just think there's no foundation for

3       any of this.

4              THE COURT:  No.  I think he just simply asked do

5       they ever go back and talk to them.

6       BY MR. GRAY:

7       Q.  For advice, yes, that's what I'm asking you.  If you

8       don't understand it, I will try to explain it, sir.

9       A.  No, I understand.  And my answer is, yes, that would be

10      very typical.  That's a relationship that they have made

11      with somebody on the police department that, you know, quite

12      frankly, was a mentor, somebody that they looked up to,

13      somebody that they had trusted, and they will often go to

14      them for help.

15      Q.  And the field training officer -- well, strike that.

16             Let's get into where there's an incident, a crime

17      was committed and the police officers are there

18      investigating it.  Who would be in charge -- based on your

19      experience, who would be in charge of that incident?

20      A.  Well --

21             MS. TREPEL:  Objection.  Vague.  I'm just not

22      clear about the relevance of the generalities that this

23      witness is testifying to.

24             MR. GRAY:  Well, the relevance is --

25             THE COURT:  No, the relevance is fine, but the

1    vagueness I think we need --

2              MR. GRAY:  I'm trying not to lead.

3              THE COURT:  -- to --

4         (Simultaneous indiscernible crosstalk)

5              MR. GRAY:  I don't want to lead.

6    BY MR. GRAY:

7    Q.  Okay.  A situation where two or three officers are on a

8    scene, somebody is being restrained waiting for an

9    ambulance, and somebody was resisting --

10             MS. TREPEL:  Objection.

11   Q.  -- strongly and --

12             MS. TREPEL:  Your Honor --

13   Q.  -- the resistance, who would be in charge of that

14   incident --

15             MS. TREPEL:  Objection.

16   Q.  -- in your opinion?

17             MS. TREPEL:  Your Honor, may have we a sidebar on

18   this point?

19             MR. GRAY:  In your perception.  I didn't mean

20   opinion.

21             THE COURT:  Yeah, I guess we can.

22        **(At sidebar)**

23             MS. TREPEL:  Mr. Gray, are you on?

24             Your Honor, I'd object at this point.  Mr. Gray is

25   asking this witness a hypothetical question.  This witness

1    has not been noticed as an expert.  He is not qualified to

2    give lay opinion testimony either.  There's no foundation

3    for any of the facts in this case and he is not an expert

4    who can be posed hypothetical questions, so I would object

5    to this line of questioning.

6            MR. GRAY:  Excuse me, Your Honor.  Can I get my

7    paper?  I'd like to --

8            THE COURT:  Yes, you may.

9            MR. PLUNKETT:  I cannot hear Earl.

10           MS. TREPEL:  I can't either.

11           MR. GRAY:  Can you hear me now?

12           THE COURT:  Yes.

13           MR. GRAY:  Okay.  Your Honor, I'm not calling him

14   as an expert.  I'm asking him as a lay witness.  His

15   testimonies were actually based on what he perceives.  It's

16   going to be helpful to the jury because it's sort of

17   confusing in this case as to who was in charge at the scene.

18   He will helpful -- be helpful in that area.

19           And his testimony isn't based on scientific,

20   technical, or other specialized knowledge.  It's just based

21   on police department procedure, and he's been 25 years in

22   that experience.  And he certainly can say the person in

23   charge would be the most experienced officer, the senior

24   officer.

25           MS. TREPEL:  Your Honor, as a lay witness Mr. Gray

1    said he can testify as to what he perceived, but he just

2    posed a hypothetical question.  This is not about what he

3    perceived.  A lay witness can opine based on their

4    experience without -- what is in their perception based on

5    their experience.

6            If he was an eyewitness, he could give a rational

7    opinion based on his experience, that's not technical

8    knowledge, but this question was a hypothetical based on

9    facts that he has no knowledge about and no perception of.

