1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

3       ------------------------------------------------------------
                                   )
         United States of America,  )  File No. 21-cr-108
4                                   )          (PAM/TNL)
                  Plaintiff,        )
5                                   )
         v.                         )
6                                   )
         Tou Thao(2),               )  Courtroom 7D
7        J. Alexander Kueng(3), and )  St. Paul, Minnesota
         Thomas Kiernan Lane(4),    )  Tuesday, February 22, 2022
8                                   )  9:44 a.m.
                  Defendants.       )
9                                   )
         ------------------------------------------------------------

10

11

12          BEFORE THE HONORABLE PAUL A. MAGNUSON
         UNITED STATES DISTRICT COURT SENIOR JUDGE

13

              **(JURY TRIAL PROCEEDINGS - VOLUME XX)**

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by mechanical stenography;
         transcript produced by computer.

```
 1    APPEARANCES:

 2    For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                              BY:  ALLEN A. SLAUGHTER, JR.
 3                                 LEEANN K. BELL
                                   MANDA M. SERTICH
 4                            300 South 4th Street, #600
                              Minneapolis, MN 55415
 5
                              DEPARTMENT OF JUSTICE
 6                            CIVIL RIGHTS DIVISION
                              BY:  SAMANTHA TREPEL
 7                            150 M Street NE
                              Washington, D.C. 20530
 8
       For Defendant          ROBERT M. PAULE, PA
 9     Tou Thao:              BY:  ROBERT M. PAULE
                              920 2nd Avenue South, #975
10                            Minneapolis, MN 55402

11                            PAULE LAW PLLC
                              BY:  NATALIE PAULE
12                            5100 West 36th Street
                              P.O. Box 16589
13                            Minneapolis, MN 55416

14     For Defendant          LAW OFFICE OF THOMAS C. PLUNKETT
       J. Alexander Kueng:    BY:  THOMAS C. PLUNKETT
15                            101 East 5th Street, #1500
                              St. Paul, MN 55101
16
       For Defendant          EARL GRAY DEFENSE
17     Thomas Kiernan Lane:   BY:  EARL P. GRAY
                              332 Minnesota Street, #W1610
18                            St Paul, MN 55101

19     Court Reporter:        RENEE A. ROGGE, RMR-CRR
                              United States District Courthouse
20                            300 South 4th Street, Box 1005
                              Minneapolis, MN 55415
21

22

23

24

25
```

1

<u>**I N D E X**</u>

                                                      <u>PAGE</u>
2   CLOSING ARGUMENT BY MS. SERTICH               3966
    CLOSING ARGUMENT BY MR. ROBERT PAULE          4034
3   CLOSING ARGUMENT BY MR. PLUNKETT              4079
    CLOSING ARGUMENT BY MR. GRAY                  4102
4   REBUTTAL CLOSING ARGUMENT BY MS. BELL         4128

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2                       **IN OPEN COURT**

3                       **(JURY PRESENT)**

4          (Defendants present)

5              THE COURT:  You may be seated.  Good morning,

6      everyone, and welcome back.

7              Please be advised that your colleague, Juror

8      No. 52, has been excused from further service with respect

9      to this case.

10             I'm going to ask that, first of all, Juror No. 60,

11     if you would slide to the far end over there, I'd appreciate

12     it.  Thank you.  We had a little conversation just as she

13     was coming in about being alone in the front row.

14             And then with that, Juror Number 70 -- let's see.

15     I need to check.  69.  Okay.  Juror No. 69, if you would

16     take the next seat over there.

17             Juror No. 70, if you'd take the first seat there.

18             And then the two of you back in the amen corner,

19     if you want to come up a row, why, you are welcome to do so.

20             Okay.  And incidentally, members of the jury,

21     please don't speculate or worry about why Juror No. 52 is

22     just not with us.  It was a matter that it was appropriate

23     that she be excused from further service.

24             And with that, we've heard all the testimony we're

25     going to hear in the case and we are now prepared for

```
 1    summation.

 2              I will recognize the government for summation.

 3    Ms. Sertich.

 4              MS. SERTICH:  May it please the court --

 5              THE COURT:  Proceed.

 6              MS. SERTICH:  -- counsel, members of the jury.

 7              In their custody.  In their care.  "Please, the

 8    knee on my neck."  "I'm through."  "I can't breathe,

 9    officer."  "Please, man, somebody help me."  "I can't

10    breathe."  "They're going to kill me."  "They will kill me."

11    "I can't breathe."  And then one last time, "Please, I

12    really can't breathe."

13              By the time George Floyd gasped out his final

14    words on May 25th, 2020, Officer Chauvin had already been

15    kneeling on him, pressing his knee into Mr. Floyd's neck for

16    four minutes and 40 seconds.  Make no mistake, this is a

17    crime.

18              By that time Defendant Thao had stood just a few

19    feet away for four minutes and 40 seconds staring right at

20    Officer Chauvin as he slowly pressed the air out of the

21    handcuffed and compliant man lying facedown on the ground

22    begging for his life.

23              By that time Defendant Thao had ignored Mr. Floyd,

24    who said 23 times while restrained on the ground, "I can't

25    breathe," begging, "Please," 16 times.
```

1              By that time Defendant Thao had also ignored the

2      pleas of a 61-year-old man in -- a 61-year-old man, a man in

3      his 30s, two teenage girls, and a 9-year-old girl, all of

4      who could see the obvious, that a man was dying right before

5      their eyes.

6              By the time George Floyd spoke his last words,

7      Defendant Thao had done nothing for four minutes and

8      40 seconds.  Actually, that's not quite true.  He had done

9      nothing to stop the crime happening in front of him, but he

10     hadn't actually done nothing.  He had chosen to argue with

11     and mock the people who were begging him to intervene.

12     "This is why you don't do drugs, kids."  And "He's talking,

13     so he's fine."

14             He had decided that, rather than tapping Chauvin

15     on the shoulder or shoving him off of George Floyd or even

16     just telling him, "That's enough, I got this," he would

17     argue with and belittle the people who were trying to get

18     him to do what the law, not to mention human decency and

19     common sense, required him to do, to stop the slow-motion

20     killing unfolding right in front of him.

21             We know Thao recognized something was wrong

22     because he upped the EMS call to a Code 3, but then never

23     told dispatch the important information that could have sent

24     fire rescue to the scene in two minutes, that there was a

25     person having trouble breathing.  He never did update that

1    information.  None of the officers did.

2         That was Defendant Thao.  By the time George Floyd

3    said his final words, Defendant Kueng had been crouching

4    shoulder to shoulder with Officer Chauvin for those same

5    four minutes and 40 seconds.

6         By that time Defendant Kueng had also ignored all

7    of those pleas.  He had also chosen not to tap Officer

8    Chauvin on the shoulder or ask him to move off of George

9    Floyd's neck.  But he, too, had not actually done nothing.

10   Nothing would have been bad enough.

11        Defendant Kueng had spent that time pressing

12   George Floyd's handcuffed wrist into his lower back while

13   Officer Chauvin pulled the fingers of that same hand right

14   in front of Kueng.

15        Defendant Kueng pressed George Floyd further into

16   the pavement and made it that much harder for Mr. Floyd to

17   reposition himself or to draw enough air into his lungs.

18   Kueng held that position for more than eight minutes.

19        And as the terrified bystanders begged and

20   pleaded, cried out repeatedly for any one of the defendants

21   to do something, anything, Defendant Kueng instead casually

22   picked gravel out of the tire in front of him and laughed

23   with Officer Chauvin, who mocked --

24        MR. PLUNKETT:  Misstates the evidence.

25        MS. SERTICH:  -- George Floyd's pleas by saying it

1     took George Floyd --

2              THE COURT:  This is final argument.  Overruled.

3              Go ahead.

4              MS. SERTICH:  -- mocked George Floyd's pleas by

5     saying that it took George Floyd a heck of a lot of oxygen

6     to keep talking.  As he told you, a little moment of levity

7     as his actions literally pressed the remaining oxygen out of

8     George Floyd's body and carbon dioxide caused George Floyd's

9     organs to fail.

10             And how about Defendant Lane?  By that moment,

11    when George Floyd said his final words, Defendant Lane had

12    also pushed George Floyd's legs down, on and off, but even

13    up to five minutes into the restraint and crouched just feet

14    away from Officer Chauvin, choosing not to stop the horror

15    unfolding right under his nose.

16             And you know that he affirmatively chose not to do

17    anything because you know, based on what he said out loud

18    and based on his training, what was going on in his head at

19    that moment.  He was thinking that George Floyd was in

20    distress, maybe he had excited delirium, and that if they

21    didn't roll George Floyd over onto his side, he could die.

22    You know what was going through his head because he said

23    bits and pieces of what he was thinking out loud.  "Roll him

24    on his side."  "I just worry about the excited delirium."

25             But even though he recognized and even gave voice

1    to the mortal danger George Floyd was in, he did nothing to

2    give Mr. Floyd the medical aid he knew Mr. Floyd so

3    desperately needed, medical care that he had the ability,

4    the authority, and the legal obligation to provide.

5            And then even at that point, when George Floyd

6    forced out his final words, the defendants were still only

7    halfway through their crime.  Even after the moment when

8    George Floyd moaned, "Please, I really can't breathe," these

9    three defendants stood by and watched their fellow officer

10   press the life out of him for another full minute and then

11   another and then another and then another, for another

12   nearly five minutes.

13           They sat by and chose to do nothing while George

14   Floyd stopped moving, lost consciousness.  They plainly knew

15   of Mr. Floyd's worsening condition, not only from their

16   front row seats on top of and right next to Mr. Floyd, but

17   also from the frustrated calls of the witnesses.

18           Defendant Lane continued to voice a concern,

19   agreeing with Bystander Alyssa Funari that George Floyd was

20   passing out and asked again, "Should we roll him on his

21   side?" and asked Defendant Kueng if he could find a pulse.

22           Defendant Kueng, still pressing George Floyd's

23   wrist into his back and holding George Floyd's buttocks and

24   legs down with his knee, checked for George Floyd's pulse

25   twice and said twice that he couldn't find one.

1         As you heard from emergency room physician

2    Dr. Bebarta, if you don't think you have a pulse, you assume

3    you don't have a pulse.  He said if they don't have a pulse

4    and they're not moving or not breathing, they are probably

5    pulseless.  It's a medical emergency.

6         Thao himself testified that at that point every

7    second counts and that even a minute of delay can diminish

8    the likelihood of survival.

9         In response to this obvious emergency, Defendant

10   Thao stood there and stared directly at George Floyd's

11   increasingly lifeless body for another two full minutes

12   after Mr. Floyd stopped speaking.

13        He then -- watch the videos; you will see this for

14   yourselves, particularly Darnella Frazier's video,

15   Exhibit 17, and Genevieve Hansen's video, Exhibit 19 -- he

16   then stood in the way of the bystanders' view of what was

17   happening to George Floyd, blocking their ability to provide

18   aid or see what was happening to him.  He taunted them and

19   ignored them when they addressed him by name and asked him

20   to give George Floyd aid or get his fellow officers to do

21   so.

22        But, as we've heard so often throughout this

23   trial, Kueng and Lane were new officers.  To those who have

24   suggested that it is just too much to expect of junior

25   officers that they stand up to Chauvin and suggest to him

3972

1       that he stop killing a man right in front of them, I have

2       this to say:  Charles McMillian, Alyssa Funari, Genevieve

3       Hansen, Donald Williams, Darnella Frazier, and her

4       nine-year-old cousin.

5               What the defense has suggested to you throughout

6       this trial is that it is just too much to expect a trained

7       officer with nine years experience under his belt and two

8       officers who just went through a year and a half of

9       training, one of whom had previous law enforcement

10      experience, to so much as say to Officer Chauvin, "Hey, man,

11      get your knee off his neck" or "That's enough, let up," or

12      even, "Sir, check the carotid pulse."

13              The defense wants you to accept that it is too

14      much to ask of them to say those things because in Thao's

15      case the defense position is it wasn't his job.  You have

16      heard law enforcement witness after witness reject that

17      idea.  It is every officer's job on scene.  They want you to

18      accept that in Kueng and Lane's case, it's too much to

19      expect them to do their duty and risk the disapproval of a

20      more experienced officer.

21              Let me be clear about this.  You do not have to

22      accept Kueng 's assertion that he believed Chauvin could

23      fire him.  Two other MPD officers have testified that field

24      training officers, let alone field training officers who are

25      no longer supervising a trainee, cannot unilaterally fire

 1    officers.

 2             But even if you credit his concern, let's be clear

 3    about what this means.  The defense's position is that it is

 4    just too much to expect police officers to do their duty and

 5    attempt to aid a man they placed in their custody when it

 6    means risking the disapproval of a fellow officer, even when

 7    the result is that someone dies.  That is what the position

 8    boils down to, and MPD policy and common sense will tell you

 9    to reject that.

10             They want you to accept that it is too much to ask

11    of them to say those things, even though it was not too much

12    for those regular people walking by, who saw exactly what

13    was happening, who recognized the direness of the situation

14    and who asked, then pleaded, then begged, then demanded that

15    the defendants do something, anything, to save George

16    Floyd's life.

17             Those civilians didn't have a badge.  They didn't

18    have other officers who could back them up.  Each civilian

19    knew when they stepped forward to question the police and

20    particularly when Defendant Thao gruffly ordered them not to

21    get involved, they knew these officers they were watching

22    had more power than they did, more authority than they did,

23    and could cause trouble for them.

24             But they still insisted, even though they, unlike

25    the defendants, had no affirmative duty to help George

1   Floyd; even though they, unlike the defendants, had never

2   sworn to keep the public safe; even though they, unlike the

3   defendants, were not trained as to exactly how to respond to

4   a situation like this; even though they, unlike the

5   defendants, were being ordered away from George Floyd; even

6   though they, unlike the defendants, were threatened with

7   Mace; even though they had no power --

8              MR. GRAY:  Judge, I object to this.  Threatened by

9   the defendants with Mace.  My client didn't.  She should

10  particularize the defendants.

11             THE COURT:  Sustained.

12             MR. GRAY:  Move that the jury be told to disregard

13  that.

14             THE COURT:  Disregard it.

15             MS. SERTICH:  Even though they had no power, no

16  authority, no obligation, they knew they had to do

17  something.

18             Darnella Frazier's little cousin was born right

19  around the time Thao took his oath and became a police

20  officer.

21             MR. ROBERT PAULE:  Your Honor, I'd object to this.

22  She is using a nontestifying witness to testify and drawing

23  on the jury's emotion by consistently referring to a

24  nine-year-old child.

25             THE COURT:  Sustained.

1          MS. SERTICH:  May I refer to her statements on the

2    video, Your Honor, the evidence on the record?

3          MR. ROBERT PAULE:  Your Honor, I would ask that

4    that last portion of Ms. Sertich's argument be stricken as

5    improper.

6          THE COURT:  Yeah, counsel, I just don't think that

7    the reference to that individual is appropriate or we don't

8    need that in the argument.

9          MS. SERTICH:  Not her statements in the video?

10          THE COURT:  That's right.

11          MS. SERTICH:  Instead, other than Lane asking a

12    few questions, questions that show he knew there was a

13    serious problem, these defendants did nothing to stop or

14    attempt to stop Derek Chauvin and none of them did a thing

15    to help George Floyd until after the ambulance arrived and

16    Mr. Floyd had been in cardiac arrest for more than five

17    minutes.

18          What the bystanders didn't know, but what you have

19    seen and heard, is that the officers were actually listening

20    to them, that as soon as Alyssa Funari said she thought

21    George Floyd was passing out, Defendant Lane said, "Yeah, I

22    think he's passing out," that when Genevieve Hansen and

23    Donald Williams demanded the officers take George Floyd's

24    pulse, Defendant Kueng immediately checked for a pulse and

25    told Chauvin and Lane he couldn't find one.

 1          What the bystanders could never have imagined, of

 2     course, is that the officers knew this, knew Mr. Floyd had

 3     passed out, couldn't find Mr. Floyd's pulse, and would

 4     choose to do nothing about it.

 5          As a result of the officers' actions and inaction,

 6     exactly what the bystanders warned them about happened, a

 7     human being, someone's son, father, friend, significant

 8     other, George Perry Floyd, Jr. --

 9          MR. ROBERT PAULE:  Your Honor, I'd object to this.

10     There's been no evidence elicited as to any of those things

11     that Ms. Sertich just said.  She's also appealing to the

12     jurors' prejudice by using the phrase "say his name."

13     Totally inappropriate.

14          MS. SERTICH:  Your Honor, there's evidence in the

15     record of him calling out to these people that I mentioned

16     while he's on the ground on the video that is admitted as

17     evidence.

18          MR. ROBERT PAULE:  Your Honor, that is not

19     accurate.  It misstates the evidence.

20          THE COURT:  The jury will recall the evidence that

21     was given with respect to Mr. Floyd's comments, and I think

22     that will end that matter.

23          Continue.

24          MS. SERTICH:  As a result of this action and

25     inaction, George Perry Floyd Jr. died a slow and tortuous

1     death over the course of nine minutes right there in front

2     of these defendants, underneath their knees, handcuffed,

3     unarmed, unresisting in broad daylight on a public street.

4            Now, as you heard from Judge Magnuson about a

5     month ago now, the indictment in this case contains two

6     counts, both of which charge deprivation of rights under

7     color of law in a slightly different way.

8            Defendants Thao and Kueng are charged in Count 2

9     with depriving Mr. Floyd's rights by failing to intervene to

10    stop Mr. Chauvin's use of unreasonable force.  And all three

11    defendants, Thao, Kueng, and Lane, are charged in Count 3

12    with depriving Mr. Floyd's rights through deliberate

13    indifference to his medical needs, which means that they

14    purposefully failed to provide medical aid to Mr. Floyd

15    while he was in their custody and care.

16           I'm going to go through the law of both counts

17    with you now and summarize the evidence that proves beyond a

18    reasonable doubt, and then some, that these defendants are

19    guilty.

20           I'll put this law up on the screen for you now as

21    we go through, but you will see these same instructions from

22    Judge Magnuson.  You will get a copy of the instructions to

23    use during your deliberations.  You will be able to go back

24    to them and read them yourselves.

25           For Count 2, failure to intervene, there are four

1    elements, four things the government must prove beyond a

2    reasonable doubt:

3              First, that the defendants deprived George Floyd

4    of a right, privilege, or immunity secured by the

5    Constitution or laws of the United States by failing to

6    intervene to stop Chauvin from using unreasonable force.

7              Second, that the defendants acted willfully, that

8    is, the defendants committed such act with a bad purpose or

9    improper motive to disobey or disregard the law,

10   specifically intending to deprive the person of that right.

11             The third element of Count 2 that the government

12   must prove is that the defendants acted under color of law,

13   meaning that at the time of the offense the defendants were

14   acting in their official capacity, in this case as officers

15   with the Minneapolis Police Department.

16             And fourth and finally, the government must prove

17   that bodily injury and/or death was a result of the

18   defendants' conduct.

19             I'm going to go through each of these four

20   elements with you, and I'm actually just going to take them

21   slightly out of order to knock out the easiest one first and

22   that's element three, that the defendants were acting under

23   color of law, acting in their official capacity at the time

24   of the crime.

25             This element is not in dispute.  The parties have

1    stipulated to this fact.  You heard my colleague, Ms. Bell,

2    read that stipulation into the record, and it is

3    Government's Exhibit 105.

4         And, of course, you saw that all the defendants

5    were in uniform and working as Minneapolis Police Department

6    officers that day.  Mr. Floyd recognized that, calling Kueng

7    and Lane "Mr. Officer" more than 30 times during their

8    interaction.

9         The first element -- or the third element, the

10   first we're talking about, is met.  We can check that one

11   off.  This element is the same for Count 3.  We'll talk

12   about that later.

13        So then we can go back to the first element of

14   Count 2, where you must determine whether the defendants

15   deprived George Floyd of a constitutional right by failing

16   to intervene.

17        Judge Magnuson will tell you that every person in

18   the United States has the right to be free from an officer

19   using unreasonable force against him.  And crucially for

20   this case, this right is violated not only by an officer who

21   personally uses unreasonable force, but also by any officer

22   who has knowledge of another officer's unreasonable force,

23   has the opportunity to intervene to stop it, and chooses not

24   to do that.  This element actually has four subelements to

25   prove, so I'm going to walk through each one to demonstrate

1       that the government has proven this element.

2              So the first part of this determination that you

3       see there next to the letter "A" is whether Officer Chauvin

4       used unreasonable force.  That factor wasn't seriously

5       questioned in this trial, so I won't spend much time on it.

6              You've learned that Officer Chauvin, like any

7       other officer, was permitted to use only that amount of

8       force that was reasonably necessary to control his arrestee.

9              Everyone who testified on this point, Inspector

10      and former commander of training Katie Blackwell, medical

11      support coordinator Officer Nicole Mackenzie, expert witness

12      Chief Timothy Longo, even defense expert Steve Ijames agreed

13      that there was a period of time while Mr. Floyd was still

14      conscious that Officer Chauvin's force was unreasonable and

15      that it continued until after the ambulance arrived.

16             According to defense expert Steve Ijames, it was

17      obvious beyond question.  He had never seen anything like it

18      in any department, and George Floyd was killed as a result

19      of this unreasonable use of force.

20             The first part of this constitutional violation

21      has been proven beyond a reasonable doubt.

22             The second part of the constitutional violation --

23      that's "B" on the screen -- requires the government to prove

24      that Defendants Thao and Kueng observed or otherwise knew

25      that Chauvin was using unreasonable force.  The answer to

1    this question is yes as to both defendants.

2           In terms of observing the force, we've already

3    discussed the front row seats that Defendants Thao and Kueng

4    had to Chauvin's obviously unreasonable force.

5           When Thao was on the stand, the defense played

6    only parts of his body-worn camera footage, up until about

7    8:21 p.m. and then they skipped ahead until about 8:26 p.m.,

8    avoiding more than five minutes.  You will have the video

9    showing these missing minutes, the video we watched over a

10   month ago now, as well as all the video --

11          MR. ROBERT PAULE:  Your Honor, I'd object to that

12   last comment as burden shifting and improper.

13          THE COURT:  Oh, I'll overrule.  It was over a

14   month ago.  Go ahead.

15          MS. SERTICH:  -- as well as all the video admitted

16   as exhibits in this trial.  They'll all be available to you

17   in the deliberation room.  Review the videos as much and as

18   often as you need to do, because they show and tell what

19   happened better than any testimony.

20          Review Defendant Thao's body-worn camera video,

21   Exhibit 9; review the video recorded by Darnella Frazier,

22   Exhibit 17; the Milestone video from across the street,

23   Exhibit 14.  Watch how for six whole minutes Thao stands

24   right there next to his partners staring at Chauvin while

25   he --

1          MR. ROBERT PAULE:  I'd object to this as

2     misstating the evidence.

3          THE COURT:  It's overruled.

4          MS. SERTICH:  He's staring at Chauvin while he

5     presses on George Floyd with his knees.  During that time

6     Thao stood staring at Chauvin while Chauvin pressed his left

7     knee into Mr. Floyd's neck and Mr. Floyd said he couldn't

8     breathe because of the knee on his neck and then stopped

9     speaking, stopped moving, and lost consciousness.

10          Two and a half minutes into the restraint Thao

11     questioned Mr. Floyd directly.  "What are you on?"  George

12     Floyd responded, "I can't breathe.  Please, a knee on my

13     neck."  Charles McMillian told Mr. Floyd right then to get

14     up and get in the car.  Mr. Floyd responded, "I will.  I

15     can't move."

16          Over six minutes into the restraint, Thao stepped

17     forward and faced the bystanders and from then up until the

18     time the EMS arrived this group of concerned citizens

19     provided Thao and Kueng with play-by-play commentary on what

20     Officer Chauvin was doing to George Floyd.  They said:

21     "You're stopping his breathing."  "Look at him."  "Get off

22     of him."  "He cannot breathe."  "He's not responsive right

23     now."  "Is he breathing right now?"  "You call what he's

24     doing okay?"  "He's not moving."  "He has not moved not one

25     time."  "Did they just kill him?"  "Check his pulse."

1     "Check the pulse."  "Do they have a pulse?"

2          Eight minutes into the restraint Alyssa Funari

3     cries, "You're still on him."  And then "You stand by your

4     coworkers, right?"  Those are your partners, right?"  At

5     about the same time Donald Williams tells Chauvin to get off

6     of --

7          MR. ROBERT PAULE:  Objection.  This violates the

8     confrontation clause as Mr. Williams did not testify.  It's

9     being offered for the truth of the matter asserted and is

10    improper.

11         THE COURT:  That I sustain.  He did not testify.

12         MS. SERTICH:  Your Honor, I'm just repeating his

13    words that are in evidence on the video.

14         MR. ROBERT PAULE:  Your Honor --

15         THE COURT:  It's overruled.

16         MR. ROBERT PAULE:  Your Honor, I would ask that

17    the jury be instructed to disregard Ms. Sertich's last

18    statement.

19         THE COURT:  I sustain that objection.  The jury

20    will disregard.

21         MS. SERTICH:  Thao, throughout this latter part of

22    the restraint, and you can go back and listen to Donald

23    Williams' words on those videos --

24         MR. ROBERT PAULE:  Your Honor, I object.  This is

25    a repeated objection.  It's totally inappropriate and it's

1    intentional, given the fact it was just repeated after the

2    court ordered her to not do that.

3              MS. SERTICH:  It goes to Mr. Thao's knowledge,

4    Your Honor, not to the truth of the matter.

5              THE COURT:  Okay.  Proceed.

6              MS. SERTICH:  Thao, throughout this latter part of

7    the restraint, heard them loud and clear.  He responded with

8    taunts and tried to hide the situation from their view.

9              During this time Kueng was shoulder to shoulder

10   with Chauvin and had a close-up view of Chauvin's knee on

11   Mr. Floyd's neck.  You can see it in Kueng's body-worn

12   camera video.  I'll play just --

13        (Video recording played)

14             That clip is from 30 seconds after Lane said

15   Mr. Floyd had passed out.

16             But you, as jurors, can also use your common sense

17   to determine that Kueng could see Chauvin's left knee.

18   While he was sitting at Mr. Floyd's waistline right next to

19   Officer Chauvin, Mr. Floyd's head was no more than a few

20   feet away from him.

21             In terms of his ability to observe the

22   unreasonable force, he heard Mr. Floyd say he couldn't

23   breathe because of the knee on his neck.  He could hear and

24   see and feel that Mr. Floyd stopped talking and stopped

25   moving.

1          He told Lane to just leave him when Lane asked

2    about rolling Mr. Floyd on his side.  He heard Lane say that

3    Mr. Floyd had lost consciousness and asked whether Mr. Floyd

4    had a pulse.  He twice checked for Mr. Floyd's pulse and

5    said he couldn't find one.

6          And, of course, the bystanders were also

7    indirectly telling Kueng what was happening.  Now, with

8    respect to those bystanders, Kueng testified he heard noise.

9    And when asked if he heard words, he claims he heard

10   expletives.