10           MR. GRAY:  Well, I have to disagree.

11           THE COURT:  Counsel, just a minute.  Let me in on

12   this.  If this was a hypothetical question, which I think it

13   was, then I sustain the objection.  But the witness is

14   entitled to give his observations as his position on the

15   Minneapolis Police Department.  So we'll pick it up from

16   there and go forward.

17       **(In open court)**

18   BY MR. GRAY:

19   Q.  Based on your observation and experience and

20   perception --

21           THE COURT:  Just a minute.

22   Q.  -- if two inexperienced officers and --

23           MS. TREPEL:  Objection, Your Honor.  This is a

24   hypothetical question.

25           THE COURT:  Counsel, can you just hold it for just

1    a minute?  I have been handed a note that I need to read and

2    I can't pay attention.

3               MS. TREPEL:  I apologize, Your Honor.

4          (Pause)

5               THE COURT:  Ms. Magee, would you please suggest

6    that they hold any information with respect to that.

7               Okay.  I apologize.  I was trying to multitask and

8    I'm not very good at that.

9               Would you restate your question, Mr. Gray?

10              MR. GRAY:  Yes.

11   BY MR. GRAY:

12   Q.  Based on your experience as a police officer and being a

13   lieutenant, a sergeant, working your way up through the

14   ranks, if you were at a scene and you were a sergeant and

15   there were two recruits there, who would be in charge of

16   that scene based on your experience?

17              MS. TREPEL:  Objection to the hypothetical.

18              THE COURT:  It's overruled.  You may answer.

19   BY MR. GRAY:

20   Q.  Go ahead.

21   A.  The sergeant would be in that case just because of their

22   rank.

23   Q.  Well, what about if somebody -- let's change it, then,

24   and not a sergeant, just a senior officer and two rookies.

25   Who would be in charge then?

1    A.   That senior officer would be.

2    Q.   And why do you say that?

3    A.   It is the way that -- it's kind of -- again, kind of

4    goes back to speaking to that hierarchy, you know, both with

5    the formal rank structure and then even there is specific,

6    you know, policy language about seniority and senior

7    officers.

8              And in a situation like a scene that you are

9    describing, and it could be a big scene, a small scene, but

10   typically somebody needs to be in charge.  And there's

11   specific policy language that talks about that person that's

12   in charge, and that would be an incident commander or a --

13   what we call for short an IC.

14             You know, somebody needs to be in charge because

15   sometimes we just don't have the luxury, depending on the

16   situation or if you're dealing with people that are hostile

17   or fighting, you know, to be able to stop and deliberate

18   with everybody there for a period of time.  You know,

19   somebody has to be in charge, somebody needs to take charge,

20   and somebody needs to make those calls, and that is -- if

21   there's a supervisor present, that would be a supervisor,

22   meaning a sergeant, a lieutenant, up the chain of command

23   or, in the absence of a rank, it would be the officer that

24   has the most seniority.