11         Watch his body-worn camera video, Exhibit 7;

12   review the transcript, Exhibit 7-A.  As soon as Alyssa

13   Funari yelled, "He's about to pass out," Lane responded,

14   "Yeah, he's passing out."  And, again, when off-duty

15   firefighter Genevieve Hansen started demanding a pulse

16   check, Kueng checked for a pulse.

17         Watch what he did at the time, not what he said on

18   the stand.  Listen to the video.  Kueng heard the

19   bystanders, and that's another way he had reason to know

20   about Chauvin's unreasonable force.

21         So the second consideration for failure to

22   intervene, that Defendants Thao and Kueng observed or

23   otherwise knew that unreasonable force was being used, has

24   been met.

25         The third part of this constitutional violation --

1    that's "C" up on the screen -- asks whether Defendants Thao

2    and Kueng had the opportunity and means to intervene to stop

3    the unreasonable force.

4         They had the opportunity and the means.  They were

5    police officers with guns and badges, specialized training,

6    and fellow officers and supervisors that they could call on

7    the radio.  They could speak.  They could ask questions.

8         This wasn't a split second use of force, like a

9    gunshot wound or a kick to the head, where the opportunity

10   to intervene in the force is over before onlooking officers

11   have a chance to jump in and make things right.  Not split

12   second.  Not 30 seconds.  Not a minute.  Several minutes,

13   569 seconds.

14        MR. ROBERT PAULE:  Your Honor, I'd object.  This

15   violates *Graham vs. Connor*.

16        THE COURT:  It's overruled.  Final argument.  You

17   may argue.

18        MS. SERTICH:  Defendants Thao and Kueng watched

19   and listened to George Floyd's condition slowly deteriorate

20   while Derek Chauvin pressed his knee into George Floyd's

21   neck, and they were right there next to him, within speaking

22   distance, within touching distance, within distance to tap

23   Mr. Chauvin's shoulder and tell him, "He's not okay, we need

24   to move him now."  They had the ability, authority,

25   opportunity, means, and duty to intervene for more than nine

1    minutes.

2              And while we're talking about the opportunity to

3    intervene, I want to be clear about something.  You've heard

4    the defense suggest over and over during this trial that

5    those bystanders are somehow to blame because they made the

6    scene unsafe.  As Genevieve Hansen testified, the only

7    person that scene was unsafe for was George Floyd.

8              Every day in the United States hundreds of

9    thousands of police officers and even hundreds of officers

10   working just for the Minneapolis Police Department go to

11   work and act with courage.  It is incredibly important work.

12   What could be more important than protecting our community

13   from possible harms?

14             Officers literally run into danger, into

15   situations with active shooters, into violent domestic

16   disputes, into people who want to cause them harm.  They

17   perform jobs under incredible stress.  They act with almost

18   unbelievable courage.  This case isn't about those officers.

19             In this case these bystanders saw a violent crime

20   being committed by a police officer.  They begged police

21   officers to do something about it, which is a normal

22   reaction to seeing a crime.  They are not yelling threats.

23   They're yelling:  "He's not talking."  "He's passing out."

24   "Check his pulse."

25             And the police officers stood by and watched doing

1   nothing as the perpetrator of the crime, who happened to be

2   a fellow officer, pressed a knee into a man's neck until

3   slowly, minutes later, he died.

4           And even while watching a police officer kill a

5   man in front of them, these good Samaritans stayed

6   non-violent and compliant.  It seems the defense wants you

7   to think that the bystanders should have seen what they saw,

8   done nothing, and walked away.

9           That can't be the right answer, not in the United

10  States.  In this country we are not prohibited from

11  questioning the police or other public officials.  Each

12  citizen has the right to do so.  Nobody is above the law.

13          Maybe the reason the defense wants to suggest that

14  the bystanders should have looked the other way is because

15  that's what each of the defendants did.

16          MR. PLUNKETT:  Burden shifting.  Objection.

17          MR. GRAY:  Objection.

18          THE COURT:  I sustain the objection.

19          MS. SERTICH:  Equally nonsensical is the

20  defendants' claim that the group of bystanders was somehow

21  threatening to --

22          MR. PLUNKETT:  Objection.  Disparaging.

23          MR. GRAY:  Objection, Your Honor.  My client never

24  claimed that.  She says "defendants."  My client is not even

25  involved in this.

1          THE COURT:  I think it's repetitious, but I'll let

2     you continue, counsel.

3          MS. SERTICH:  We're talking about a group of

4     unarmed, upset, but well-behaved bystanders.  We're talking

5     about minors, a sworn firefighter, and a 61-year-old man, a

6     no doubt vocal but compliant man, who literally crossed his

7     hands in front of him when he stepped off of the curb, who

8     pulled others back onto the curb at Defendant Thao's

9     direction.

10          You heard from a number of law enforcement

11     officers in this case, Inspector Blackwell and Lieutenant

12     Zimmerman to name just two, that the bystanders were not a

13     threat.  Inspector Blackwell noted they were complying with

14     orders to back up onto the sidewalk.  Lieutenant Zimmerman

15     told you that, based on the hundreds and hundreds of crime

16     scenes he's been to, these bystanders were actually trying

17     to help Mr. Floyd to be able to breathe with their

18     suggestions.  Even defense expert Ijames told you the

19     officers on scene did not appear to be threatened by these

20     bystanders.

21          You know in a bunch of ways that the defendants

22     weren't actually scared of the bystanders.

23          First, you have the video where no one looks the

24     least bit scared.  You can watch the videos and see that for

25     yourselves.

1          Second, you have the defendants' actions.

2    Defendant Thao mocked the bystanders.  Again, Defendant

3    Kueng picked gravel out of a tire.  Defendant Lane squatted

4    casually, arms dangling loosely over his thighs.

5          Even Kueng told you from his side of the squad car

6    he simply assumed the scene might not be safe because

7    Officer Chauvin didn't do anything.  Yet, he never said a

8    word to ask Chauvin about it.

9          Defendant Thao straight up told you the scene was

10   safe enough to render medical aid to Mr. Floyd.

11         And, finally, you know they weren't threatened

12   because none of the defendants did any of the things

13   officers do when they are threatened.  They didn't call for

14   backup or Thao could have asked Lane, who stand 6'7" tall

15   and was serving no purpose near George Floyd's feet, to

16   come --

17         MR. ROBERT PAULE:  Your Honor, I'd object.  That

18   violates the pretrial order and she's shifting the burden.

19         THE COURT:  I sustain that.  You can't do that,

20   counsel.

21         MR. ROBERT PAULE:  Would note the record for

22   prosecutorial misconduct repeatedly during the closing

23   argument.

24         THE COURT:  Noted.

25         Continue.

```
 1              MS. SERTICH:  The truth is Thao didn't need

 2     help --

 3              MR. ROBERT PAULE:  I'd object to the use of the

 4     word "truth."  No one knows what the truth is or is entitled

 5     to it.  That is totally improper.

 6              THE COURT:  Overruled.  It's final argument.

 7              MS. SERTICH:  The truth is Thao didn't need help

 8     because the bystanders weren't a threat.  Kueng told you as

 9     much from the stand.

10              The defendants never informed EMS that the scene

11     was not Code 4, meaning safe, and did not warn EMS that

12     there was any danger before or upon their arrival.  Kueng

13     testified he didn't feel it was necessary for him to do

14     anything to assist Thao as the paramedics arrived on the

15     scene.  And the paramedics were, in fact, able to safely

16     load Mr. Floyd onto a stretcher and get him in the

17     ambulance.

18              The defendants never believed that these

19     bystanders were a threat.  The people standing there were,

20     in fact, doing more than the officers.  And that's the

21     problem with this scene.  The officers, and not the

22     bystanders, should have been doing everything in their power

23     and authority to stop the unreasonable force in front of

24     them.

25              MR. GRAY:  Judge, I object to this.  My client is
```

1    not charged with intervention and she keeps including "the

2    officers."  She can separate them by --

3              THE COURT:  Well, counsel, I think it's very clear

4    that there's a Count 2, there's a Count 3.  To the best of

5    my knowledge, she's dealing with Count 2 and your client is

6    not charged in Count 2.

7              MR. GRAY:  Thank you.

8              THE COURT:  Continue.

9              MR. PLUNKETT:  Objection.  Burden shifting too,

10   Your Honor.

11             THE COURT:  It's overruled.

12             MS. SERTICH:  Again, watch the video.

13        The bystanders only really got loud when George

14   Floyd was transferred with no pulse and not breathing, head

15   hanging limply to the side onto a stretcher.  Even then was

16   Thao concerned or threatened when they were at their most

17   agitated?

18     (Video recording played)

19             No.  He turned his back on them.  They all did.  A

20   reasonable officer would not turn his back on a threat.

21             The third part of this second element has been

22   proven beyond a reasonable doubt.  Kueng and Thao had the

23   opportunity and the means to intervene in Chauvin's use of

24   force.

25             Now, the last part of this element, part "D" on

1    the screen, requires you to consider whether Defendants Thao

2    and Kueng failed to take reasonable steps to intervene to

3    stop the unconstitutional force.

4            That's easy, even though it was not easy to watch,

5    because neither of these defendants took any steps, not one,

6    to even try to get Mr. Chauvin off of Mr. Floyd.  You've

7    seen the video.  Not one.  Not one statement.  Not one

8    gesture.  Not one physical intervention.

9            The only officer who said anything at all,

10   Defendant Lane, isn't charged in this count.  And when

11   Defendant Lane asked for the first time if they should roll

12   Mr. Floyd on his side, Kueng shot him down.  He said, "No,

13   just leave him."

14           Those are the four parts of this constitutional

15   violation and that is how you know the evidence proves

16   Defendants Thao and Kueng violated George Floyd's right to

17   be free from Officer Chauvin's use of unreasonable force,

18   the second element of Count 2.

19           Also keep in mind every police officer has their

20   own independent duty to intervene.  That makes sense,

21   because it doesn't help the person in custody if everyone

22   can point their finger and say later it was someone else's

23   responsibility, like here if Thao tried to argue it was

24   Kueng and Lane's duty because they're sitting right there

25   next to Officer Chauvin or if Kueng tried to say his duty to

1    intervene goes away because he heard Chauvin rebuff Lane's

2    questions.  The responsibility is on them all.  They all

3    have to act.  The constitutional duty to act applies to them

4    individually and independently.

5           Also keep in mind that an officer has a duty to

6    intervene regardless of rank or seniority.  Now, that's not

7    really a concern with respect to Thao.  He's right there.

8    He's experienced.  He's Chauvin's partner.  He certainly had

9    the means to save his partner from himself.

10           But what about Kueng?  You heard from Lieutenant

11    Zimmerman, from Inspector Blackwell, from Officer Mackenzie,

12    from Chief Longo, even from defense expert Steve Ijames

13    everyone has the duty to intervene.  It's right there in the

14    MPD policy.

15           And the MPD encouraged that kind of behavior

16    early, at the academy, remember, by telling academy

17    recruits, like Kueng, that they would be responsible for the

18    actions of their co-recruits and actually both their actions

19    and their inaction at the academy before they were even on

20    the streets.

21           And, yes, the MPD policy and procedures manual is

22    more than 500 pages long, but the recruits got a smaller

23    selection in that academy handbook, just 30 pages selected

24    for the recruits as the most important to learn.  And what

25    was included?  Use of force, duty to intervene.  And then

1    they discussed it with the recruits and used scenario-based

2    training to emphasize the communication that has to happen

3    among a team of officers using force.

4           Inspector Blackwell told you that their final

5    scenario at the academy involved a fight with five suspects,

6    and the main point of this scenario was for the recruits to

7    communicate with one another.

8           And so as soon as they got a suspect into custody,

9    they had to roll the suspect over on their side and

10   communicate with the other recruits on the scene about what

11   to do next.  And they had to keep repeating that strategy

12   with each suspect until the scene was controlled and safe.

13          Kueng also should be expected to intervene because

14   he'd been trained on how to intervene when someone is

15   committing a crime.  He had been trained on how to gain

16   compliance when someone isn't doing what they're supposed

17   to.  That starts with presence and then moves to verbal

18   commands and then moves to physical contact.

19          He practiced those during his FTO period when he

20   went on about 185 calls for service, including calls -- and

21   you all heard about the details of one -- where Kueng had to

22   work with other officers to restrain a violent person and

23   attempted to get that person up off the ground, even while

24   the person was still kicking.

25          Mr. Chauvin was the same rank, officer, as the

1    defendants here.  It makes no difference that an officer has

2    19 years on the job with lots of experience on the street or

3    if the officer has five months on the job like Defendant

4    Kueng, whose training is still fresh in his head.

5         As Lieutenant Zimmerman told you, when we take our

6    oath to be police officers, when they pin that badge on us,

7    it doesn't mean that you get a free pass for a day or a week

8    or six months or a year.  It means that you're responsible

9    for a person's safety, just as much as I would be or the

10   chief of police would be.  We all take the same oath.

11        And you know what?  That makes sense.  When

12   someone calls the police, they don't get to ask for a

13   19-year veteran.  They're asking for a sworn officer,

14   someone with the authority to enforce the laws the way they

15   can't on their own.

16        When an officer takes on that responsibility, they

17   assume all of the responsibilities, the duties that come

18   with it.  They don't get to pick and choose, follow some

19   obligations and not others, or to protect people in custody

20   only when a new officer is on scene, but not when an

21   experienced officer shows up.  The laws of the United States

22   simply do not permit experienced or new police officers to

23   violate the rights of the people in their custody.

24        And one other thing.  You've heard a lot about

25   whether Officer Chauvin controlled the scene.  Everyone,

1    including the defendants themselves, agreed that controlling

2    a scene doesn't change the duties of the noncontrolling

3    officers.

4            But look and listen carefully what Officer Chauvin

5    says and also to how little he says over the course of nine

6    and a half minutes, how Kueng rebuffs Lane when Lane first

7    asks if Mr. Floyd should be rolled on his side.  Officer

8    Chauvin is not ordering these defendants around.  He barely

9    talks to them.

10           And you don't need training to know that niceties,

11   like the need to call someone "sir," do not trump a human

12   life.  You just need plain old common sense and plain old

13   human decency.  The officers knew that George Floyd couldn't

14   breathe, didn't have a pulse, and was dying.

15           The defense has suggested that it was difficult or

16   uncomfortable for newer officers to question the actions of

17   Chauvin, but this argument simply means that they balanced

18   the discomfort of questioning a colleague against protecting

19   the safety of a man in their custody and care, and then made

20   the choice not to upset their colleague rather than do their

21   duty, even though that choice resulted in the death of a

22   human.

23           The government has proven beyond a reasonable

24   doubt that the defendants violated George Floyd's

25   constitutional rights by failing to intervene, which is the

1    first element of Count 2.

2            The next element to address is whether the

3    government has proven the defendants acted willfully,

4    meaning they acted with a bad purpose or improper motive to

5    disobey or disregard the law, specifically intending to fail

6    to do what the law requires.  What this means is that the

7    defendant has to intentionally fail to intervene knowing

8    that the law requires him to intervene.

9            This means the government must prove that Thao and

10   Kueng knew that failing to intervene was wrong, but they

11   failed to do it anyway.  In other words, they knew better.

12           Don't get tripped up by the term "bad purpose."

13   It is a bad purpose for an officer to know his duty and

14   decide not to act.  If you have kids, you know what

15   "willfulness" means.  It's not complicated.  They know it's

16   wrong and they do it anyway.  That's the bad purpose.  They

17   don't have to intend a tragic outcome and they don't have to

18   wish someone harm.

19           Here's something important to keep in mind.  In

20   order to prove that the defendants acted willfully, the

21   government does not have to show that the defendants acted

22   with any ill will towards George Floyd or even that they

23   intended to hurt him.

24           I wanted to repeat this because you should keep

25   this in mind when defense counsel is making their closing

1     arguments.  The government has not alleged and does not need

2     to prove any ill will towards George Floyd.

3             For Count 2 the government has to prove the

4     defendants knew the force Officer Chauvin was using was

5     unreasonable and that they had a duty to stop it and yet

6     they chose, for whatever reason, to ignore that duty.

7     That's willfulness.

8             And willfulness is a state of mind, which means

9     that for this element you have to figure out what was in the

10    defendants' heads.  There are a few ways to figure out

11    what's going on inside an officer's head.

12            Sometimes you can tell by what he does or doesn't

13    do or what he does or doesn't say.  And another way you can

14    figure out what's in an officer's head is to look at the

15    training he received and the policies he agreed to.  You can

16    figure out what was in his head by looking at the

17    information that was put in his head during training.

18            Here, the defendants from their training very well

19    knew they were required to intervene in an unreasonable use

20    of force.  They chose not to intervene.  They acted

21    willfully.

22            You heard from Chief Kelly McCarthy of the

23    Minnesota POST Board that the duty to intervene is one of

24    those core learning objectives that's so important, they

25    bring it up through all of the officers' education.

1      And Defendants Thao and Kueng received explicit

2   training on the duty to intervene as well.  Their decisions

3   in this case certainly violated MPD policy, which is proof

4   of their willfulness.

5          MR. PLUNKETT:  Objection.  Improper statement.

6          THE COURT:  It's overruled.

7          MS. SERTICH:  As you saw --

8          THE COURT:  Continue.

9          MS. SERTICH:  -- MPD policy sets forth a clear use

10   of force policy that requires officers to use the amount of

11   force that is objectively reasonable in light of the facts

12   and circumstances known to the officer at the time the force

13   is used.  This is just the beginning of that policy, you

14   might remember.  As you may recall, the sanctity of life is

15   of paramount concern.  It is one of the purposes or

16   cornerstones of the policy.

17          The MPD policy and procedure manual also clearly

18   sets forth these defendants' duty to intervene.  It shall be

19   the duty of every sworn employee present at any scene where

20   physical force is being applied to either stop or attempt to

21   stop another sworn employee when force is being

22   inappropriately applied or is no longer required.

23          You heard testimony from Inspector Blackwell that

24   Kueng received training on this point in the year prior to

25   the killing of George Floyd while he was training at the

 1    academy.

 2          Thao also learned of the formalized duty to

 3    intervene as part of MPD policy when it was added to the

 4    policy and procedural manual in 2016.  He was also trained

 5    on the policy during defensive tactics refresher courses in

 6    2018 and 2019.

 7          Take a close look at that policy again.  Every

 8    sworn employee.  There are no exceptions here, not for

 9    officers of different ranks, ages, or seniority.  The

10    defendants knew this.  They understood it.

11          One of the purposes of this policy, as we heard

12    from the law enforcement witnesses in this case, is to

13    protect other officers from themselves in challenging

14    situations.  Why would that not apply to our more junior

15    officers?

16          Kueng told you he knew he had the duty to

17    intervene, but he didn't intervene in part because he didn't

18    know whether the scene was safe.  I understand why he would

19    say that now, but we've already discussed what he said and

20    did that day that make it clear he and the other officers

21    did not feel that way on May 25th, 2020.

22          Kueng also told you he didn't intervene because he

23    didn't know the force was unreasonable.  Derek Chauvin

24    pressed his knee into George Floyd's neck for nine and a

25    half minutes.  Kueng testified he didn't recognize the force

1    as unreasonable because he believed Chauvin could be using a

2    leg to neck restraint that's mentioned in MPD policy but

3    that he and the other officers were never trained to use.

4          But it does not matter whether Kueng recognized

5    this leg restraint as part of MPD policy or not because, as

6    he was trained at the academy, neck restraints of any kind,

7    as described in MPD policy and during training these

8    defendants actually received, including hands-on,

9    scenario-based training, can only be used on subjects who

10    are actively resisting, period.

11          Active resistance is when a person engages in

12    action to make it more difficult for officers to achieve

13    actual physical control.  Again, review the video evidence

14    in this case.  The three officers atop Mr. Floyd had

15    physical control of Mr. Floyd very early in the restraint,

16    and so they knew from training the use of any neck restraint

17    after that time, based on the policy and based on their

18    training, is unreasonable, regardless of the exact technique

19    being used, arm, leg, doesn't matter, and regardless of the

20    amount of pressure that was being applied.

21          And the scenario-based drills these officers had

22    on the use of neck restraints had, consistent with MPD

23    policy, trained them that when an officer uses a neck

24    restraint and causes someone to go unconscious, the officer

25    must take immediate steps to assess the person's condition

 1    and aid a person to bring them back to consciousness.

 2              Here, Kueng could see the exact opposite.  Chauvin

 3    tipped kneeling on Mr. Floyd, keeping him unconscious.

 4    Chauvin's unreasonable force was obvious and inexcusable.

 5    The only people who have suggested otherwise are the

 6    defendants, and their self-interest is obvious.

 7              MR. PLUNKETT:  Objection.  Burden shifting.

 8              THE COURT:  Sustained.

 9              MS. SERTICH:  Everyone else, from children on the

10    scene, to the defense's expert, and everyone in between,

11    acknowledged that Chauvin's force was indefensible.

12              MR. ROBERT PAULE:  Your Honor, I'd object on

13    burden shifting and the continuing, continuing referring to

14    a juvenile witness who has not testified.

15              MS. SERTICH:  We have many other juveniles on the

16    scene.

17              THE COURT:  Counsel, there were multiple people

18    that were under the age of 18 at the time of this.  So to

19    the one person, yes, I sustain.  To the other people, I'd

20    overrule.  In the meantime, it's final argument.  Let's

21    continue.

22              MS. SERTICH:  Thank you, Your Honor.

23              Defendant Thao said he didn't intervene because he

24    trusted the other officers on scene to do the right thing.

25    His argument completely undermines the point of

1    intervention.

2            He was trained that when you see something that

3    doesn't look lawful, you have to do something about it and

4    not blindly follow another officer's judgment.  And, by the

5    way, he could see that the other officers on the scene were

6    not doing the right thing.

7            MR. ROBERT PAULE:  I'd object to that as

8    misstating the facts, Your Honor.

9            MR. GRAY:  Object to that, Your Honor.  It

10   includes my client --

11           THE COURT:  It's overruled.  It's final argument,

12   counsel.  Let her argue.

13           MS. SERTICH:  The defendants voluntarily and

14   intentionally chose not to act in this case, contrary to

15   their training.  The government has proven their willfulness

16   beyond a reasonable doubt.

17           That brings us to the fourth and final element of

18   Count 2.  As to failure to intervene, the government must

19   prove and has proven in this case that when the defendants

20   failed to intervene, George Floyd suffered bodily injury

21   and/or died as a result of the defendants' conduct.

22           During your deliberations, if you find the

23   defendants guilty of Count 2, that will just be based on the

24   bodily injury and then you will have the opportunity on the

25   verdict form to indicate whether the offense also resulted

1    in the death of Mr. Floyd or, as has been proven over the

2    past several weeks, both bodily injury and death.

3           Bodily injury is easy to figure out.  You will see

4    in the instructions it means anything from a cut or

5    abrasion, to physical pain, to impairment of a bodily organ.

6           You saw overwhelming evidence of injury to George

7    Floyd in this case that was caused by the force when he was

8    restrained on the ground, from his cries of pain, to his

9    abrasions that Dr. Baker told you were consistent with being

10   pressed against the concrete, to the impairment of his

11   airway, lungs, and eventually heart and brain while the

12   officers compressed his body.

13          For Count 2 Judge Magnuson will instruct you that

14   death results from the constitutional violation where

15   Mr. Floyd's death was a foreseeable result of the

16   constitutional violation.  You should note here that the

17   government does not have to prove that the defendants

18   intended for Mr. Floyd to die.

19          The medical examiner who conducted the autopsy in

20   this case, Dr. Baker, determined that Mr. Floyd died from

21   cardiopulmonary arrest, complicating law enforcement subdual

22   restraint and neck compression.  In layman's terms,

23   Mr. Floyd died because his heart and lungs stopped working,

24   and the immediate cause was being subdued and then

25   restrained with a neck restraint by law enforcement.

1      Dr. Baker said Mr. Floyd's underlying health

2    conditions played a contributing role, but were not the

3    immediate cause of death.

4      He also deferred to a pulmonologist about whether

5    the partial blockage of an airway and the inability of a

6    person to fully expand their chest cavity could cause

7    someone to die by asphyxiation and deferred to a

8    toxicologist about whether the drugs in Mr. Floyd's system,

9    fentanyl and methamphetamine, would have been enough to kill

10   someone with Mr. Floyd's history.

11     He classified the death as a homicide, meaning the

12   actions of another person or persons were involved in

13   causing Mr. Floyd's death.

14     You heard the testimony of medical care providers

15   and experts during this trial, Dr. Systrom and Dr. Bebarta,

16   physicians whose lives' work revolve around the lungs and

17   the heart, toxicology and resuscitation.

18     What you learned from them is that George Floyd

19   died while being restrained on the ground and that he died

20   from asphyxiation because of the unreasonable force, the

21   obstructive and restrictive compression that prevented him

22   from getting sufficient oxygen.

23     Over the course of the restraint, George Floyd was

24   deprived of oxygen because his body was compressed and

25   restricted in a way that didn't allow him to take in and use

1    sufficient oxygen to keep his brain functioning and his

2    heart beating.

3            That deprivation came from being held down on

4    concrete with his arms handcuffed behind his back; from

5    Chauvin's knees on his upper airway and posterior chest

6    wall, which partially blocked his airway and prevented his

7    chest and diaphragm from expanding; from Defendant Kueng's

8    downward pressure on Mr. Floyd's wrist, which pushed

9    Mr. Floyd's forearm into his back.

10           What you can conclude is that while Officer

11   Chauvin's actions, along with the actions of Dr. Kueng

12   [sic], caused these issues, the failure to intervene then

13   also resulted in this death.

14           You heard from Dr. Systrom that George Floyd did

15   not die from a heart event that day and would not have died

16   from a heart event that day had he not been restrained on

17   the ground by the officers.

18           You heard from Dr. Bebarta, the emergency room

19   physician and toxicologist, that George Floyd did not die

20   from a drug overdose that day and would not have died from a

21   drug overdose without the actions and inaction of these

22   defendants.

23           A key measurement taken in the ambulance,

24   Mr. Floyd's end-tidal carbon dioxide level, was almost

25   double the normal level, and this is scientific and

1    measurable proof that Mr. Floyd died from low oxygen.

2          While it has been a few weeks since evidence from

3    these experts was presented to you, you will recall that

4    none of these facts or their conclusions were seriously

5    contested.

6          MR. PLUNKETT:  Objection.  Burden shifting.

7          THE COURT:  That's overruled.

8          MS. SERTICH:  The government has presented you

9    with proof beyond a reasonable that Officer Chauvin's

10   unreasonable force resulted in both -- I'm sorry.  The

11   government has presented you with proof beyond a reasonable

12   doubt that the defendants' conduct in failing to intervene

13   in Officer Chauvin's unreasonable force resulted in both

14   bodily injury to and the death of George Floyd.