25   Q.   Okay.  Thank you.  And would it be unusual, based on

```
 1    your experience, to restrain somebody and wait for an

 2    ambulance?

 3    A.  No.

 4              MS. TREPEL:  Objection.

 5              THE COURT:  It's overruled.  It stands.

 6              MR. GRAY:  Okay.  Thank you, sir.  That's all I

 7    have.

 8              Thank you, Your Honor.

 9                    CROSS-EXAMINATION

10    BY MS. TREPEL:

11    Q.  Good afternoon, Lieutenant Nelson.

12    A.  Good afternoon, counselor.

13    Q.  My name is Samantha Trepel.  I represent the United

14    States.  We haven't met before, right?

15    A.  That's correct.

16    Q.  Okay.  And do you have a flight to catch this evening?

17    A.  I have a flight tomorrow.

18    Q.  Okay.  I won't hold you late, but I just want to make

19    sure we were not --

20    A.  Sure.

21    Q.  -- going to cause you to miss a flight.

22    A.  Very good.  I appreciate that.

23    Q.  And somehow -- I apologize.  My questions are not here.

24              MS. TREPEL:  I apologize.  One moment.

25              THE COURT:  Sure.
```

```
 1           (Pause)

 2               MS. TREPEL:  That's what I was looking for.

 3      BY MS. TREPEL:

 4      Q.  All right.  In your testimony you were talking about

 5      your experience in military; is that right?

 6      A.  That's correct.

 7      Q.  All right.  And that was in the National Guard?

 8      A.  Yes.

 9      Q.  Now, members of the military are required to obey lawful

10      orders; is that right?

11               MR. PLUNKETT:  Objection.  Scope.

12               THE COURT:  No, there was a question about

13      military before.  I overrule.

14               MR. PLUNKETT:  And about lawful orders, Your

15      Honor.

16               THE COURT:  I overrule.

17               THE WITNESS:  Yes.

18      BY MS. TREPEL:

19      Q.  Okay.  But there's no obligation in the military to

20      follow an unlawful order; is that right?

21      A.  That is correct.

22      Q.  Members of the military are accountable for their

23      actions?

24               MR. PLUNKETT:  Objection.  Scope.  Relevance.

25               THE COURT:  Again I overrule.
```

```
1              THE WITNESS:  Correct.

2     BY MS. TREPEL:

3     Q.  And members of the military can also be held accountable

4     if they follow an unlawful order, right?

5     A.  Yes, if they have reason to believe that that is an

6     unlawful order.

7     Q.  Right.  There's no defense to "I was just following

8     orders," right?

9     A.  That is correct.

10    Q.  All right.  And to be clear, you were not saying that

11    MPD is a military organization, right?

12    A.  To be clear, that is not what I was saying.  It's a

13    paramilitary organization.

14    Q.  Right.  The military protects us against enemies,

15    foreign and domestic, and police officers are peace

16    officers, right?

17    A.  That is correct.

18    Q.  Their job is to prevent and investigate crime?

19    A.  That is amongst some of their jobs, yes.

20    Q.  Also includes apprehending criminals?

21    A.  Mm-hmm.

22    Q.  Maintaining public safety in the community?

23    A.  Yes.

24    Q.  But the police do operate according to a chain of

25    command, as you testified?
```

1    A.  Yes.

2    Q.  All right.  And that's helpful to you in your experience

3    as a supervisor?

4    A.  That we have a rank structure?

5    Q.  Yeah.

6    A.  Yes.

7    Q.  And so training new officers about that chain of command

8    is important to their understanding of their job as police

9    officers, right?

10   A.  Correct.

11   Q.  Would you say it's also important to instill values like

12   treating others with respect?

13   A.  Absolutely.

14   Q.  And that's because, in part at least, police officers

15   are interacting with members of the public every day?

16   A.  Correct.

17   Q.  Sometimes in tense situations, right?

18   A.  Yes.

19   Q.  And so having officers who have developed a habit of

20   treating others with respect can be helpful in those

21   situations, right?