15         All four elements of Count 2 have been met.

16   Defendants Thao and Kueng are guilty of the crime charged in

17   Count 2.

18         That brings us to Count 3, deliberate

19   indifference, for which there are also four elements, four

20   things the government must prove beyond a reasonable doubt

21   as applicable to all three defendants, Thao, Kueng, and

22   Lane.

23         Again, we'll address that third element first,

24   that the defendants acted under color of law, which is the

25   same as Count 2.  Just as in Count 2, you know the element

1    is satisfied because the parties have stipulated to it.

2            Now, moving back up to the first element, the

3    government must again prove that defendants deprived George

4    Floyd of a right secured by the Constitution of the laws of

5    the United States, but for Count 3 this is a different

6    constitutional right.

7            Count 3 charges all three officers with a

8    constitutional violation called deliberate indifference or

9    the failure to provide Mr. Floyd with medical aid.  A police

10   officer violates the Constitution when he or she

11   deliberately denies or delays critical medical care to a

12   person in police custody.

13           Like the constitutional violation in Count 2, this

14   one also has some subelements that we have to go through.

15           First, the government must prove, in "A" up on the

16   screen there, that Mr. Floyd had an objectively serious

17   medical need.

18           Judge Magnuson will tell you that a serious

19   medical need includes a need that is so obvious that even

20   people with no formal medical training would recognize that

21   care is required.  So obvious, say, that a teenager can

22   recognize it.

23           Here, there was no doubt that George Floyd had a

24   serious medical need.  That evidence was overwhelming.  He

25   couldn't breathe, as the officers heard from both him and

1    the bystanders.  He passed out, as noted by Defendant Lane.

2    Eventually Kueng couldn't find a pulse.  Mr. Floyd went into

3    cardiac arrest and died.

4            The first part of this element has been met.

5            The second part of deliberate indifference --

6    that's "B" on this list -- is that the defendants knew of

7    the serious medical need.  You can use your common sense on

8    this point, like any other.

9            Kueng testified that he couldn't say whether he

10   thought Mr. Floyd had a serious medical need while Mr. Floyd

11   was restrained on the ground.  As jurors, you get to decide

12   what testimony you believe or do not believe.

13           You should not believe Kueng's testimony on this

14   point because, as he also testified, he thought it was

15   possible Mr. Floyd was suffering from excited delirium,

16   which he had been trained was a potentially dangerous

17   problem.

18           He was aware Mr. Floyd was initially saying he

19   couldn't breathe.  He heard Mr. Floyd's talking slow and

20   then observed that Mr. Floyd stopped talking.  He observed

21   that Mr. Floyd stopped moving.  He heard Lane say that

22   Mr. Floyd had lost consciousness and then, of course, he was

23   unable to find a pulse.

24           As jurors, you can use your common sense to

25   consider this testimony.  Anyone, anyone can recognize that

1    someone with a knee on their neck who has slowly lost the

2    ability to speak, stopped moving, and gone unconscious has a

3    serious medical need.

4            Kueng had to have felt Mr. Floyd grow weaker and

5    weaker and then limp underneath him.  Any person, even

6    without checking a pulse and without any training, let alone

7    emergency medical responder certification, can see that

8    would be a serious medical need.

9            Add to that the fact that a person's pulse cannot

10   be found, for any person, any reasonable person trained or

11   untrained, that is an emergency requiring immediate action.

12           As Genevieve Hansen said on the scene that day,

13   the fact that they aren't checking for a pulse and doing

14   chest compressions at that point is on another level.

15           Thao was also aware of the serious medical need

16   because, although while he told you Mr. Floyd's trachea was

17   being protected by the ground, I think we heard that right,

18   he thought Mr. Floyd's trachea was being protected by the

19   ground, he stood for six minutes and stared at Officer

20   Chauvin and George Floyd while Mr. Floyd said he couldn't

21   breathe, fell silent, stopped moving, and then was rendered

22   unconscious.

23           He was right there, not yet curbside facing the

24   bystanders, for more than six minutes.  Then when he faced

25   the bystanders, they repeatedly told him in all the ways

1    we've discussed that George Floyd was in serious medical

2    need.

3            Charles McMillian, 61 years old and out being

4    nosey in the neighborhood, as he described it, told you that

5    he was trying to tell the officers that what they were doing

6    was wrong because he could tell things weren't right with

7    Mr. Floyd and that he could not breathe.

8            This raises another point that may seem obvious.

9    To the extent Thao turned away from Officer Chauvin and

10   Mr. Floyd after six minutes, he already knew something was

11   very wrong.  He saw Mr. Floyd was unconscious, and he was

12   told that it was getting even worse.  Thao does not get a

13   pass on knowledge of Mr. Floyd's serious medical condition

14   by actively attempting to avoid it.

15           Now, in addition to those same reasons we know

16   Kueng was aware of Mr. Floyd's serious medical needs, we

17   know Lane was aware of Mr. Floyd's serious medical needs,

18   but also because he talked about it.  He expressed concern

19   about excited delirium and twice asked whether Mr. Floyd

20   should be rolled on his side.

21           When Lane testified, he tried to scale back his

22   concern for Mr. Floyd's serious medical need to make it seem

23   like he possibly didn't have knowledge of those medical

24   needs, but you saw what his belief was in those moments on

25   top of Mr. Floyd.

1          The second part of deliberate indifference, that

2     the three defendants actually knew Mr. Floyd had a serious

3     medical need, has been proven in this case.

4          The third party of the constitutional violation,

5     which is part "C" up on the screen, is that the officers

6     failed to take reasonable measures to address Mr. Floyd's

7     serious medical need, which is clearly met here because they

8     did nothing to render medical aid during the time Mr. Floyd

9     lay on the ground.

10          Jenna Scurry, the dispatcher, who could tell

11     something was wrong after watching the events unfold on a

12     small screen in her office, testified that none of the

13     officers, which would include Lane, who made the original

14     call to EMS, and Thao, who upped the request to the more

15     urgent Code 3, did not request fire and rescue.

16          Contrary to their training and common sense, they

17     did not tell dispatch the reason for the upgrade to the

18     Code 3 emergency, never said the patient was having

19     difficulty breathing, never said the patient was

20     unconscious, never said they couldn't find a pulse, even

21     though the radios are right there on their shoulders.  Derek

22     Smith told you that in this case he should have been told

23     why there was a change from Code 2 to Code 3.

24          And had the officers even taken that simple step,

25     Jenna Scurry told you the Minneapolis Fire Department would

1   have been on the scene earlier.  Fire Captain Jeremy Norton

2   and Firefighter Genevieve Hansen told you they could have

3   started CPR on the ground and the paramedics could have

4   arrived prepared to deal with a cardiac arrest.  Instead

5   they responded to a Code 3, mouth injury.

6              As you heard from a number of witnesses, including

7   defense expert Steve Ijames, the most simple form of medical

8   aid, placing Mr. Floyd in the side recovery position, should

9   have been performed before Mr. Floyd fell unconscious.  Any

10  of these three defendants could have taken that step and

11  saved George Floyd's life before his condition moved from

12  serious to critical.

13             As you also heard from Inspector Blackwell and

14  Officer Mackenzie and as common sense tells you, Lane's two

15  questions about whether Mr. Floyd should have been rolled on

16  his side were not reasonable medical measures.

17             The questions were not reasonable measures to

18  address Mr. Floyd's serious medical need.  The questions did

19  not get Mr. Floyd more air in his lungs.  They didn't get

20  the officers stopping his breathing [sic] off of him so that

21  he could expand and contract his lungs and take air into his

22  throat.

23             Then, as you again very clearly heard from Officer

24  Mackenzie and Inspector Blackwell, as soon as these former

25  officers discovered George Floyd did not have a pulse, they

 1    should have immediately started CPR.  It didn't matter

 2    whether the ambulance had been called.  They should have

 3    started that immediately.  Remember what Lieutenant

 4    Zimmerman said?  You do everything you can until a medical

 5    professional can take over the medical aid.

 6          You've heard some testimony that while Mr. Floyd

 7    certainly needed immediate CPR, Kueng and Lane weren't sure

 8    the scene was safe enough to perform any additional medical

 9    assessment or medical care of any kind because there were

10    people nearby they couldn't see who were shouting.

11          But defense expert Steve Ijames conceded that

12    Kueng could have stood up and checked Mr. Floyd's carotid

13    pulse, just like the paramedic, Derek Smith, did a few

14    minutes later.

15          And, again, common sense.  They could have rolled

16    Mr. Floyd on his side or performed CPR in the exact place

17    where they had him restrained on the ground and would have

18    been in the exact same position in terms of their safety.

19    All three defendants testified they knew time is of the

20    essence when CPR is needed.

21          One last thing on the failure to provide medical

22    aid.  Maybe these officers were mistaken about what exactly

23    was ailing Mr. Floyd.  To be clear, the defendants don't

24    have to correctly diagnose the problem.  They have to

25    recognize there is a problem and do something.

1          All three defendants mentioned at various points

2     their suspicions that Mr. Floyd was on drugs.  So perhaps

3     they were concerned he was overdosing or perhaps they were

4     concerned about excited delirium, as Lane mentioned.

5          Let's talk about excited delirium for a moment.

6     We all watched the videos of George Floyd's encounter with

7     law enforcement, and we all watched the six or so videos

8     that the defendants watched during their excited delirium

9     training.  Watching all of those videos called a phrase to

10    mind, "one of these things is not like the others."

11         These MPD officers were shown what excited

12    delirium looks like and sounds like, and that's not what

13    Mr. Floyd looked like or sounded like.  Even for Thao, who

14    didn't show up on the scene until Mr. Floyd was resisting

15    getting into the squad car, Mr. Floyd's behavior did not

16    resemble what we saw in those videos.  He was communicating

17    with the officers, not running around naked, covered in

18    blood.  Mr. Floyd even said that he wanted to lay on the

19    ground.

20         But let's assume for a moment that one or more of

21    the defendants mistakenly thought Mr. Floyd was suffering

22    from excited delirium.  You all heard a lot of testimony

23    that shows that excited or agitated delirium is a

24    controversial topic, that understanding what it is is hard,

25    that diagnosing it is hard, that figuring out exactly what

1    factors will cause it is hard.

2            But what we saw from the MPD training that all

3    three defendants received and heard from a number of

4    witnesses is that regardless of whether anyone can

5    accurately identify excited delirium, the treatment is the

6    same.  Once you get that person restrained and handcuffed,

7    you get them in the side recovery position as soon as

8    possible, just like you do with anyone else who is prone and

9    handcuffed and successfully restrained, except it may be

10   even more urgent to get them in the side recovery position

11   there because, according to the training, the danger of

12   dying during an episode of excited delirium is so much

13   higher.

14           You heard from a number of witnesses that an

15   officer in this situation should hover nearby, perhaps

16   resting a hand on the arrestee to make assessment easier and

17   to be ready if the arrestee wakes up in an agitated state,

18   but you should not keep them in the prone position

19   indefinitely and certainly not while they are rendered

20   unconscious or lose a pulse.

21           As Officer Mackenzie and defense expert Ijames

22   told you, the officers are trained to always do those ABCs

23   of assessment, airway, breathing, and circulation, and then

24   react if something goes wrong.  The assessment isn't

25   providing medical aid.  It's how the officers figure out

1    what aid they need to provide.  These defendants didn't do

2    any of that.

3          The excited delirium training directed the

4    officers to place a person in the side recovery position

5    once a person has been restrained.  And as you heard from

6    Officer Mackenzie, that side recovery position is taught in

7    half a dozen different courses at the academy: EMR, CPR,

8    excited delirium, Narcan, and tactical combat casualty care,

9    also in a training video on positional asphyxia.  These

10   officers learned this concept repeatedly because it is basic

11   and foundational to much of the care officers are trained to

12   provide.

13         The defendants here failed to take any reasonable

14   measures to address Mr. Floyd's serious medical need.  The

15   second element of Count 3 has been satisfied.

16         So having gone through all the subelements of the

17   first element of Count 3, we can move on to the second

18   element of Count 3, deliberate indifference, which is,

19   again.  The willfulness:

20         And you will see we have the same basic definition

21   of "willfulness" that we saw in Count 2, but here the

22   government must prove that the defendants knew George Floyd

23   was in serious distress and knew that they had a duty to do

24   something about it and yet they intentionally failed to aid

25   him.  That's willfulness in the context of Count 3.

1          The defendants, from their training, from the

2     sheer obviousness of Mr. Floyd's condition and how he went

3     from saying he couldn't breathe to not having a pulse during

4     the nine and a half minutes Chauvin knelt on his neck, very

5     well knew Mr. Floyd had a serious medical need.

6          That they did nothing to change the position he

7     was in after so many red flags demonstrates their

8     willfulness.  Because they knew Mr. Floyd needed aid and

9     they didn't aid him, they acted willfully.

10          Now, this should be common sense, but the

11     defendants also had so much training.  Defense expert Steve

12     Ijames took no issue with their medical training.

13          The MPD policy and procedure manual contains the

14     department's policy relating to the provision of medical

15     care.  This applies to all people in need of medical aid

16     that the officers encounter, whether or not in their custody

17     and care.

18          The policy says that if MPD officers come into

19     contact with someone in medical crisis, they should contact

20     EMS and, while waiting for EMS, provide any necessary first

21     aid consistent with MPD training.

22          From Officer Nicole Mackenzie we learned exactly

23     what that medical training was.  When they were cadets, the

24     defendants received a 40-hour emergency medical responder

25     course with both textbook learning and in-class lectures,

1    culminating in EMR certification.  They trained for and

2    received CPR certification.

3          They participated in training regarding positional

4    asphyxia and the dangers of leaving an arrestee in the prone

5    and handcuffed position.  Notice what it says on the bottom

6    of this screen.  "When there's pressure coming up to the

7    chest, a person has to lift body weight."

8          They participated in training regarding the

9    necessity for constant monitoring of the ABCs of arrestees

10   in the care and custody of officers and reassessment of the

11   care and treatment being provided to that arrestee.

12          Defendants Kueng and Lane had been through the

13   program less than a year before George Floyd was killed.

14   Defendant Thao, who had been through the program a number of

15   years prior, received annual in-service medical training

16   with alternating years where he was refreshed on either CPR

17   or Narcan and received this positional asphyxia training

18   separately.

19          And throughout all of the training, both at the

20   academy and during in-service training, many different

21   courses are permeated with instructions regarding the side

22   recovery position.

23          Defendant Lane received additional training while

24   he was working at the Hennepin County Juvenile Detention

25   Center.  He had CPR training there and training regarding

1    positional asphyxia.  He was trained on the dangers of

2    putting pressure on a subject's torso or neck when they are

3    on the ground with their hands behind them.  He was trained

4    that once restraints are applied, a person should be placed

5    in a position that doesn't restrict breathing right away.

6           Officer Mackenzie testified that, according to MPD

7    training, Mr. Floyd should have been placed in the side

8    recovery position within the first couple of minutes of when

9    he was restrained on the ground.  The fact that George Floyd

10   was saying "I can't breathe" should have further prompted

11   the officers to take that step to address George Floyd's

12   serious medical need.

13          Now, significantly, Officer Mackenzie made clear

14   that these officers were trained that just because an

15   arrestee can talk does not mean the arrestee is receiving

16   sufficient oxygen.

17          These defendants knew what they were doing was

18   wrong and they did it anyways.  This is proof of the

19   willfulness the defendants acted with in choosing not to aid

20   Mr. Floyd.

21          Now, some of you might be asking yourselves about

22   Defendant Lane in particular, why isn't it enough that he

23   was concerned about excited delirium and asked twice if

24   Mr. Floyd should be rolled over?  After all, he was so much

25   junior to the guy actually using the force.  Why isn't that

1     enough?  And I want to answer that head on.

2              Lane's suggestions demonstrate that he knew

3     Mr. Floyd needed help and he knew what help to give, but

4     Lane's statements didn't get Mr. Floyd any more oxygen.  And

5     in the circumstances of this case, Lane's suggestions

6     weren't reasonable measures, not when the force being used

7     by Officer Chauvin was so dangerous and went on for so long.

8              And because it would have taken so little for

9     Lane, for any of the defendants to render help, if they had

10    said, "He is not okay, we need to roll him now," then they

11    could have rolled George Floyd over and that small action

12    would have saved his life.

13             The defense wants you to think that there's

14    nothing the defendants could have done, that if they had

15    told Officer Chauvin to stop --

16             MR. PLUNKETT:  Objection.  Disparaging.

17             THE COURT:  It's final argument.  Continue.

18             MS. SERTICH:  -- that if they had told Officer

19    Chauvin to stop, he would have kept going.  But we don't

20    know that.

21             MR. GRAY:  Judge, I object to that.  He was told

22    to stop.

23             THE COURT:  Again, counsel, it's final argument.

24             Continue.

25             MS. SERTICH:  Listen and see if he was told to

1    stop.  He was never tapped on the shoulder.  Never said, "He

2    can't breathe.  We need to get up."  Never picked up a radio

3    or a cell phone.  Never called a supervisor or, even once

4    they noticed George Floyd had no pulse, "Get off of him.  We

5    need to find a pulse."  For Thao, all it would have taken

6    was taking a step or two back to the side and saying, "If

7    you don't have a pulse, it's time for CPR."  But instead

8    they did nothing.

9         We also know Defendant Lane asked those couple of

10   questions, but notice those questions happened before he and

11   Kueng couldn't find George Floyd's pulse.  After that he

12   said nothing, did nothing.  When the need was the greatest,

13   he did the least.

14        Defendant Lane is differently situated than

15   Defendants Thao and Kueng because he is the one person who

16   spoke up and tried, meekly as it was, to intervene.  And for

17   that reason he's not charged in Count 2.

18        MR. GRAY:  Judge, I object to that as improper

19   argument, why he's not charged.

20        THE COURT:  Yeah, I sustain that, counsel.

21        MS. SERTICH:  What he is charged with is failing

22   to even try to render any medical aid.

23        And another way you know that Defendants Kueng and

24   Lane acted willfully, and this goes --

25        MR. GRAY:  Judge, I object to her argument saying

1    we know.  It's improper argument.

2         THE COURT:  She can choose her words.  It's final

3    argument.

4         Continue.

5         MS. SERTICH:  The other way you know that

6    Defendants Kueng and Lane acted willfully, and this goes to

7    Count 2 for Kueng as well, that they knew what they had done

8    was wrong and did it anyway is because afterward they lied

9    about it and tried to hide what actually happened.

10        Remember that Lane and Kueng gave statements about

11   what happened with George Floyd later that night to their

12   supervisor, Sergeant Pleoger, and to an investigator,

13   Lieutenant Zimmerman.  They told Sergeant Pleoger and

14   Lieutenant Zimmerman how George Floyd appeared to be high on

15   drugs, how they struggled to get him into the squad, that

16   they put him on the ground, he was breathing, and then the

17   ambulance arrived, and that they found a pipe on him.

18        Notice what they didn't say.  They didn't mention

19   that Chauvin was pressing his knee into Mr. Floyd's neck,

20   that George Floyd was held in the prone position for nearly

21   nine and a half minutes, that Mr. Floyd was saying he

22   couldn't breathe and then stopped talking and moving

23   entirely, that Mr. Floyd fell unconscious or that Mr. Floyd

24   didn't have a pulse for several minutes, even though

25   Defendant Lane had just performed CPR in the ambulance on

 1    Mr. Floyd minutes before he gave this statement to Sergeant

 2    Pleoger, and notice not a word about excited delirium.

 3              Defendant Kueng testified that the report he gave

 4    to Sergeant Pleoger was that Mr. Floyd stopped moving after

 5    EMS arrived, and then he testified that that report was not

 6    true.  By the way, Thao was standing there during that

 7    report to Pleoger.

 8              MR. ROBERT PAULE:  I'd object.  That misstates the

 9    evidence.  My client moved away for a great period of time

10    during that.

11              THE COURT:  I'll sustain that, counsel.

12              MS. SERTICH:  You'll be able to see the times in

13    the video, as you can see in this picture, when Mr. Thao is

14    standing there during the report to Pleoger and note that he

15    added nothing, said nothing.

16              Speaking of lying, you've heard some things on the

17    stand you shouldn't believe.

18              THE COURT:  Counsel, you will note an hour and a

19    half has passed.  I would suggest that you wrap up as

20    quickly as you can.

21              MS. SERTICH:  I have just a few more points here,

22    Your Honor.

23              Here are just a few.  Thao wants you to believe

24    his training and experience told him that if a person is

25    talking, they can breathe sufficiently.  But as Alyssa

1    Funari pointed out five minutes into the restraint, "Is he

2    talking now?"  He was not.  If Defendant Thao's true belief,

3    in direct opposition to his training, was if you can talk,

4    you can breathe, he should have sprung into action when

5    George Floyd stopped talking.  But he didn't.

6         Kueng wants you to believe that he couldn't hear

7    the bystanders begging him over and over to check George

8    Floyd's pulse, to get the knee off of Mr. Floyd's neck, but

9    that he could here expletives and he could hear the subtle

10   snap of Officer Chauvin's belt as he removed his Mace.

11        Kueng wants you to believe that the officers

12   wanted to give EMS quick access to George Floyd, even though

13   they didn't do a thing to get Mr. Floyd ready for EMS care.

14   And even when EMS arrived, they all just sat there with

15   Floyd proned in handcuffs, with Chauvin continuing to press

16   his knee into Mr. Floyd's neck.

17        MR. GRAY:  Judge, I object to this.  It's improper

18   argument.  She says they all just sat there when the EMS

19   arrived.  That's absolutely false.  My client stood up, went

20   over and --

21        THE COURT:  The jury will recall the testimony.

22        Continue, counsel.

23        MS. SERTICH:  Kueng wants you to believe that he

24   thought George Floyd was attracted to the plexiglass inside

25   of the squad car, a symptom of possible excited delirium,

1    while George Floyd was panicking about the idea of even

2    getting into the car and then struggling to get out.

3             Lane wants you to believe that he thought George

4    Floyd was okay because he saw a vein sticking out in

5    Mr. Floyd's arm, which would mean he still had blood

6    pressure.  You never heard or saw any training that seeing a

7    vein in an arm means that someone has a pulse.  It also

8    defies common sense.

9             You should not believe any of this testimony, and

10   you can use these lies when you decide to believe or

11   disbelieve Kueng and Lane and Thao's other testimony.  The

12   reason a person lies is because the person knows that he

13   has --

14            MR. ROBERT PAULE:  I'd object to this as improper

15   vouching.

16            THE COURT:  It's final argument.

17            Continue.

18            MS. SERTICH:  The reason a person lies is because

19   the person knows he has something to hide.  It's evidence of

20   willfulness.  Kueng and Lane knew what they did and didn't

21   do was wrong, and that's why they left those details out of

22   their statements to a superior officer and an investigator.

23            The defendants acted willfully when they didn't

24   provide medical care to George Floyd, knowing that he needed

25   it.  The third element of Count 3 has been met.

1          As to Count 3, failure to provide medical aid, the

2     government must next prove and has proved that the failure

3     to provide medical aid resulted in Mr. Floyd's bodily injury

4     and death.

5          It stands to reason that if the failure to stop

6     Derek Chauvin's unreasonable force was the cause of George

7     Floyd's death, the failure to provide him with medical care

8     in the moment also caused his death.

9          Because the defendants didn't take those

10    reasonable measures to provide medical aid, rolling

11    Mr. Floyd on his side, performing CPR, Mr. Floyd suffered

12    those same injuries we previously discussed with respect to

13    Count 2.

14         You will recall that Dr. Systrom and Dr. Bebarta

15    testified that, in line with what the MPD teaches its

16    officers, if George Floyd had been placed in a position

17    where he could breathe normally before he was rendered

18    unconscious, he would not have gone into cardiac arrest.  He

19    would have lived.

20         It was clear from the moment George Floyd was

21    restrained on the ground that he was having trouble

22    breathing and was in medical distress.  The defendants had

23    about five whole minutes to place Mr. Floyd in the side

24    recovery position or sit him upright before more significant

25    medical assistance was needed.  They chose to do nothing

 1    instead, and in doing nothing caused George Floyd's death.

 2          You heard from the same experts that during the

 3    minutes the defendants sat there and did nothing, after

 4    Mr. Floyd's asphyxia led to his heart stopping, Mr. Floyd's

 5    chances of resuscitation plummeted down to zero.

 6    Dr. Bebarta explained that if a cardiac arrest is witnessed

 7    and CPR begins immediately, chances for survival increase

 8    exponentially.  As you heard from Dr. Systrom, by the time

 9    Lane began CPR in the ambulance, it was too late.  CPR

10    needed to be started on the ground by the officers to be

11    successful.

12          Instead, contrary to their training, contrary to

13    their EMR and CPR certification, the defendants chose to do

14    nothing for more than two and a half minutes after Mr. Floyd

15    became nonresponsive but before the ambulance arrived,

16    precious minutes, as we know and as they had been trained,

17    when a person is in cardiac arrest.  They chose to do

18    nothing, and their choice to do nothing resulted in

19    Mr. Floyd's death.

20          The testimony and evidence presented to you prove

21    all four elements of Count 3 beyond a reasonable doubt.

22          As a community, we have expectations of police

23    officers.  We expect officers to not only protect the

24    community, but to serve the community with courage and

25    compassion, like the MPD motto says.

1          We hope they'll walk the beat, get to know the

2     community, knowing that the communities in which they work

3     have strengths and weaknesses; and when people commit

4     crimes, they get arrested and go to jail.

5          Arresting individuals who commit crimes is a big

6     part of police work, but when that happens, if the person

7     gets injured or suffers an overdose or goes into cardiac

8     arrest, then the police do what they are trained to do.

9     They provide medical assistance.

10          It's what we expect from them as a community

11     because that's what the Constitution demands, to act, to

12     provide medical care, to at the very least try to the best

13     of their abilities.

14          And as we've heard from law enforcement officer

15     after law enforcement officer over the last month, what

16     needed to occur in this case was simple.  And on May 25th,

17     2020, there was no respect for the sanctity of life, no

18     adherence to the foundation of police work, just these

19     officers' inactions, which led to one thing, George Floyd's

20     death.

21          The government here has the burden of proving

22     beyond a reasonable doubt that Thao and Kueng failed to

23     intervene to stop or attempt to stop Chauvin's unreasonable

24     force and that they and Lane failed to provide George Floyd

25     with necessary medical aid.  The government has met and

 1    surpassed that burden.

 2            Over the last several weeks we've presented you

 3    with evidence of the events of May 25th, 2020, evidence of

 4    the training these officers received, and a medical review

 5    of what happened to Mr. Floyd.

 6            But the most important things you need for this

 7    case are simple.  First, the videos showing what happened to

 8    George Floyd while he was restrained on the ground; and,

 9    second, your common sense.

10            It is not complicated.  All of the witnesses,

11    including the defendants, agreed they had a duty to

12    intervene, a duty to provide medical aid.  It is not

13    complicated.  Officer Chauvin pressed his knee into George

14    Floyd's neck while he was restrained on the ground for far

15    too long and everyone, including George Floyd, including the

16    bystanders, including these defendants, knew George Floyd's

17    condition was slowly deteriorating, that he was slowly

18    dying.  Charles McMillian could tell and did tell the

19    officers that Mr. Floyd couldn't breathe.