22   A.  Yes.

23   Q.  All right.  And similar to the military, though, police

24   officers at the Minneapolis Police Department are required

25   to follow department rules and regulations, right?

```
1    A.  Yes.
2    Q.  And they have to follow lawful orders given by a
3    supervisor, right?
4    A.  Yes.
5    Q.  And that's in the policy?
6    A.  Yes, it is.
7    Q.  Okay.  And it's also common sense, right?
8    A.  Yes.
9    Q.  And equally commonsensical, right, is a police officer
10   is not expected to follow an unlawful order, correct?
11   A.  Yes.  If they have reason to believe that it is clearly
12   unlawful, yes, I would agree with that.
13   Q.  And MPD officers, according to policy, are accountable
14   for their use or their failure to use delegated authority,
15   right?
16   A.  I'm sorry.  Could you repeat that?
17   Q.  Yeah.  According to the policy, officers are accountable
18   for their use or failure to use delegated authority?
19   A.  Yes.
20   Q.  So, in other words, simpler terms, officers are told
21   that they're accountable for their actions, right?
22   A.  Yes.
23   Q.  And they're also told they're accountable for their
24   inactions, right?
25              MR. GRAY:  Judge, I object to this as outside what
```

```
 1    I was asking this person about.  It's outside my direct;
 2    that's for sure.
 3              THE COURT:  Oh, I think it's appropriate.  It's
 4    cross-examination.  You may continue.
 5              THE WITNESS:  Can you repeat the last part of
 6    that, ma'am?
 7    BY MS. TREPEL:
 8    Q.  Of course.  So officers are also told they're
 9    accountable for their inactions, correct, by the --
10    A.  You could be held accountable for an inaction,
11    absolutely.
12    Q.  And being a police officer also requires the use of
13    judgment in the performance of duties, right?
14    A.  Yes.
15    Q.  No one's directing a police officer to blindly follow
16    orders, right?
17    A.  That is correct.
18    Q.  But officers must follow the law?
19    A.  Yes.
20    Q.  And they're expected to follow police department policy
21    too, right?
22    A.  Yes.
23    Q.  All right.  And -- all right.  The police department's
24    duty to intervene policy requires officers to stop or
25    attempt to stop another sworn employee when force is being
```

1    inappropriately applied, correct?

2              MR. GRAY:  Judge, I object to this.  My client is

3    not charged with intervention.  I called this witness for

4    one reason --

5              THE COURT:  Sustained.

6              MR. GRAY:  -- and that's the paramilitary.

7    BY MS. TREPEL:

8    Q.  Now, you testified you were present at the special

9    operation -- I'm going to mess up the acronym, but the SOC?

10   A.  Yes, the SOC.  The special operations center.

11   Q.  I was close.

12   A.  You were very close.

13   Q.  Okay.  But you were not actually an instructor at the

14   academy.  You were just co-located in the SOC; is that

15   right?

16   A.  That is correct.

17   Q.  Okay.  I just want to make sure I understood.  All

18   right.  You had -- you testified on direct about who is in

19   control of a scene; is that right?

20   A.  Who is in -- who is in command.

21   Q.  Who is in command of a scene.

22   A.  Yes.

23   Q.  And you were referring to some policy language about

24   seniority; is that right?

25   A.  Yes.

1   Q.  Okay.  And you were actually referring to sort of larger

2   incidents, if I understood you correctly; is that right?

3   A.  Incidents, large incidents, small incidents, correct.

4   Q.  Well, the actual policy at MPD says it's the most senior

5   officer in the first squad to arrive; is that right?

6   A.  There is some language about that, but there's also some

7   language that defines what an incident commander is at an

8   incident.

9   Q.  Right.  And those are sort of the bigger scale

10  incidents, isn't that right, according to the terms of the

11  policy?

12  A.  I, I would describe it as incidents.  They could start

13  small, expand into a big incident.  It could be, it could

14  start out as a big incident, but I would say incidents in

15  general.  And I'm specifically referring to in the policy

16  manual where it defines an incident commander.

17  Q.  Right.  And that's the policy I'm referring to.  That

18  incident commander situation comes up when it's a big

19  incident and there's multiple different squads arriving,

20  right?

21  A.  No.  I'm talking about there is a list of definitions of

22  terms.  And as an incident commander -- and I think it

23  speaks to an emergency scene, an investigation, and I think

24  it's also even talking about special events.

25  Q.  All right.  So that would be the command authority

 1    ranking or senior officers policy 1407?

 2    A.  That is -- that is it, I believe.

 3    Q.  Okay.  So we're talking about the same thing.  So --

 4         MR. GRAY:  Excuse me.  1-201 is the definition

 5    that he's talking about.