20            MR. GRAY:  Judge, I object to this as repetitious.

21            THE COURT:  Repetitious.  I sustain.

22            MS. SERTICH:  Alyssa Funari told the officers,

23    "He's not moving.  In over a minute, "He's not moving."

24            MR. ROBERT PAULE:  Your Honor, same objection.

25    This is repetitious.

1          THE COURT:  It is repetitious, counsel.

2          MS. SERTICH:  Your Honor, I have not covered

3     this --

4          THE COURT:  It is repetitious.

5          MS. SERTICH:  -- with Mr. Funari, and I'm about to

6     be done.

7          THE COURT:  It is repetitious.

8          MS. SERTICH:  These defendants knew what was

9     happening and, contrary to their training, contrary to

10    common sense, contrary to basic human decency, did nothing

11    to stop Derek Chauvin or to help George Floyd.  And you know

12    it because you've seen it.

13          In their custody was in their care.  Not only was

14    George Floyd utterly unable to take care of himself, not

15    even able to lift himself in a position to draw the breaths

16    he needed to survive, but because these officers had their

17    badges and their guns and their power and their authority,

18    Mr. Floyd couldn't even count on the kindness of strangers,

19    the bystanders, who so easily saw the urgency of the

20    situation and who begged these defendants in desperation to

21    please stop the killing of this helpless man in their

22    custody and care.

23          They chose not to intervene.  They chose not to

24    aid George Floyd, as the window in which Mr. Floyd's life

25    could have been saved slammed shut.  This is a crime.  The

1    defendants are guilty as charged.

2              Thank you for your time.

3              THE COURT:  Members of the jury, we're going to

4    take a morning recess at this time.  I would caution the

5    members of the jury not to discuss the case amongst

6    themselves or with other persons.

7              We are going to stand in recess now, so caution

8    the jury that while you've heard the summation of one of the

9    parties in the case, you have not heard the summation of the

10   other parties and I therefore caution you to continue to

11   keep an open mind.

12             With that, the jury may be excused.

13                          **IN OPEN COURT**

14                        **(JURY NOT PRESENT)**

15             THE COURT:  Counsel, I stayed on.  Ms. Magee just

16   handed me a note saying that the jurors' lunches are here.

17   I have no idea what they are having for lunch.  I think

18   they're cold lunches, so I don't think it makes much

19   difference.

20             My suspicion is we should stay in recess for 10,

21   15 minutes and come back in and hear your argument,

22   Mr. Plunkett -- I'm sorry, I'm looking at Mr. Plunkett --

23   and hear your argument, Mr. Paule, but if there's a

24   compelling reason not to, we could put it over too.

25             MR. ROBERT PAULE:  Your Honor, I don't really have

1    a preference.  If the court would like me to go forward now

2    or if the court would like to have the jurors hear the

3    defense's arguments consecutive in the afternoon, I'm fine

4    either way.

5              THE COURT:  Ballpark, what's your time?

6              MR. ROBERT PAULE:  Hour, hour and a half.

7              THE COURT:  Okay.  Maybe we should take our noon

8    break at this time.  Let's take a break until 12:30.  We'll

9    take a one-hour break today and we'll come back at 12:30.

10   We'll have lunch and break now.

11       (Lunch recess taken at 11:32 a.m.)

12                        *  *  *  *  *

13       (12:31 p.m.)

14                      **IN OPEN COURT**

15                      **(JURY PRESENT)**

16             THE COURT:  Welcome back, everybody.

17             Mr. Paule, I'll recognize you for summation.

18             MR. ROBERT PAULE:  Thank you, Your Honor.

19             May it please the court.

20             THE COURT:  Proceed.

21             MR. ROBERT PAULE:  Counsel for the government.

22   Mr. Kueng, Mr. Plunkett, Mr. Lane, and Mr. Gray and you, the

23   members of our jury.  Good afternoon.

24             I again would like to begin my closing by

25   acknowledging the death of Mr. Floyd.  This tragic event is

1       what brings us here today.  The loss of Mr. Floyd's life,

2       like the loss of any human life, is a tragedy.  However, a

3       tragedy is not a crime.

4              I'd also like to take the opportunity to thank

5       you, members of the jury, for your service, for the time

6       that we've taken out of your lives.  You've had to put your

7       lives on pause to perform a civic duty, the long hours for a

8       nearly month-long trial.  I'd like to thank you for your

9       time and your concentration and your sacrifice for being

10      here.

11             It's important to acknowledge also that the rule

12      of law must prevail, and what that means is in our society

13      when we have disputes, they must be decided in a court of

14      law.  For these things to be decided out in the air of

15      public media and opinion, on TV, that's not the way we, as a

16      society, want to decide certain things.

17             As a brilliant legal mind once said, the rule of

18      law must prevail.  And what that means is to decide an issue

19      as important as what we're doing here today, it must be done

20      in a courtroom with the rules of evidence and an independent

21      group of people who are picked to decide what has or has not

22      been proven, and that is your role as a jury in this case.

23             We talked about it at the outset.  This is

24      obviously Judge Magnuson's courtroom.  He is in charge of

25      this courtroom.  He is what is referred to as a judge of the

1      law.  Among his many duties, his job is to instruct you on

2      what the law is and what it is not.

3              You, as the jury, as a group are considered the

4      judges of the facts.  And what that means is that you, as a

5      group, will decide what facts have been or have not been

6      proven in this courtroom.  That is your role as a group as

7      the judges of the facts.

8              Your duty is to then take the facts as you decide

9      them and apply the law exactly as the court gives it to you

10     and render a just and true verdict, and it's important that

11     you are allowed to do this in an atmosphere that makes you

12     make your decision free from any sympathy or any bias.

13             Now, it's essentially the right to a jury trial

14     that sets our legal system in our country apart from

15     virtually any other.  We are essentially the only legal

16     system that allows a group of citizens to come together with

17     no bias either way, no skin in the game to make a decision

18     what has and has not been proven, and that's one of the

19     cornerstones of our legal system.

20             I'm going to discuss also at this point sort of

21     three bedrock legal principles of criminal law, and these

22     principles used together will give you the framework that

23     you need to act in your proper function as a jury to analyze

24     the evidence in this case.  The first principle I'm going to

25     talk about is the presumption of innocence.

1          Now, the court will give you -- I'd like to start

2     out by pointing out the court will give you legal

3     instructions.  It's my understanding you will get a packet

4     of these instructions.  You can bring them with you back to

5     the jury room.

6          And I want to point out at the outset if I in any

7     manner state the law which is different than what Judge

8     Magnuson gives it to you, you should disregard what I've

9     said about the law and rely solely on the law as he gives it

10    to you, because that is what is proper in this case.

11         But I want to talk to you about these three legal

12    principles, the first one being the presumption of

13    innocence.

14         My client in this case -- and, by the way, I'd

15    like to point out at this point I'm only going to talk about

16    one particular lawsuit, as the court puts it, because right

17    now in this courtroom you have three people standing trial,

18    but I only represent Mr. Thao and my comments should only be

19    taken in consideration of the case of the United States of

20    America vs. Tou Thao.

21         So in this case I'm going to talk about the

22    presumption of innocence.  My client, like anyone in America

23    charged with a crime, is presumed to be innocent.  And ask

24    yourselves:  What does it really mean to be presumed to be

25    innocent?  Well, it means many things, as I tell my clients.

1          It means, first of all, a jury has to presume your

2     innocence to every element and every aspect of the case.

3     Simply because the government has chosen to bring charges

4     against a person is of no import.  Those are merely

5     allegations.

6          The jury's role is to presume that a person is

7     innocent of the charges against him.  And as you will hear

8     Judge Magnuson tell you, the presumption of innocence alone

9     can be sufficient to justify a not guilty verdict.

10         Now, going to what I tell my clients, is when a

11    person is presumed to be innocent, it means many things.  It

12    means again, first of all, the jury must look at you as if

13    you are innocent of these charges.

14         And that presumption of innocence maintains with

15    you and stays with you until the end of a trial when a jury,

16    acting as a group, comes to a decision that the government

17    has proven you guilty, it has overcome the presumption of

18    innocence.

19         But the presumption of innocence means much more

20    than that.  It means that there is no burden whatsoever on a

21    defendant.  He is under no duty to present any evidence

22    whatsoever.  He is under no duty to call any witnesses.

23    He's not even under any duty to question the government's

24    witnesses.  Because he is presumed to be innocent, the

25    burden of proof is entirely on the government.

1           The final thing about the presumption of

2    innocence, it means that my client is not under any duty to

3    testify at all.  One of the constitutional rights guaranteed

4    everyone is the right to remain silent.

5           And how that comes into play in a court trial is

6    if a person exercises their right to remain silent, it means

7    they don't have to testify.  That is part of the presumption

8    of innocence in this case.

9           So at the outset you, as a jury, must view my

10   client as innocent of these charges.

11          The second legal principle I want to talk about is

12   the burden of proof.  In this case, like any criminal case,

13   the burden of proof is solely on the prosecution.  Again,

14   the presumption of innocence stays with my client unless and

15   until the government can meet their burden of proof.  In

16   other words, there is no duty for my client to prove his

17   innocence.  Instead, the burden of proof is entirely on the

18   government, just like it is in every courtroom throughout

19   the United States of America.

20          The third concept I'd like to talk about is proof

21   beyond a reasonable doubt.  And let me rephrase that so you

22   can be very clear about how I'm discussing this and what I

23   am saying.  The phrase is "proof beyond a reasonable doubt."

24          Now, the court in its instructions to you will

25   give you the definition of what "proof beyond a reasonable

1    doubt" is.  And I'm not going to go over that when I talk

2    about these principles.  Instead, I'm going to talk about

3    the concept of proof beyond a reasonable doubt or, as I like

4    to refer to it when I'm speaking to my clients, proof beyond

5    all reasonable doubt.

6              Now, what you will hear in the instructions on

7    proof beyond a reasonable doubt is that it does not mean

8    beyond all possibility of doubt.  It simply means proof to a

9    point where there is no reasonable doubt.

10             And this is where you, as a jury, we want you to

11   bring your reason and common sense into the equation.  We

12   selected you because presumably we thought, A, you were

13   neutral, but, two, that you were reasonable people and

14   possessed the common sense that we want in people to make

15   decisions in a case like this.

16             But what proof beyond all reasonable doubt means,

17   at least to me in a concept -- and, again, if this is in any

18   way different than what Judge Magnuson tells you the law is,

19   please disregard what I say because I'm talking about the

20   concept.

21             Proof beyond all reasonable doubt means just that.

22   It means proof to a point where at the end of the case there

23   is no rational, reasonable, logical explanation for what the

24   evidence is in court other than a person is guilty.

25             At one point in my career I was arguing that same

1 point and I was objected to by the prosecutor, and the

2 prosecution's objection was that they don't have to prove it

3 beyond all reasonable doubt, they only had to prove it

4 beyond a reasonable doubt.  And upon expressing that, the

5 prosecutor quickly realized:  What am I saying?  Mr. Paule

6 is right.

7    So the burden on the government in this case is to

8 prove their case to a point called proof beyond a reasonable

9 doubt.  And, again, follow the judge's instructions on that.

10 But that means the burden of proof is on them to proof the

11 charges against my client, and in this case there are two.

12    He is charged with violating the United States

13 Constitution in two fashions.  One is Count 2, which is a

14 failure to intervene.  In other words, he violated his duty

15 to intervene when he's confronted with unreasonable force.

16 The allegations are that the force used by then Officer

17 Chauvin was unreasonable under the circumstances and my

18 client failed to intervene.  That is Count 2.

19    Count 3 is an entirely different function.

20 Count 3 alleges that my client violated the Constitution by

21 exercising or using deliberate indifference to Mr. Floyd's

22 serious medical needs.

23    And if you think about both of these charges, my

24 client isn't really charged with doing anything.  He's

25 charged with the exact opposite.  He's charged with not

1    doing something.

2         And the important thing for you, at least in my

3    thought process in terms of your analysis, is I think it's

4    pretty clear what my client did do.  I think the evidence in

5    this case is relatively clear.

6         As sort of the use of technology has changed, we

7    oftentimes have video footage or recordings or much more

8    forensic evidence than we used to have.  And this case

9    provides perhaps the clearest example of that in the sense

10   that we have a tremendous amount of video which shows what

11   did or did not happen.

12        And at least my position is I think that it's

13   pretty clear what did or didn't happen.  But the important

14   question for you to consider is why because, again, what the

15   government has to prove isn't just, A, as to Count 3, that

16   my client was deliberately indifferent to the serious

17   medical needs of Mr. Floyd, but that he had what's called a

18   specific intent to do so.

19        And let me explain this.  What the government

20   needs to prove isn't just that Mr. Floyd had a medical need.

21   It's that Mr. Floyd had a serious medical need that would be

22   obvious to people, recognizable.  That also takes into

23   account the particular facts and circumstances, which I will

24   talk about later.

25        But, again, what they need to prove is they need

1   to prove he had serious medical needs.  And then the

2   government needs to prove that my client was not only aware

3   of those serious medical needs, but that he chose to be

4   indifferent to them.

5          And if you look at the charge itself, it requires

6   not just indifference; it requires something called

7   deliberate indifference.  And "deliberate indifference"

8   means, at least to me, that you recognize that there is a

9   serious medical need and you choose not to act and you do so

10  deliberately.

11         But if you look at what the elements of this are,

12  not only is the government required to prove that and prove

13  that beyond all reasonable doubt, but they also have to meet

14  the additional element of willfulness.

15         And if we could put up on the screen -- you will

16  get, again, a copy of the definition of "willfulness" in

17  your instructions, but the important word is the word

18  "willfully" or "willfulness."

19         And if you look at what this says, it says,

20  "Willfulness.  A person acts willfully when they commit an

21  act with a bad purpose or an improper motive."

22         In other words, getting to my argument about this

23  deliberate indifference count, they not only have to prove

24  that Mr. Floyd had a serious medical need, but that my

25  client was aware of it, that he chose to be indifferent,

1    that he chose so deliberately and that he did so with this

2    element of willfulness, which means not only do you say,

3    well, maybe I'm just going to choose to be indifferent and

4    not just indifferent but deliberately, but I have to possess

5    the specific intent of violating the law.

6            Now, when we talk about what the law is with

7    regard to this element of willfulness, it's essentially to

8    violate the Constitution.  And as you will find out, a

9    person doesn't need to be specifically aware that they're

10   violating the Constitution, just that they are breaking the

11   law.  That is what willfulness needs and they need to

12   establish.

13           Now, with regard to Count 2, the failure to

14   intervene, again, it requires a number of steps and the

15   government has to prove all of these steps beyond a

16   reasonable doubt.

17           They have to prove, first of all, that Mr. Chauvin

18   was using unreasonable force.  And that unreasonable force

19   has to be what's called objectively unreasonable force, and

20   what that means is not just is it unreasonable, but a

21   reasonable person or an objective person would decide that

22   that is unreasonable force.

23           And then knowing that, the person has to, A, have

24   a duty to intervene, which I'm not contending that then

25   Officer Thao did not have.  He was a sworn officer.  They

1    have a duty to intervene if they see unreasonable force

2    being used.  But they have to fail to act upon that duty.

3    And, again, this requires a very specific intent.  I'll

4    explain to you a little bit about intent versus specific

5    intent.

6           If you think about it in general terms, let's say

7    I take pills every day, a number of pills.  I have one of

8    those nice little weekly things with my pills in it.  At the

9    end of a week I say I need to get more pills or I need to

10   fill up my thing.  I make a point of filling up my pill

11   container so I can take those pills every day.  I am doing

12   an intentional act to do that.

13          But my purpose in doing that intentional act is to

14   take those pills so that I can theoretically be a healthy

15   person.  I not only intend to take the pills, but my

16   specific intent is to make myself healthier.

17          In this case what the government has to prove with

18   the failure to intervene charge is the specific intent of

19   willfulness, which, again, means that not only is my client

20   accused of failing to intervene when there's

21   reasonably -- excuse me, objectively unreasonable force, but

22   that my client did so with the specific purpose of

23   willfulness, which means a bad purpose or an improper

24   motive.  This is what the government needs to prove beyond a

25   reasonable doubt.

1           If we could now take that down.

2           What this means in some sense is that even if you,

3    as a jury, once you've decided the facts, come to the

4    conclusion that perhaps Mr. Thao's actions weren't the right

5    course of action, they still must be done with the specific

6    purpose of a bad purpose or an improper motive.  In other

7    words, I'm not only choosing to take the actions that I'm

8    doing, or the inactions, but that I'm doing so to

9    specifically violate the law.  That is what the charges are

10   against my client and that is what is required of the

11   government to prove.

12           Now, let's look back to the actions of May 25th,

13   2020, Memorial Day.  It was a Monday about 8:00 p.m. At that

14   time of day my client was partnered with Officer Chauvin for

15   the day, and the two of them were back at the Third Precinct

16   having their lunch break.  It's an odd time to have lunch,

17   but if you are working middle watch, that makes sense.

18           They're at the Third Precinct when they receive a

19   dispatch requesting them to respond to Cup Foods, which is

20   located at 38th and Chicago.  The information provided to

21   them was that someone was trying to pass a counterfeit bill

22   or a forgery; two, that the suspect was still on the scene,

23   which turns this into what's called a priority call, if you

24   remember that, because if the suspect's still on the scene,

25   they want officers to respond quickly so they can

1    theoretically detain that person and investigate the

2    situation; and, third, that the person was under the

3    influence of either drugs or alcohol.  That's what these

4    officers knew when they were sitting there having lunch.

5            So they get into the car and as you can see from

6    my client's body camera footage -- and, again, as an aside,

7    if you look at my client's body footage, there are actually

8    four separate videos.

9            The first one shows the initial response when the

10   car was leaving the Third Precinct.  You can see the lights

11   and sigh reasons bouncing off things.  And then you can see

12   them going slow and talking.

13           And the second video is the one that starts when

14   they are arriving at the scene of Cup Foods, but in this

15   first video you can see that my client and Officer Chauvin

16   are responding Code 3.  They're responding lights and sirens

17   to that specific dispatch.  All right?

18           And think about this.  The next thing they know is

19   that Squad 320, which is the squad with the two rookie

20   officers, Officers Kueng and Lane, responds because the call

21   at Cup Foods was in their particular sector and they should

22   be responding within their sector to calls.  So they

23   essentially take over the call and then they arrive at Cup

24   Foods and they call out a Code 4, which means the scene is

25   safe.

1          Instead of turning around and going back to the

2     Third Precinct to have their lunch, they continued on.

3     Think about how Mr. Thao's life would have been different if

4     he just decided to go back and have his lunch.

5          But instead they continue to respond to the scene

6     to provide backup for the other officers.  And think about

7     the evidence you've heard about which car theoretically is

8     assigned to a scene and who is in charge.

9          But they go there to provide backup to the

10    officers in Squad 320.  And why do they do that?  Because,

11    one, it's a couple of rookies who have been paired together.

12    Secondly, this is the area you heard my client or you --

13    when you listen to the video, the first one of the four on

14    his body cam, you can hear him say, "This is Bloods

15    territory."  Again, he's referring to a specific Minneapolis

16    street gang that's sort of headquartered in that area.

17         But the idea is that this is an area that might be

18    a little more hostile to police than perhaps other areas,

19    and my client expressed concern because he didn't know that

20    the rookies would necessarily be aware of that.

21         And then as they're on their way they hear, I

22    believe -- and, again, this is an important concept.

23    Lawyers can spend hours, days, even months analyzing a case

24    and figuring out what we think the evidence is.  That's true

25    of me in the case of United States vs. Thao, but it's also

1    true of the government with all of their lawyers.  You get

2    to decide what the facts really are.  So if my recollection

3    of the facts is different than what you as a jury think, go

4    with your recollection of the facts.

5         But my recollection of the facts is they receive

6    word that they're taking one out, which means a police

7    officer is removing someone from a car, and then there's

8    some sort of indication of a struggle.  And I'm not sure

9    whether this comes from dispatch or whether it's what my

10   client overheard.  But they continue to go there to provide

11   backup to these other two officers.

12        Now, when they arrive on the scene, as you see

13   them pull up you will see them coming to Cup Foods to

14   Chicago Avenue heading west on 38th Street.  And as they

15   cross over Elliot, which is the street one block east of

16   Chicago Avenue, on 38th Street they pull over to the

17   left-hand side of the road.

18        The left-hand side of the road is where the blue

19   Mercedes SUV is.  It's also where Officer Chang, the

20   Minneapolis Park Police officer, has parked his vehicle,

21   because Officer Chang has likewise responded to the call for

22   backup that there may be a struggle.

23        And as my client and Officer Chauvin pull up to

24   the left-hand side, you heard my client testify that he did

25   so because he could see Officer Chang out with two people,

1    so there's a numeric disadvantage.

2           But then you will hear and you will see on the

3    body camera the car then go to the right to the north side

4    of 38th Street and park just east of Chicago Avenue, and

5    that's sort of when the sound clicks in on my client's body

6    camera on that second round of footage on his body cam.

7           But you will see in that Officer Chauvin gets out

8    first, and Officer Chauvin is walking ahead of my client and

9    arrives at Squad 320 first.  And when my client actually

10   arrives at Squad 320, Officer Chauvin is already over on the

11   far side of Squad 320.  So my client is observing, as he

12   walks up, Officer Kueng struggling with George Floyd, who is

13   in handcuffs.

14          And, again, an important thing to keep in mind is

15   that you must judge the actions of my client, Officer Thao,

16   based on what the facts and circumstances were known to him

17   at the time.

18          The law in this case talks about, you know, you

19   shouldn't look at the actions of an officer in 20/20

20   hindsight.  You have to, to be fair, look at them from what

21   my client knew at the time he was doing it.

22          Now, when my client arrives, he doesn't know much

23   about what has already occurred.  The interactions with

24   Officer Lane and Officer Kueng over at the side of the

25   Mercedes SUV after Mr. Floyd was removed from the car, the

1    struggle that occurred between Officer Lane and Mr. Floyd

2    and then joined by Officer Kueng, who helped to handcuff

3    him, and then walking Mr. Floyd over and having him seated

4    by the side of the Dragon Wok restaurant and then escorted

5    over to Squad 320 in front of Cup Foods, my client doesn't

6    know those things.

7         What he knows when he's arriving is Officer Kueng

8    is struggling with a handcuffed man, who is a large man, and

9    this person is resisting getting in the back of the car.

10   That is what's referred to as active resistance.

11        And you can -- you heard my client testify about

12   this, that, A, he didn't physically touch Mr. Floyd at this

13   time, that he actually never touched Mr. Floyd during the

14   entirety of this event, but that he's observing as Officer

15   Kueng is trying to place Mr. Floyd in the back of the car

16   for sort of reasons unknown to my client.

17        And what does he observe as he's doing this?  He

18   can see Officer Kueng shoving and he can see Mr. Floyd

19   stiffening up, which makes it difficult to place him in the

20   back of the car, but there's a struggle and you can see on

21   his body cam he's looking around trying to see what's going

22   on.

23        You can see at one point Officer Kueng putting his

24   forearm sort of up against Mr. Floyd's chest, upper chest

25   area, and it may well have been moving up to his neck, but

1    at that point my client can see and hear Mr. Floyd say, "I

2    can't breathe."

3              And think about that, because at that point my

4    client doesn't know what's gone on before this.  And there's

5    nothing that would inhibit Mr. Floyd's breathing at that

6    point.  His testimony was that Mr. -- excuse me, Officer

7    Kueng's arm was sort of in the upper chest area.  That is

8    not going to cause somebody to not be able to breathe.

9              Think back to what my client testified about his

10   own experience with people who are going into custody or in

11   custody claiming that they can't breathe under circumstances

12   where clearly they should be able to breathe.

13             At that point then Mr. Floyd ends up inside the

14   car.  I believe -- and you as the jury get to determine

15   this -- that Officer Lane may have gone around and helped

16   pull Mr. Floyd into the car.

17             And then he sees Mr. Floyd sort of eject himself,

18   even while he's handcuffed with his hands behind his back,

19   out of Squad 320 and onto essentially Chicago Avenue on the

20   passenger side of the vehicle.

21             My client then goes around the vehicle.  And you

22   will see from his body camera footage that as he goes around

23   the vehicle, Officer Kueng has gone around the vehicle

24   first.  And when he goes around the corner, he can see

25   Officers Kueng, Chauvin, and Lane engaged in a struggle with

1    Mr. Floyd.

2              And think about this.  You've got one person who

3    is handcuffed with his hands behind his back who is actively

4    resisting, who is trying not to go in the squad car and is

5    not listening to commands by the police officers to get in

6    the car.  Yet that one person is able to sort of out-muscle

7    or overpower those three officers.

8              My client then goes back around to the driver's

9    side of Squad 320 and opens the door up, standing there, I

10   think, waiting to assist the other officers when they put

11   Mr. Floyd in the back of the car to act, as he described it,

12   as a puller, to help pull Mr. Floyd back in the car.

13             And you see on his body camera footage at this

14   point Officer Chauvin has taken over command of the struggle

15   and you will again see Mr. Floyd saying, "I can't breathe."

16   And I'll leave it up to you to decide what the evidence is,

17   but at some point you can see Officer Chauvin behind

18   Mr. Floyd with his arm around, and it's not around his neck,

19   it's lower down, but Mr. Floyd is again saying, "I can't

20   breathe."  Are those circumstances that would lead you to

21   believe that he reasonably couldn't breathe or maybe is he

22   doing something else, feigning, exaggerating for whatever

23   purpose?

24             But at that point, then they sort of all end up

25   outside of the squad.  And my client will close the squad

1    door on the driver's side and he goes around the side of the

2    car.

3         And if you listen to his body camera, that's when

4    he makes the phrase about hog-tieing or something like that,

5    because what he testified to is he tries to almost narrate

6    to use the body camera as a means of sort of recording or

7    providing some sort of memorialization of what he was

8    thinking and why.

9         And he testified that he was thinking that because

10   you've got three officers that can't control someone.  And

11   he's also thinking, as he testified, there's a limited

12   amount of time when people can physically struggle.  It sort

13   of becomes a point where they're exhausted.

14        So as he's walking around the side of 320 to go

15   back again where the other three officers and Mr. Floyd are,

16   he's already coming to the conclusion that what they're

17   doing isn't working.  And think about that; three officers

18   are not able to control a person in handcuffs.

19        So when he gets around to the side of the car, he

20   can see them struggling.  He can hear Mr. Floyd saying,

21   "Just put me on the grouped."  So my client says to himself

22   this is pointless and he says, "Let's just put him on the

23   ground."  At that point Mr. Floyd is put to the ground.

24        Now, as an aside, in my opening statement I talked

25   about the use of force.  I talked about how the use of force

1   is sometimes difficult to watch.  And think about some of

2   the evidence we've had in this case about the use of force,

3   including some of those restraint videos from 2017 where the

4   recruits are being taught to try to take down a person who

5   is wearing a padded suit.  Even in that controlled

6   environment, the use of force is difficult to watch, it is

7   violent, it is graphic, and it is up close and personal.