 6         THE WITNESS:  Yeah, I'm talking about the

 7    definitions part of -- it's before the policy.  Typically,

 8    there will be some definitions so that as you're reading the

 9    policy and it refers to different terms, you're able to

10    tell, okay, that's incident commander, what is that.  Well,

11    this is how it's defined in policy.

12    BY MS. TREPEL:

13    Q.  All right.  And I would like, then, to direct your

14    attention to that command authority section, so not the

15    definition, but the actual policy about the ranking or

16    senior officers.

17    A.  And I do not have that in front of me.

18    Q.  And I'm afraid I have one copy, but I'll show it to you

19    and then if you recognize it --

20         MR. GRAY:  I can supply what you have.

21      (Counsel confer)

22         THE WITNESS:  Thank you.

23    BY MS. TREPEL:

24    Q.  Do you see that now?

25    A.  Yes, I do.

```
 1    Q.  All right.  And so I was referring to that second
 2    sentence there.  Does that say, "In the absence of a
 3    supervisor, the senior sworn employee of the first squad to
 4    arrive at the incident shall be responsible for police
 5    activity until relieved by a supervisor"?
 6    A.  Yes.  407, command authority, yes.
 7    Q.  Okay.
 8    A.  Yeah.  And I'm sorry for the confusion.  I was -- again,
 9    I was referring to the 1-201 definitions and terms used in
10    the department manual --
11    Q.  No problem.
12    A.  -- sliding them down to incident commander.
13    Q.  I just want to make sure we were on the same page,
14    literally.
15    A.  Okay.
16    Q.  All right.  Now, you also testified a bit about FTOs.
17    And you have some experience as a supervisor working with
18    FTOs; is that right?
19    A.  Yes.
20    Q.  Okay.  And so just to be clear, FTOs don't unilaterally
21    have the ability to fire a person, correct?
22              MR. GRAY:  I object to this.  Outside the scope of
23    my direct examination.
24              THE COURT:  That is outside the scope, counsel.
25              MS. TREPEL:  I think he spoke about FTOs, Your
```

1    Honor, and I think it's relevant to some of the testimony

2    we've been hearing.

3              THE COURT:  Okay.  Then I'll let you testify.  Why

4    don't you answer the question then.

5              THE WITNESS:  Unilaterally them, just them

6    themselves as a newly MPD employee?

7    BY MS. TREPEL:

8    Q.  Well, the supervisory officer, in other words, the FTO,

9    him or herself, can't just on the street decide to fire

10   somebody on the spot, right?

11   A.  That is correct.  There is a -- there is a disciplinary

12   process that would have to be -- like anybody would go

13   through.

14   Q.  Right, like anybody would go through.  Presumably in a

15   larger organization, there is human resources or some

16   administrative protocols to go through?

17   A.  Yeah, and there's specific protocols for -- yeah, for a

18   probationary employee, which an FTO -- somebody that is an

19   FTO would be a probationary employee, different than like an

20   MPD employee that is through their probation process,

21   correct.

22   Q.  Because it would be kind of chaos if one officer could

23   fire another one on the street?

24   A.  Yes.

25   Q.  Okay.  And to be clear, a police department's culture

```
1    doesn't change anything about a police officer's duty,

2    correct?

3            MR. GRAY:  Object.  I didn't get into the culture

4    or the duty.  I object.  Outside the scope of the

5    cross-examination [sic].

6            THE COURT:  This is cross-examination and I -- the

7    witness may answer the question if he knows.

8            THE WITNESS:  Can you -- I'm sorry.  Can you

9    repeat it?

10   BY MS. TREPEL:

11   Q.  Absolutely.  A police department's culture doesn't

12   change an individual police officer's duty, correct, their

13   sworn obligation?

14   A.  I'm not sure what you mean by "culture."  That's a

15   pretty broad --

16   Q.  Sure.  You were here testifying about paramilitary

17   culture at the academy, right?

18   A.  Yes.

19   Q.  So that kind of thing, that ephemeral culture of the

20   department, doesn't change an officer's sworn duty to uphold

21   the law, correct?  That's all I'm saying.

22   A.  No, I don't -- I don't think it changes that, but within

23   the culture of the MPD it's --

24   Q.  That was my question.

25   A.  Yeah.
```