8   And use of force is not only difficult to watch at times,

9   but it can be difficult to comprehend what is going on and

10  why.

11          Now, getting back to this instance, Mr. Floyd is

12  put on the ground and you can see the other three officers

13  go down with him, Officer Chauvin by his head area, Officer

14  Kueng near his derriere, as I think it's been called, and

15  Officer Lane at his feet.  And at this point you hear a

16  discussion about a hobble or what's called an MRT.

17          Now, just to be clear, the MRT is a maximum

18  restraint technique.  It is essentially where you use a

19  hobble or a strap to wrap around a person's ankles.

20          And I believe since the Freddie Gray case that we

21  heard some testimony about where a person was injured and

22  died in the back of a police van when they were hobbled, the

23  Minneapolis Police Department policy has changed where now

24  they want to use two hobbles, one to wrap around a person's

25  ankle, the second is to tie that hobble, the first one, to

1    the belt loop or the belt independent of the handcuffs.  But

2    the idea is to put a person in a position where they can

3    struggle, but they're just struggling against themself.

4            So there's a discussion about that.  And then my

5    client goes to the back of Squad 320, because he's standing

6    right there, opens up the rear hatch and begins looking

7    through two black bags.  These are what are referred to

8    oftentimes as duty bags for the officers.  They keep things

9    that they think they may have to use in those bags.

10           Now, Ms. Sertich and the government during the

11   course of this trial has tried to claim that my client spent

12   the first six minutes standing there staring at Mr. Floyd

13   and what was going on.

14           In my humble opinion, they're playing sort of fast

15   and loose with the facts, because you can see my client go

16   around to the back of Squad 320 and search purposely for a

17   hobble in the back of the car.

18           Are we able to turn that off?  Thank you.

19           And he can't find one in the first bag, which I

20   think you realize is Officer Kueng's bag, so he goes over to

21   the second bag.  And you can hear Officer Lane saying, "I've

22   got one in my bag."  And when he flips it up, sure enough,

23   you can see it says, "Hobble," so he grabs the strap out of

24   there.

25           Notice, if you will, where my client's attention

1    is.  Because if you look from his body camera footage, you

2    will see a reflection and you can see my client.  And this

3    is obvious; he's looking in the bag for the hobble.

4             So he gets out this hobble device, this strap, and

5    goes back around to the side of the car and gives it to

6    Officer Chauvin.  Officer Chauvin then gives it to Officer

7    Lane.  I'm not sure if Mr. Kueng handled it.  I'll let you

8    guys figure that out.  But there's then a discussion about

9    whether we should be applying the hobble.

10            Now, what we know is if the hobble is applied,

11   then Mr. Floyd is not needed to be held in that prone

12   position.  But the discussion of the hobble -- and just as

13   an aside, the way the arguments are set up procedurally is

14   that the government gets to go first with their closing

15   argument.  Then I, on behalf of my client, I'm entitled to

16   give a closing.  And then the government is afforded a

17   rebuttal, so sort of a second closing argument,

18   theoretically to just try to rebut the things that I've

19   said.

20            So they may talk about this and they may try to

21   direct your attention to the fact that my client said if we

22   put a hobble on, we'll have to get a sergeant out.  And this

23   is -- you could attribute that statement to a number of

24   different things.

25            One, it could be, as the government no likely will

1    try to point out, that my client was just simply being lazy.

2    We have to get a sergeant out here.  We have to explain all

3    this.

4         But the reality is when police officers use force,

5    under Minneapolis policy they have to have a sergeant come

6    out and review that use of force -- you heard my client

7    testify about we'll have to take pictures, because he's had

8    that happen -- and look at the hobble.

9         Now, putting that aside, my client also knows at

10    this point that EMS has been called.  And if you recall, at

11    this point EMS has been called Code 2.  And what that means

12    is respond directly, but you don't need to use your lights,

13    you don't need to use the siren, you don't need to run.

14    Just get here as quickly as possible.  So he already knows

15    EMS is on the way.

16         And what does he also know at this point?  You

17    heard my client testify that in his interactions with

18    Mr. Floyd, he believed him to be high or under the influence

19    of drugs.  And if that is indeed the case, if somebody is

20    under the influence of drugs, then it becomes a medical

21    issue.  And since EMS is on their way, they're going to have

22    to decide that.

23         Now, as an aside, I would point out that if you

24    think about the four people who have come into this

25    courtroom and testified who directly interacted with

1    Mr. Floyd on May 25th, all of them suspected that Mr. Floyd

2    was under the influence of drugs.

3           First of all, Chris Martin, the young employee

4    from Cup Foods.  He was the person that took the counterfeit

5    bill from George Floyd.  And he indicated that he held it up

6    and he didn't know what to do, and he thought George Floyd

7    might be so high that he didn't realize he'd passed a

8    counterfeit bill.

9           But then he went out and interacted with him, not

10   once, but twice, as he was trying, at the direction of his

11   manager of the store, to bring Mr. Floyd back in to deal

12   with the situation of the counterfeit bill.  And when they

13   called 911, he was standing right there and heard the person

14   say we think he's under the influence of something.

15          Now, think back to what Mr. Martin said when he

16   testified early, early on in this case.  When he was talking

17   with him, he felt that Mr. Floyd was high.  He said he was

18   reacting slowly to some of the words and had difficulty

19   forming the word I think it was baseball.  But his direct

20   impression, as he testified to, was that George Floyd was

21   high or under the influence of drugs.

22          The second person who interacted with Mr. Floyd

23   was Officer Lane.  Officer Lane's testimony is that he, too,

24   believed that Mr. Floyd was under the influence of drugs.

25   You heard him asking have you been taking drugs, something

1    like that, and going over to talk to Shawanda Hill and

2    Morries Hall, who were the two other occupants of the blue

3    SUV, asking them what's going on with him, why is he

4    behaving like this.

5            And then when he goes over and they pick him up

6    and start escorting him across the street when he's asking

7    him about has he be doing drugs, well, first of all, George

8    Floyd denied that, which we now know was false.  And second

9    of all, if you listen to it, George Floyd says, "I was

10   hoopin' earlier."  And, again, I brought that up in my

11   opening statement and told you to pay attention to that.

12   Hoopin', as we now know, can be used to describe when

13   someone is taking drugs rectally.

14           Then you look at Officer Kueng.  Officer Kueng

15   came over to help handcuff Mr. Floyd and walk Mr. Floyd over

16   to the Dragon Wok.  He said on the way there Mr. Floyd

17   dropped down or sort of fell down, not once, but twice,

18   which could be indicative of somebody on drugs.  He too

19   noticed the erratic behavior of Mr. Floyd and he was asking

20   him, "Are you on something?"  He also noticed foam around

21   his mouth.

22           And think to the inside of Squad 320 when it would

23   be the special agent from the BCA, McKenzie Anderson,

24   testified.  She was the person from the BCA crime scene team

25   who came out and documented what was inside both the blue

1    SUV and the Squad 320.  And she documented a number of blood

2    stains in the rear of Squad 320, including one high up sort

3    of on the seat right by the passenger side door.

4           And do you remember looking at that and her

5    making -- her agreeing with my comment that that could be

6    consistent with somebody who is bleeding out of their nose,

7    having their face pushed up against it?  Because it looks

8    like there's a nose print and two what could be lips.

9           And then right off to the side of it was some

10   white residue that was never tested.  That would also

11   confirm the foam around the mouth, assuming that hypothesis

12   is correct.

13          So you have Officers Lane and Kueng and Chris

14   Martin all believing that George Floyd is high on drugs, and

15   then you have my client.  And my client, going back to the

16   point where Mr. Floyd is down on the ground, they're trying

17   to figure out what to do, do you remember my client saying,

18   "What are you on?"  At that point then my client starts

19   asking, "We have EMS started, correct?"  What are we -- and

20   I'll leave this up to you, but it's my recollection that

21   Mr. Lane, then Officer Lane, said, "We've got EMS coming,"

22   which is the paramedics, "Code 2."

23          And then there's a suggestion of stepping it up to

24   Code 3, and then my client called into dispatch on his radio

25   to step up EMS's response to Code 3.  They didn't do that

1    for a bad purpose.  They did that to get EMS there quicker,

2    because they realized that at this point they had some sort

3    of a medical situation developing.

4         And when you have somebody who is -- who you're

5    detaining who is in some sort of a medical situation, that

6    has to be dealt with by medical people, like EMS.  So at

7    this point my client knows they're not going to put him in

8    the back of the squad and bring him to the jail; they're

9    going to hold him until EMS shows up.

10        Now, I would also point out a couple things.  One

11   is, again, and I'm not trying to demean Mr. Floyd in any

12   way, but Mr. Floyd clearly wasn't being honest when he said

13   he wasn't on drugs.  We now know he was on drugs for a

14   couple different reasons.

15        One is the toxicology results that Dr. Baker and

16   others have talked about.  He had both methamphetamine and

17   fentanyl in his system.

18        Secondly, the second search of the Mercedes SUV

19   resulted in the discovery of two pills that were in the

20   center console, both of which were tested, both of which

21   were determined to have both methamphetamine and fentanyl as

22   what was in them.

23        And then you've got the search of Squad 320, the

24   second search, that turned up the little white pill down on

25   the floor by that center barrier and some other pill

1    fragments that had been left during the course of the first

2    search.  And we know that that pill, the round pill, whether

3    it was whole or not, down on the floor of Squad 320

4    contained methamphetamine and fentanyl.

5           And additionally we know that that pill was

6    actually tested, determined to have George Floyd's saliva on

7    it and George Floyd's DNA.  So that would lead a reasonable

8    person, using their common sense, to believe that that came

9    from George Floyd's mouth.

10          So we know that, in fact, he was having narcotics

11   in his system.  That is consistent with the observations of

12   all four of these people.

13          Now, you heard testimony about excited delirium,

14   and I'd like to talk to you about that, because, if you

15   recall, all three of the officers, independently and perhaps

16   for different reasons, came to the conclusion, at least to

17   them, that they believed Mr. Floyd was in excited delirium

18   syndrome.

19          As an aside, let's step back.  We know that Derek

20   Smith said, when he was questioned, that based on what he

21   knew about the call, he suspected that there may be excited

22   delirium.

23          And when I talked to him about excited delirium,

24   he said, yes, this isn't something that a lawyer made up.

25   This is something that he's seen that he's interacted with

1    with people in his job as a paramedic.

2            You also heard testimony from Dr. Langenfeld.

3    He's the emergency room doctor that attempted to revive

4    George Floyd at HCMC.  He's seen people in excited delirium.

5            You heard Dr. Baker say that he's dealt with

6    excited delirium, he's familiar with it, and he's actually

7    certified as a cause of death excited delirium.

8            This is not something that's made up.  It's

9    historical.  It goes back to different things referred to as

10   Bell's mania, agitated delirium, all kinds of things.  It is

11   a concept that has much conflict about whether or not it's a

12   real syndrome or what it is, but you know that it's not

13   something that's made up and you know that my client and the

14   other officers were trained on it.

15           And if you look at it, all three of the officers

16   came to their own independent conclusion that Mr. Floyd

17   might be in the throes of excited delirium and that's what

18   they were trying to deal with here.

19           What do we know about why that was?  My client

20   testified that, in his observations of Mr. Floyd, that

21   Mr. Floyd was sweating profusely, and this is when he's

22   arriving at the car before he's gone over to the far side;

23   that Mr. Floyd was agitated and not following instructions.

24           He believed that George Floyd was under the

25   influence of drugs.  I believe his testimony was it was

4065

1    obvious he was high; and, secondly, he said that he heard

2    George Floyd say, "I ate too many drugs" when he's down on

3    the ground on the side of Squad 320.

4          Also his testimony was that this was the most

5    violent struggle he's ever seen with somebody in handcuffs.

6    And think about this.  You've got a person with his hands

7    handcuffed behind his back, which limits the use of his

8    arms, yet that person was able to physically resist not one,

9    not two, but three officers who were trying to get him in

10   the back of the car.  These are officers who are trained at

11   things like pain compliance, various techniques to do this,

12   and yet they couldn't get him in the back of the car and

13   contain him in there.  That goes to the idea of super-human

14   strength.

15         And if you look at the other three officers and

16   what their testimony is, why they believe this, if you look

17   at Officer Kueng, he testified that, A, he believed George

18   Floyd was on drugs; B, that George Floyd was foaming at the

19   mouth; C, that he was sweating profusely; D or four, that he

20   had an attraction to glass.  You heard Officer Kueng testify

21   about George Floyd striking his face on the glass partition,

22   not once, but twice.  And then, third, that he was -- excuse

23   me, fifth, that he was exhibiting super-human strength in

24   terms of his ability to resist being put in the car and his

25   resistance on the ground.

1          Officer Lane also testified, and you actually hear

2     him say that when he's on the scene, "I'm worried about the

3     excited delirium or whatever."  Well, maybe he's just making

4     it up, but let's look at the objective reasons he may well

5     have believed that.

6          I believe Officer Lane testified, apart from

7     his excited -- excuse me, his comment about the excited

8     delirium on the video, that he believed that Mr. Floyd was

9     on drugs, and you can see that from his earlier comments

10    going back as far the Dragon Wok; that Mr. Floyd was

11    sweating profusely; that he had a very strong, super-human

12    almost level strength; and I don't want to put my

13    descriptive words on that, but he described Mr. Floyd as not

14    being able to come under control, they weren't able to put

15    him in the side of the squad; and that also that he had

16    banged his face on the glass partition.

17         And if you think about this, you think about the

18    training the officers received, that NOTACRIME, I'd like to

19    go through some of those.  And I have to step away from the

20    microphone, so I'll speak loudly for our court reporter, but

21    I'd like to put some things up here to see whether or not

22    the officers' beliefs or understandings are actually borne

23    out by the training they received.

24         Now, what I'm going to do is I'm going to refer to

25    Exhibit T-12.  There's another exhibit number, but it's the

1    PowerPoint presentation that was given at the Minneapolis

2    Police Department in terms of training, both at the police

3    academy and as well in the in-service training.

4         You heard Inspector Blackwell talk about this and

5    you heard them use the word "NOTACRIME."  It's an acronym or

6    a group of symbols to allow people to remember this in

7    situations.

8         And if you look at slide 16, it says, "NOTACRIME

9    is a pneumonic used to remember specific clues or behaviors

10   we," training police officers, "can use to identify excited

11   delirium syndrome subjects."

12        And then 17 just has a video.

13        But then slide 18, the first one is "N."  "Patient

14   is naked and sweating."  And it shows one of the videos you

15   could see of a person that was naked.  Now, the government

16   has taken pains to point out that George Floyd wasn't naked,

17   and I'm not claiming he was.  First of all, he's in

18   handcuffs.  He can't take off his clothes.  But "N" stands

19   for is naked and sweating.  Think about the testimony from

20   all three officers about Mr. Floyd sweating profusely.

21        Going then to slide 20, the "O."  "Not," n-o.

22   "Patient exhibits violence against objects."  And if you

23   think about the second bullet point there, high likelihood

24   that glass is targeted.  The glass partition in between the

25   front and back seats of Squad 320.

1          Then there's another video, which we won't show

2     you again.

3          The "T" stands for "Patient is tough and

4     unstoppable."  Three officers not able to control a person

5     in handcuffs such that they can even put him in the back of

6     the squad.

7          "A" for NOTACRIME, the onset is acute, which means

8     it can happen right away.

9          Now, one of the things the government has pointed

10    out was that there was no information in dispatch about the

11    officers coming to an emotionally disturbed person or people

12    reporting something, but that doesn't mean that it can't

13    happen, just because it's not reported.

14          And we have another video, which we won't show you

15    again.

16          "C" stands for "Patient is confused."  I would

17    point out that although Mr. Floyd seemed agitated, it did

18    not appear to me that he was confused because he was able to

19    respond to questions.  It appeared to me he was responding

20    to Mr. McMillian's questions and not following the police

21    commands, but I'm not arguing he was confused.

22          "R:  Patient is resistant.  Handcuffing and

23    hobbles will take multiple officers."  Isn't that really

24    what we're watching here?  And if you will see in the

25    comment to this -- and, again, this is how my client was

1    trained -- "MPD blue hog pile."  They are talking about ways

2    to control a person who is suspected to be in excited

3    delirium.

4         "I" for NOTACRIME stands for "Patient's speech is

5    incoherent."  I don't know that Mr. Floyd's speech was

6    incoherent.  But they also say, "Do not rely on information

7    they give you to be accurate."  I'm not on drugs.  I'm not

8    that guy.  Was that really accurate?

9         "M" of NOTACRIME stands for mental health.  Any

10   behavior that seems to be out of the ordinary, and then it

11   can be anything you observe from the scene.  In other words,

12   you don't have to rely on preexisting information.  It can

13   be things you as an officer observe.

14        And then "E:  EMS should be requested early."

15   What did the officers already have in this case?  They had

16   EMS being already requested and now they're stepping it up.

17        And then going on to infamous slide number 31.  I

18   can show you at the bottom here.  There we go.  And this is

19   the slide that was used in training that shows a person

20   being put down who is suspected of being in excited

21   delirium, at least for purposes of this drill, with the knee

22   on his neck.

23        Now, this, of course, is the only slide in that

24   PowerPoint that talks about placing the subject in the

25   recovery position.

1          You would also note in the comments that it said,

2     "You may need to have one officer ride along with the

3     subject if there is a chance they could become violent."

4     Why do you suppose they are training officers this?  Because

5     obviously there have been recorded instances of people who

6     would appear to be under control who suddenly become violent

7     and fight again.

8          Now, if you go to that training and you think

9     about what all three of those officers said, again, all

10    three officers come to the same conclusion, rightly or

11    wrongly, but at least it is based on their training and not

12    something they're just grabbing out of the blue.  And

13    Officer Lane was verbalizing this at the scene.

14         Now, again at this point my client asks that EMS

15    be stepped up to Code 3.  And he testified that he would

16    expect them, if they're responding from Hennepin County

17    Medical Center to 38th and Chicago, that it would take

18    approximately five to six minutes for them to get there.

19         So at this point they decide that they're not

20    going to use the restraint, again, for two reasons.  One is

21    that potentially Mr. Floyd is in a drug ingestion or an

22    overdose that's going to need to be assessed for that and it

23    becomes a medical issue because you don't bring people who

24    may well be having a drug reaction issue to jail without

25    giving them medical attention first; and the second, the

1    police officers suspected that Mr. Floyd was in excited

2    delirium.

3            Now, going, then, to analyzing my client's actions

4    from a perspective of what he knew, this is what he was

5    dealing with.

6            Now, look at my client's training.  Again,

7    basically what they train Minneapolis police officers to do

8    specifically with people in excited delirium is to get them

9    under control and await the arrival of emergency medical

10   services.  These are the paramedics that you've heard about

11   that come out and sedate people.

12           Secondarily, look at my client, who has

13   independent experience and training dealing with people in

14   excited delirium.  You will remember that when he was laid

15   off following the recession in 2009, that he went to work at

16   Fairview Riverside Hospital as security.  And in that role

17   he didn't receive any training about excited delirium, but

18   he was repeatedly called on to restrain people who were

19   severely agitated or potentially in excited delirium at the

20   behest of medical personnel, nurses and doctors.  And his

21   role was to restrain them, as he testified, people using

22   knees, multiple people on them, so they could be sedated for

23   their own well-being.

24           And then look at essentially my client's

25   additional experience with excited delirium, because he's

1    been a police officer for a period of time.  He testified

2    that he's dealt with people who he suspected of being in

3    excited delirium approximately 30 times over the course of

4    his career.  And with regard to that, the training, if you

5    look at it from the department, is to restrain that person

6    until EMS shows up.

7            Now, let's shift focus to the training, because

8    you heard Inspector Blackwell come in here and testify we do

9    not train people to put knees on neck in Minneapolis, that's

10   not something we authorize.  We also know that's probably

11   not accurate at this point.

12           All right.  We know that neck restraints are

13   allowed.  And even using your leg to do a neck restraint on

14   somebody is allowed per policy, even though there's no

15   training on this.

16           Now, if we look at Inspector Blackwell, she

17   testified that when she became head of the training

18   division -- she was promoted to lieutenant -- she became

19   head of the training division, she reviewed all the training

20   herself.  She reviewed it and previewed it with command

21   staff, including the chief of police, to make sure his

22   vision was in there.  And her testimony was they didn't use

23   knees on neck.

24           Now, I won't go back and relive all this, but if

25   you look at some of the training, we know that there were

1    knees on neck being trained in Officer Thao's academy.

2         If we could put up just a couple pictures.  And

3    this is from his time at the academy in 2009.  If you

4    recall, he was actually given sort of as a memento a number

5    of different photographs.  And so we've got some photographs

6    from 2009 that clearly show things.  And these are exhibits

7    which have been admitted in evidence.  You can review those.

8         This is Exhibit T-27.  This is one of the

9    supervisor's desk at the police academy, Special Operations

10   Center.  And you can see in the background there's a

11   bulletin board and you can see at the top there are the

12   officers that were a part of the academy.

13        And if we could show a couple videos that clearly

14   show officers using their knees on someone's neck.  Do you

15   see the knee right there (indicating)?

16        Okay.  We can move to the next one.  And if you

17   look at the officer's knee.

18        If you could move to the next one, this is

19   actually a 2009 version of Officer Thao, along with another

20   recruit, and they are using their knees on people's necks.

21        And then we also showed you videos that were taken

22   in the 2017 police academy.  This is when the officers are

23   doing drills on how to put handcuffs on somebody down.  And,

24   again, Officer Black -- excuse me, Inspector Blackwell's

25   testimony was we don't train the use of knees.  Do you see

1      the officer's knee on the person's neck?

2              And if you recall the testimony about the special

3      equipment they're wearing, that helmet actually has a plate

4      on the back of the neck as opposed to the front, which lends

5      credence to the idea that they might be expecting that

6      people use their knees on neck.

7              There's another one.

8              And there's another one.

9              And there's one where two officers are doing this.

10             And then if you go to that infamous slide 31,

11     which if we could take down that, it again shows an

12     instructor using their knee on someone's neck.  We now know

13     that Officer Blackwell's testimony wasn't accurate.

14             Now, if you look at my client's specific excited

15     delirium training, he testified he received training on

16     excited delirium at the police academy that was a

17     PowerPoint.  And then following his layoff, he came back to

18     the police academy and over the course of years in-service

19     was shown that exhibit, T-12.  He testified he had seen that

20     exhibit.

21             All right.  He also had had lots of exposure to

22     people in this circumstance, in excited delirium, and he

23     talked about the need, what they're trained on, to restrain

24     the people so they don't exhaust themself to death,

25     essentially for their own safety.  That's why they come in

1    and sedate them.

2            I would point out a couple things.  One is the

3    government equates restraint to use of force, and that's not

4    always correct.  A person can be restrained without a use of

5    force.  An officer can come over and place his hand on my

6    arm.  That's not really a use of force.  He's just

7    restraining me.  I can also be restrained when I'm put in a

8    room with special padding, like at Fairview Riverside, or I

9    can be restrained down on the ground.  The idea is why is a

10   person being restrained.

11           Now, look at my client's experience.  He testified

12   about two specific examples of the approximate 30 times he

13   dealt with excited delirium.

14           One was when they responded to a car in a snow

15   bank, and by the time he'd gotten there both fire and EMS

16   was there and the person was loaded into the back of the

17   paramedics thing, and they were sitting around talking when

18   all of a sudden the person woke up and started fighting.

19           The second one my client testified about getting a

20   call to "one down" on approximately 46th and Hiawatha and

21   coming there and EMS had already loaded the person up when

22   they're sitting there talking.  And then the person got in

23   the van.  They asked them, "Do you want somebody to go

24   with?"  "No, I don't."  And then a couple minutes later

25   there's a call fighting with paramedics.

1          So in my client's own experience, he's dealt with

2     people who have risen up when they're in excited delirium

3     and gotten violent again, in addition to his particular

4     training.

5          Now, with regard to the training he received, they

6     talked about the role of police in sedation in that

7     PowerPoint.  Again, you'll get that to go back with you.

8     The role of the police officer is clearly to restrain a

9     person so that they can be sedated for their own safety.

10          Now, the government's talked about scene safety

11     and they made a great deal of this crowd up there, that that

12     crowd wasn't posing any danger to the officers.  But when

13     you look at my client's actions or inactions, look at the

14     idea of scene safety as being much more than just simply the

15     crowd of people who were standing there doing whatever

16     they're doing.

17          And, by the way, these people don't know what's

18     going on.  They don't know what's going on with Mr. Floyd

19     before, when he was in the car or brought over to the Dragon

20     Wok or brought here, the struggle.  All they see is the

21     police officers on him.

22          And they're calling out and asking for certain

23     things, but when they're doing that, my client's testimony

24     is they were restraining Mr. Floyd to wait for EMS.  They're

25     essentially waiting for medical services to arrive to sedate

1    him for his own well-being.

2           Additionally, you've seen from some of those

3    videos in the excited delirium training these people can be

4    violent, maybe -- it's a medical issue, I'm not saying

5    they're doing anything criminal or wrong, but you can see

6    them punching people, punching fences, breaking free,

7    attacking police officers, doing all kinds of stuff.  This

8    is what they train these officers to believe is going on

9    with excited delirium.

10          So there's a component of safety of the officers

11   and then a component of protecting the person from themself

12   or attacking bystanders.  So think about that when you look

13   at my client's actions.

14          Now, if you look at this case, one of the things

15   the government has pointed out is they don't have to prove

16   that Mr. Thao intended to have Mr. Floyd die.  Absolutely

17   correct.  I'm not saying any of that is wrong.  But you have

18   to look at my client's intentions within the context of

19   willfulness.

20          And if my client reasonably believes that

21   Mr. Floyd may be in excited delirium and reasonably believes

22   that he needs to be held until EMS arrives, his purpose is

23   not a bad purpose and it's not done with improper motive.

24   It is done to make sure that he receives the medical

25   attention he needs.  This is what goes to the idea of

1    willfulness, ladies and gentlemen of the jury.  This is an

2    element the government has to prove beyond all reasonable

3    doubt.

4            I would also point out one final thing is that

5    with regard to the deliberate indifference to the serious

6    medical needs and the failure to intervene, one of the

7    things that my client was trained is that if you don't have

8    a pulse, you are supposed to perform immediate CPR.

9            And so the idea is that if Mr. Thao was standing

10   there and the other three officers are monitoring or dealing

11   with Mr. Floyd and he doesn't see them rolling Mr. Floyd

12   over and doing CPR, a logical assumption from that, from his

13   training, is that Mr. Floyd still has a pulse.

14           If that is the case, he's not being deliberately

15   indifferent to the medical needs of Mr. Floyd and,

16   additionally, that force is not unreasonable because

17   Mr. Floyd still has a pulse.

18           The specific intention behind my client's actions,

19   rightly or wrongly, was to try to make sure that Mr. Floyd

20   was actually being held until he could receive medical

21   attention.  And for you to find my client guilty, you have

22   to find that his actions in doing so were done with a bad

23   purpose or improper motive.