1          MR. GRAY:  Object, Your Honor.

2          THE WITNESS:  Very good.

3          MS. TREPEL:  One moment, please.

4     (Pause)

5          MS. TREPEL:  No further questions.

6          THE COURT:  Thank you.

7          Mr. Gray.

8          MS. TREPEL:  I'm going to need a second.  Sorry,

9     Mr. Gray.

10                     REDIRECT EXAMINATION

11    BY MR. GRAY:

12    Q.  On policy 1-201 it defines an Incident Commander,

13    correct?

14    A.  Yes.

15    Q.  And on 407, Command Authority, it describes, "The

16    ranking on-duty sworn supervisor at the scene of any police

17    incident shall be in charge."

18          And then we go over here to the Incident

19    Commander.  "An officer, who by rank, seniority, or

20    designation is in charge at an emergency scene,

21    investigation or planned special event."

22          Do you take that to mean that the person with

23    seniority is the one in charge at an incident?

24          MS. TREPEL:  Objection.  Leading.

25          THE COURT:  Oh, I'm going to let it go.  You may

 1     answer.

 2                    THE WITNESS:  Yes.

 3                    MR. GRAY:  And that's all I have.  Thank you, sir.

 4                    THE COURT:  Thank you.

 5                    MS. TREPEL:  No further questions.

 6                    THE COURT:  Okay.  Thank you very much.

 7              Mr. Nelson, I have to tell you, when I saw your

 8     name on the list, I was worried whether I could handle this

 9     case.  My best friend in high school was Gary Nelson.

10     You're not the right one.

11                    THE WITNESS:  All right.  Very good.  Thank you,

12     Your Honor.

13                    THE COURT:  Thank you.

14                    THE WITNESS:  You all have a great weekend.  Thank

15     you.

16                    THE COURT:  Members of the jury, as you know, we

17     are taking our own Presidents Day holiday according to the

18     way we declare it to be, I guess.  It's kind of nice to be

19     in charge once in a while.

20              We're going to stand in recess at this time until

21     next Monday morning at 9:30.  Now, during the course of this

22     recess, once again, do not discuss the case amongst

23     yourselves or with other persons.  Do not read or listen to

24     other media accounts.  Do not carry out any personal

25     investigations.  Don't check the internet-type things.  And,

1    simply, just keep your own counsel and keep an open mind.

2    You've not heard all the evidence in the case and so,

3    therefore, please keep an open mind with respect to the

4    case.

5         With all of that, we wish all of you a good

6    weekend.  We look forward to seeing you on our Presidents

7    Day next Monday morning at 9:30.

8                         **IN OPEN COURT**

9                       **(JURY NOT PRESENT)**

10        THE COURT:  Mr. Paule, you had something that you

11   wanted to bring to my attention?

12        MR. ROBERT PAULE:  I did, Your Honor.  However, I

13   think given the fact we are getting transcripts, I would

14   withdraw my request to make a record until I've had a chance

15   to review the transcript to make sure I'm accurate in what

16   I'm describing, Your Honor.

17        THE COURT:  Okay.  Sounds good.

18        Have a good weekend, everybody.

19        My sympathy to you again and to your wife,

20   Mr. Gray.

21        MR. GRAY:  Thank you, Your Honor.

22        THE COURT:  And we're in recess until Monday at

23   9:30.  And because it is a holiday, I hope the logistics of

24   getting in and out and all the rest of those things are

25   worked out okay.  We'll do the best we can.

1          (Court adjourned at 4:13 p.m., 02-17-2022.)

2                              *   *   *

3          I, Renee A. Rogge, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6                         Certified by:  /s/Renee A. Rogge
                                         Renee A. Rogge, RMR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25