24           In this case when I spoke to you at the outset, I

25   said at the end of this case, once you've heard all the

1    evidence, there will only be one reasonable verdict and that

2    verdict is not guilty on all counts.  Remember, just because

3    something has a tragic ending does not mean it's a crime.

4          Thank you very much.

5          THE COURT:  Thank you, Mr. Paule.

6          Members of the jury, let's take a brief recess at

7    this time.  We'll stand in recess for just about ten

8    minutes.  And, again, keep an open mind and don't discuss

9    the case.

10         The jury may be excused.

11   (Recess taken at 1:37 p.m.)

12                         *  *  *  *  *

13   (1:48 p.m.)

14                       **IN OPEN COURT**

15                       **(JURY PRESENT)**

16         THE COURT:  Mr. Plunkett, I'll recognize you for

17   summation.

18         MR. PLUNKETT:  May it please the court.

19         Ms. Bell, your team, Mr. Paule, Ms. Paule, Mr. Tou

20   Thao, Mr. Gray, Mr. Lane, family, supporters, friends,

21   members of the jury.

22         There are four factors that led to the

23   conclusion -- lead to the conclusion that Mr. Alex Kueng, a

24   26-year-old idealist from North Minneapolis, did not act

25   willfully as alleged in the crimes he is charged with.

1    Those factors are:  One, his inadequate training; two, his

2    lack of experience; three, his perceived subordinate role to

3    Mr. Chauvin and the other officer; and his confidence in his

4    senior officers, one of which, Mr. Chauvin, was his field

5    training officer until just two and a half shifts prior to

6    this event.  Those four factors, combined with a

7    confrontational crowd, created a dynamic, unusual, and,

8    frankly, foreign situation.

9            When we first met during my opening statement, I

10   told you that this case is about a tragic event in our

11   nation's history that we have all now viewed from every

12   available angle and perspective.  As I said, things cannot

13   be unseen.

14           But those many videos that we have now been

15   exposed to are not what Alex Kueng saw, perceived, or

16   experienced on May 25th, 2020.  In fact, his own body

17   camera, body-worn camera, does not fully explain or

18   demonstrate what he perceived and experienced as it was

19   happening.

20           There's one legal principle that I anticipate the

21   court will instruct you on, well, there's many, but one I

22   want to focus on, and that is the need to avoid relying on

23   20/20 hindsight while you apply the law to the facts in your

24   examination of Mr. Kueng's conduct.

25           Now, of course you must take the law as it comes

1   to you from the court, but what does it mean to avoid using

2   20/20 hindsight?  It means, as a fact-finder, you should

3   avoid considering matters that are outside the realm of

4   Mr. Kueng on what he could see, perceive, or experience when

5   considering or determining if his actions reflect a willful

6   disregard for Mr. Floyd's constitutional rights.

7          Again, I'm Tom Plunkett and this is my closing for

8   Mr. Alex Kueng.  A closing is a wrap-up.  It's Mr. Kueng's

9   last opportunity to have me address you on his behalf.

10          In the next hour or so, and I will try to move

11   with a little alacrity here as we've been here a month --

12   I'm going to talk about who Alex Kueng is, why he became a

13   police officer, his training, the evidence, testimony that

14   we have heard over the last month.

15          But first I want to talk about the elements of

16   these two offenses.  I put the elements first because a jury

17   must apply the law as the judge gives it to you to the

18   facts.  So to simply put -- put it simply, if we don't talk

19   about the law first, you have nothing to apply the facts to.

20          Elements.  I anticipate this court will instruct

21   you on the elements of the offense.  Now, perfectly clear,

22   I've said it already, any time throughout my presentation

23   when I talk about law, always know now and throughout my

24   closing presentation that only the judge can give you the

25   law.

1           Alex Kueng is charged with two counts in this

2    criminal indictment.  Both of the counts charge him with

3    deprivation of civil rights.  Although each count is an

4    alleged violation of the same law or statute, they are, in

5    fact, different offenses with slightly different elements,

6    although there's a fair amount of overlap.  Elements are

7    what the government needs to prove to you by proof beyond a

8    reasonable doubt.

9           In Count 1 it is alleged that Alex Kueng deprived

10   Mr. Floyd of his right to be free from unreasonable seizure

11   during an arrest on May 25th, 2020.

12          In Count 2 it is alleged that Alex Kueng deprived

13   Mr. Floyd of liberty without due process of law by acting

14   with deliberate indifference to George Floyd's serious

15   medical needs.

16          There are four elements, I believe, to each

17   offense.  For now I'm going to focus on the second of those

18   four elements, and that's the willful element.

19          To act willfully means that it must be proven that

20   Alex Kueng acted with a bad purpose or improper motive to

21   disobey or disregard the law, specifically intending to

22   deprive Mr. Floyd of his rights.

23          The government does need to show Alex Kueng had a

24   specific intent.  Specific intent must be proven.

25   Essentially, that as he knelt there that day, he intended to

1    willfully deprive Mr. Floyd of his rights.  If it is not

2    shown that there's a willful act with specific intent to

3    deprive Mr. Floyd, and not just shown, but shown by proof

4    beyond a reasonable doubt, then the crime is not proven.

5             In Count 2 the government must prove that Alex

6    Kueng acted with deliberate indifference.  That means the

7    government must prove that George Floyd suffered -- and this

8    is Count 3 -- from one or more objectively serious need and

9    that Mr. Alex Kueng knew of that serious medical need, but

10   deliberately disregarded George Floyd's medical needs.

11            Evidence.  Most of the evidence came to us from

12   the mouths of witnesses and via videos.

13            I anticipate that the court will instruct you on

14   the credibility of witnesses.  Please listen to that

15   instruction.  I'm not going to read it to you.  I want to

16   move -- be efficient, but not waste your time.  You are

17   going to get a copy of the instructions.  Please take a

18   close look at that one.

19            Now let's talk about some of the witnesses.

20   Dispatcher Jenna Scurry and Captain Norton of the

21   Minneapolis Fire Department.  It wasn't entirely clear to me

22   why they talked so much about this fire truck versus

23   ambulance thing.

24            Keep in mind -- it's a small point, but the

25   government brought it up, so I thought I should cover it.

1    When Captain Norton with many, many years of experience
2    testified, Captain Norton said EMS is not solely the fire
3    department.  Captain Norton testified -- please recall that
4    I confirmed.  If you say I need EMS, are you asking for
5    medical services?  He says, yes, sir, that's paramedics and
6    fire.  I believe Mr. Thao testified to that too.  When you
7    say EMS, you expect the entire calvary.  That's what these
8    gentlemen did.  I don't know that it's an important part of
9    the case, but the government brought it up, so I felt I
10    needed to address that.

11        Paramedic Derek Smith.  A calm fellow, to be sure;
12    a highly trained and experienced paramedic and a man of few
13    words.  He felt the scene was not safe to provide medical
14    care, so he moved Mr. Floyd to a different location.  To
15    him, the scene was not safe for medical care.  He chose to
16    go a couple of blocks away.  He felt the crowd was hostile.

17        There was questions to him about his May 29th
18    interview with the FBI where he said I'm going to go home at
19    the end of the night.  The way they teach it is scene safe,
20    and that scene was not safe.

21        Inspector Blackwell.  Please take time to reflect
22    on and scrutinize the difference between Inspector
23    Blackwell's direct examination by the government and her
24    cross-examinations.

25        I'm going to run through just a few quick things

1    that she talked about and then I'm going to talk about some

2    other things.

3            You've already seen these, so I want to go through

4    these pretty quickly.  I think this is T-20.  She told you

5    straight up that this is never trained, but we know that in

6    Tou Thao's class and in 2017 that the knee on the neck was a

7    common practice.  We know that because we've seen it on two

8    different occasions.

9            She also told you that at this big fight training

10   scenario -- we never saw the fight training scenario, we

11   never heard any testimony about it from anyone except her,

12   but what we did see is scenarios end when the persons are

13   handcuffed.  We did see that.

14           The side recovery position was never part of the

15   scenarios.  Do you remember I asked her about the lesson

16   plans?  Because the government had gone through the lesson

17   plans in some detail.  And she conceded that it appears

18   nowhere in the lesson plan.

19           This is the duty to intervene training.  This is

20   one slide in a slide deck.  What is the duty to intervene?

21   We found out now that when you come to this slide, somebody

22   reads to you, to the recruit, the policy; gives a couple of

23   rather obvious examples about situations where you should

24   intervene, kicking somebody in the head that's handcuffed;

25   and then they play this video.  But this video doesn't exist

1    anymore, so we don't really know what it is.

2            We know in the training that she said, oh,

3    heavens, no, we don't train a "us" verus "them" mentality.

4    That's not what we do.  But when we got to the last slide in

5    the use of force defensive tactics presentation, we saw the

6    video with very disturbing images.  Even their expert,

7    Mr. -- Chief Longo, said that that video was disturbing.  I

8    don't see any reason to play it for you again.  We don't

9    have five minutes to sit and watch that again.  I think

10   we've seen it twice.

11           We have this slide from the excited delirium

12   training.  I think we heard testimony that what this slide

13   shows -- I think Mr. Paule brought up the comments -- is

14   that someone with excited delirium needs to be held down.

15           We learned that the inspector was promoted out of

16   training just two and a half months before the DOJ

17   started -- the Attorney General for the United States,

18   Department of Justice started their patterns and practices

19   investigation and we found out that that investigation is

20   going to focus, among other things, on training.

21           We know that Inspector Blackwell met several times

22   with a team of lawyers, and I think one of the agents said

23   there was 100 agents on this case.  She met with them many

24   times.

25           She talked to me once on the phone.  I told her I

1    can't talk to you, but I've got a private investigator named

2    Susan Johnson.  When Susan Johnson called her three times

3    and left a message, she didn't talk to us.  She said I

4    receive a lot of phone calls that I don't know the validity

5    of who they are.  Well, the validity of who they are is I

6    said I've got an investigator named Susan Johnson and she'll

7    be in touch with you.  Think about that in terms of what it

8    shows for bias.

9         She had a past relationship with Mr. Chauvin of

10   about 20 years.  I think they were CSOs at the same time in

11   different precincts.  She personally chose Mr. Chauvin to be

12   an FTO.  She confirmed that.  She said that when they choose

13   FTOs, they don't look at any psychological evaluations, they

14   don't do that, yet they have these people training young

15   officers.  That only came out on cross.  The government

16   didn't bring that up.

17        She said that the recruit academy had gone

18   completely away from a paramilitary structure.  I'm not

19   going to run through that training manual again from the

20   recruit program.  You've seen it already.  Just rely on your

21   memory.  But several hours of drill and ceremony, parade

22   rest, stand at ease, column left.  And she testified that,

23   well, those have a lot to do with riot training.  Brace the

24   wall, all these things.

25        Inspector Blackwell testified that the officer of

1      the day position is a leadership opportunity in the academy

2      to get officers, young officer -- recruit officers

3      accustomed to dealing with, you know, real-life police

4      officers.  That didn't really pan out.

5              Exhibit K-F, that is the Survey Monkey from 2018.

6      It's an exhibit that you will have an opportunity to read

7      and review and think about.  It chronicles the depth of the

8      chronic failures of the FTO program, that nobody knows what

9      the recruits are being taught.  One of the FTOs doesn't even

10     want more training because he characterized Minneapolis

11     Police training as going into a room and zoning out and

12     drinking too much coffee until you need to relieve yourself.

13     That chronicles -- that's what chronicles the problems.

14             And in response to that, she created a 40-hour

15     class, a 40-hour class with no metric of learning, no test.

16     Well, there's one test.  They got a lawyer that teaches

17     about some constitutional principles.  Of course, the lawyer

18     shows up at the test.  That class is some sort of magic

19     inoculation against all the problems in that program?

20             It's her program.  She was the training -- head of

21     training.  Now there's an investigation from the DOJ.  She

22     has some bias.  She's close friends with -- or was a close

23     associate of Mr. Chauvin.

24             The point is this.  I've asked you, the jury, to

25     consider four factors.  I'm sure you remember what they are.

1    And we're going to talk about some more of those things.

2            Officer Mackenzie.  Good officer, shows

3    initiative, dedicated.  She endeavored to help the

4    department save money, yet still provide good training.  She

5    created the EMR program for the City of Minneapolis.  That's

6    her baby.  That's her contribution.  That's her mark on the

7    world.

8            Let's talk about some of the things that the

9    government never seems to mention to you from the EMR

10   training.

11           Here we have page 80.  Your first consideration at

12   any emergency scene is safety.  Your safety is paramount, as

13   is the safety of others on the scene.  Some scene safety

14   hazards include violent or hostile situations.

15           Page 82, scene safety.  If the scene -- if the

16   incident is hostile, fight or flee, use cover or

17   concealment.

18           Page 83.  This is talking about triage of medical

19   patients.  To implement START, first ensure that you are

20   safe and that you have communicated that type of incident

21   with which you are involved to your communications center.

22           Page 214.  Assessment of cardiac arrest.  Ensure

23   the scene is safe.

24           They were tested on this.  Exhibit 85, page 2,

25   make sure the scene is safe.  As a critical criteria -- you

 1    lose points.  Critical grading criteria.  Failure to
 2    determine the scene is safe.  The same in this patient
 3    assessment section.
 4            Page 9 of that exhibit.  Check the scene is safe,
 5    then approach the patient.  You approach the scene and
 6    ensure that it is safe.  Demonstrate what you do next.
 7            Same thing on -- similar on page 10.  It talks
 8    about check the carotid pulse.
 9            Page 11.  Ensure the scene is safe.
10            Here's the test.  This is Mr. Kueng's test.  The
11    best method for checking circulation in a triage situation
12    is to check the carotid pulse.
13            Page 17.  If you are unable to feel a carotid
14    pulse in an unconscious person within five to ten seconds,
15    you should begin cardiopulmonary resuscitation at once, CPR.
16            18.  Determine that the scene is safe and assess
17    the patient.
18            Check the carotid pulse, we heard that repeatedly.
19    On cross-examination Officer Mackenzie talked about --
20    talked about this.  She agreed that checking the carotid
21    pulse was the gold standard.  And where an EMR should go
22    during the ABCs, airways, breathing, and circulation, the
23    "C" is the carotid pulse.
24            Officer Mackenzie agreed in her testimony that
25    Officer Chauvin was in the best position to assess Mr. Floyd

1   due to his proximity to Floyd's head and his carotid artery.

2   She agreed that when Mr. Kueng did not get a radial pulse or

3   a wrist pulse, that he reported that to Officer Chauvin, who

4   was in control of the head.

5          She also confirmed that if a person cannot find a

6   radial pulse, they should actually check a carotid pulse.

7   In fact, if you don't find a carotid pulse, she said you

8   should have another person check before beginning CPR if it

9   can be done quickly.

10          Officer Mackenzie confirmed or testified that the

11   radial pulse is not reliable when a person is in handcuffs.

12          She also testified that there isn't a discernible

13   difference between EMS and fire and rescue.

14          Lieutenant Zimmerman.  You can't help but like the

15   lieutenant.  He's a venerable grandfather figure, but we did

16   peel back that onion just a little bit.  Let's talk about

17   that.

18          He's not a bad man, he's a good person, but he,

19   like most, viewed the video, the Frazier video.  That's the

20   viral video.  It's powerful.  The video shows Mr. Chauvin.

21   But his testimony was not consistent with what a good

22   homicide investigator does, because after viewing that video

23   he began confabulating the facts, changing them to fit a

24   narrative that he wanted.

25          He testified that the boys lied to me.  They told

1    the FBI -- yeah, the first thing they said was, you know,

2    can we turn off our body-worn cameras?  That imputes a

3    suggestion that the officers wanted to hide something.  I

4    played the video for you.  They never said it.  They told

5    him that they suspected an overdose.  That's a very

6    significant change from what was actually said, because if

7    you honestly suspect an overdose, then you've got actual

8    knowledge of a serious medical need.  Never said, it was

9    never said to him, but he told that to the FBI.  There's a

10   third thing that escapes me right now, so I apologize.

11          Keep in mind the context of that statement.

12   They're calling it a statement, but there was not a question

13   and answer.  It's nothing like that.

14          Ah, the third thing.  It came back to me like a

15   flash.  He told the FBI that they lied because they never

16   told him 330 was involve.  330 is the squad car for Mr. Thao

17   and Mr. Chauvin.  They actually did say that.  Granted, he

18   was looking at his phone.  When you look at the video, he

19   looks up, though, while they're talking about that.  I don't

20   know why he'd tell that to the FBI except he saw this

21   powerful video and it changed how he saw it and perceived

22   the events that night.

23          The context of that interview too, if you

24   remember, was a critical incident interview.  They thought

25   that this was the safety statement, where you're just

1    supposed to give a little bit of information to the --

2    actually it's supposed to be the scene commander, but the

3    guys were young, they were inexperienced.  They just knew it

4    was a lieutenant, so they cooperated.  I think Mr. Lane was

5    trying to clarify this.  What do you want?  Front to back?

6    He says yeah.

7            Sergeant Pleoger, this is a use of force review

8    that I think Mr. Kueng said he'd never actually experienced

9    before.  But to come up here and look at you people in the

10   eye and say that those two interviews show that -- I'm more

11   worried about Mr. Kueng, but that these two officers were

12   lying, that doesn't pan out.  That doesn't make sense.  That

13   doesn't -- it conflicts with common sense.  This wasn't a

14   question and answer interview.  This wasn't a planned thing.

15   This was tell me what happened.  The same with Sergeant

16   Pleoger.

17           Experts.  We heard from two use of force experts,

18   Mr. Longo, Chief Longo, very good witness.  But one can't

19   miss the fact that Mr. Longo said he was contacted by

20   Ms. Trepel, who is seated right over here from the DOJ.

21           It didn't come out in his report, it didn't come

22   out when the government was questioning him, but on

23   cross-examination we found out that he had volitionally

24   involved himself in the investigation from very near the

25   beginning.  On cross-examination we found out that he called

1    up the county attorney's office because he wanted to be

2    involved in this case.  We found out that he gave -- because

3    there was going to be an interview of at least one officer,

4    he fed questions to the investigators through the county

5    attorney's office and to the BCA.

6         I don't know that you can say that you are

7    objectively evaluating a case if you are involved in the

8    actual investigation from day one and you seek it out.  It

9    certainly is much different than Ms. Trepel calling him up

10   and saying to you are you interested.

11        Cozy relationship with the DOJ through his

12   monitoring programs.  The materials that he read were

13   cherry-picked.  He only got what the government wanted him

14   to have.  Think of bias.  Think of things that would have to

15   make you question the veracity of his testimony.

16        He testified that he'd been through the training

17   scenarios and everything and that he thought the duty of --

18   the intervention training was really quite good here in

19   Minneapolis.  I confronted him on that.  You mean reading a

20   slide and reading a policy and giving a couple of examples

21   is good training?  Well, no.  He's craw-dadding at that

22   point.  He said, well, I looked at the -- you know, all the

23   training.  Well, we found out before he even testified from

24   Inspector Blackwell that the word "intervention" doesn't

25   even appear in the lesson plans.

1              Mr. Ijames, Steve Ijames.  Forty years as a law

2      man; done use of force training all over America, all over

3      the world; doesn't have a dog in this fight.  He's not paid

4      for his time.  He testified and he explained that when you

5      look at this situation, that -- well, first, the training

6      was lousy, inadequate.  And he was given full access to the

7      entire file.  He could look at anything he wanted.  He

8      didn't look at the Super Bowl Taser plans, things like that,

9      but he wasn't restricted.  Think about his testimony.  I'm

10     not going to review this stuff in all that great of detail

11     because you sat here and you heard it too.

12              Special Agent Vogel.  The judge is going to tell

13     you about not using 20/20 hindsight.  Well, I think the

14     special agent spent over 100 hours looking at these videos

15     and trying to piece together his rather attractive

16     three-colored timeline.  The timeline, however, is just data

17     marks in time.  It's not accurate because it doesn't show

18     what happened, it didn't show what people saw, perceived, or

19     knew.

20              Doctors.  We heard from doctors from all over the

21     country, truly outstanding doctors that had many hours to

22     review all the video, look at this from many different

23     angles.  I think I reviewed all of the different things two

24     of those doctors reviewed and it was a rather lengthy list.

25              And they came up with conclusions about very

1    intricate medical things.  One of the doctors even testified

2    that he used the expression on Mr. Floyd's face to determine

3    when he had passed out.  Again, these are things that they

4    were able to see, perceive, and know that were not available

5    to the officers.

6            Actually, we had two doctors from right here in

7    Minnesota, Dr. Baker and Dr. Langenfeld.  I don't know that

8    we needed any more information, but we had to have two

9    more -- at least two more physicians come in and talk about

10   it.  They spent a lot of time and they were paid a handsome

11   fee.

12           There was many bystanders, Genevieve Hansen,

13   Darnella Frazier, Alyssa Funari, several bystanders.  What

14   they have in common is that they saw things from a

15   perspective that was unavailable to Officer Kueng.

16           Alex Kueng, that's really the only thing I should

17   have to talk about.  Alex Kueng took the stand behind me.

18   He testified.  He listened to every question that the

19   government wanted to put to him and answered it.  You decide

20   if he was truthful.  He reflected on his answers, listened

21   to the questions, and answered them.

22           He explained what he was able to perceive and

23   understand.  He talked about not knowing if the scene was

24   safe.  Why not?  Because Mr. Chauvin unsnapped his Mace and

25   shook it at the crowd.  That was a moment of significance to

 1    him.  He could hear bits and pieces.  He could hear some

 2    things.  I don't know what all he heard.  He talked about

 3    how this was the biggest struggle he'd ever been in.  He

 4    talked about how his focus shifted, had some tunnel vision,

 5    some auditory exclusions because of the intensity of the

 6    situation.  That's what he could see.  That's what he could

 7    perceive.  That's what he could experience.

 8            And who is Alex Kueng?  He's a young man.  He was

 9    only 26 at the time, 28 now, certainly the youngest person

10    involved here.  North Minneapolis kid.  Comes from a blended

11    family.  Had reasons not to like the police because they --

12    I don't think he used the word "harassed," but they were

13    impolite to his sisters or his family members when they came

14    to the home.

15            But he comes from a family of missionaries that go

16    abroad and help people, his grandfather, his mother, and

17    himself.  And he wants to make this world a better place, a

18    better place not for him, but for everybody.  That's why he

19    decided that he was going to become a police officer.

20            Got a job doing security I think at Macy's.  No

21    training there.  Got into the program, was a CSO and worked

22    very hard.  Yeah, he had training, no question about it.

23    I'm not trying to say he wasn't trained.  I'm trying to say

24    that the training was inadequate to help him see, perceive,

25    and understand what was happening here.

1          He was in the FTO program.  He was under the

2    influence of an FTO that he'd had for two more sessions than

3    policy wants, than policy says you should do.  He respected

4    this person.  He looked up to this person.  He relied on

5    this person's experience.

6          This is something that I really want to talk

7    about, because the government talked about this in their

8    closing.  It was objected to, the way they presented it in

9    their testimony.  And I don't say this lightly, but this is

10   just plain sneaky.

11         They took this body-worn camera, Ms. Sertich right

12   from her mouth said that this is how things happened during

13   the examination.  Tom Lane, TL:  "Roll him on his side?"

14   George Floyd:  "Ah."  JK, that's Alex Kueng, J. Alexander

15   Kueng JK:  "No."  Derek Chauvin:  "No."  JK, Alex Kueng:

16   "Just leave him."  Derek Chauvin:  "Staying put the way you

17   got him."  George Floyd:  "Ah!"  They actually presented

18   that to you as evidence in a serious case.

19         Let's take a look at that video.

20     (Video recording played)

21         This case is not just data marks in time.  This is

22   a flowing event, and it didn't flow the way that transcript

23   tries to make you believe or that the government tries to

24   make you believe.  It flows the way it happened on this

25   tape.  That's what you have to rely on.  That's the real

 1    evidence.

 2             I'll show the other video that they talked about

 3    of Mr. Kueng, Alex Kueng right here.  This is the one where

 4    we cross-examined and he said, well, I was just passing

 5    information down the line.  But in the interest of

 6    completeness, they tried to portray this one to you

 7    differently than it really is.  We'll take a quick look at

 8    it

 9         (Video recording played)

10             What happened at this scene, Alex Kueng was

11    confronted with something that was probably beyond his depth

12    at that point.  This guy -- you know, Alex Kueng, he only

13    looks small when he stands next to Tom Lane.  He's a

14    broad-shouldered fellow.  He's a high-level competitive

15    soccer player.  He and Mr. Lane couldn't get Mr. Floyd in

16    the car, try as they did with their training.  They were

17    working on it.

18             Mr. Chauvin shows up with Mr. Tou Thao.  And just

19    like in FTO, they took over, indicating that you're not

20    doing it right.  The question is what did he see, perceive,

21    and experience.

22             I'm going to talk about the JIGS a little bit.

23    JIGS means jury instruction guide.  Some people put these up

24    on the big screen.  I don't think that's necessary.  Let's

25    just kind of move through these.  It's my understanding the

1    court will give you your own copy to look at, but this is

2    the law.

3            You will be instructed on the presumption of

4    innocence, page 13.  "The presumption of innocence alone is

5    sufficient to find each defendant not guilty of each count."

6            Willful, it's an element.  The defendants acted

7    willfully, that is, with a bad purpose or improper motive to

8    disobey or disregard the law, specifically intending to

9    deprive the person of their rights.

10           Page 19, it talks about objectively unreasonable

11   in light of the facts and circumstances as judged from the

12   perspective of a reasonable officer on the scene without the

13   benefit of 20/20 hindsight, without the benefit of looking

14   at the Frazier video, without the benefit of having doctors

15   that are -- have years of education and decades of

16   experience.

17           Unreasonable use of force to occur in their

18   presence if that officer has the opportunity to stop the

19   force.  Read on from there.  This means that if an officer

20   knows that the fellow officer is using unreasonable force,

21   they have to realize it.

22           That the defendant actually knew Mr. Floyd had a

23   serious medical need.  However, you must find that the

24   defendant had specific intent to deprive the person of a

25   protected constitutional right by federal law.

1          Specific intent instruction.  To establish

2    specific intent, the government must prove that the

3    defendant knowingly did an act which the law forbids

4    purposely, purposely intending to violate the law.

5          You're going to have the JIGs.  You don't need me

6    to read you the JIGs.  I've been watching you.  You are

7    hardworking.  I've seen note-taking, watching, listening.

8    Apply the law, the law to the facts and think about it.

9          You are a jury.  We often hear about the mob

10   mentality.  Courts are this country's protection against the

11   mob, and courts depend vitally on you, as jurors, to examine

12   the facts and discharge your duty to be fair and impartial.

13   The exact opposite of a mob.

14         There is a quote from a book about a case that

15   captures this and the quote is this:  When a man is thrown

16   to the mob, is that justice?  Let me tell you what justice

17   is.  Justice is the law.  And the law is a man's feeble

18   attempt to lay down the principles of fairness for all,

19   fairness for all.  And fairness isn't a deal.  It's not a

20   contract or a hustle or an angle.  Fairness.  Fairness is

21   what your grandmother taught you.  Fairness is about being

22   honest.  That is what this case is about, that is what the

23   law is about, fair to all.

24         Judge Magnuson will instruct you about the law.

25   For you, as jurors, fairness is to follow the law and apply

1     it to these facts and have the bravery to do just that.

2     That's the only way we don't descend into the mob.  This is

3     the only way we carry out the important business that bring

4     us all together to serve our constitutional principles that

5     so many gave so much to preserve.

6               Thank you.

7               THE COURT:  Thank you, Mr. Plunkett.

8               Members of the jury, let's take another ten-minute

9     recess at this time.  We will stand in recess for another

10    break.  And please don't discuss the case during the recess

11    and continue to keep an open mind.

12              The jury may be excused.

13         (Recess taken at 2:31 p.m.)

14                         *  *  *  *  *

15         (2:45 p.m.)

16                        **IN OPEN COURT**

17                       **(JURY PRESENT)**

18              THE COURT:  Mr. Gray, I'll recognize you for

19    summation.

20              MR. GRAY:  Thank you, Your Honor.

21              Your Honor, counsel, counsel, ladies and gentlemen

22    of the jury.

23              I sat through the same arguments you sat through,

24    and I've readjusted my arguments because of their arguments.

25    Some people call it summation, but it's more of an argument.

1            And, as you know, my client is only charged with

2     one count -- you've heard that for the last three,

3     four weeks -- and that's being deliberately indifferent to

4     George Floyd's medical needs.

5            And you've heard the other attorneys talk about

6     specific intent, willfulness, actual knowledge that the

7     person, Mr. Floyd, has a medical need, a serious medical

8     need.

9            Before I get in there, though, and start talking

10    about that, I'd like to talk about the federal government's

11    final argument that they presented to you, and there are

12    some things in that argument that just don't sit well.

13           First of all, they talk about this crowd that

14    egged on the -- check Floyd's pulse, do this, do that.  You

15    will hear that crowd when you watch the videos.  I'm not

16    going to play them for you, but you will see it's not the

17    friendliest crowd.

18           Maybe not at first when the older gentleman was

19    talking to them, but when the older gentleman was talking to

20    them, he told George Floyd to cooperate and get in the

21    vehicle.  We didn't hear that.

22           And the crowd, the crowd -- of Floyd resisting,

23    that crowd didn't see that, most of those people.  They

24    didn't see the three and a half minutes of a 6'2", 6'4",

25    225-pound man of muscle fighting with two police officers.

1     They're not using clubs.  They're not Macing him or

2     anything.  They're just trying, trying to put him in the

3     backseat of a squad.  And these bystanders, they didn't see

4     that part of it.

5            But the government -- you rely on those

6     bystanders.  If they tell you to check the pulse, you check

7     the pulse.  They didn't get all the information as the

8     police officers did, Lane and Kueng.

9            They didn't see the original arrest when George

10    Floyd fell down, struggled with the officers to get

11    handcuffed.  They didn't see that.  They didn't see George

12    Floyd in the car.

13           And I'm not bad-mouthing George Floyd, but let's

14    face it, let's face the facts and the evidence.  And the

15    evidence is that when my client walked up to that Mercedes,

16    this -- George Floyd was not cooperative at all at first.

17           My client had to take his gun out and yell at him,

18    "Just let me see your hands," before he did it.  And think

19    about that.  And that's policy.  You heard that from the

20    lady, Blackwell.  She said that's what you are supposed to

21    do when somebody doesn't cooperate.

22           And as soon as George Floyd started cooperating,

23    put his hands on the wheel, my client, Thomas Lane, did what

24    he was trained to do; he put the gun in his holster.  And

25    you may have heard somewhere in this trial that that's

1    difficult to do once the officer draws it out.  But he put

2    it back and he talked softer to George Floyd.

3             They got him out of the vehicle.  Finally, he had

4    to pull him out.  And they struggled with him to handcuff

5    him, two young men struggling with George Floyd.  And why?

6    Because they were trying to wrestle him.  They weren't

7    bashing him over the head with anything.  They're trying to

8    be cooperative police officers, to cooperate with the

9    people, the arrestee.  They're trying to de-escalate the

10   situation.

11            They finally got him handcuffed.  Then my client

12   goes over and asks the two passengers:  "What's with

13   Mr. Lane [sic]?"  And they say, "Oh, no, he's not on drugs.

14   He just doesn't like the police."  And that's paraphrasing.

15   You may have in your notes -- but that's basically what they

16   said.

17            And what do the experts say from the Minneapolis

18   Police Department, Blackwell and Mackenzie?  That's what

19   you're supposed to do.  Mackenzie says by doing that you're

20   trying to find out if the noncompliance is a result of an

21   intent, that the man intended to do it, or is he an

22   alcoholic, is it drugs, what's with the guy, or is he

23   mentally ill, actually.  And that's what Mr. Lane did

24   pursuant to policy, right in the book.  We went through it

25   two or three weeks ago.

1           Then he comes over and they handcuff -- no, they

2    already had Mr. Lane [sic] handcuffed, but he was sitting on

3    the ground.  They got him up and they were going to put him

4    in the squad car, pursuant to policy.  You take the man and

5    you put him in an enclosed situation where you can do your

6    investigation, and they did that.  Mackenzie said that,

7    Blackwell said that, yeah, that's policy.  Do that and then

8    do your investigation.

9           But that didn't work that way, did it?  On the way

10   over my client said, "Well, are you on anything?"  Does

11   George Floyd say, "Yes, I've taken fentanyl and

12   methamphetamine and, by the way, I have a couple pills in my

13   car and, oh, also there's some counterfeit bills in the

14   seat?"  He didn't say that.  He said, "No.  Just hoopin'" or

15   something with white stuff coming out of his mouth.

16          And these are two young police officers in an area

17   that was described to you without any contravention that

18   this is a Blood area, a high crime area.  And I would assume

19   at 8 o'clock at night it's getting dark out and that's when

20   the other people, rather than the young people, come out on

21   the street in that area.  My goodness, the clerk you see --

22   you seen the clerk had a Glock pistol in his back.  Most

23   stores do not have their clerks with guns in their back.

24          So what do we have?  We have George Floyd getting

25   to the car and all of a sudden, all of a sudden he's

1    claustrophobic for the first time.  We haven't heard any

2    evidence that he'd been claustrophobic before that.  We saw

3    him with his windows up in his Mercedes, because my client

4    had to pound on the window to get it down.  But he's

5    claustrophobic.

6            And what does my client say?  He says, "I'll roll

7    the windows down."  He says, "I'll stay with you."  All the

8    de-escalation taught at the school, the academy, that's what

9    he was doing.  He was trying to de-escalate Mr. Floyd,

10   talking to a man who was obviously not having all his

11   faculties.  He obviously was either drunk or drugged up.  He

12   wasn't drunk, there was no alcohol in his autopsy, so it was

13   drugs, methamphetamine and fentanyl.

14           And they can't put him in the squad, but my client

15   trying to talk him in there, as he's taught, "I'll roll the

16   windows down."  And you look at it, you check it five times.

17   He said that.

18           And during this time who arrives on the scene?

19   Derek Chauvin with his younger partner.  Chauvin's got

20   19 years.  His partner has, what, eight years?  I don't

21   recall.  That's 26 years of police experience.  Most of the

22   police officers retire before 26 years.

23           But think about it.  We have these officers on the

24   scene and my client and Mr. Kueng, because they don't want

25   to pound on the guy or beat him or zap him or Mace him,

1    they're still trying to wrestle with him.  And my client

2    is -- they're tugging on him on the passenger side of the

3    door.

4         Chauvin comes over -- and you saw in the video and

5    you saw in the photos -- got in front of my client, who is a

6    large man, but he sees who it is and he backs off.  And then

7    Mr. Chauvin takes charge.  It's clear after he grabbed

8    him -- and you saw the picture -- put him on the ground,

9    Mr. Chauvin was now the boss.

10        So he's now on the ground.  And my client, Thomas

11   Lane, what does he do?  Pursuant to training, pursuant to

12   what he was taught, he called the ambulance, like he was

13   supposed to.  Code 2.  He's got a cut lip.  He's now on the

14   ground.

15        And my client, as Dr. Baker said, had nothing to

16   do with the death of George Floyd, with the asphyxia.  My

17   client never was on him where he would have caused any of

18   the so-called positional asphyxia.  And that was Baker.

19   That's evidence of innocence.

20        And, by the way, I told you in my opening

21   statement that you would hear from the government.  Their

22   evidence will be evidence of innocence, not any guilt.  And

23   right up to now you've heard nothing but innocent conduct by

24   a rookie police officer.  That's all you've heard.

25        And what does he do?  He calls an ambulance.  He

1    says to -- should we put his legs up, which would cause him

2    not to be in a prone position.  Deliberate indifference of a

3    medical service?  No.  He was concerned.  He saw him in the

4    prone position.  So should we put his legs up?  No.  Should

5    we hobble him?  No.  Those were the bosses that were

6    talking.  Tom Lane can't argue with them.

7           You know that.  We don't need commanders, we don't

8    need the police officers in here to say, well, if somebody

9    has seniority, you look to them.  That's common sense.

10   That's common sense.

11          If you go on a job for four days and you have a

12   veteran there next door to you and you -- and something

13   happens of a crisis, you look to him for help, if it's in

14   that business.  That's common sense.

15          And we sure know that Chauvin, based just on his

16   conduct here and being a field training officer, was going

17   to be the leader of the pack with these two kids, with these

18   two guys.  He knew that.  He was going to take charge.

19          And when he saw Mr. Floyd thrashing in the car, he

20   put him down.  He was going to get him.  He was going to

21   show these guys.  So he put him down and put his knee on his

22   neck.  These guys didn't know that.  My client, he's down at

23   his feet.

24          And after -- and you will see there's three and a

25   half -- if you want to measure it, over three and a half

1    minutes where George Floyd was in the vehicle trying to

2    fight out, hit his head against the wall or the glass or

3    something, was thrashing and kicking.

4           Two strong officers, I'm assuming, could not

5    control him in a way that wouldn't being pounding him on the

6    head with a club or something of that nature.  They were

7    using what they were taught.  My client was -- that you

8    wrestle with them, you try to get him in there.  They didn't

9    do that.

10          So down on the ground George Floyd is resisting.

11   He's resisting.  He's kicking his legs, you will see it in

12   the video, and he's resisting.  And he resists for I think

13   it's about four and a half minutes.  I have my notes.  They

14   like to say that he laid without resisting for six minutes,

15   but he was resisting.  And if you look at the video -- here

16   we go.  If you look at the video, you will see that.

17          And as soon as he slowed down, Thomas Lane said to

18   Chauvin, "Shall we roll him on his side?"  What he was

19   taught at the academy, the training.  "Shall we roll him on

20   his side?"  And what does Chauvin say?  "No."  It wasn't

21   maybe.  It was a no and don't talk to me anymore sort of --

22   he didn't say that, but you've been talked to by people like

23   this.  You've all experienced that in your life.  It was a

24   no.

25          And then he says, "Well, I'm thinking about

1    excited delirium."  Where did he -- he didn't make that up.

2    He must have learned that somewhere.  "I'm thinking about

3    excited delirium."  And what does Chauvin say?  "Well,

4    that's why we have the ambulance coming."

5         Around that time Thao asked -- and let's just back

6    up one second.  Concerned about Floyd's serious medical

7    needs?  When my client asked that, is that deliberate

8    indifference?  Is he deliberately indifferent?  Does he know

9    something and is working against taking care of the man?

10   No.  He's not deliberately indifferent.  If anything, he's

11   very concerned about the arrestee.

12        He spoke up to a man with 19 years, a man who is a

13   TFO, training field officer.  And the man said, "No."  So he

14   backs off.  He does say, "I'm thinking about excited

15   delirium."  And he says, "That's why we have the ambulance."

16        Around that time -- I'm not going to get exact

17   times here -- again my client suggested to Thao -- Thao

18   asked what the ambulance was coming at, and he said a 2.

19   And my client said, "Better step it up to a 3."  Deliberate

20   indifference?  No.  The experts, Mackenzie Blackwell, agreed

21   when he did that, he was showing concern for the arrestee,

22   to step it up to a 3.

23        And they're waiting for the ambulance to come.

24   Two minutes after the first request where my client -- to

25   have George Floyd rolled on his side, he said it again.

1    "Shall we roll him on his side?"  And what does Chauvin say?

2    He doesn't.  He doesn't say anything.  He ignores this

3    person over here.  He's just a rookie.  He doesn't know what

4    he's doing.

5         You know what's going through Mr. Chauvin's mind?

6    He's got his knee on him.  He's got this Donald Williams

7    yelling at him, telling him he's a bro.  He's -- all kinds

8    of stuff he was calling him.  And he was paying attention to

9    him.

10        My client, down by his legs at this time --

11   there's no more resistance -- never got a chance to see,

12   actually see George Floyd's face.  He told you and he told

13   in the statement he gave that he thought Mr. Chauvin had his

14   knee on his back of his neck or the top of his shoulder.

15        In any event, after the second roll over and it

16   was ignored, we then get to the crisis time because he isn't

17   moving.  And Lane is looking up -- and you heard his

18   testimony on this.  He's looking up, and it's not disputed,

19   and he sees the back muscles going up, reassuring him that

20   Mr. Floyd is still breathing.  In fact, he says -- at

21   8:25:13 he says -- Lane says, "He is breathing."  Lane said,

22   "He is breathing."  26 seconds after that was when Lane said

23   roll him on his side the second time, with no answer.

24        After that, 29 seconds later, Lane asked Kueng to

25   check his pulse, and he saw Kueng checking his pulse up on

1    his wrist with handcuffs on.  And he checked it twice trying

2    to find one, and he finally said he couldn't find one.

3            So all of that is being concerned about George

4    Floyd's medical needs.  Not deliberately indifferent.  Lane

5    was concerned.  He showed it.  He proved it to everybody.

6            And that's when I said in my opening statement all

7    of this government evidence that we're seeing, it's all

8    going to establish my client's innocence.  And so far we

9    have nothing to show that he's deliberately indifferent,

10   that he doesn't -- that he has a bad purpose.  And that's

11   what they have to show.

12           So after the -- Kueng checks 46 seconds later.  He

13   doesn't -- my client sees that it's up by the handcuffs on

14   the wrist.  He saw where it was.  So he checked the pulse.

15   He went down to the ankle.  He didn't go up to George

16   Floyd's head and neck, no, because he's down by the ankle

17   and he figured he'd check that.  He knows Derek Chauvin's up

18   there and he wouldn't be able to check the carotid pulse.

19           So at 8:26:54, and you've got an exhibit -- one of

20   Tom Lane's exhibits is this time sheet, so you can go over

21   these.  At 8:26:54 he checks his ankle pulse.  Doesn't find

22   one.

23           Seven seconds later, seven seconds, Lane says,

24   "Here we go."  And the lights and siren, he sees them.

25   25 seconds later, at 8:27, the EMT arrived.  So what do we

1     have?  We've got 32 seconds, 32 seconds between the time

2     when the check -- the pulse was checked and the EMT arrived.

3              And as Lieutenant Zimmerman said, when the EMRs

4     hit the ground with their feet, they take over.  No

5     uncertain words about that.  The police officers, the MPD,

6     Minneapolis police officers, if requested -- or if they

7     offer it can assist, but the EMRs or Ts, they're now in

8     charge.

9              So when they were in charge, it was seven seconds

10    after Lane checked the pulse.  That was after he saw the

11    lights.  25 seconds later.  I apologize.  8:27.  25 seconds.

12    So it would be 32 seconds the EMT arrived.

13             Ten seconds after they arrive, ten seconds, Lane

14    tells the paramedics he's not responsive.  Exactly, exactly

15    what he was trained to do, tell the paramedics what's wrong,

16    he's not responsive.  And the paramedic was walking towards

17    the fellow, Derek Smith.

18             Derek Smith, when I asked him was Mr. Lane helpful

19    when he went in the ambulance, he said, "Yes."  And he

20    turned to Tom and he said, "Thank you, Mr. Lane."  Remember

21    that?  He was that sincere about getting the help.  Doesn't

22    that show that he was not deliberately indifferent?  Isn't

23    that substantial evidence that my client was not

24    deliberately indifferent about any of George Floyd's medical

25    needs?  Of course it does.

1          Why did the government indict him?  We know why.

2     Politics, ladies and gentlemen.  As Mr. Plunkett said, mob

3     rule and politics.

4          MS. BELL:  Objection, Your Honor.  Move to strike.

5          THE COURT:  It's overruled.  It's final argument.

6          MR. GRAY:  Yeah, he was indicted, an innocent man.

7     So far we haven't seen anything.  Well, let's go on.

8          Lane stands over Floyd in five seconds getting

9     ready to put him on the stretcher.  Four seconds after that

10    Smith takes the carotid pulse.  And this is key.  Because

11    after Smith took the carotid pulse, he didn't do anything

12    but get up.  Didn't make a face, nothing.  Walked slowly --

13    or walked into his ambulance, got the stretcher, and walked

14    back.

15         And as my client testified, when he saw that, he

16    was relieved because he thought, well, he must be all right

17    because the paramedic, he didn't look in a rush.  He didn't

18    take George Floyd right there, as apparently the government

19    thinks my client should have.  He didn't pick George Floyd

20    up, put him over on his back, and try to do chest

21    compressions.  No.  Why didn't he?  He told you.  Because of

22    the unruly crowd.  Remember that?  The crowd was unruly and

23    I didn't want to be interrupted, so I didn't do it that way.

24         He went in -- he walked in the ambulance, no

25    running at all, walks out with the stretcher and he tells

1      him to get out of the way, but it's on the second page here.

2      He says, "Get out of the way," which -- you know, get out of

3      the way, I'm the man.

4           And Lane helps with the stretcher and 34 seconds

5      go by before they load him into the ambulance without -- you

6      have a heavy man.  You get him on the stretcher.  You are

7      not rushing.  Paramedic is ahead of this.  They put him in

8      the ambulance.

9           You know what?  And this is the part that any

10     reasonable person should just be disgusted, should be

11     infuriated to see one of your citizens -- the United States

12     of America charges one of your citizens when he offered to

13     go in the ambulance, after he saw his face, to go in the

14     ambulance and help out.  How in the world could our

15     government, the wonderful United States of America, freedom

16     and all that, charge somebody that does that?  Think about

17     it.  Sort of scary.  In other words, you can do an innocent

18     act and you can end up in a courtroom like this, because

19     that's what happened to Thomas Lane.

20          He went in the ambulance, as he was supposed to

21     do.  He told them what happened, told them about the

22     resistance when they were waiting for the ambulance.  He

23     didn't know at that time that the reason George Floyd died

24     was positional asphyxia.  He had no idea of that.  He just

25     said, "We held him waiting for the ambulance.  I was down by

1     his feet."

2              So he does chest pumps.  He's the first one to do

3     CPR, and that was 78 seconds.  Now we got the paramedic

4     involved in this, so it's not my client's fault.  And you

5     saw, you've seen the video.  78 seconds and that's when

6     Lane -- the paramedic tells Lane to start the CPR.

7              And watch it if you haven't -- if you want, watch

8     this man get on his chest after Smith takes his clothes off

9     and is pressing down, and you will see that he's really

10    trying to revive the guy.  He's taking his airway.  He's not

11    deliberately indifferent about anything.  He wants to revive

12    the man.

13             This man was at one time in his custody.  After

14    Chauvin took over, no longer, but at one time he was in his

15    custody.  And he knew about custody and he knew about care,

16    and that's what he was doing.  Did he do anything up to now

17    that would show any disrespect for George Floyd?  No, not at

18    all.

19             That was Lane that started the CPR.  He does the

20    CPR, checks his airway.  You saw it on the video.  The LUCAS

21    comes out.  My client helps out with that.

22             And one more important thing is this.  There were

23    only two paramedics, so one paramedic had to drive that

24    ambulance because it was a load and go, I guess, because of

25    the unruly crowd.  You can't get around that, government.

1    That's what Smith said, that's why I left.  So it must not

2    have been as peaceful as the government would like you to

3    believe.

4           Anyway he left, drove down a couple blocks.  And

5    during those two blocks was when my client was assisting, or

6    three blocks, whatever.  And he was needed.  Besides

7    everything else, he was needed to start the CPR, because

8    Derek Smith couldn't get the LUCAS out, do the CPR, and take

9    the man's clothes off.  He couldn't do all that without

10   assistance.  They had two because they weren't planning on

11   loading and go.  But they did, and that's when my client

12   helped out.

13          He gets out of that ambulance, gets in a fire

14   truck and rides back.  What happens?  At some point in time

15   he talks to Pleoger or somebody and Zimmerman, and he's

16   accused of lying, lying, he lied to them.  What's really

17   strange is that Zimmerman walked away before they finished

18   the story.

19          But what's really the truth here is they didn't

20   lie.  They didn't know at that time that the reason George

21   Floyd died was because he was on the ground in a prone

22   restraint with Derek Chauvin on his neck.  They didn't know

23   that.  They assumed he was on drugs.  And you know what?  He

24   was.  He was eating them in the backseat of the squad car.

25          His saliva was on that partial pill, and that

1    wasn't found until the defense wanted another search of the

2    squad.  You heard that.  Interesting, huh?  Well, as soon as

3    we charge him, let's drop it, let's not investigate.  Well,

4    it was investigated and he was eating -- he was eating

5    methamphetamine and fentanyl in the backseat of that squad.

6    He had two more pills in his car.

7              In any event, these two officers accused of lying

8    and they just didn't know what happened to George Floyd.

9    They didn't know yet.

10              What's really another ridiculous thing, this

11    prosecutor stood up here and told you that my client lied.

12    And I'm looking -- I'm thinking:  What?  I looked back.  She

13    never, ever, ever accused him of that, never cross-examined

14    him on what he told Zimmerman or what he told Pleoger.  She

15    just stood up in front of you without challenging my client

16    with cross-examination, which is a truth teller.  That's

17    what you use cross-examination for, is to find the truth.

18    She never once asked him why he said that.  No.  So I didn't

19    say anything.  But then in her final argument he lied.  He

20    didn't lie.  Lane didn't lie.  Totally unfair conduct.

21    Unfair.  It's as unfair as it could get.

22              And the character of Tom, that's what they're

23    trying to do.  Well, he lied.  He doesn't have a good

24    character.  Oh, doesn't he?  The judge will tell you

25    character evidence you can consider in deciding the guilt or

1    innocence of somebody.  It's very important.

2            That's why we live a good life, ladies and

3    gentlemen.  That's why if we get accused of something and

4    we're innocent, we can go back to our relatives or friends,

5    the people we work with, and we can rely on them to stand in

6    court under oath and say that man is a good person, that man

7    is peaceful.  And that's what we did.

8            And you take that into consideration with all of

9    his other conduct of innocence, and there could only be one

10   verdict in this case.

11           She said also that they all turned their back.

12   How in the world can a prosecutor interested in justice --

13   that's what they're supposed to have here.  This is the

14   Justice Department of the United States of America, and she

15   accuses all three of these officers of turning their back.

16   My client never turned his back.  Neither did the other

17   guys, when you think about it.

18           When you think about it -- and we're going to get

19   there pretty quick.  I'm trying to be short, trying to get

20   you out of here at a good time.  But when you think about

21   it, none of these officers turned their back.

22           When you think about it, George Floyd was on his

23   own here.  Killing somebody -- did he have a bad night?  Who

24   knows?  Who knows?  But this is not the kind of case where

25   three, four men go out and shoot somebody, rob somebody,

```
1    where it's obvious that there's a criminal intent, a bad
2    purpose.
3              And the other lawyers have gone over that, but
4    when you look at the instructions, by golly, the
5    instructions -- I don't need them, Thomas Lane doesn't need
6    them, because he was never deliberately indifferent.
7    There's no way he was.
8              But you have to -- I've got a few of them here.
9    It's a problem when you get a piece of paper and you start
10   putting tabs on it.  You got more tabs than the paper.  So
11   I'm finding it here.
12             Bad purpose and improper motive.  Bad purpose,
13   improper motive.  Did you see in the evidence of any bad
14   purpose or improper motive of this guy, Thomas Lane?  Think
15   back for the last three weeks.  Any -- one scintilla of
16   evidence of that?  Everything he did -- yes, sir.  Should we
17   roll him on his side?  Should I go with you in the
18   ambulance?  Want me to do the chest compressions?
19             Another -- the government relies -- it's
20   unbelievable to me, I've been around a while, but it's
21   unbelievable that the government stands up here and relies
22   on the spectators, relies on them without them knowing
23   anything about what they see then and yelling at these cops.
24   The old man, elderly man who was there in the beginning,
25   told George Floyd to go into the car.
```

4122

1          Getting back to the character of my client, he

2     got the community service award when he graduated, voted by

3     his other students, voted by the police that he was there

4     with.  The mayor of Minneapolis, the police Chief Arradondo

5     shook his hand.

6          Five months later, within hours, he terminated my

7     client.  No investigation, nothing like this, where you

8     would see exactly what happened.  He terminated him, a man

9     who worked for years trying to become a cop.  Talk about

10    being ruled by the mob, politics.  It's very dangerous now

11    to be a cop, very dangerous.

12         I'm going to check my notes here.  Oh, there's one

13    other thing that I -- unless I think of something else.

14    Mr. Paule talked to you about the presumption of innocence

15    and proof beyond a reasonable doubt and also about a jury

16    trial.

17         But what I always wondered and what I thought

18    about over the years is:  Why in the world would you have a

19    presumption of innocence?  Every day out of your life you're

20    going to read the newspaper and you say, oh, they arrested

21    Mr. Jones, they got the man finally.

22         All through your life when somebody is arrested,

23    you presume that they did the right thing, the government,

24    the prosecutors, the cops.  Then all of a sudden you are put

25    in this jury room and you're told you can't do that.  You

1      have to presume that they made a mistake, that the

2      government made a mistake, our government.  They make a lot

3      of mistakes, as we learn through life, but the government

4      made a mistake.  You have to presume that.

5              And why -- and you cannot -- as the judge will

6      tell you, that presumption is so strong that it can get you

7      acquitted, that alone.  And that presumption stays with you

8      until and if the government proves each and every element in

9      the case beyond a reasonable doubt, the type of proof that

10     you would unhesitatingly act in the most important affairs

11     of your life.

12             And don't doubt it for a second, ladies and

13     gentlemen, this is the most important affair of my client's

14     life, and it should be for you.  It's the type of proof

15     where ten years from now, when you are looking in the mirror

16     and you think back on this, I did the right thing, I found

17     him not guilty.

18             And that's your job.  Your job is to judge the

19     facts and apply the law and the Constitution.  You are the

20     enforcers of the Constitution.  You're the unbiased, fair

21     jury that looks at this case and decides it, and there could

22     only be one decision in this case.

23             And then you ask, well, why do we have that?

24     Well, when you look over on that side of the room, you will

25     note four to ten prosecutors, who knows how many FBI agents.

1    Every person they need to do one thing.  You know what that

2    is?  To convict my client and convict the others.  That's

3    their goal.

4              Ladies and gentlemen, don't ever think that this

5    is not an adversary proceeding.  This is the government, the

6    United States of America, against my client, Thomas Lane.

7    And our forefathers, in law and authority, said, well, if

8    that's the case, if the government does that, we're going to

9    give the defendant the presumption of innocence and require

10   our government to prove the case beyond a reasonable doubt.

11             And why do they do it?  Because of the power, the

12   unending spending money, spending money of taxpayers.  Just

13   think of this case.  And that's why we have those

14   constitutional rights.

15             One thing about -- a lot of this case went into

16   training.  And as I told you in my opening statement, we

17   like that.  Yeah, the training, sure.  Because you know

18   what?  And I'm not going to try and repeat myself, but

19   Thomas Lane followed training right to the T.

20             And their argument -- and I'm going to sit down in

21   a couple minutes, I promise, but their argument that,

22   well -- and I think this is their argument on this timeline,

23   that they found the pulse -- that Kueng found a pulse and --

24   where is it here?  Kueng can't find a wrist pulse at

25   8:26:08.

1           So right then, because Kueng took a wrist pulse,

2     my client should have run up.  How does he get Chauvin off?

3     "Mr. Chauvin, would you please get off?"  That ain't going

4     to happen because these protesters are yelling at him.  So

5     what would a reasonable person do?  You can't do any more

6     than ask him to get off.

7           And that's what the policy says.  I brought it up

8     a couple times.  You've got to stay -- you've got to be in a

9     safe area and you've got to do what a reasonable person

10    would do.

11          And a reasonable person, in this case Tom Lane,

12    would request of him -- they know the ambulance is coming --

13    check the pulse, when he couldn't get one.  And it's not the

14    carotid pulse because Chauvin's on that.  And as soon as the

15    paramedics arrive, my client went to work, told them about

16    it, helped them, went in the ambulance.

17          There is no, no, no medical indifference --

18    deliberate indifference of his medical needs all through

19    this.  I don't need to talk about willfulness or specific

20    intent, because the first element, deliberate indifference

21    of his medical needs, was never proven.

22          I thank you, ladies and gentlemen.  It's been a

23    pleasure sitting with you for the last month.  I bet some

24    days you wonder why you volunteered for this, but thank you

25    very much.

1          THE COURT:  Thank you, Mr. Gray.

2          MR. GRAY:  Thank you, Your Honor.

3          THE COURT:  Members of the jury, we're going to

4    take another recess at this time.  Again, please keep an

5    open mind and don't discuss the case during the recess.

6          We are in recess for an afternoon break.

7          (3:24 p.m.)

8                          **IN OPEN COURT**

9                        **(JURY NOT PRESENT)**

10         THE COURT:  Mr. Gray, I understand you'd requested

11   that I stay on.

12         MR. GRAY:  I don't think I took over my time,

13   30 minutes or 40.  How many?  And I know the other two

14   lawyers, I don't think they did either.  But the government

15   took over two hours, as I recall it, and because of

16   that and they said they were going to do an hour and a half

17   yesterday, I believe, because of that, I request the court

18   to order the government to limit their rebuttal to 10

19   minutes or 15 --

20         MS. BELL:  Your Honor --

21         MR. GRAY:  -- because they already took a half

22   hour more than --

23         MS. BELL:  -- we actually did not.  We took an

24   hour and 45 minutes.  We had predicted an hour and a half

25   for initial closing, and the closing was extended in part

1   because of a number of objections by defense counsel.  I

2   plan to be as brief as possible.  I will --

3          THE COURT:  Brief as possible I think should be

4   15 minutes.

5          MS. BELL:  I will endeavor to be done in

6   15 minutes, and I apologize to Renee in advance.

7          THE COURT:  Okay.  Counsel, I have another factor

8   that's involved.  It's my understanding that our chief judge

9   has ordered the closure of the courthouses at 3 o'clock this

10  afternoon, and we are obviously past that.

11         First and foremost, as an elderly participant, I

12  don't necessarily listen to the chief because I used to be

13  one and I know that you don't necessarily have to pay

14  attention to him.

15         But I am concerned about safety of people,

16  obviously, and so I'm going to suggest that we take this

17  break.  We will have the government give their rebuttal, and

18  at the conclusion of that we then do recess for the day and

19  I will charge the jury first thing tomorrow morning.  And

20  hopefully everybody will be able to get home safe and sound.

21         With that, let's take a short recess and we'll

22  come back in.

23         MR. PLUNKETT:  Ten minutes, Your Honor?

24         THE COURT:  Yeah, or something like that.

25     (Recess taken at 3:26 p.m.)

```
1                          *  *  *  *  *

2         (3:37 p.m.)

3                        IN OPEN COURT

4                       (JURY PRESENT)

5              THE COURT:  Ms. Bell, proceed.

6              MS. BELL:  Thank you, Your Honor.

7              All right, ladies and gentlemen.  You get to hear

8     from one last lawyer one last time, and it's me.  I am going

9     to talk to you about some things that I think don't matter.

10             MR. PLUNKETT:  Objection.  Improper assertion of

11    the government's "I."

12             MS. BELL:  Your job in the jury room is to decide

13    what facts matter and what facts don't matter.  I submit to

14    you that there are facts in this case that you've heard

15    about that actually don't matter to the ultimate question,

16    but were relevant for information.  I'll give you an

17    example.

18             We heard that May 25th, 2020, was Memorial Day.

19    It doesn't matter to someone's constitutional rights if it's

20    Memorial Day or Labor Day or Christmas.  It's a fact, but it

21    doesn't determine your decision.  Okay.

22             And so there are other facts, other pieces of

23    information that I submit to you when you think about the

24    evidence in the case don't actually matter to the question

25    of constitutional rights and what happened.
```

1        The neighborhood doesn't matter.  Your

2   constitutional rights don't change if you get stopped

3   driving through X neighborhood or Y neighborhood.  Your

4   rights are the same.  The defense would have you believe

5   that somehow your constitutional rights change depending on

6   what neighborhood you are in.

7        MR. PLUNKETT:  Objection.  Disparaging.

8        MR. GRAY:  Objection, Your Honor.  There was never

9   any argument about that.

10       THE COURT:  I don't know if that's true or not,

11  but, anyway, it's rebuttal.

12       Continue.

13       MS. BELL:  Look at the video.  These are folks out

14  walking.  There's families walking by, people with kids on

15  the street.  People go into the store.  It does not matter

16  what neighborhood it was to the constitutional rights that

17  apply or to the actions of these officers.

18       It also doesn't matter that Mr. Thao never touched

19  Mr. Floyd, because this is a crime of failing to do

20  something.

21       It also doesn't matter that Officer Thao had some

22  experience with people saying, "I can't breathe" in the past

23  and maybe they could breathe because, as Officer Thao

24  admitted on cross-examination, as the defense expert said,

25  you have to take that seriously.  You have to.  Someone's

1    life might depend on it.

2              And it also doesn't matter what happened before

3    Mr. Floyd was pinned on the ground.  There's been argument

4    that Officer Thao wasn't there, the bystanders weren't

5    there, except for Charles McMillian who, in fact, tried to

6    help the police; and then when the police were not doing

7    what they are constitutionally obligated to do, he told

8    them, someone who had been there.

9              But here's why they didn't have to be there the

10   whole time, because you know that force used has to be

11   appropriate and proportional at the time.  Someone who was

12   violent earlier, if they stopped struggling, if they stop

13   resisting, if they go unconscious, you cannot continue to

14   use force.  Period.

15             And I want to be clear.  The government is not

16   arguing that the officers shouldn't have investigated the

17   forgery or shouldn't have tried to detain Mr. Floyd to

18   figure out what was going on.  No one is saying they

19   shouldn't have put him in the squad car.  No one is saying

20   that Mr. Floyd wasn't refusing the officers' orders to get

21   in the squad car.

22             What we are saying is that once he's on the ground

23   and has stopped resisting, Officer Chauvin's force was

24   unreasonable.  As the defense expert said, obvious beyond

25   question it was unreasonable.  And once that force was

1    unreasonable, which defense expert said was while Mr. Floyd

2    was still conscious, Officer Thao and Officer Kueng had a

3    duty to stop it.

4         The pills in the car also don't matter because

5    they weren't in Mr. Floyd's bloodstream.  They're

6    information, but the doctors told you --

7         MR. GRAY:  Objection.  Misstatement of the

8    evidence that they weren't in the bloodstream.

9         MS. BELL:  Your Honor --

10        THE COURT:  That's overruled.

11        MS. BELL:  Pills found in the car cannot be in

12   your body.  The same with the six-pack on the seat that you

13   drive back from the liquor store is not in your belly unless

14   you drunk it.  It's either got to be in the car or in you.

15   That's it.  It can only be one place or the other.

16        The carotid pulse.  Oh, we've heard a lot about

17   the carotid pulse and it's the gold standard.  Sure.  If you

18   can't find a pulse, the answer cannot be "I did nothing."

19   The answer cannot be, "Oh, well, I couldn't."

20        Mr. Lane [sic] just said Lane couldn't check the

21   carotid.  Not true.  Mr. Lane could get up from where he was

22   and walk over and check the carotid pulse.  But if he

23   couldn't get there, if he somehow thought he was going to be

24   prevented from doing that, if he didn't think there was a

25   pulse, he has to start CPR.  Period.  That's the

1     expectation.  That's the reasonable measure that we have.

2          It is not reasonable not to do anything and excuse

3     it by saying, "Well, I was down by the legs.  I couldn't

4     reach a carotid pulse.  I was in the middle.  I couldn't

5     reach a carotid pulse.  So I just didn't do anything."  That

6     is not a reasonable measure.

7          I submit to you, ladies and gentlemen, that the

8     CPR in the ambulance ultimately also did not matter.  As my

9     grandpa used to say, a day late and a dollar short.

10         The CPR in the ambulance was done almost seven

11    minutes after Lane asks the first time, "Should we roll him

12    on his side," a time that Mr. Lane felt perfectly safe to

13    roll Mr. Floyd onto his side, a time the defense expert

14    agrees Mr. Floyd should have been placed on his side.  That

15    simple move would have saved Mr. Floyd's life, according to

16    Dr. Systrom's testimony.  Seven minutes is too late.

17         And so is six minutes, which is how much time it

18    took from when Mr. Lane noticed that Mr. Floyd was going

19    unconscious to when CPR was started in the ambulance.  And

20    so is five minutes, which is the second time that Officer

21    Lane asked to roll him on his side.

22         Excuses like, "Well, Derek Smith didn't seem to be

23    rushing" don't excuse the things you didn't do up until that

24    point.  You have a duty to provide medical aid.

25         MR. GRAY:  Judge, I object to this as don't

4133

1    excuse.  Circumstantial evidence.  They can look at

2    Mr. Smith's conduct and circumstantial evidence with regard

3    to my client.

4              MR. ROBERT PAULE:  And, Your Honor, I'd object as

5    disparaging in general, which is improper.

6              THE COURT:  Okay.  It's rebuttal, final.

7              Continue.

8              MS. BELL:  And so, ladies and gentlemen, things

9    that didn't -- that happened later don't excuse the earlier

10   failures.  They just don't.

11             And we heard a lot about excited delirium in this

12   case.  Excited delirium, another thing largely irrelevant.

13   George Floyd wasn't suffering from excited delirium.  Every

14   single medical expert who got up here, who knew anything

15   about it, said, "Nope, I don't think he was suffering from

16   that."  So it has nothing to do with his cause of death.

17             MR. ROBERT PAULE:  I'd object as misstating the

18   evidence, Your Honor.

19             THE COURT:  That I sustain.

20             MS. BELL:  Your Honor, Dr. Langenfeld --

21             THE COURT:  That I sustained.

22             MS. BELL:  I'll identify the folks.

23   Dr. Langenfeld, Dr. Baker, Dr. Bebarta, who is actually an

24   expert in excited delirium, all said nope.

25             MR. ROBERT PAULE:  Your Honor, I would object to

1     that.  She's summarizing the evidence inaccurately.

2                THE COURT:  I sustain, counsel.

3                MR. GRAY:  Move it be stricken.

4                THE COURT:  Stricken.

5                MS. BELL:  Even if you believe officers thought

6     Mr. Floyd was suffering from excited delirium, that doesn't

7     change either the force they could use or the medical aid

8     they needed to render.  There is no question you cannot

9     continue to use force on an unresisting person.  Period.

10               MR. ROBERT PAULE:  I'd object to that statement

11    because the testimony is it depends on the facts

12    and circumstances.

13               THE COURT:  That's overruled.  It's argument.

14               MS. BELL:  The defense expert, Mr. Ijames, said

15    that while Mr. Floyd was still conscious, the force became

16    unreasonable.  It doesn't matter if Mr. Floyd was suffering

17    from a drug overdose, excited delirium or some other medical

18    condition; the force was not appropriate.  And the medical

19    care is actually the same.  Roll them on their side, whether

20    it's an overdose, excited delirium or another medical

21    condition.

22               The defendants have argued that they somehow

23    thought they could ignore all the other training they had

24    about a person's ABCs, airway, breathing, and circulation.

25    By the way, the "C" stands for circulation, not carotid.

1           MR. GRAY:  Judge, Defendant Lane did not argue

2     that.  She should separate the defendants.

3           MR. PLUNKETT:  It's also disparaging.

4           THE COURT:  The jury will recall the evidence.

5           Continue.

6           MS. BELL:  The training required them to roll

7     Mr. Floyd on his side.  If he was experiencing excited

8     delirium and was handcuffed and under control, if he was

9     unconscious, if he was having breathing problems, roll him

10     on his side.

11           And there's been talk about the role and

12     sedation -- of sedation and excited delirium.  Mr. Floyd did

13     not need to be sedated.  He was unconscious.  He was not

14     resisting.  He was, according to Mr. Ijames, safe to roll on

15     his side.

16           I'm going to talk about willfulness a little bit.

17     Willfulness is an element in both Count 1 and Count 2.

18     Willfulness requires that you act with a bad purpose or

19     improper motive to disobey or disregard the law.

20           To prove willfulness the government has to show

21     that the defendants knew what they were doing was wrong and

22     they did it anyway.  If you have kids, you probably

23     understand what willfulness means.  It's not complicated.

24     They knew it was wrong.

25           MR. ROBERT PAULE:  Your Honor, I'd object to that

 1    as misstating the law.

 2              THE COURT:  Overruled.

 3              MS. BELL:  They knew what they were doing was

 4    wrong and they did it anyway.

 5              Each defendant took the stand and told you they

 6    knew they had a duty to intervene and they knew they had a

 7    duty to render medical aid.  They knew from their training

 8    about those duties.  They knew from their training that an

 9    officer hitting or punching a handcuffed person was not

10    appropriate because that is obvious that that's wrong.

11              Well, ladies and gentlemen, the defense expert,

12    Mr. Ijames, said that Officer Chauvin's force was

13    unreasonable, it was obvious beyond question.  They knew

14    they had to intervene.  The force was obvious beyond

15    question, and they had opportunities and means to do so, and

16    they didn't.  That knowing what you're supposed to do,

17    knowing what the law requires and disregarding that is

18    willfulness.

19              You don't have to have a nefarious purpose, you

20    don't have to intend the person is going to die, but you

21    have to have a purpose that you know you're supposed to do

22    this thing and you don't.

23              And with respect to the duty to intervene, Officer

24    Thao and Officer Kueng ignored their duty.  They made other

25    choices.  They disregarded the most basic training concepts.

1   And when we look at the concept of "In your custody and in

2   your care," rendering medical aid, disregarded those

3   concepts and didn't render medical aid.

4           The defendants acted willfully.  They knew what

5   their training was, they knew what they were supposed to do,

6   and they didn't do it.

7           Your job during this trial is to decide what you

8   believe.  You can decide you believe all or some or none of

9   what a witness says.  You get to watch the videos, and you

10  get to -- some of you, maybe your style is you're going to

11  watch the videos and just look at for what Officer Thao,

12  understand his perspective what he was doing.

13          MR. GRAY:  Judge, I object to this as improper

14  rebuttal.

15          THE COURT:  It's overruled.

16          MS. BELL:  You get to decide how you're going to

17  approach that.  Maybe you watch them and then you just watch

18  what Officer Kueng did and figure out his perspective, what

19  he could see and hear.  But you decide, ladies and

20  gentlemen, what these officers could see and hear and

21  understand.

22          And I submit to you that when you see the video,

23  things like, well, Officers Kueng and Lane couldn't see

24  George Floyd's face, like the doctors testified to, we saw

25  his face, we knew he was unconscious, they didn't need to

1    see his face.  Listen to the video.  Officer Lane said, "I

2    think he's passing out."  The crowd was yelling, "He's going

3    unconscious."  You decide what they heard, saw and observed.

4    And as Dr. Systrom said, they had a front row seat to George

5    Floyd.

6            We heard testimony that George Floyd was 6 feet

7    and a few inches tall.  Okay.  If three officers in 6 feet,

8    it's about 2 feet, 2 feet, 2 feet, if you divided it

9    equally.  Use your reason and common sense, ladies and

10   gentlemen.  What did these officers see?  What could Officer

11   Kueng see, shoulder to shoulder with Derek Chauvin?  He

12   could see his knee.  I submit to you that when you review

13   the videos -- look at the Milestone.  It's actually a great

14   view from behind.  You can see the officers lined up.

15   That's the one that's the city camera.  You can see the

16   officers lined up.  You can see how close they are.  You can

17   see using your common sense exactly what they could see.

18           We've also heard about some talk about scene

19   safety and sort of in two places.  One, the scene itself was

20   unsafe and then, number two, maybe George Floyd might spring

21   to life and pose a safety risk.  On that point, George Floyd

22   was searched, handcuffed, on the ground with not one, not

23   two, but three officers holding him down, and he had another

24   one standing on the side.  He stopped speaking.  He went

25   unconscious.  He was no threat at all.

```
 1              As to scene safety, no one called for backup.
 2              MR. GRAY:  Object.  She's now -- that's improper
 3       rebuttal.  She's arguing her case again.
 4              THE COURT:  I think you are, counsel.  I sustain
 5       that.
 6              MS. BELL:  I'm arguing scene safety, which was
 7       raised by all three defense counsel, actually.
 8              MR. GRAY:  Going over the same facts.
 9              THE COURT:  Yeah, I --
10              MS. BELL:  Your Honor.
11              THE COURT:  I think we are, counsel, and I
12       guess -- and I'm concerned on the time issue, as you all
13       know, so let's just move on.
14              MS. BELL:  All right.  I'm --
15              Every jury gets to decide how they deliberate, how
16       many times you look at evidence, what evidence you want to
17       look at once or twice or five times.  It's entirely up to
18       you.  Maybe you need extra speakers or extra copies of
19       certain exhibits.  How you deliberate is up to you.  I would
20       submit to you that the videos are important to watch.
21              MR. GRAY:  Object to that as repetitious.  She's
22       talked about the videos for the last ten minutes, Your
23       Honor.
24              THE COURT:  I'll overrule.  She can answer.
25              MR. PLUNKETT:  That's also invading the province,
```

1    Your Honor.

2              THE COURT:  Again, it's overruled.

3              MS. BELL:  The videos are sometimes hard to watch,

4    I agree, but you have to watch them because they're the

5    evidence in this case, as difficult as they might be.

6              So we've heard over and over that in your custody

7    is in your care or, even more simply, if someone's in your

8    custody, they're your baby.  And although Mr. Floyd was a

9    grown man, as he lay on the ground and handcuffed, pressed

10   into the ground by these three men, he was in fact helpless

11   as a baby to protect himself.

12             We know from the videos, from the testimony and

13   from the common sense that all of these three defendants in

14   this case, Officers Thao, Kueng and Lane, knew that George

15   Floyd's life was at risk.  They absolutely knew that they

16   had the ability, the authority and the legal obligation to

17   intervene.  That's with respect to Thao.

18             MR. GRAY:  Object to that, Your Honor.  My client

19   is not charged with intervening.

20             MS. BELL:  I just made that clarification,

21   Mr. Gray.

22             MR. GRAY:  I didn't hear it.

23             MS. BELL:  They all absolutely knew that they had

24   the ability, the authority and the legal obligation to

25   attend to Mr. Floyd's serious medical condition, as he lay

1     there unconscious, not responsive and otherwise helpless,

2     and they weighed their risks.

3              Police officers have incredibly difficult jobs.

4     They often see people on their worst day.  And they have

5     power to help people, to protect victims, to investigate

6     crime, to take away the freedom of someone who commits a

7     crime, but with that power comes responsibility.  Because of

8     that power, our Constitution requires that law enforcement

9     officers do what they can to stop unlawful harming of

10    someone in their custody and in their care, even if it's

11    done by another law enforcement officer.  They have the

12    ability and the authority and the obligation to stop it.

13             There are no free passes to the Constitution

14    because the risk as demonstrated in this case is too great.

15             MR. GRAY:  Judge, I object to this.  Improper

16    rebuttal.  I never argued there was a free pass.  Totally

17    improper.

18             THE COURT:  No.  It's summation.

19             Continue.

20             MS. BELL:  There is no pass for "I was a brand-new

21    officer."  There is no pass for "It would have been hard or

22    uncomfortable to speak up."  There is no pass for "I was

23    afraid I'd get in trouble."  No pass even for "I thought I

24    might lose my job."

25             Our Constitution weighed the risks and the

1    Constitution says you must act, you must take reasonable
2    steps to stop the force, you must take reasonable steps to
3    provide medical care.  These defendants weighed those risks
4    and chose not to act.
5             MR. ROBERT PAULE:  I'd object to that as burden
6    shifting, Your Honor.
7             THE COURT:  It's summation.  The burden does not
8    shift.
9             MS. BELL:  They chose not to take reasonable steps
10   under the law.  That is willfulness, knowing that what
11   you're doing is wrong in violation of the law and doing it
12   anyway.
13            MR. GRAY:  I'd object.  She said that three times
14   now.
15            MS. BELL:  That is the argument.
16            THE COURT:  That is argument.
17            MS. BELL:  All right.  Sum up here.  To paraphrase
18   a quote, evil happens when good men do nothing.  This
19   happened in part because these three defendants did nothing.
20            MR. GRAY:  Object to that.
21            MR. ROBERT PAULE:  I'd object.
22            THE COURT:  To that I sustain.
23            MR. ROBERT PAULE:  I'd ask that that be -- the
24   jury be instructed to disregard that argument, which is
25   improper.

```
1              MS. BELL:  This happened --

2              THE COURT:  Well, we're going to complete the

3    argument.

4              Continue, counsel.

5              MS. BELL:  Thank you.

6              This happened because these defendants did not

7    intervene, Thao and Kueng, and all three defendants did not

8    render medical aid.  They didn't have to intend to harm

9    Mr. Floyd.  They just had to know that they needed to take

10   certain actions under the law and they failed to do so.

11             They weighed what they knew they were supposed to

12   do, according to the law, against perhaps a difficult thing.

13   They didn't do the right but difficult thing.  This is now

14   going to turn to your hands, where you are going to have to

15   do the right but perhaps difficult thing.

16             Last, I want to say it wouldn't be surprising if

17   you felt sympathy for one of the defendants.  But as the

18   judge will tell you, you cannot let sympathy influence you.

19   You can feel bad someone was a rookie or you can wish that

20   they made different choices, but it would not be okay.  It

21   would be a violation of your sworn duty as jurors to put

22   your sympathy above the legal obligations of the law.

23             These defendants violated their obligations to

24   act.  The facts and the law establish that.  You have an

25   obligation to render a verdict based solely on the facts and
```

1    the law without passion or prejudice, without sympathy, even

2    if it's hard, because that's what the Constitution requires.

3            This was both a tragedy and a crime, and in this

4    case the only verdict that is supported by the facts and the

5    law is guilty on all counts for all defendants.

6            THE COURT:  Members of the jury, the lawyers know

7    this, but you didn't.  Our chief judge has ordered a snow

8    emergency and that the courthouses be closed.  Frankly, it

9    was ordered an hour ago at 3:00, but now it's 4:00.

10   Nevertheless, we're going to wait till tomorrow morning to

11   give the instructions of the court as to the law that's

12   applicable to the case.

13           And, frankly, that's being done -- not that we

14   couldn't do it today, we could, but it's being done for the

15   safety of everybody involved in this matter.  We have a

16   bunch of snow out there.  I haven't got any idea how much,

17   but there has been a bunch of snow that's fallen today.

18           And so I don't know anything about the road

19   conditions or anything else, but other people apparently do

20   because they are suggesting that the courthouses be closed,

21   and so I think that's what we need to do.

22           Now, members of the jury, you've heard all the

23   evidence you are going to hear in the case.  You've heard

24   the summations of the lawyers with respect to the case.  You

25   still have not heard the instructions as to the law that's

1    applicable to the case.

2              So continue to keep an open mind with respect to

3    the matter.  And, with that, as you go into this evening,

4    don't discuss the case among yourselves or others.  Don't

5    carry out any personal investigations.  Don't read any media

6    accounts or visit any internet factors and that kind of

7    thing with respect to the case.

8              And, with all of that, we wish you a good evening.

9    We will see you tomorrow morning.

10             Now, I'm going to change the time to start

11   tomorrow morning.  We're going to start at 9 o'clock.  We'll

12   start at 9:00 tomorrow.  You will hear the court's

13   instructions of the law, at the conclusion of which you will

14   commence your deliberations with respect to the case.

15             With that, the jury is excused.

16        (4:03 p.m.)

17                          **IN OPEN COURT**

18                       **(JURY NOT PRESENT)**

19             THE COURT:  Counsel, I stayed on for a minute.  I

20   don't think we want to do this tonight, but we need to find

21   a time tomorrow to both inventory and make sure that we have

22   appropriate exhibits ready to go to the jury.

23             I have, I think, maybe one or two differences that

24   Renee and I might have with respect to the records that I've

25   kept.

1          But I have to tell you, Mr. Paule, that I've got

2     difficulty with your exhibit list and what's submitted and

3     what's not.  That, to me, is the biggest challenge.

4          Mr. Plunkett, Mr. Gray, I don't have any problems

5     there.

6          MR. GRAY:  I've only got two.

7          THE COURT:  I can count to two, that's why.

8          Okay.  Let's figure out when we're going to do it.

9     We don't want to wait too long after they start

10    deliberations to get it to them.  So if it gets done

11    earlier, great; if it doesn't, why, that's when we'll do it.

12         Okay.  See you tomorrow.

13         MR. GRAY:  Thank you, judge.

14         THE COURT:  Hopefully -- I have no idea if we've

15    got bad roads or not out there.  Neither do you.  You

16    haven't even see the daylight.

17         See you tomorrow.

18         (Court adjourned at 4:04 p.m., 02-22-2022.)

19                         *   *   *

20         I, Renee A. Rogge, certify that the foregoing is a

21    correct transcript from the record of proceedings in the

22    above-entitled matter.

23         Certified by:  /s/Renee A. Rogge
                           Renee A. Rogge, RMR-CRR
24

25